**Richard R. Best**
**REGIONAL DIRECTOR**
**Celeste Chase**
**David Stoelting**
**Olivia Zach**
**Attorneys for Plaintiff**
**U.S. SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**Phone:  (212) 336-0174 (Stoelting)**
**Email: stoeltingd@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— :
**SECURITIES AND EXCHANGE COMMISSION,** :
: **21-CV-_____ (   )**
**Plaintiff,** :
:
-against- : **COMPLAINT**
:
**MEDALLION FINANCIAL CORP.,** :
**ANDREW MURSTEIN,** : **Jury Trial Demanded**
**LAWRENCE MEYERS,** :
**and ICHABOD'S CRANIUM, INC.,** :
:
**Defendants.** :
———————————————————————— :

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against Defendants Medallion Financial Corp. ("Medallion Financial"), Andrew Murstein

("Murstein"),  Lawrence Meyers ("Meyers"), and Ichabod's Cranium, Inc. ("Ichabod's

Cranium") alleges as follows:

## PRELIMINARY STATEMENT

1.       From late 2014 through 2017, Murstein—Medallion Financial's President and

Chief Operating Officer—perpetuated two fraudulent schemes intended to boost Medallion

Financial's sinking stock price.  Until 2014, Medallion Financial had been on an extended run of success, as its stock rose to an all-time high of $17 per share and the company paid cash dividends every quarter.  Driving this success was Medallion Bank, a wholly-owned subsidiary of Medallion Financial, which provided the majority of the company's profits year in and year out.  Medallion Financial's primary business—making loans to taxi drivers secured by the medallions—seemed impervious to challenge.

2.      By 2015, however, everything had changed.  Ridesharing apps such as Uber and Lyft threatened the taxi industry and the value of taxi medallions—which collateralized the loan portfolios held by Medallion Financial and Medallion Bank—dropped dramatically.  Medallion Financial's stock dropped to about $3 per share and the regular dividend payments stopped.  The company, moreover, became a target of short-sellers and sharply negative discussions on financial websites and blogs.  Under pressure to do something, Murstein violated the federal securities laws.

3.      The first scheme involved illegal touting.  To try to silence the short-sellers and bloggers that were writing Medallion Financial's epitaph, Murstein hired Meyers, whose specialty was "stealth" public relations, and paid Meyers to anonymously promote Medallion Financial online.  Murstein approved Meyers's pieces before publication, which did not disclose the payments, and Meyers made hundreds of postings, many of them using pseudonyms.  In early 2016, Murstein hired a second person to tout anonymously and, at Murstein's request, Meyers trained the new touter.  Murstein knew or was reckless in not knowing that the touters did not disclose their affiliation with the company.  For Murstein, that was the point: his touters would not be credible if they disclosed that they were being paid.

4.      In late 2016, after nearly two years of recruiting, paying for, and encouraging

anonymous touters, Murstein's secret was exposed.  Journalists confronted him with the obvious fact that hiring and paying someone to anonymously tout was a violation of the securities laws. Murstein, however, falsely claimed that he did not know his touter posted anonymously. Seeking to bury the controversy, Murstein had the second touter sign a non-disclosure agreement and paid her hush money.  Neither Medallion Financial nor Murstein ever disclosed to investors Murstein's conduct in recruiting, paying, and instructing his touters.  Murstein acted knowingly or recklessly in hiring and keeping touters on the Medallion Financial payroll for nearly two years.

5.      The second scheme was to increase Medallion Financial's stock price by boosting the carrying value, or "fair value," of Medallion Bank.  There was no legitimate basis to do so, however, because of the deteriorating value of the collateral securing the Bank's medallion loan portfolio.  And the valuation firm Medallion Financial used to determine fair value made this clear to Murstein.

6.      Murstein pressured the valuation firm to accept his inflated number. The valuation firm, however, refused. As a result, Murstein abruptly fired the valuation firm and went opinion-shopping for a firm that would agree to value that Bank at his targeted number of $193 million. Murstein quickly found an investment bank that was lured by his *quid pro quo* offer:  provide the requested valuation number in exchange for much more lucrative investment banking work in the future.

7.      The Bank's reported fair value—which was $166 million as of 2nd quarter of 2016)—jumped to $193 million (3rd quarter 2016) and then to $280 million (4th quarter 2016) and $290 million (4th quarter 2017) .

8.      Investors were not told the truth.  Medallion Financial's Forms 10-K and 10-Q for

the last two quarters of 2016 and all four quarters of 2017 attributed the increases to "expressions of interest" in the Bank from "investment bankers and interested parties"; to "a court ruling involving a marketplace lender"; and that "a valuation specialist" had been engaged.  These disclosures were false and misleading.

9.      In fact, Medallion Financial's sudden increases in fair value—at a time when the collateral values of the Banks's loans were plummeting—resulted from Murstein's behind-the-scenes conduct, which included firing Medallion Financial's valuation firm, instructing the new valuation firm on the correct value, biasing the new firm with possible incentives, and concealing information from Medallion Financial's Auditor (the "Auditor").

10.      Medallion Financial's financial statements contained other inaccuracies related to its valuations.  In its Form 10-Q as of September 30, 2016, the Bank and Medallion Financial valued Chicago medallions at twice their market rate.  Medallion Financial also failed to properly value its medallion-backed loans by failing to take into account the adequacy of the collateral and market conditions.  And Medallion Financial inaccurately reported its loan-to-value ("LTV") ratios for its medallion-backed loans in its Form 10-K for 2017.  As a result, Medallion Financial's internal accounting controls also were not properly designed to implement appropriate valuation procedures consistent with Generally Accepted Accounting Principles (GAAP).  Murstein, who was head of the Investment Committee and controlled Medallion Financial's valuation procedures and decisions, aided and abetted these violations.

11.      The misconduct materially impacted Medallion Financial's financial statements. The reported fair value for Medallion Bank was overstated by at least $110 million at year-end 2016 and by at least $85 million at year-end 2017.  In addition, the portfolios of medallion loans held by Medallion Financial were overvalued by more than $30 million at year-end 2016 and by

the same amount at year-end 2017, which were additional material misstatements.  As a result, Medallion Financial's reported total assets and total shareholders' equity were overstated by more than $140 million at year-end 2016, and both were overstated by more than $115 million at year-end 2017 (excluding the impact of income taxes).

**VIOLATIONS**

12.     By engaging in the foregoing conduct and as alleged further in this Complaint:

a.     Defendants Medallion Financial and Murstein violated Sections 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.     Defendant Medallion Financial violated Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13], and Defendant Murstein aided and abetted these violations by Medallion Financial;

c.     Defendants Meyers and Ichabod's Cranium violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Defendants Medallion Financial and Murstein aided and abetted these violations by Meyers and Ichabod's Cranium;

d.     Defendants Medallion Financial and Murstein aided and abetted uncharged violations by others of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

e.     Defendant Murstein violated Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

13.     The Commission brings this action pursuant to authority conferred by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) and 21(d)(5) of the

Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

14.     The Commission seeks a final judgment: (a) restraining and permanently

enjoining Defendants from engaging in the acts, practices and courses of business alleged against

them herein and from committing future violations of the above provisions of the federal

securities laws; (b) ordering Defendants to disgorge any ill-gotten gains they received and to pay

prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)]; (d) barring Defendant Murstein from serving as an officer or

director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)]

and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering such other

and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16.     Venue lies in the Southern District of New York pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain of the acts, practices, transactions, and courses of business alleged in this complaint

occurred within the Southern District of New York, and were effected, directly or indirectly, by

making use of means or instrumentalities of transportation or communication in interstate

commerce, or the mails, or the facilities of a national securities exchange, in that Medallion

Financial's operations were primarily located in New York, New York, and Medallion Financial is a public company with common stock that trades on the NASDAQ exchange.

## DEFENDANTS

17.     **Medallion Financial** is a Delaware corporation with its principal place of business in New York, New York.  Medallion Financial's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Medallion Financial files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and the rules thereunder.  Medallion Financial traded under the stock ticker TAXI until 2016, when it changed to MFIN.

18.     **Murstein**, age 57, is a founder, Director, President and Chief Operating Officer of Medallion Financial.  Murstein resides in New York, New York.  He received compensation of approximately $3.54 million for 2014, $3.56 million for 2015, $1.92 million  for 2016, and $2.23 million for 2017.  His compensation package for those years included salary, bonus, restricted stock awards, country club membership, a driver, a car lease, parking, car insurance and social club memberships.  Murstein and his father Alvin Murstein, who is Medallion Financial's Chief Executive Officer (CEO), own or control nearly 15% of Medallion Financial's common stock.

19.     **Meyers**, age 55, resides in Woodland Hills, California.  Meyers is the owner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole director of Defendant **Ichabod's Cranium** which, from at least 2014 through 2016, did business under the name **Asymmetrical Media Strategies**.

## RELEVANT ENTITY

20.     **Medallion Bank** (the "Bank" or "Medallion Bank") was established by Medallion Financial in 2003.  The Bank is regulated by the Utah Department of Financial

Institutions and the Federal Deposit Insurance Corporation.  Prior to 2018, the Bank was required to be carried at fair value on Medallion Financial's financial statements.

## FACTS

### I.     Background.

21.     A taxicab medallion is a license to operate a taxi and accept street hails.  In New York City and other cities, the number of taxi medallions is restricted by municipal authorities. Medallions are  typically financed by firms such as Medallion Financial, which focused primarily on New York City medallions, but also loaned to purchasers of medallions in Chicago, Boston, and Cambridge, Massachusetts.

22.     For decades before 2015, the price of medallions continued to increase.  In the mid-1990s, New York City medallions sold for approximately $200,000 each.  By 2011, taxi medallions were selling for $1 million or more each and, by 2013, the value of a New York City medallion had risen to $1.3 million.

23.     In 1996, Alvin Murstein and his son, Andrew Murstein, established Medallion Financial as a public company.  Medallion Financial's Form 10-K for 1996 stated that the company's "principal focus is the origination and servicing of loans financing the purchase of taxi medallions and related assets."

### II.     Medallion Financial's Stock Price Plummets As Ridesharing Apps Proliferate.

24.     As apps such as Uber and Lyft became popular in 2014, the threat to Medallion Financial's business model was apparent.  An internal memorandum signed by Murstein in 2016 recognized the threat posed by Uber: "The media constantly touted [Uber], and fear began to spread about the taxi medallion industry.  The Company's stock began to drop dramatically as investors worried about the Company's collateral and rising delinquencies."

25.     Medallion Financial's stock price fell from $17 per share in 2013 to $3 per share in 2015.  Other key financial metrics underscored Medallion Financial's distress.  For example, the company's net investment income before taxes was $15.1 million in 2014 and $16.8 million in 2015, but it reported *losses* of $9.9 million in 2016 and $7.8 million in 2017.  Dividend income from the Bank to Medallion Financial also dropped precipitously, from $15 million in 2014 and $18 million in 2015, to $3 million in $2016 and $0 in 2017.

26.     The value of the collateral underlying the medallion loans similarly declined from 2014 through 2017, as shown by increases in the reported aggregate LTV ratio.  LTV expresses the ratio of a loan to the value of the asset purchased.  An LTV ratio over 100%  indicates that the value of the collateral is not sufficient to cover the loan.  The LTV ratio of Medallion Financial loan portfolio increased dramatically from 60% as of December 2014 to 131% by December 2017.

27.     Medallion Bank, which had been the crown jewel among Medallion Financial's assets, was experiencing similar declines in performance.  Its net income, for example, which was $26.3 million in 2014 and $23.7 million in 2015, plummeted to $2.0 million in 2016 and $4.6 million in 2017.  Losses on the medallion loans were a primary cause for the precipitous decline in net income.  In 2015, the Bank recorded less than $5 million in medallion loan losses; in 2016, more than $56 million; and about $35 million in 2017.  The Bank had been the source of the great majority of Medallion Financial's earnings, and those earning had allowed the company to pay cash dividends to its shareholders every year.  Those dividend payments stopped in late 2016.

28.     Faced with a deteriorating stock price and concerned investors, Murstein undertook two fraudulent schemes.

III.     **Defendants' Illegal Touting Scheme.**

    A.      **Murstein Hires Meyers to Secretly Counter Negative Media.**

29.     From 2014 through 2016, Meyers did business through Asymmetrical Media Strategies, whose web site described its "strategic crisis communications strategies" as offering "guerilla PR tactics to deliver our clients' messages."  Myers's website also stated: "[w]e will employ any strategy or tactic you desire"; "if you are under attack from opponents seeking to destroy you, we will launch an asymmetrical, sustained, multi-front assault on them"; and "Anonymity—Attack opponents without client exposure—you are kept in the clear. . . .  Because we operate without any detectable connection to you, you may engage opponents in any way you choose, while we carry out our stealth mission to undermine their position."

30.     On December 1, 2014, Meyers emailed Murstein to say that "[t]he market clearly does not understand your business," and suggested "that you retain me to do some online PR for the company via all the financial outlets I write for."  When Murstein responded with interest, Myers proposed "a monthly retainer where I am constantly writing about the company . . . bashing Uber, and specifically the low risk that exists to TAXI itself even if medallion process were to fall[.]"

31.     Meyers and Murstein signed a Consulting Agreement dated December 19, 2014 (the "Agreement") between Ichabod's Cranium d/b/a Asymmetrical Media Strategies and Medallion Consulting Services LLC (a subsidiary of Medallion Financial).  The Agreement stated that Meyers was being retained to "provide[] various public relations, marketing and communications services, such as articles, blog posts . . . in order to influence public opinion with regard to company issues."  For providing these services and agreeing "to partner with [the] Company," the Agreement stated that Myers would be paid a consulting fee of $5,000 per

month.

32.     The Consulting Agreement also provided that, prior to the publication of any "articles, blog posts, etc.," Meyers "must receive the prior written approval of both [Medallion Financial's] President and Legal Department," who are required to "review and approve or reject" any materials.

33.     Just before the Agreement was executed, Murstein forwarded it to Medallion Financial's Chief Compliance Officer and General Counsel for review.  On December 18, 2014, the General Counsel emailed Meyers that "we're a public company and the SEC's view is that if a company engages anyone to perform social media functions the company is adopting that person's statements as its own."

34.     Between December 2014 and June 2016, Meyers published at least fifty to sixty articles and hundreds of comments relating to Medallion Financial, for which the company paid Meyers approximately $65,000.  Meyers never disclosed the compensation he received from Medallion Financial.

35.     Meyers's articles and comments appeared on Seeking Alpha, TheStreet.com, InvestorPlace.com, Crain's NewYorkBusiness.com and BloggerNewsNetwork.com.  Meyers's articles and comments argued, consistent with what Murstein told him, that Medallion Financial was grossly undervalued, that the threat from Uber and Lyft was overstated, that Medallion Financial stock was an outstanding opportunity for value investors, and that the stock could again reach the price of $15 to $17 per share.

36.     For example, in an article on Seeking Alpha dated February 9, 2015, and entitled "NYC Data Proves Taxi Medallion Resilience; Rideshare Effect Negligible," Meyers claimed that "[t]here is no reason why TAXI stock should be selling below $10….  TAXI stock should

trade back to $15 once the market realizes it has overreacted."

37.     Meyers's articles and comments also argued for a much higher value for Medallion Bank.  In an article dated August 5, 2015, entitled "Medallion Financial Delivers Again. Will the Market Ever Learn?" posted to Seeking Alpha, Meyers (using a pseudonym) wrote that "Medallion Bank is arguably worth $595 million.  If we include realized losses, the Bank made $27 million, and is worth $459 million.  Yet Medallion Financial Corporation carries the Bank at around $160 million."

38.     Meyers prepared his articles and comments in close coordination with Murstein. As Murstein was particularly angered by the posts of several individuals, Meyers frequently targeted these individuals with vitriolic postings.

39.     Murstein sent emails to Meyers on what to write and how to respond to negative articles about Medallion Financial.  On April 9, 2016, for example, Murstein saw an article on Seeking Alpha by "ValueSquared" titled: "Medallion Financial: Overstated Book Value With A Significant Near-Term Downside Catylyst Starting With Chicago in 1Q '16."   Murstein emailed Meyers asking him to "put out short piece tmrw and say something like…who might even be behind that anonymous post.  You can say what I told you today . . . . [t]hat you anaylsyzed [sic] the losses of medallions consumer division from 2003 to today… [and] losses never went very high."  Murstein added additional points for Myers to make is another April 9 email: "You can also add his analysis is flawed as it makes no mention or calculations based upon the fact that 100% of taxis loans are personally guaranteed. . . . They [Medallion Financial] were prudent lenders and it shows.  There's a reason that they have never had a medallion loss.  They know what they are doing far better than anyone else in that industry. They have learned well from being in that industry for over 70 years."  Murstein followed up with Myers two days later to ask

"[d]id you publish it yet?"

40.     On April 11, 2016, Myers published (under one of his aliases) in Seeking Alpha his response, titled "Medallion Financial: Understated Book Value With A Significant Near-Term Upside Catalyst As Shorts Rush To Cover."  Meyers's response repeated many of the points from Murstein's April 9 emails.

41.     On April 12, 2016, a broker at a large financial services firm forwarded Myers's April 11 Seeking Alpha article to Murstein.  Murstein did not inform the broker that the article was published by Meyers at the direction of Murstein and in exchange for compensation.

42.     Meyers emailed links to Murstein of his articles.

43.     Many of Meyers's articles also included the following false statements:  "I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it.  I have no business relationship with any company whose stock is mentioned in this article."

44.     Meyers's articles, whether under his own name or an alias, never disclosed that he was being paid by Medallion Financial.  Instead, Meyers identified himself in his articles as "president of PDL Broker, Inc." or as "an independent contributor."

45.     Meyers's paid touting on behalf of Medallion Financial largely ceased after June 2016.

46.     On November 17, 2016, however, when Murstein received by email a Seeking Alpha article referring to Medallion Financial's "imminent bankruptcy risk," Murstein emailed Meyers to see if Meyers was able to "get pieces published on Seeking Alpha or do you know anyone else that can?"  Meyers declined.

47.     Murstein knew or recklessly disregarded that Meyers, in his articles and posts, did not disclose the compensation he received from Medallion Financial and posted using pseudonyms.

**B.      Murstein Hires Another Contractor to Anonymously Tout.**

48.     In early 2016, Murstein became acquainted with a woman in her twenties (the "Contractor") who was looking for work.  As Murstein wanted to have another person touting on behalf of Medallion Financial in addition to Meyers, Murstein offered her an Independent Contractor Services Agreement, which Murstein and the Contractor signed.

49.     The Contractor had little to no experience with investor relations or the financial markets; as a result, Murstein instructed the Contractor to "speak with [Meyers] on what to do." Meyers then tutored the Contractor on his methods for posting anonymously.

50.     Murstein knew from emails he received that Meyers was showing the Contractor how to post anonymously and that Meyers told the Contractor "get a fake ID from the Internet" in order to avoid having to identify herself and reveal her connection with Medallion Financial.

51.     In an April 25, 2016 email, Murstein urged the Contractor to publish an article and then asked her "What name are you using?"  The Contractor responded with her alias.

52.     On April 26, 2016, the Contractor emailed Murstein that she was "[h]appy to keep writing articles" but "it's just how we are going to publish anonymously is the question."

53.     The day after that, on April 27, 2016, the Contractor forwarded to Murstein an email from an editor at Seeking Alpha thanking the Contractor for "an interesting article" but stating that "[w]e were unable to verify your ID.  Please resubmit after uploading a scan of a valid photo ID[.]"  The Contractor asked Murstein, "What do you think I should do regarding the ID situation?"

54.     On April 28, 2016, the Contractor emailed Murstein that she was "still publishing under a pen name" and was "seeing which one of my friends will let me borrow theirs [ ID]."

55.     In an April 29, 2016, email that was forwarded to Murstein, Meyers advised the Contractor that "first you have to come up with a fake resume."  Murstein also instructed the Contractor through a text message to use a friend's name to open an account on Seeking Alpha.

56.     On May 2, 2016, Murstein emailed the Contractor that he was "just focused on you getting your articles out for now.  Have you gotten any on any web sites yet or picked up by anyone?"  The Contractor responded:  "Larry [Meyers] sent me the process I have to go through, it's kind of crazy.  In order to be a contributor I have to make up a whole person so I have to do a fake resume, everything.  This goes for basically every single website I have tried to get published on.  It's a process."

57.     In a May 4, 2016, email, the Contractor told Murstein about her efforts to get published on TheStreet.com:  "Larry [Meyers] sent me an email walking me through it. . . .  I have to make up a fake resume and apply to be a contributor, can't be anonymous but [a friend] agreed to let me use her ID so that's what I'm using now for everything."  She also told Murstein that Meyers had allowed her to rewrite some of his stories but to "just change up the wording so that plagiarism software won't detect anything."  Murstein responded, "Good update."

58.     Murstein urged the Contractor to increase the frequency of her positive  postings about Medallion.  Between May 2016 and November 2016, the Contractor published numerous articles and comments on websites, including Seeking Alpha and Huffington Post.  The Contractor was paid by Medallion Financial but never disclosed that compensation.

59.     On August 2, 2016, Murstein texted the Contractor with numerous statements about Medallion Bank and instructed her to "go to yahoo message board for MFIN," the ticker

symbol Medallion Financial's stock traded under, and "[p]ost on yahoo."

60.     On August 5, 2016, Murstein instructed the Contractor to accuse two individuals who had criticized Medallion Financial on Seeking Alpha of being "security law violators."

61.     On November 17, 2016, Murstein texted the Contractor to remind her to "[j]ust keep blogging and commenting positive stuff on Medallion," and five days later he texted her "[d]on't comment under your real name."

62.     Like Meyers's postings, the Contractor's articles and comments repeated Murstein's instructions that the Bank was undervalued and that Medallion Financial's stock was underpriced.

63.     For example, in a May 3, 2016 article published on Huffington Post, entitled "Safety in a Subsidiary: Untangling the Web of Perception Surrounding the Taxi Medallion Industry, Uber, TAXI Stock, & Medallion Financial Corporation," the Contractor wrote: "The fact of the matter is that TAXI has a hidden gem beneath its solid and consistent stance in the stock market in its subsidiary, Medallion Bank ('The Bank')."

64.     The Contractor's "Safety in a Subsidiary" article also stated:  "If the Bank is making $25m a year, easy, the best case scenario would be that their worth is, say $500 million and in the worst case $250 million, which is still much more than the total market cap, mind you. If smart investors were to dig a little deeper and do a little more due diligence they will walk away knowing that in fact, the Bank is worth double the market capital today."  At the time of this post, the Bank's reported fair value was $152 million, far below the article's "worst case" projection of $250 million.

65.     Murstein personally directed the content of the Contractor's posts.  For example, in an email to the Contractor sent on August 2, 2016, Murstein wrote:  "Things to blog and

comment about.  Please do this today:…will be a big boost to the stock price when people figure it out. . . predicting a huge pop in their price in the immediate future."  The Contractor immediately responded that she was "posting things now."  And in an email sent on August 2, 2016, at 1:36 p.m., Murstein told the Contractor "[f]rom now until 4pm you should just put comments on those web sites please."

66.     In another email to the Contractor on August 3, 2016, Murstein wrote:  "Say: Look at the bank and nothing else.  $170 mil of equity and $40 mil of pre tax earnings.  It's worth at least $400 mil."

67.     In an audio recording, Murstein instructed the Contractor that: "I view the stock worth at $10-$15 per share….  [T]he Bank alone is worth $20 per share….  Put this out tomorrow."

68.     Murstein reviewed and approved many of the posts before they were published online.  For example, on July 7, 2016, the Contractor emailed Medallion Financial's public relations firm (the "PR Firm") regarding one article and wrote:  "Will forward to Andy [Murstein] now so we can get the OK to publish."

69.     Murstein also reviewed articles relating to Medallion Financial after their publication.  On one audio recording, Murstein asked the Contractor "How do I find your post?"  The Contractor also forwarded links or screen shots of articles and comments to Murstein after publication.

70.     In 2016, Medallion Financial's web site (www.medallion.com) had a section described as:  "In The News: Articles about Medallion Financial have regularly appeared in major publications.  To view the latest Press releases, Articles and Interviews please click below."  During 2016, the "In The News" section contained links to at least two articles written

by the Contractor:  "Melrose, Medallion and Medallions" and "Safety in a Subsidiary," both of which appeared in Huffington Post.  The author of both pieces was identified only as "Contributor" on Medallion Financial's website, and there was no disclosure that the author was paid by Medallion Financial to write those articles.

71.     Murstein acknowledged that the purpose of the touting activity was to boost Medallion Financial's stock price.  In an email to the Contractor on November 16, 2016, he wrote: "All I would like you guys to do today is to write articles and post comments on message boards to support our stock."

72.     Murstein knew or recklessly disregarded that the Contractor did not disclose the compensation she received from Medallion Financial and that the Contractor used aliases in her articles and comments about Medallion Financial.

**C.     Murstein Paid a Public Relations Firm to Anonymously Tout.**

73.     In 2016, the PR Firm told Meyers it was also willing to make similar anonymous postings promoting Medallion Financial.  As a result, Murstein also paid the PR Firm to write positive articles about Medallion Financial.  The PR Firm published at least one comment in which it claimed that "the Bank could be worth over $300 million and the Bank stock could easily be worth over $12 as a standalone company to MFIN."

74.     The PR Firm misrepresented its affiliation with Medallion Financial.  In an internal email on July 7, 2016, an individual from the PR Firm acknowledged that, when contacted by Seeking Alpha, he claimed that he was not being compensated by Medallion Financial, which was consistent with Murstein's instructions.  In a November 17, 2016, email, Murstein instructed the PR Firm to "publish under an anonymous name."  In a November 18, 2016, email, Murstein told the PR Firm that "the article shouldn't be coming from me you or the

company though. More like an anonymous blogger."  The PR Firm also emailed Murstein on

November 16, 2016, for approval on pieces, writing "Andy, Please review the attached article for

accuracy and style."

**D.**     **Murstein Responds Falsely to Press Inquiries About the Touting.**

75.     On November 26, 2016, a reporter for the *New York Post* emailed Murstein:

> Hi Andrew, My colleague got some information about a woman who
> works for your company.  [The Contractor] has been writing articles for
> Huff Post touting the stock price of Medallion Financial under a pen
> name.  This is not only on [sic] ethical, but experts say it is illegal.  My
> colleague reached out to [the Contractor], but I wanted to reach out to you
> as well.  How long has [the Contractor] been working for you?  What is
> her role in the company?  Did you know that she was writing for
> Huffington Post?  Did you know what kind of articles she was writing?  If
> not, how do you feel to find out she was doing this?  What are the next
> steps you plan to take?

76.     Murstein's emailed response to the reporter stated that "I am not aware of the

postings 'under a pen name' to which you are referring as potentially raising ethical and legal

issues.  Can you please send me the postings in question, and then we'll review them and get

back to you with a response."

77.     The reporter then told Murstein that the Contractor's "article[s] are listed on the

news section of your website as just Contributor."  Murstein falsely responded: "I was unaware

of the below but am now looking into it."

78.     On November 27, 2016, Murstein was interviewed by the *New York Post* reporter,

and Medallion Financial's General Counsel and the PR Firm attended.  According to notes of the

interview taken by the PR Firm, "[Murstein] said he didn't know [the Contractor] was writing

stories touting Medallion for Huffington Post under [an] assumed name and posting them

without a byline on the Medallion website," and "[Murstein] sees nothing wrong with her trying

to protect her identity, considering the viciousness of the short sellers."

79.     According to the PR Firm's notes, "the Post reporter[] said she spoke to a former attorney general who said that paying someone to tout the stock under a pen name is illegal," and Murstein responded that "in his opinion it is not illegal because everything in the articles is public information already."

80.     Murstein also falsely claimed in the interview that he knew the Contractor "had a background in marketing and PR and was recommended by an IR firm," and that the Contractor had stopped working for Medallion Financial in October 2016.

81.     On January 17, 2017, Murstein received by email another media inquiry stating that "your former IR [investor relations] head . . . used a pseudonym . . . to post positive articles on Medallion for the Huffington Post, and also posted pro-Medallion comments on financial blogs such as Seeking Alpha and Yahoo Finance.  Doing so is a practice known as 'stock-touting' which could be a potential securities law violation."

82.     On behalf of Murstein, Medallion Financial's General Counsel again responded falsely to the reporter that "any comments she is alleged to have posted under a pseudonym she would have posted unbeknownst to Medallion."  On January 27, 2017, the reporter responded with an email stating the Contractor "was responsible for posting the Huffington Post articles which you subsequently placed on your website.  It is obvious that you knew what she did.  This could potentially constitute a securities law violation."

**E.      Murstein Paid the Contractor Hush Money to Conceal His Scheme.**

83.     Although Murstein knew that the Contractor had posted under an alias, he texted the Contractor on November 26, 2016, after he had received the media inquiries, and asked her: "Why did you post articles under a fake name?"  The Contractor responded on the same day: "Because you asked me to not use my name.  Do you want me to switch it to my name?"

84.     On December 1, 2016, Murstein texted the Contractor:  "I'm trying to get you an agreement and get you paid extra money but it won't be ready until tmrw or Monday."

85.     On December 5, 2016, Murstein and the Contractor signed a Confidential Agreement and General Release (the "Release"), in which the company agreed to pay the Contractor $15,000 in exchange for the Contractor agreeing to release Medallion Financial from all claims.  The Release also required the Contractor to falsely affirm "that she was never instructed by [Medallion Financial] or any other Releasee to write any articles, blogs, posts or comments about Medallion under a pen name or false name."

86.     Fearing that the touting would be made public, on January 18, 2017, Murstein texted the Contractor: "Our lawyers are sending you a letter that you are telling people I told you to write under a false name.  First of all there is no reason to talk to people about that.  Plus you signed something that says you aren't supposed to be talking to anyone."

87.     Neither Medallion Financial nor Murstein ever disclosed to investors that for two years Murstein had engaged and paid multiple persons to promote Medallion Financial in numerous online forums.

## IV.     <u>Murstein's Scheme to Increase the Bank's Fair Value.</u>

88.     Prior to 2015, Medallion Financial measured the Bank's fair value as the equivalent of "book value," which represented the bank's assets minus its liabilities, and Medallion Financial's Forms 10-K represented that "Medallion Bank had little value beyond its recorded book value."

89.     In 2015, however, Medallion Financial changed its approach to determining the fair value of the Bank to the more subjective (and malleable) fair value determination.  This change coincided with the rise of the ridesharing apps and the deterioration in medallion asset

values,

90.     To justify this change, Medallion Financial claimed the increase in the value of the Bank was justified because the Bank had a "premium" as a Utah industrial bank that increased its worth well beyond book value.

91.     The Bank's status as a Utah industrial bank, however, did not support a significant premium over book value.  In a public response letter submitted to the Commission's Division of Investment Management in February 2016, Medallion Financial acknowledged the many limitations inherent in the Utah bank charter:  the Bank was "not a full-service bank; cannot offer checking accounts, which are highly profitable for commercial banks"; the Bank "has no retail locations, no core deposits, does not provide residential mortgages, and does not provide credit cards."  The Bank was also required to maintain its capital at a minimum of 15% of its average assets.  This 15% "leverage ratio" was "higher than that required by peer banks and further limits the value of [Medallion Financial's] investment in Medallion Bank."  Finally, the Bank was "prohibited from entering into new business lines" without regulatory approval, and regulatory restrictions on transfers of the Bank's charter also impacted the Bank's value.

92.     Murstein also knew that several peer banks had marked down their taxi medallion loans to amounts approximating the value of the collateral.

93.     In late 2016, Murstein nevertheless sought to reverse the downward slide of Medallion Financial's stock price by nearly doubling the purported fair value of the Bank.  At the time, there was no basis to support a material increase in the Bank's fair value.

A.   **The Valuation Firm.**

94.     In 2015, Medallion Financial hired a third-party valuation firm (the "Valuation Firm") to perform a fair value analysis.  The Valuation Firm was a specialist with substantial experience in bank valuations.

95.     Under GAAP (ASC 820-20-55-1), "[t]he objective of a fair value measurement is to estimate the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions."

96.     Applying these principles, the Valuation Firm provided a fair-value opinion in 2015, which formed the basis for Medallion Financial's disclosures in its Form 10-K for 2015. The Form 10-K for 2015 reported Medallion Bank's fair value at about $152.1 million, and the Form 10-Q for the second quarter of 2016 reported Medallion Bank's fair value at $166.4 million.  Both valuations were about 11% over book value.

B.   **Murstein Goads Other Financial Firms to Endorse His Valuation Number.**

97.     Murstein wanted to drive the Bank's fair value even higher above book value.  He therefore set out to manufacture market demand for Medallion Bank at the price that he determined.  To this end, Murstein initiated contact with four financial firms hoping to generate support for his number.  Murstein did not tell these firms that the purpose of his contact was to generate support for an increased valuation with the Auditor and the Valuation Firm.

98.     The contacts followed a similar pattern.  An email by Murstein would propose a future transaction involving a sale of all of a piece of the Bank at a number dictated by Murstein. Murstein would then ask for something in writing expressing support for his valuation number. At that point, the discussions about a transaction would go no further because Murstein's

purpose was not to negotiate the transaction but rather to mislead the Valuation Firm and the Auditor.

99.     On October 17, 2016, Murstein sent Investment Bank A and Investment Bank B identical emails stating that:  "[W]e were approached by an investment bank asking if we are interested in selling a minority stake in our bank to their client. . . .  I think we should pursue this or possibly sell it to another investor.  Using other potential comps our bank would be worth well over $300 million. . . .  [C]ould you quickly put together a rough valuation for our bank. . . .  Once we review it [the valuation] we can discuss engaging your firm."

100.    Within days, Investment Banks A and B—incentivized by the prospect of investment banking fees—both responded.  Investment Bank A  emailed Murstein a letter and summary that stated that "it is reasonable to assume a valuation range of $185MM - $325MM" and that $300 million was "a reasonable proxy for a control sale price" but that this view was "tempered by regulatory uncertainty" that any transaction would receive approval.  Investment Bank B responded with a "potential valuation analysis" listing a range of valuations of the Bank up to $371 million.

101.    Next, on October 28, 2016, Murstein emailed the president of another Utah industrial bank and asked:  "Do you feel that you would be able to value Medallion Bank at $200 million?"  Murstein repeated his request in another email to the industrial bank on October 29, 2016:  "[S]end me an email Monday saying your [sic] interested in discussing a valuation above $200 mill[ion] with us.  I personally think it's worth a lot more but if I get the email saying that we can discuss everything on the phone or in person."

102.    On October 30, 2016, the bank president emailed Murstein a one-sentence response:  "We are good at 200."

103.   The industrial bank never pursued the transaction with Murstein, but internal emails show it was highly skeptical the Bank should be valued at $200 million.  In late November 2016, the industrial bank prepared an offer letter to be sent to the Bank's Board of Directors offering $123.7 million in cash—not $200 million—to purchase the Bank.  The draft letter, which was not sent, noted that this proposed offer was "lower than our previously submitted indication of interest" but stated that this was appropriate given recent financial disclosures by Medallion Financial.  In an internal email dated November 21, 2016, an employee of the industrial bank stated:  "I think Murstein used us, when he requested we give him a $200 million value on the bank so that he could justify not writing it down[.]"

104.   Murstein's final effort at generating support for his valuation occurred in December 2016, when Murstein tried to revive stalled negotiations with a consumer lender over a loan participation program.  Murstein introduced a new term into the deal which would require the consumer lender to acquire a 2% interest in the Bank, and that for this purpose "Medallion Bank will be valued at 10 times 2017 projected earnings of $35,000,000 or $350,000,000."

105.   On December 13, 2016, Murstein emailed the consumer lender that "the investment in the bank is a big part of the deal for us."  As Murstein stated in an internal email dated December 15, 2016, "[T]he valuation that the bank will receive [from the consumer lender] is very high. . . .  [I]t should also greatly help the parent[ ]  company stock price."

106.   In late December 2016, however, the consumer lender notified Murstein that it was ending the negotiations, but would consider revisiting the small equity investment if another loan participation or partnership arrangement between the parties could be arranged in the future.

107.   Murstein tried to use these contacts as support for his increased valuations. Murstein never told the Auditor, however, that he initiated these contacts and provided the

valuation numbers to the firms.  Murstein also did not tell the firms that he would provide their responses to the Auditor as support for the increased valuation.

108.    The Auditor, however, emailed Murstein on October 24, 2016, that Investment Bank A's summary was "a 'pitch' document with appendices rather than a valuation" and "does not support the increase in value in the 3rd quarter of 2016."  In an October 31, 2016, email to Murstein, the Valuation Firm dismissed Investment Bank B's analysis as "a pitch document" not justifying an increase in the Bank's fair value.

109.    Regarding the industrial bank, Murstein forwarded the "good at 200" email to his CFO and declared: "[t]his is the final clincher.  [The industrial bank] has been talking to us about buying our bank and just sent this email of at least two hundred million dollars.  This should be an easy valuation for us to convey to the auditors."  Murstein then forwarded this email chain to the Auditor.  The Auditor, however, responded that the "good at 200" email "doesn't offer much context" and asked for more information "that would make this a bonafide offer."

110.    A Medallion Bank official was also skeptical of the proposed deal with the consumer lender, and advised Murstein in a December 15, 2016, email that "it would be best to resolve our medallion problems before we enter into the strategic partnership business," which he estimated would be twelve months in a best case scenario.

111.    Murstein disagreed, prompting a Bank executive to be more candid to Murstein: "Volatility is the enemy of this mission. . . .  The volatility introduced by ride-share means that, in the best case, the bank only loses millions of dollars working through it. Worst case, we lose *hundreds* of millions-and the odds of this outcome remain too high. . . .  The strategic partnerships business adds to the volatility of the bank. . . .  [T]he

reputation/regulatory/legal/operational risks remain enormous in our eyes."

112.    Murstein, however, was not primarily interested in the strategic partnerships but rather in generating any support, however tenuous, for an increased valuation of the Bank that would elevate Medallion Financial's stock price.

**C.      For 3Q 2016, Murstein Pressures the Valuation Firm to Increase Fair Value.**

113.    When the Auditor told Murstein that another fair-value opinion was needed for the third quarter of 2016, Murstein sought to have the Valuation Firm increase the Bank's value to $193 million.

114.    On November 1, 2016, Murstein wrote the Valuation Firm:  "I would like to give this one more shot before we throw our long term relationship away.  I assume if we signed a letter of intent…stating the value of Medallion Bank would be a minimum of $200 million you would be able to sign off on our valuation."

115.    The Valuation Firm, however, told Murstein, over several emails, that the purported transactions from the financial firms were too tenuous to form the basis of any valuation analysis—noting specifically that any sale would first need to include due diligence, including a review of the Bank's loans.

116.    On October 31, 2016, the Valuation Firm emailed Murstein that:

[T]here is not material information that [the Valuation Firm] can place significant weight on in changing our prior valuation methodology to conclude with a higher value.  The potential sale of the Bank to a third party could receive significant weight if you were far along in a transaction in terms of diligence, vetting with the regulators, and the presence of at least a term sheet and/or definitive agreement.

117.    On November 1, 2016, Murstein responded that the Valuation Firm was "going out of [its] way not to be reasonable" and that the Valuation Firm's refusal to accept Murstein's valuation evidence "will now greatly effect [sic] our relationship going forward."

118.    Despite Murstein's pressure, the Valuation Firm refused to increase the fair value of the Bank, and responded to Murstein that "we have prior valuations that have been reviewed and approved by the Board . . . based on lower earnings . . . and there does not appear to be rationale to change the multiple, such as lower perceived risk . . ." The Valuation Firm also told Murstein that a valuation analysis had to "consider that the recent trajectory of asset quality and earnings is negative."

119.    In internal email dated November 1, 2016, an executive at the Valuation Firm was more explicit: "[W]e have ample recent evidence that medallion loans are souring (Signature Bank, BankUnited, etc.)…. Noncurrent loans have increased 101 basis points in one quarter alone since your last valuation…. This is a strong argument for value of the bank declining, not increasing." In another internal email dated November 2, 2016, an executive at the Valuation Firm wrote: "Unfortunately at this point, if you have not done so already, you have to let him [Murstein] know that unless he is agreeable to [the Valuation Firm] independently valuing Medallion Bank, he is going to have to go elsewhere…. Wish I had another solution but I think we have lost the client to maintain our integrity and avoid potential liability."

**D.    Rejecting the Auditor's Advice, Murstein Fires the Valuation Firm.**

120.    On November 1, 2016, after the Valuation Firm refused to provide a valuation of $193 million for Medallion Financial's third quarter Form 10-Q, Murstein fired the Valuation Firm.

121.    Murstein fired the Valuation Firm against the advice of the Auditor. On October 21, 2016, the Auditor emailed Murstein: "[The Valuation Firm] is necessary. On a quarter to quarter basis the methodology should not change. Especially when supporting an increase of this size, we will need additional support." On October 24, 2016, the Auditor emailed Murstein that

"your current valuation firm" should "conclude on a value."

122.     The Valuation Firm also advised Murstein of the importance of maintaining consistency in an October 31, 2016 email: "we are tied to the prior valuation methodology in the absence of compelling new information that we would be required to consider."

123.     On November 2, 2016, Murstein emailed the Auditor that he was "done with [the Valuation Firm.]"  Murstein—after complaining that the Auditor was "costing us significant dollars to obtain these valuations"—then misrepresented to the Auditor the reasons that he fired the Valuation Firm:  "They have been difficult to work with for quite some time.  They are too small for a transaction of this size."

124.     The Auditor pushed back, telling Murstein:  "The key here is to bridge the gap from your prior quarter's valuation, and utilize known methods (hopefully consistent methods) from the prior quarter to evaluate the fair value for this quarter. . . .  I would recommend that you continue to utilize the same third party specialist quarter-after-quarter."

125.     Murstein rejected his Auditor's advice, and did not disclose to the Auditor that he fired the Valuation Firm because it refused his demand to increase the Bank's fair value.

126.     GAAP principles (ASC 820-10-35-25) provide that "[v]aluation techniques used to measure fair value shall be applied consistently."

127.     By firing the Valuation Firm and using a new firm that used different assumptions and inputs from what had previously been used, without justification or evidence that it would produce a value more representative of the Bank's fair value, Murstein and Medallion Financial violated GAAP.

E.     **Murstein Entices Investment Bank C Firm to Provide a Valuation.**

128.     After firing the Valuation Firm, Murstein immediately began opinion-shopping for a more compliant firm.

129.     On November 1, 2016, Murstein sent Investment Banks A and B, as well as a third investment bank ("Investment Bank C"), identical emails stating:

> Do you think you can issue something like this report [attaching the Valuation Firm's 2Q 2016 report] indicating the bank is now worth at least 1.3 times book value or $193 million.  I believe it is worth substantially more but that is the minimum amount that needs to be confirmed right now for us to work with you to potentially sell a portion of the bank.  Thank you.

130.     Investment Banks A and Bank B did not respond to Murstein's email.

131.     An employee of Investment Bank C, however, responded within minutes:  "I have little doubt that we can."

132.     Investment Bank C did not typically provide valuation opinions for public company audits.  It agreed to do so largely because of the incentive offered by Murstein to "sell a portion of the bank," which was much more lucrative than providing a valuation.

133.     The *quid pro quo* arrangement that Murstein offered—providing a pre-determined valuation number dictated by Murstein in exchange for investment banking work—was not disclosed to the Auditor or to investors.

134.     In order to reach the valuation number that Murstein demanded for the third quarter Form 10-Q, Investment Bank C did not use assumptions and inputs that were consistent with the Valuation Firm's earlier reports.  Instead, Investment Bank C changed key assumptions, including the discount rate used to estimate the present value of future cash flows, in order to obtain the higher fair-value number that Murstein directed.

135.     Due to Murstein's abrupt firing of the Valuation Firm and hiring of Investment

Bank C, Medallion Financial had to rush to meet its filing deadline for its Form 10-Q for the third quarter of 2016.

136.    On November 9, 2016, the Auditor emailed Murstein that the "due date of the [Form 10-]Q is today" and the Auditor still had not received "management's valuation memo that specifically deals with the reasons for the [Bank's] increase in [fair] value this quarter[.]"

137.    The valuation memorandum, signed by Murstein, was emailed to the Auditor that afternoon, just hours before the Form 10-Q became public.

### F.    Medallion Financial's Form 10-K Filing for 2016.

138.    For the quarter ending December 31, 2016, Medallion Financial increased the valuation of Medallion Bank from $193 million to $280 million.  The overall increase totaled approximately $110 million in only six months, which meant that the fair value had changed from approximately 11% greater than book value to more than double book value.

139.    The increase in the value of the Bank to $280 million as of December 31, 2016, was again driven by Murstein's pressure on Investment Bank C.  Murstein had already determined the value he wanted to report for the Bank and conveyed that value to Investment Bank C before they had done the valuation analysis.

140.    The Bank's reported fair value as of December 31, 2016, of $280.6 million, was nearly four times greater than the market capitalization of its parent company, Medallion Financial, which was $73 million as of that date.

141.    The Bank's valuation for the period ending September 30, 2016, was approximately "41% up the range" ultimately provided by Investment Bank C.  In a late January 2017 email exchange between Murstein and Medallion Financial's CFO, the two discussed the need for the valuation of the Bank for the following quarter, December 31, 2016, to also be 41%

"up the range."  The CFO then told Murstein that "the $280 MM for this valuation needs to be roughly 41% up the range they derive as well."

142.    Murstein discussed potential valuation ranges with the CFO, concluding "[d]epends on the range, but for example $239 to $339 puts it right at 41%.  Other ranges would work too."

143.    Murstein then forwarded that email exchange to Investment Bank C, with the note "see [b]elow."

144.    Investment Bank C's report as of December 31, 2016, issued on March 1, 2017, concluded that the fair value of the Bank ranged from $262 million to $309 million.  (A value of $280 million was approximately 41% "up the range" provided by the Investment Bank.)

### H.    Medallion Financial's 2017 Periodic Filings.

145.    For the second quarter of 2017, Investment Bank C provided another report but made clear that the report was not an independent fair-value determination:  "For the avoidance of doubt, the Analysis is a mathematical exercise based on a series of inputs provided by the Company and represents neither an opinion as to the value nor a fair market valuation of the Bank on the part of [Investment Bank C]."

146.    In fact, all of Investment Bank C's valuation reports were mere "mathematical exercises" that did not take into consideration the poor credit quality of the Bank's loan portfolio and simply accepted management's projections.  As a result, the Bank's fair value rose to $286 million by the second quarter of 2017, more than double the Bank's book value.

147.    On July 11, 2017, Murstein sent Investment Bank C an angry email criticizing it for failing to generate any offers for the Bank, stating that: "You were engaged to sell a minority piece in the bank. That's why you took on the project."

148.     Murstein fired Investment Bank C in late July 2017, and Medallion Financial hired yet another firm to provide a valuation opinion—the third such firm in less than one year. This firm's opinion tracked Investment Bank C's approach, and the Bank reported a fair value of $290.5 million by year-end 2017.

149.     Murstein knew that medallion values were continuing to deteriorate in 2017.  A consultant retained by Murstein reported to him in August 2017 that "there continues to be deterioration in values as indicated by arms length transfers in NYC and Chicago," and that "the survivability of the medallion system" was at stake.  The consultant estimated medallion values at $150,000 for New York City medallions and $10,000 for Chicago medallions.

150.     The dramatic increases in the Bank's fair value of its common stock, as compared to book value, is summarized below (numbers are in millions):

|  | 6/30/16 | 9/30/16 | 12/31/16 | 3/31/17 | 6/30/17 | 9/30/17 | 12/31/17 |
|---|---|---|---|---|---|---|---|
| Fair Value | 166.5 | 193.9 | 280.6 | 284.4 | 286.0 | 290.7 | 290.5 |
| Book Value | 149.9 | 149.0 | 135.6 | 139.3 | 140.6 | 145.2 | 137.9 |
| Ratio | 111% | 130.1% | 207% | 204.1% | 203.4% | 200.2% | 210.7% |

**I.     False and Misleading Disclosures in Forms 10-K and 10-Q.**

151.     Medallion Financial's 2016 and 2017 Forms 10-K and Forms 10-Q, gave three reasons in the Management's Discussion and Analysis ("MD&A") for the increases in the Bank's fair value:

a.     "Expression(s) of interest in Medallion Bank from both investment bankers and interested parties has continued through 2016 and 2017;"

b.     "[I]n the third quarter of 2016 there was a court ruling involving a marketplace lender that the Company believes heightens the interest of marketplace lenders to acquire or merge with Utah industrial banks;"  and

      c.   "We also engaged a valuation specialist to assist the Board of Directors in its determination of Medallion Bank's fair value."

152.    Each of these reasons for the Bank's significant valuation increase was false or misleading, as Murstein knew or recklessly disregarded.  A reasonable investor would find the company's explanations of the reasons for the Bank's increases in fair value to be material.

153.    *First*, Murstein knew that the "expressions of interest" from third parties were not appropriate as a basis for a fair value calculation.  This is what the Valuation Firm and the Auditor told him.  No sale ever occurred, and none of the purported bids went beyond the rote recital of Murstein's inflated valuation number.  None of the third parties even conducted due diligence.  In fact, the "expressions of interest" were manufactured by Murstein not to sell the Bank but to create the illusion of genuine market interest in order to justify the Bank's skyrocketing fair value.

154.    Fair value is intended to measure the price at which a willing buyer and a willing seller would enter into a transaction.  In 2016 and 2017, however, it was apparent that there were no willing buyers to be found.  As noted above, Murstein knew from Investment Bank C that there was almost no market interest in acquiring even a portion of the Bank, other than in a "junk bond priced deal."  As Investment Bank C told Murstein:  "[C]learly the market reaction to the capital raise was substantially different than your expectations and more in line with your stock value."

155.    *Second*, the "court ruling" the MD&A referred to, *Consumer Financial Protection Bureau v. CashCall, Inc.,* No. 15-cv-7522-JFW (C.D. Cal. Aug. 31, 2016), had nothing to do with the Bank.  As emails show, on the afternoon of November 9, 2016—the same day the Form

10-Q was filed—the reference to the *CashCall* decision was inserted as a last-minute rider to the MD&A.

156.    *Third,* the disclosure that Medallion Financial used "a valuation specialist" was false and misleading.  In fact, Medallion Financial used three different valuation firms that used different methods and inputs.  The disclosure also omits, among other things, that Murstein fired the Valuation Firm against the Auditor's advice, hired Investment Bank C by offering it banking work in exchange for valuing the Bank at a certain number.

157.    These false and misleading disclosures in the MD&A appear to have originated with the valuation memorandum that Murstein signed in November 2016, and that was provided to the Auditor just before the third quarter Form 10-Q was filed.

158.    As Murstein knew or recklessly disregarded, Medallion Financial's reported fair value for Medallion Bank was overstated by approximately $110 million at year-end 2016 and by about $85 million at year-end 2017.

159.    Medallion Financial's valuation of the Bank, as well as its disclosures in its periodic reports and corresponding earnings releases furnished as exhibits to Forms 8-K, was misleading for the periods ending September 30, 2016, December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017, as Murstein knew or recklessly disregarded.

## V.    **Books and Records and Internal Controls Violations.**

160.    Medallion Financial was required to make and keep books, records and accounts, which accurately reflect the values of its assets.

161.    Medallion Financial was also required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things

transactions are executed in accordance with management's general or specific authorization, and that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.  To this end, Medallion Financial was required to establishing procedures designed to prevent errors and irregularities

162.    Medallion Financial's internal accounting controls were not properly designed to implement an appropriate valuation methodology and procedures to value Medallion Financial's loans or the Bank consistent with GAAP.  In particular, Medallion Financial's valuation procedures did not adequately take into account the decline in the value of medallions. Furthermore, Medallion Financial did not have sufficient internal accounting controls to analyze the application of the valuation techniques being used in the valuations of the Bank to ensure they were being done on a consistent basis.  And Medallion Financial's documentation concerning its valuation decisions and reporting disclosures was inadequate.

163.    During 2016, both Medallion Bank and Medallion Financial had loans that were collateralized by taxi medallions in both New York and Chicago.  In addition to loans collateralized by medallions, Medallion Financial also owned some Chicago medallions outright. In 2016, the value of medallions was declining precipitously, but the drop was particularly significant in the Chicago medallion market.

164.    As of September 30, 2016, the Bank and Medallion Financial valued Chicago medallions at twice their market value.  Medallion Financial and Murstein knew that Medallion Financial was valuing the Chicago medallions at twice the market value because they closely monitored transactions occurring in the market place.  As Medallion Financial and Murstein were aware, sufficient and readily available comparable sales data suggested that Chicago medallions had a value of $65,000 each as of September 30, 2016.

165.    Murstein signed a valuation memo provided to the Auditor on November 9, 2016, that stated that the average sales price of a Chicago tax medallion in November 2016 was $64,700.  Murstein was also aware that a comparable bank had already reduced the value of its Chicago medallions to $60,000 each based on reports it had received from an investor analyst firm.

166.    Despite the data points cited in its valuation memo indicating a fair value of less than $120,000 each and sales transactions indicating an even lower value, Medallion Financial valued the Chicago taxi medallions it owned at $120,000 each.  Medallion Financial and Murstein simply disregarded all comparable sales when calculating the fair value of the Chicago medallions in an effort to avoid materially impacting Medallion Financial's financial statements.

167.    Medallion Financial also failed to consider collateral value when calculating the value of its medallion-backed loans, contrary to fair-value accounting principles.  As Murstein's November 2016 valuation memorandum states, Medallion Financial calculated the value of loans at par (*i.e.*, the amount of outstanding principal) so long as the loans were performing. Medallion Financial concluded that loans were performing if the loan payments were not more than ninety days past due and/or lacked other indicia of distress (such as bankruptcy of the borrower or troubled debt restructuring).

168.    Given the significant decline in the value of medallions—the collateral for the loans—throughout 2016 and 2017, this valuation methodology did not approximate fair value. Medallion Financial nevertheless claimed that it reported its loans at fair value in its financial statements filed with the Commission.

169.    Medallion Financial's summary of significant accounting policies stated:  "In determining the fair value [of the loans], the Board of Directors considers factors such as the

financial condition of the borrower, the *adequacy of the collateral*, individual credit risks, cash flows of the borrower*, market conditions for loans* (e.g. values used by other lenders and any active bid/ask market), historical loss experience and the relationships between current and projected market rates and portfolio rates of interest and maturities."  (Emphasis added.)

170.    Medallion Financial, however, failed to do such a fair value analysis, even when it was aware that both the "adequacy of the collateral" and "market conditions for loans" had deteriorated significantly.  Importantly, Medallion Financial had sales data that showed the value of taxi medallions—the collateral that supported its medallion-backed loans—had declined in both of the company's major markets, New York and Chicago.  Between the end of 2014 and the end of 2017, New York medallion sales prices had declined by approximately 60 percent, and Chicago prices had declined by over 80 percent.

171.    Medallion Financial and Murstein knew or recklessly disregarded that Medallion Financial was not carrying the medallion-backed loans at fair value but was instead significantly overvaluing the loans given their significantly increased risk profile.  Medallion Financial's reported aggregate loan-to-value ratios climbed to over 130%—meaning that the outstanding loan principal was substantially higher than the collateral value and indicating that the loan was significantly riskier.  Medallion Financial and Murstein knew that other holders of medallion-backed loans had begun to mark their loans down to collateral value, even when those loans were less than 90 days past due.

172.    Medallion Financial knew that the loans were significantly riskier by 2016 and that market conditions had significantly worsened but failed to consider that changing landscape when calculating the value of its loans.

173.     Another inaccuracy concerned the weighted average LTV ratio of the loan portfolio.  The LTV ratio is material because it gives investors the ability to estimate the extent to which the loans are over- or under-collateralized.  Under-collateralized loan portfolios are significantly riskier to the lender because there is not enough collateral to collect against if the debtors default on the loans.  An LTV ratio greater than 100% indicates the portfolio is under-collateralized.

174.     Medallion Financial made misleading statements regarding the method by which it calculated the LTVs for its loans in its 2017 financial statements.  In both its 2016 and 2017 Forms 10-K, Medallion Financial claimed to calculate LTV ratios on a gross loan balance— meaning that the managed unrealized depreciation or allowance was not included in the calculation.  The amount of managed unrealized depreciation on these loans during this time period was significant—approximately $63 million for both 2016 and 2017.  For both 2016 and 2017, Medallion Financial claimed that the LTV ratios were approximately 130 percent.

175.     In Item 1 of its Form 10-K for the year ended December 31, 2017, Medallion Financial claimed that its weighted average LTV of loans collateralized by taxi medallions was 131% compared to 129% at December 31, 2016.  The Form 10-K stated that "[t]hese ratios also do not factor in the [] unrealized depreciation on these loans of $62,723,000 and $63,252,000 as of December 31, 2017 and 2016, respectively."

176.     These statements were false and misleading.  For the 2017 Form 10-K, Medallion Financial actually calculated the LTV on a net basis—meaning that the approximate $63 million in unrealized depreciation or allowance was included prior to calculating the LTV ratio.

177.    Medallion Financial's misstatement regarding LTV in its 2017 Form 10-K misleadingly gave the appearance that the LTV ratios remained stable, at approximately 130%, for the periods ending in 2016 and 2017.

178.    If Medallion Financial had calculated the 2017 LTV ratio consistently with the 2016 LTV calculation, and in the way described in its 2017 Form 10-K, the LTV ratio would have been 155%. That increase in LTV ratio from approximately 130% in 2016 to approximately 155% in 2017—a significant increase in LTV ratio—would have shown the decline in the collateral supporting for Medallion Financial's and the Bank's loans during that time period.

179.    As Medallion Financial's President and Chief Operating Officer, and as head of the Investment Committee and Chief Credit Officer, Murstein knowingly or recklessly failed to ensure that Medallion Financial kept accurate books and records through the recording of inaccurate valuations for the Bank, the medallion-backed loans, Chicago medallions and LTV disclosures.

180.    Medallion Financial failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.  Murstein knowingly or recklessly aided and abetted Medallion Financial's books and records and internal accounting controls violations.

## VI.    <u>Murstein Deceived the Auditor.</u>

181.    On November 9, 2016, Murstein signed a management representation letter in connection with the Form 10-Q filing for the third quarter of 2016.  The letter was provided to the Auditor, and, among other things, represented that:

> "[W]e agree with the findings of . . . valuation specialists . . . used.  We did not give or cause any instructions to be given to specialists regarding the values or amounts derived

in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the specialists."

182.   This representation was false.  In fact, Murstein had given instructions to Investment Bank C regarding the Bank's minimum fair value and offered investment banking work to bias the valuation opinion.

183.   Murstein also signed management representation letters in connection with Medallion Financial's filings for the period ended December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017.

184.   The management representation letters signed by Murstein also stated that:

- Interim consolidated financial statements were "prepared in conformance with U.S. Generally Accepted Accounting Principles";
- "[W]e have designed our internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting";
- "We have no knowledge of any fraud, suspected fraud, or allegations of fraud affecting the Company involving management…where fraud could have a material effect on the interim consolidated financial statements"; and
- "There are no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated interim financial statements."

185.   Murstein knew or was reckless in not knowing that each was these representations was false.  Murstein knew or recklessly disregarded the GAAP violations; the internal controls failures; the misrepresentations and omissions in the MD&A; and his failure to disclose his and the company's role in the touting scheme.

186.   Murstein was also the sole signatory for the valuation memoranda provided to the Auditor to explain the reasons behind Medallion Financial's valuation decisions.  Murstein signed the valuation memoranda for Medallion Financial's filings for the period ended December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017

187.   Murstein's November 2016 valuation memoranda emphasizes the summaries Murstein solicited from Investment Banks A and B as supporting the increased valuation, even

though the Valuation Firm and the Auditor told Murstein that the summaries were insufficient. The memorandum also states that the Utah industrial bank—the source of the "good at 200" email—"contacted the Company unsolicited to acquire the Bank and indicated a value of over $200 mill." This was false: the email was not "unsolicited" because Murstein initiated the contact, and no offer at all was made for the Bank.

188.  Murstein's valuation memoranda for 2017 also refer to "a potential minority investor in Medallion Bank at a $350 million valuation to purchase a 0.57% of Medallion Bank." As described above, that transaction was part of a larger partnership arrangement that was not being negotiated, and Murstein's representation that he was "currently negotiating the terms of such an agreement" was misleading.

## VII.   GAAP Violations

189.  Medallion Financial violated GAAP's fair value principles, including ASC 820-20-55-1 ("objective of fair value measurement is to estimate the price . . . to sell the asset . . . under current market conditions"); ASC 820-10-35-25 ("valuation techniques . . . shall be applied consistently"); ASC 820-10-35-24 ("reporting entity shall use valuation techniques that are appropriate in the circumstances . . . maximizing the use of observable inputs"); ASC 820-10-35-54E ("reporting entity shall include appropriate risk adjustments"); ASC 820-10-55-8 ("fair value measurement should include a risk premium reflecting . . . the uncertainty inherent in cash flows"); ASC 820-10-35-54D ("analysis of the transactions or quoted process is needed"); ASC 820-10-35-54J-c ("reporting entity . . . shall take into account the transaction price"); and ASC 820-10-35-54G (even if "significant decrease in the volume or level of activity . . . the objective of a fair value measurement remains the same"). Murstein know or should have known, or was reckless in disregarding, these violations.

## TOLLING AGREEMENTS

190.     In 2019, 2020 and 2021, Medallion Financial, Murstein and Meyers signed tolling agreements entered into with the Commission.  Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Medallion Financial, Murstein and Meyers] authorized, instituted, or brought by . . . the Commission . . . arising out of the [Commission's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ."  Each tolling agreement further provides that the Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

191.     Collectively, these agreements tolled the running of any limitations period or any other time-related defenses alleged in this Complaint from October 21, 2019 through December 31, 2021, a period of at least 803 days (as to Medallion Financial and Murstein), and from October 16, 2019 through December 31, 2021, a period of at least 808 days (as to Meyers)

### FIRST CLAIM FOR RELIEF
**(Defendants Medallion Financial and Murstein)**
**Violations of Section 17(a) of the Securities Act**

192.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 191, as if fully set forth herein.

193.     By engaging in the conduct described above, Defendants Medallion Financial and Murstein, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by

use of the mails, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

194.    By engaging in the foregoing, Defendants Medallion Financial and Murstein violated, and unless restrained and enjoined, will continue violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**(Defendants Medallion Financial, Murstein, Meyers, and Ichabod's Cranium)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

195.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 191, as if fully set forth herein.

196.    By engaging in the conduct described above, the Defendants, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities on a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

197.    By engaging in the foregoing, the Defendants violated and, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### (Defendants Meyers and Ichabod's Cranium)
### Violations of Section 17(b) of the Securities Act

198.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 191, as if fully set forth herein.

199.    By engaging in the conduct described above, Defendants Meyers and Ichabod's Cranium, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspapers, articles, letters, investment services or communications which, though not purporting to offer securities for sale, described such securities for a consideration received or to be received, directly or indirectly, from an issuer, underwriter or dealer without fully disclosing the receipt past or prospective of such consideration and the amount thereof.

200.    By engaging in the foregoing conduct, Defendants Meyers and Ichabod's Cranium violated, and unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## FOURTH CLAIM FOR RELIEF
### (Defendants Medallion Financial and Murstein)
### Aiding and Abetting Violations of Section 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

201.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 191, as if fully set forth herein.

202.    By engaging in the conduct described above and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Medallion Financial and Murstein, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendants Meyers's and Ichabod's Cranium's, and

other uncharged touters, primary violations of Section 17(b) of the Securities Act [15 U.S.C. §

77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder

[17 C.F.R. § 240.10b-5], because they knowingly or recklessly provided substantial assistance to

Defendants Meyers's and Ichabod's Cranium's, and other uncharged touters', violations of

Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

203.    Unless restrained and enjoined Defendants Medallion Financial and Murstein will

continue aiding and abetting violations of Section 17(b) of the Securities Act [15 U.S.C. §

77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder

[17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF
**(Defendant Medallion Financial)**
**Violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20,**
**13a-1, 13a-11 and 13a-13 thereunder**

204.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 191, as if fully set forth herein.

205.    By engaging in the conduct described above, Defendant Medallion Financial (a)

failed to make and keep books, records and accounts that in reasonable detail accurately and

fairly reflected its transactions and disposition of assets; and (b) failed to devise and maintain a

system of internal accounting controls sufficient to provide reasonable assurances that

transactions were executed in accordance with management's general or specific authorization;

transactions were recorded as necessary to permit preparation of financial statements in

conformity with generally accepted accounting principles or any other criteria applicable to such

statements, and to maintain accountability for assets.

206.    By engaging in the conduct described above, Medallion Financial failed to file

with the Commission such financial reports as the Commission has prescribed, and medallion

Financial failed to include, in addition to the information expressly required to be stated in such

reports, such further material information as was necessary to make the statements made therein,

in light of the circumstances in which they were made, not misleading,

207.    By engaging in the foregoing conduct, Defendant Medallion Financial violated

and, unless retrained and enjoined, will continue violating Sections 13(a), 13(b)(2)(A) and (B) of

the Exchange Act [15 U.S.C. § 78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and

13a-13 thereunder [17 C.FR. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13].

### SIXTH CLAIM FOR RELIEF
**(Murstein)**
**Aiding and Abetting Violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act
and Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder**

208.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 191, as if fully set forth herein.

209.    By engaging in the conduct described above and pursuant to Section 20(e) of the

Exchange Act [15 U.S.C. § 78t(e)], Defendant Murstein, singly or in concert, directly or

indirectly, aided and abetted, and is therefore also liable for Defendant Medallion Financial's

primary violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §

78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.FR. §§

240.12b-20, 13a-1, 13a-11 and 13a-13], because he knowingly or recklessly provided substantial

assistance to Defendant Medallion Financial's violations of Sections 13(a), 13(b)(2)(A) and (B)

of the Exchange Act [15 U.S.C. § 78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11

and 13a-13 thereunder [17 C.FR. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13].

210.    Unless restrained and enjoined Defendant Murstein will continue aiding and

abetting violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §

78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.FR. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13].

## SEVENTH CLAIM FOR RELIEF
### (Murstein)
### Violations of Rule 13b2-2 of the Exchange Act

211.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 191, as if fully set forth herein.

212.    By engaging in the conduct described above, Defendant Murstein, directly or indirectly: (a) made or caused to be made materially false or misleading statements to an accountants; or (b) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (1) an audit, review, or examination of financial statements required by the Exchange Act or rules thereunder; or (2) the preparation of filing of a document or report required to be filed with the Commission.

213.    By engaging in the foregoing conduct, Defendant Murstein violated and, unless restrained and enjoined, will continue violating Rule 13b2-2 of the Exchange Act [17 C.FR. §§ 240.13b2-2].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

a) finding the Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

b) permanently restraining and enjoining the Defendants and their agents, servants, employees and attorneys and all persons in active concert who receive actual notice of the

injunction and each of them from, directly or indirectly, violating or aiding and abetting violations of the federal securities laws alleged in this complaint;

c) ordering the Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts;

d) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

e) permanently barring Defendant Murstein from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

(f) granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: New York, New York
      December 29, 2021

                    Respectfully submitted,


            By:     /s/  Richard R. Best
                    Richard R. Best
                    Celeste Chase
                    David Stoelting
                    Olivia Zach
                    *Attorneys for Plaintiff*
                    U.S. Securities and Exchange Commission
                    New York Regional Office
                    200 Vesey Street, Suite 400
                    New York, New York 10281-1022
                    Tel: (212) 336-0174 (Stoelting)
                    Email: stoeltingd@sec.gov