**SHELDON L. POLLOCK**
**Associate Regional Director**
**Celeste Chase**
**David Stoelting**
**Paul Kim**
**Karen Willenken**
**Olivia Zach**
**Attorneys for Plaintiff**
**U.S. SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**Phone:  (212) 336-0174 (Stoelting)**
**Email: stoeltingd@sec.gov**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              **Plaintiff,**<br><br>            -against-<br><br>**MEDALLION FINANCIAL CORP.,**<br>**ANDREW MURSTEIN,**<br>**LAWRENCE MEYERS**<br>**and ICHABOD'S CRANIUM, INC.,**<br><br>                              **Defendants.** | **21 Civ. 11125 (LAK)**<br><br>**AMENDED COMPLAINT**<br>**Jury Trial Demanded**<br><br><br>**ECF Case** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Amended

Complaint against Defendants Medallion Financial Corp. ("Medallion Financial"), Andrew

Murstein ("Murstein"), Lawrence Meyers ("Meyers"), and Ichabod's Cranium, Inc. ("Ichabod's

Cranium") alleges as follows:

## PRELIMINARY STATEMENT

1.      From late 2014 through 2017, Murstein—Medallion Financial's President and

Chief Operating Officer—perpetrated two fraudulent schemes intended to boost Medallion

Financial's sinking stock price.  Until 2014, Medallion Financial had been on an extended run of

success, as its stock rose to an all-time high of $17 per share and the company paid cash dividends every quarter.  Driving this success was Medallion Bank, a wholly-owned subsidiary of Medallion Financial, which provided the majority of the company's profits year in and year out.  Medallion Financial's primary business—making loans to taxi drivers secured by the medallions—seemed impervious to challenge.

2.     By 2015, however, everything had changed.  Ridesharing apps such as Uber and Lyft threatened the taxi industry, and the value of taxi medallions—which collateralized the loan portfolios held by Medallion Financial and Medallion Bank—dropped dramatically.  Medallion Financial's stock dropped to about $3 per share and the regular dividend payments stopped.  The company, moreover, became a target of short-sellers and sharply negative discussions on financial websites and blogs.  Under pressure to do something, Murstein violated the federal securities laws.

3.     The first scheme involved illegal touting.  To try to silence the short-sellers and bloggers that were writing Medallion Financial's epitaph, Murstein hired Meyers, whose specialty was "stealth" public relations, and paid Meyers to anonymously promote Medallion Financial in various publications.  Murstein approved Meyers' pieces before publication, which did not disclose the payments, and Meyers posted more than 1,000 articles and comments, many of them using one of several aliases.  In early 2016, Murstein hired a second person to tout anonymously and, at Murstein's request, Meyers trained the new touter.  Murstein knew or was reckless in not knowing that the touters did not disclose their affiliation with the company.  For Murstein, that was the point: his touters would not be credible if they disclosed that they were being paid.

4.      In late 2016, after nearly two years of recruiting, paying for, and encouraging anonymous touters, Murstein's secret was exposed.  Journalists confronted him with the obvious fact that hiring and paying someone to anonymously tout was a violation of the securities laws. Murstein, however, falsely claimed that he did not know his touter posted anonymously. Seeking to bury the controversy, Murstein had the second touter sign a non-disclosure agreement and paid her hush money.  Neither Medallion Financial nor Murstein ever disclosed to investors Murstein's conduct in recruiting, paying, and instructing his touters.  Murstein acted knowingly or recklessly in hiring and keeping these touters on the Medallion Financial payroll for nearly two years.

5.      Medallion Financial and Murstein were dealing with other crises at the end of 2016.  Shareholders were demanding that Murstein take action to reverse the collapse of the company's stock price.  Murstein attributed the drop in the stock price at least in part to panic from investors over the failure of a Medallion Financial subsidiary to pay $8.8 million that was owed to a lender, which was an event of default and caused the lender to file a lawsuit on October 24, 2016.  As Murstein knew, and as Medallion Financial was compelled to disclose in its Form 10-Q for the third quarter 2016, the default could have triggered cross-defaults in Medallion Financial's agreements with other lenders; as a result, Murstein feared a "run on the bank."  In response to this news, Medallion Financial's stock price, and the price at which its publicly traded bonds traded, both dropped significantly.  In addition, banking regulators were

Redacted - FDIC/UDFI Material

. Later in the year, the regulators required the Bank to take additional loss reserves and restate a regulatory report.

6.      A number of banks that had been lending money to Medallion Financial for many years had stopped lending new money due in large part to the decline in the value of the medallion collateral.  The problem was not just that the lenders were no longer willing to loan to Medallion Financial, but also that with Medallion Financial's earnings declining, it risked violating covenants in at least two of its loan agreements (¶¶ 112-118 below) and faced the prospect of having to repay more than $68 million in debt immediately or renegotiate the debt on less favorable terms.

7.      To avoid this outcome, Murstein perpetrated a second scheme: to increase Medallion Financial's earnings and stock price by boosting the carrying value, or "fair value," of Medallion Bank.  As the valuation firm Medallion Financial used to determine fair value made clear to Murstein, there  was no legitimate basis to do so, especially given the deteriorating value of the collateral securing the Bank's medallion loan portfolio.

8.      Murstein pressured the valuation firm to accept his inflated number. The valuation firm, however, refused.  As a result, Murstein abruptly fired the valuation firm and went opinion-shopping for a firm that would agree to value the Bank at his targeted number of $193 million. Murstein quickly found an investment bank that was lured by his *quid pro quo* offer:  provide the requested valuation number in exchange for much more lucrative investment banking work in the future.

9.      The Bank's reported fair value—which was $166 million as of the 2nd quarter of 2016)—jumped to $193 million (3rd quarter 2016) and then to $280 million (4th quarter 2016) and $290 million (4th quarter 2017).

10.      Investors were not told the truth.  Medallion Financial's Forms 10-K and 10-Q for the last two quarters of 2016 and all four quarters of 2017 attributed the increases to "expressions

of interest" in the Bank from "investment bankers and interested parties"; to "a court ruling involving a marketplace lender"; and that "a valuation specialist" had been engaged. These disclosures were false and misleading.

11.     In fact, Medallion Financial's sudden increases in fair value—at a time when the collateral values of the Banks's loans were plummeting—resulted from Murstein's behind-the-scenes conduct, which included firing Medallion Financial's valuation firm, instructing the new valuation firm on the inflated values, biasing the new firm with possible incentives, and concealing information from Medallion Financial's Auditor (the "Auditor"). None of this was disclosed to investors.

12.     Medallion Financial's financial statements contained other inaccuracies related to its valuations. In its Form 10-Q as of September 30, 2016, the Bank and Medallion Financial valued Chicago medallions at twice their market price. Medallion Financial also failed to properly value its medallion-backed loans by failing to take into account the adequacy of the collateral and market conditions. And Medallion Financial inaccurately reported its loan-to-value ("LTV") ratios for its medallion-backed loans in its Form 10-K for 2017. Medallion Financial's internal accounting controls therefore were not properly designed to implement appropriate valuation procedures consistent with Generally Accepted Accounting Principles ("GAAP"). Murstein, who was head of the Investment Committee and controlled Medallion Financial's valuation procedures and decisions, aided and abetted these violations.

13.     The misconduct materially impacted Medallion Financial's financial statements. The reported fair value for Medallion Bank was overstated by at least $110 million at year-end 2016 and by at least $85 million at year-end 2017. In addition, the portfolios of medallion loans held by Medallion Financial were overvalued by more than $30 million at year-end 2016 and by

the same amount at year-end 2017, which were additional material misstatements.  As a result, Medallion Financial's reported total assets and total shareholders' equity were overstated by more than $140 million at year-end 2016, and by more than $115 million at year-end 2017 (excluding the impact of income taxes).

**<u>VIOLATIONS</u>**

14.     By engaging in the foregoing conduct and as alleged further in this Complaint:

a.     Defendants Medallion Financial and Murstein violated Sections 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.     Defendant Medallion Financial violated Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13], and Defendant Murstein aided and abetted these violations by Medallion Financial;

c.     Defendants Meyers and Ichabod's Cranium violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Defendants Medallion Financial and Murstein aided and abetted these violations by Meyers and Ichabod's Cranium;

d.     Defendants Medallion Financial and Murstein aided and abetted uncharged violations by others of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

e.     Defendant Murstein violated Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

15.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

16.     The Commission seeks a final judgment: (a) restraining and permanently enjoining Defendants from engaging in the acts, practices and courses of business alleged against them herein and from committing future violations of the above provisions of the federal securities laws; (b) ordering Defendants to disgorge any ill-gotten gains they received and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) barring Defendant Murstein from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering such other and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

18.     Venue lies in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange, in that Medallion

Financial's operations were primarily located in New York, New York, and Medallion Financial is a public company with common stock that trades on the NASDAQ exchange.

## **DEFENDANTS**

19.     **Medallion Financial** is a Delaware corporation with its principal place of business in New York, New York.  Until April 2, 2018, it was a closed-end, non-diversified management investment company that had elected to be treated as a business development company under the Investment Company Act of 1940, as amended.  Beginning on April 2, 2018, it was no longer registered as an investment company.  Medallion Financial's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Medallion Financial files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and the rules thereunder.  Medallion Financial traded under the stock ticker TAXI until 2016, when it changed to MFIN.

20.     **Murstein**, age 57, is a founder, Director, President and Chief Operating Officer of Medallion Financial.  Murstein resides in New York, New York.  He received compensation of approximately $3.54 million for 2014, $3.56 million for 2015, $1.92 million  for 2016, and $2.23 million for 2017.  His compensation package for those years included salary, bonus, restricted stock awards, country club membership, a driver, a car lease, parking, car insurance and social club memberships.  As of April 15, 2016, Murstein and his father Alvin Murstein, who is Medallion Financial's Chief Executive Officer (CEO), owned or controlled over 3.4 million shares, or nearly 14% of Medallion Financial's common stock, while each of the other named executives and directors owned less than 1%.  Murstein was profiled in magazines and newspapers as the public face of Medallion Financial.

21.     **Meyers**, age 55, resides in Woodland Hills, California.  Meyers is the owner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole director of Defendant

Ichabod's Cranium which, from at least 2014 through 2016, did business under the name Asymmetrical Media Strategies.

## RELEVANT ENTITY

22.    **Medallion Bank** (the "Bank" or "Medallion Bank") was established by Medallion Financial in 2003.  At all relevant times, the Bank was wholly owned by Medallion Financial.  The Bank is regulated by the Utah Department of Financial Institutions ("UDFI") and the Federal Deposit Insurance Corporation ("FDIC").  Prior to 2018, the Bank was required to be carried at fair value on Medallion Financial's financial statements.

## FACTS

I.    **Background.**

23.    A taxicab medallion is a license to operate a taxi and accept street hails.  In New York City and other cities, the number of taxi medallions is restricted by municipal authorities.  Medallions are typically financed by firms such as Medallion Financial, which focused primarily on New York City medallions, but also loaned to purchasers of medallions in Chicago, Boston, and Cambridge, Massachusetts.

24.    For decades before 2015, the price of medallions continued to increase.  In the mid-1990s, New York City medallions sold for approximately $200,000 each.  By 2011, taxi medallions were selling for $1 million or more each and, by 2013, the value of a New York City medallion had risen to $1.3 million.

25.    In 1996, Alvin Murstein and his son, Andrew Murstein, established Medallion Financial as a public company.  Medallion Financial's Form 10-K for 1996 stated that the company's "principal focus is the origination and servicing of loans financing the purchase of taxi medallions and related assets."

26.     In 2002, Medallion Financial established Medallion Bank, a wholly owned subsidiary whose intended purpose was to issue loans financing the purchase of taxi medallions and related assets" ("medallion-related loans").  These loans were originated and serviced by subsidiaries of Medallion Financial and/or third parties.

27.     In 2003, Medallion Financial purchased 159 taxicab medallions, issued by the city of Chicago, out of foreclosure.

28.     From approximately 2010 through 2015, Medallion Financial began issuing consumer loans that were unrelated to taxi medallions, and Medallion Bank began issuing consumer loans, primarily financing the purchase of recreational vehicles such as RVs.

29.     Despite Medallion Financial's efforts to diversify, the value of taxi medallions remained critical to its business from 2015 through 2017.  Both Medallion Financial and the Bank still held substantial portfolios of medallion-related loans.  Each medallion-related loan was secured by the medallion(s) purchased with that loan—and that loan became riskier and less secure as the prices of taxi medallions declined.  Medallion Financial also still held its portfolio of 159 Chicago taxi medallions.

30.     On January 31, 2017, Medallion Financial issued a press release announcing its plan "to transform the Company's overall strategy, which should allow the Company to consolidate and ultimately simplify its business for the long-term."  The press release stated that the company would no longer seek registered investment company tax treatment, and that it was "evolving toward primarily focusing on its successful Medallion Bank and consumer finance segments."  Murstein was quoted describing this evolution as a "shift in strategy."

31.     Over the course of 2015 through 2017, the value of Medallion Financial's medallion-related loans and Chicago medallions declined significantly, and its commercial loan

portfolio increased.  Throughout the period, however, the medallion-related assets still accounted for more than twice as much as any of its other investment categories (other than its investment in Medallion Bank).  The chart below illustrates these changes in the primary assets of Medallion Financial's portfolio from 2015 through 2017.

|  | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 |
|---|---|---|---|---|
| Medallion-backed loans | 311,894 | 308,408 | 266,816 | 208,279 |
| Commercial loans | 71,149 | 81,895 | 83,634 | 90,188 |
| 159 Chicago taxi medallions | 47,502 | 37,882 | 9,510 | 7,450 |

During this time frame, Medallion Financial's only other significant asset was its investment in its wholly owned subsidiary, the Bank.

32.     The Bank also held medallion-backed loans, which accounted for a substantial portion of its balance sheet.  The chart below illustrates the approximate breakdown of the Bank's portfolio among consumer loans, medallion-related loans, commercial loans and other assets, including loan loss allowances and excluding loan acquisition costs.

|  | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 |
|---|---|---|---|---|
| Consumer loans | 463,379 | 608,811 | 688,441 | 672,260 |
| Medallion loans | 364,556 | 332,149 | 261,707 | 179,868 |
| Commercial loans | 43,203 | 44,016 | 2,563 | 1,595 |
| Investment securities | 27,900 | 35,524 | 36,861 | 43,478 |

33.     In total, at the end of 2014, Medallion Financial and the Bank held a combined total of approximately $720 million of medallion-related assets, whose value declined as the market price of taxi medallions declined.  Over the next several years, the total amount of medallion-related assets decreased, but the amounts remained large enough to have a significant impact on Medallion Financial's net income or loss as valuations on those assets declined.

34.     From its initial public offering through April 1, 2018, Medallion Financial was an investment company.  Because the Bank was not an investment company, its financial results

were not consolidated into Medallion Financial's.  Instead, Medallion Financial reported the fair value of its investment in the Bank on a quarterly basis.

35.     Under both the Investment Company Act of 1940 and applicable GAAP requirements, Medallion Financial was required to determine, and report in its filings with the SEC, the "fair value" of each of its investment holdings.

36.     Under GAAP (Accounting Standards Codification ("ASC") Topic 820-20-55-1), "[t]he objective of a fair value measurement is to estimate the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions."  Accordingly, even if Medallion Financial did not plan to sell any of the loans or other investments it held, it had to value them by estimating the price at which it could sell each loan or other investment to a third party.

37.     In its periodic reports and quarterly earnings releases, Medallion Financial regularly reported its "earnings," which it defined as "net increase in net assets resulting from operations available to common shareholders."

38.     At the end of each quarter, when Medallion Financial reported its results, changes in the fair value of its assets resulted in increases or decreases to its net assets.  As Medallion Financial reported decreases in the values of its medallion related assets, a corresponding loss or expense would be included in its earnings.  Conversely, any increase in value it reported in other investments would result in gains or income in its earnings.

II.     **Medallion Financial's Stock Price Plummets As Ridesharing Apps Proliferate.**

39.     As apps such as Uber and Lyft became popular in 2014, the threat to Medallion Financial's business model became increasingly apparent.

40.     Medallion Financial's stock price fell from $17 per share in 2013 to $3 per share in 2015.  Other key financial metrics underscored Medallion Financial's distress.  For example, the company's net investment income before taxes was $15.1 million in 2014 and $16.8 million in 2015, but it reported net investment *losses* before taxes of $9.9 million in 2016 and $7.8 million in 2017.  Dividend income from the Bank to Medallion Financial also dropped precipitously, from $15 million in 2014 and $18 million in 2015, to $3 million in $2016 and $0 in 2017.

41.     The value of the collateral underlying the medallion loans similarly declined from 2014 through 2017.  For example Medallion Financial estimated the value of a New York City medallion at $315,000 as of December 31, 2017 in its Form 10-K whereas in its 10-K for the year ended December 31, 2014, it disclosed that New York City medallions sold for approximately $805,000 as of that date.

42.     Medallion Bank, which had been the crown jewel among Medallion Financial's assets, was experiencing similar declines in performance.  Its net income, for example, which was $26.3 million in 2014 and $23.7 million in 2015, plummeted to $2.0 million in 2016 and $4.6 million in 2017.  Delinquencies on the medallion loans were a primary cause for the precipitous decline in net income.  In 2015, the Bank recorded less than $5 million in medallion loan losses; in 2016, more than $56 million; and about $35 million in 2017.  The Bank had been the source of the great majority of Medallion Financial's earnings, and those earning had allowed the company to pay cash dividends to its shareholders every year.  Those dividend payments stopped in late 2016.

43.     Faced with a deteriorating stock price, an active group of short sellers, potential defaults on Medallion Financial's bank loans, and concerned investors, Murstein undertook two

fraudulent schemes. The touting scheme was intended to reverse the public perception that Medallion Financial was a poor investment because of its medallion-related assets, reducing or nullifying the impact of the short sellers' commentary.  The valuation scheme was intended to present a more favorable picture of Medallion Financial both to investors, so they would pay more for the stock, and to the company's lenders, so they would refrain from accelerating the debt or requiring refinancing on terms less favorable to the company.

## III.   Defendants' Illegal Touting Scheme.

### A.   Murstein Hires Meyers to Secretly Counter Negative Media.

44.     From 2014 through 2016, Meyers did business through Asymmetrical Media Strategies, whose web site described its "strategic crisis communications strategies" as offering "guerilla PR tactics to deliver our clients' messages."  Meyers' website also stated: "[w]e will employ any strategy or tactic you desire"; "if you are under attack from opponents seeking to destroy you, we will launch an asymmetrical, sustained, multi-front assault on them"; and "Anonymity—Attack opponents without client exposure—you are kept in the clear. . . .  Because we operate without any detectable connection to you, you may engage opponents in any way you choose, while we carry out our stealth mission to undermine their position."

45.     On December 1, 2014, Meyers emailed Murstein to say that "[t]he market clearly does not understand your business," and suggested "that you retain me to do some online PR for the company via all the financial outlets I write for."  When Murstein responded with interest, Meyers proposed "a monthly retainer where I am constantly writing about the company . . . bashing Uber, and specifically the low risk that exists to TAXI itself even if medallion process were to fall[.]"

46.     In late December 2014, Medallion Financial and Meyers, with oversight by Murstein, negotiated a consulting agreement.  Meyers provided a draft of the agreement to Murstein, who forwarded it to Medallion Financial's Chief Compliance Officer and General Counsel for review.

47.     The draft Consulting Agreement proposed by Meyers was between Ichabod's Cranium d/b/a Asymmetrical Media Strategies and Medallion Financial Corp., and it stated that Meyers was being retained to "provide[] various public relations, marketing and communications services, such as articles, blog posts . . . in order to influence public opinion with regard to company issues."  For providing these services and agreeing "to partner with [the] Company," the Agreement stated that Meyers would be paid a consulting fee of $5,000 per month.

48.     On December 18, 2014, the General Counsel emailed Meyers asking to speak.  He continued:  "[W]e're a public company and the SEC's view is that if a company engages anyone to perform social media functions the company is adopting that person's statements as its own. . . .  [D]o you know if there are ways around this SEC viewpoint?  Otherwise, I would need to put into the contract language about our review and approval of statements, etc."

49.     The final Consulting Agreement, dated as of December 19, 2014 (the "Consulting Agreement") differed from Meyers' proposed version in several respects:

      a.     It was with Medallion Consulting Services LLC, a subsidiary of Medallion Financial, rather than the parent company;

      b.     It added that, prior to the publication of any "articles, blog posts, etc.," Meyers "must receive the prior written approval of both [Medallion Financial's] President and Legal Department," who were required to "review and approve or reject" any materials; and

c.  It added that Meyers would "comply with all applicable laws and regulations . . ., including, but not limited to, the Securities Act of 1933 and the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

50.  Between December 2014 and June 2016, Meyers published over one hundred articles and over 900 comments relating to Medallion Financial, for which the company paid Meyers approximately $65,000.  Meyers never disclosed the compensation he received from Medallion Financial.

51.  Meyers' articles and comments appeared on Seeking Alpha, TheStreet.com, InvestorPlace.com, Crain's NewYorkBusiness.com and BloggerNewsNetwork.com.  He also created a blog, under the alias "Isaac Howe," at the web address www.taxitruths.com.  A list of articles identified to date that were published on those and other platforms, under Meyers' name or a Meyers alias, is attached as Appendix A; a chart summarizing the number of comments made by Meyers and a known alias on Seeking Alpha, discussing articles by Meyers and others that related to Medallion Financial, is attached as Appendix B.

52.  Meyers' articles and comments argued, consistent with what Murstein told him, that Medallion Financial was grossly undervalued, that the threat from Uber and Lyft was overstated, that Medallion Financial stock was an outstanding opportunity for value investors, and that the stock could again reach the price of $15 to $17 per share.

53.  For example, in an article on Seeking Alpha dated February 9, 2015, and entitled "NYC Data Proves Taxi Medallion Resilience; Rideshare Effect Negligible," Meyers claimed that "[t]here is no reason why TAXI stock should be selling below $10. . . .  TAXI stock should trade back to $15 once the market realizes it has overreacted."  The article stated: "I wrote this

article myself, and it expresses my own opinions.  I am not receiving compensation for it (other than from Seeking Alpha).  I have no business relationship with any company whose stock is mentioned in this article."  From February 9, 2015 through February 19, 2015, Meyers posted 29 comments in response to reactions to this article.

54.     Meyers' articles and comments also argued for a much higher value for Medallion Bank.  In an article dated August 5, 2015, entitled "Medallion Financial Delivers Again. Will the Market Ever Learn?" posted to Seeking Alpha, Meyers (using an alias) wrote that "Medallion Bank is arguably worth $595 million.  If we include realized losses, the Bank made $27 million, and is worth $459 million.  Yet Medallion Financial Corporation carries the Bank at around $160 million."  The article stated: "I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it.  I have no business relationship with any company whose stock is mentioned in this article."

55.     In at least seven Seeking Alpha articles, as shown in Appendix B, Meyers commented under both his own name and an alias.  In addition, Meyers used an alias to comment on certain articles that he had published under his name.

56.     By using an alias to write certain articles and comments, Meyers created the false impression that his opinions had greater legitimacy and support than they actually did.

57.     In addition, in September 2015, after Meyers managed to get anti-Uber articles published in both TheStreet—under the "Frederick Steier" alias—and the New York Observer— under his own name; a reporter for the Los Angeles Times was fooled, citing both "authors" for "their take" that Uber was unlikely to further steal taxi medallion market share.  Michael Hitzik, "Has Uber already peaked?", *Los Angeles Times*, Sept. 29, 2015 (available at *https://www.latimes.com/business/hiltzik/la-fi-mh-has-uber-peaked-20150928-column.html*).

58.     Meyers prepared his articles and comments in close coordination with Murstein. In some cases, Murstein sent emails to Meyers on what to write and how to respond to negative articles about Medallion Financial.  As Murstein was particularly angered by the posts of several individuals, Meyers frequently targeted these individuals with vitriolic comments.

59.     For example, on February 5, 2015, an individual with a short position in Medallion Financial ("Short Seller A") published an article on Seeking Alpha titled "Medallion Financial Corp. Loses Its Largest Institutional Investor."  After stating that a long-term institutional investor had sold its 5% stake in Medallion Financial, the author reiterated the thesis of three of his previous articles, which had suggested that the end of taxi monopolies precipitated by the entry of ride share networks "would cause billions of dollars in losses for medallion owners and financing enterprises with significant exposure to the asset class, including Medallion Financial Corporation, in particular, Signature Bank (NASDAQ:SBNY) and a large number of non-public credit unions and other specialty lenders."

60.     The February 5, 2015 article by Short Seller A concluded that Medallion Financial's "shares present an uncompelling risk profile" and were "likely to decline significantly from current levels," even as it acknowledged the company's "historically conservative lending practices in the asset class."  Meyers commented on the article, describing Short Seller A as "oblivious" to the "headwinds that face rideshare."  In another comment he wrote:  "Trying to spin data and frighten investors doesn't prove your thesis correct.  It's putting band-aids on the seeping wounds."  He repeatedly claimed that the "conversation is over" and that "the short thesis has blown up."

61.     In total, there were 227 comments on Short Seller A's article dated February 5, 2015, of which 108 were made by Meyers.  Meyers posted another five comments on the same

article under the Frederick Steier alias.  In one of these comments, on February 10, 2015, Meyers

commented that Short Seller A had been "uncharacteristically meek" about recent Taxi and

Limosuine Commission (TLC) information, claiming that it "shows your apocalyptic scenario

really isn't coming to pass, and that *Larry [Meyers] was dead-on*." (Emphasis added.)

62.     On April 9, 2016, Murstein saw an article on Seeking Alpha by "ValueSquared"

titled:  "Medallion Financial: Overstated Book Value With A Significant Near-Term Downside

Catalyst Starting With Chicago in 1Q '16" (the "ValueSquared Article").  Murstein emailed

Meyers asking him to "put out short piece tmrw and say something like…who might even be

behind that anonymous post.  You can say what I told you today . . . . [t]hat you anaylsyzed [sic]

the losses of medallions consumer division from 2003 to today… [and] losses never went very

high."  Murstein added additional points for Meyers to make in another April 9 email: "You can

also add his analysis iis [sic] flawed as it makes no mention or calculations based upon the fact

that 100% of taxis loans are personally guaranteed. . . .  They [Medallion Financial] were prudent

lenders and it shows.  There's a reason that they have never had a medallion loss.  They know

what they are doing far better than anyone else in that industry. They have learned well from

being in that industry for over 70 years."  Murstein followed up with Meyers two days later to

ask "[d]id you publish it yet?"  Meyers informed him that the Seeking Alpha publication was

pending, but that "it has also been published here," listing Medium, Blogger News and

taxittruths.org.  Murstein replied: "Please call and push Seeking Alpha to release this morning."

63.     On May 5, 2016, Meyers published an article on Blogger News Network, under

the alias "Clark Reilly," in which he suggested that Seeking Alpha had been bribed to publish

articles that were "bearish on the tax medallion financial industry," including three "extremely

bearish" articles by ValueSquared.

64.      On April 11, 2016, Meyers published (under the alias "Frederick Steier") in Seeking Alpha his response, titled "Medallion Financial: Understated Book Value With A Significant Near-Term Upside Catalyst As Shorts Rush To Cover."  Meyers' response repeated many of the points from Murstein's April 9 emails.  The article stated:  "I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it.  I have no business relationship with any company whose stock is mentioned in this article."

65.      On April 12, 2016, a broker at a large financial services firm forwarded Meyers' April 11 Seeking Alpha article to Murstein.  Murstein did not inform the broker that the article was published by Meyers at the direction of Murstein and in exchange for compensation.

66.      Meyers emailed links to Murstein of some of his articles, including the Seeking Alpha articles with the misleading disclosure about compensation, after they were published.

67.      Seeking Alpha allows users to sign up for email alerts notifying them of articles that may be of interest.  For at least some of the time in which Meyers was writing articles and comments about Medallion Financial pursuant to the Consulting Agreement, Murstein had subscribed to receive automated alerts from Seeking Alpha for articles about Medallion Financial.  For example, on April 9, 2016, Murstein received an automated alert from Seeking Alpha notifying him of the ValueSquared Article (*see* ¶ 62 above).  The email also linked to two other recent articles about Medallion Financial, including one by "Frederick Steier" titled "Positive Developments in the Taxi Medallion Financial Industry."

68.      Several of the professionals who did work for Medallion Financial, including a senior members of Investment Bank C, which Murstein hired to provide a fair value opinion for Medallion Bank (¶¶ 170-175 below), and the Auditor, also received alerts from Seeking Alpha for news and commentary on Medallion Financial.  For example, the partner in charge of the

Auditor's team working on the Medallion Financial audit, received an alert on March 13, 2015, for an article by Meyers titled "Medallion Financial 10-K: Business As Usual."  On April 9, 2016, the audit partner received an alert for the ValueSquared article and for the response by "Frederick Steier" (*see* ¶¶ 62 and 64 above).

69.     Meyers did not merely write under a variety of aliases; he used his various personas to create the false appearance that multiple individuals, with a range of backgrounds, agreed with his arguments and/or disagreed with Medallion Financial's detractors.  When he posted on Seeking Alpha, Meyers claimed that he was the CEO of a company, PDL Capital, that was a "specialty lender focusing on consumer finance" or "an entity that helps finance the sale of distressed assets to private equity firms"—in other words, an investment professional.  When posting on a blog called "Taxi Truths" under the alias "Isaac Howe," Meyers claimed to have "been in the taxi industry for more than 30 years in NYC, in many capacities."  And when he wrote on Blogger News Network, as "Clark Reilly," Meyers claimed to be a "reporter," "journalist," or "investigative journalist."  *See* Appendix A for a list of articles Meyers wrote, under his own name or an alias, and information about the accompanying disclosures of the authors' backgrounds.

70.     Meyers' articles, whether under his own name or an alias, never disclosed that he was being paid by Medallion Financial.

71.     Murstein knew or recklessly disregarded that Meyers, in his articles and posts, did not disclose the compensation he received from Medallion Financial and at times posted using aliases and/or false claims about his employment status.

72.     Meyers' paid touting on behalf of Medallion Financial largely ceased after June 2016.  On November 17, 2016, however, when Murstein received by email a Seeking Alpha

article referring to Medallion Financial's "imminent bankruptcy risk," Murstein emailed Meyers to see if Meyers was able to "get pieces published on Seeking Alpha or do you know anyone else that can?"  Meyers declined.

      **B.**      **Murstein Hires Another Contractor to Anonymously Tout.**

73.     In early 2016, Murstein became acquainted with a woman in her twenties (the "Contractor") who was looking for work.  As Murstein wanted to have another person touting on behalf of Medallion Financial in addition to Meyers, Murstein offered her an Independent Contractor Services Agreement, which Murstein and the Contractor signed.

74.     The Contractor had little to no experience with investor relations or the financial markets; as a result, Murstein instructed the Contractor to "speak with [Meyers] on what to do."  Meyers then tutored the Contractor on his methods for posting anonymously.

75.     Murstein knew from emails he received that Meyers was showing the Contractor how to post anonymously and that Meyers told the Contractor "get a fake ID from the Internet" in order to avoid having to identify herself and reveal her connection with Medallion Financial.

76.     In an April 25, 2016 email, Murstein urged the Contractor to publish an article and then asked her "What name are you using?"  The Contractor responded with her alias.

77.     On April 26, 2016, the Contractor emailed Murstein that she was "[h]appy to keep writing articles" but "it's just how we are going to publish anonymously is the question."

78.     The day after that, on April 27, 2016, the Contractor forwarded to Murstein an email from an editor at Seeking Alpha thanking the Contractor for "an interesting article" but stating that "[w]e were unable to verify your ID.  Please resubmit after uploading a scan of a valid photo ID[.]"  The Contractor asked Murstein, "What do you think I should do regarding the ID situation?"

79.     On April 28, 2016, the Contractor emailed Murstein that she was "still publishing under a pen name" and was "seeing which one of my friends will let me borrow theirs [ ID]."

80.     In an April 29, 2016, email that was forwarded to Murstein, Meyers advised the Contractor that "first you have to come up with a fake resume."  Murstein also instructed the Contractor through a text message to use a friend's name to open an account on Seeking Alpha.

81.     On May 2, 2016, Murstein emailed the Contractor that he was "just focused on you getting your articles out for now.  Have you gotten any on any web sites yet or picked up by anyone?"  The Contractor responded:  "Larry [Meyers] sent me the process I have to go through, it's kind of crazy.  In order to be a contributor I have to make up a whole person so I have to do a fake resume, everything.  This goes for basically every single website I have tried to get published on.  It's a process."

82.     In a May 4, 2016, email, the Contractor told Murstein about her efforts to get published on TheStreet.com:  "Larry [Meyers] sent me an email walking me through it. . . .  I have to make up a fake resume and apply to be a contributor, can't be anonymous but [a friend] agreed to let me use her ID so that's what I'm using now for everything."  She also told Murstein that Meyers had allowed her to rewrite some of his stories but to "just change up the wording so that plagiarism software won't detect anything."  Murstein responded, "Good update."

83.     Murstein urged the Contractor to increase the frequency of her positive  postings about Medallion.  Between May 2016 and November 2016, the Contractor published numerous articles and comments on websites, including Seeking Alpha and Huffington Post.  The Contractor was paid by Medallion Financial but never disclosed that compensation.

84.     On August 2, 2016, Murstein texted the Contractor with numerous statements about Medallion Bank and instructed her to "go to yahoo message board for MFIN," the ticker

symbol Medallion Financial's stock traded under, and "[p]ost on yahoo."

85.     On August 5, 2016, Murstein instructed the Contractor to accuse two individuals who had criticized Medallion Financial on Seeking Alpha of being "security law violators."

86.     On November 17, 2016, Murstein texted the Contractor to remind her to "[j]ust keep blogging and commenting positive stuff on Medallion," and five days later he texted her "[d]on't comment under your real name."

87.     Like Meyers' postings, the Contractor's articles and comments repeated Murstein's instructions that the Bank was undervalued and that Medallion Financial's stock was underpriced.

88.     For example, in a May 3, 2016 article published on Huffington Post, entitled "Safety in a Subsidiary: Untangling the Web of Perception Surrounding the Taxi Medallion Industry, Uber, TAXI Stock, & Medallion Financial Corporation," the Contractor wrote: "The fact of the matter is that TAXI has a hidden gem beneath its solid and consistent stance in the stock market in its subsidiary, Medallion Bank ('The Bank')."

89.     The Contractor's "Safety in a Subsidiary" article also stated:  "If the Bank is making $25m a year, easy, the best case scenario would be that their worth is, say $500 million and in the worst case $250 million, which is still much more than the total market cap, mind you. If smart investors were to dig a little deeper and do a little more due diligence they will walk away knowing that in fact, the Bank is worth double the market capital today."  At the time of this post, the Bank's reported fair value was $152 million, far below the article's "worst case" projection of $250 million.

90.     Murstein personally directed the content of the Contractor's posts.  For example, in an email to the Contractor sent on August 2, 2016, Murstein wrote:  "Things to blog and

comment about.  Please do this today:…will be a big boost to the stock price when people figure

it out. . . predicting a huge pop in their price in the immediate future."  The Contractor

immediately responded that she was "posting things now."  And in an email sent on August 2,

2016, at 1:36 p.m., Murstein told the Contractor "[f]rom now until 4pm you should just put

comments on those web sites please."

91.     In another email to the Contractor on August 3, 2016, Murstein wrote:  "Say:

Look at the bank and nothing else.  $170 mil of equity and $40 mil of pre tax earnings.  It's

worth at least $400 mil."

92.     In an audio recording, Murstein instructed the Contractor that: "I view the stock

worth at $10-$15 per share….  [T]he Bank alone is worth $20 per share….  Put this out

tomorrow."

93.     Murstein reviewed and approved many of the posts before they were published

online.  For example, on July 7, 2016, the Contractor emailed Medallion Financial's public

relations firm (the "PR Firm") regarding one article and wrote:  "Will forward to Andy

[Murstein] now so we can get the OK to publish."

94.     Murstein also reviewed articles relating to Medallion Financial after their

publication.  On one audio recording, Murstein asked the Contractor "How do I find your post?"

The Contractor also forwarded links or screen shots of articles and comments to Murstein after

publication.

95.     In 2016, Medallion Financial's web site (*www.medallion.com*) had a section

described as:  "In The News: Articles about Medallion Financial have regularly appeared in

major publications.  To view the latest Press releases, Articles and Interviews please click

below."  During 2016, the "In The News" section contained links to at least two articles written

by the Contractor:  "Melrose, Medallion and Medallions" and "Safety in a Subsidiary," both of which appeared in Huffington Post.  The author of both pieces was identified only as "Contributor" on Medallion Financial's website, and there was no disclosure that the author was paid by Medallion Financial to write those articles.

96.     Murstein acknowledged that the purpose of the touting activity was to boost Medallion Financial's stock price.  In an email to the Contractor on November 16, 2016, he wrote: "All I would like you guys to do today is to write articles and post comments on message boards to support our stock."

97.     Murstein knew or recklessly disregarded that the Contractor did not disclose the compensation she received from Medallion Financial and that the Contractor used aliases in her articles and comments about Medallion Financial.

**C.     Murstein Paid a Public Relations Firm to Anonymously Tout.**

98.     In 2016, the PR Firm told Meyers it was also willing to make similar anonymous postings promoting Medallion Financial.  As a result, Murstein also paid the PR Firm to write positive articles about Medallion Financial.  The PR Firm published at least one comment in which it claimed that "the Bank could be worth over $300 million and the Bank stock could easily be worth over $12 as a standalone company to MFIN."

99.     The PR Firm misrepresented its affiliation with Medallion Financial.  In an internal email on July 7, 2016, an individual from the PR Firm acknowledged that, when contacted by Seeking Alpha, he claimed that he was not being compensated by Medallion Financial, which was consistent with Murstein's instructions.  In a November 17, 2016, email, Murstein instructed the PR Firm to "publish under an anonymous name."  In a November 18, 2016, email, Murstein told the PR Firm that "the article shouldn't be coming from me you or the

company though.  More like an anonymous blogger."  The PR Firm also emailed Murstein on

November 16, 2016, for approval on pieces, writing "Andy, Please review the attached article for

accuracy and style."

### D.     Murstein Responds Falsely to Press Inquiries About the Touting.

100.    On November 26, 2016, a reporter for the *New York Post* emailed Murstein:

> Hi Andrew, My colleague got some information about a woman who
> works for your company.   [The Contractor] has been writing articles for
> Huff Post touting the stock price of Medallion Financial under a pen
> name.  This is not only on [sic] ethical, but experts say it is illegal.  My
> colleague reached out to [the Contractor], but I wanted to reach out to you
> as well.  How long has [the Contractor] been working for you?  What is
> her role in the company?  Did you know that she was writing for
> Huffington Post?  Did you know what kind of articles she was writing?  If
> not, how do you feel to find out she was doing this?  What are the next
> steps you plan to take?

101.    Murstein's emailed response to the reporter stated that "I am not aware of the

postings 'under a pen name' to which you are referring as potentially raising ethical and legal

issues.  Can you please send me the postings in question, and then we'll review them and get

back to you with a response."

102.    The reporter then told Murstein that the Contractor's "article[s] are listed on the

news section of your website as just Contributor."  Murstein falsely responded: "I was unaware

of the below but am now looking into it."

103.    On November 27, 2016, Murstein was interviewed by the *New York Post* reporter,

and Medallion Financial's General Counsel and the PR Firm attended.  According to notes of the

interview taken by the PR Firm, "[Murstein] said he didn't know [the Contractor] was writing

stories touting Medallion for Huffington Post under [an] assumed name and posting them

without a byline on the Medallion website," and "[Murstein] sees nothing wrong with her trying

to protect her identity, considering the viciousness of the short sellers."

104.    According to the PR Firm's notes, "the Post reporter[] said she spoke to a former attorney general who said that paying someone to tout the stock under a pen name is illegal," and Murstein responded that "in his opinion it is not illegal because everything in the articles is public information already."

105.    Murstein also falsely claimed in the interview that he knew the Contractor "had a background in marketing and PR and was recommended by an IR firm," and that the Contractor had stopped working for Medallion Financial in October 2016.

106.    On January 17, 2017, Murstein received by email another media inquiry stating that "your former IR [investor relations] head . . . used an alias . . . to post positive articles on Medallion for the Huffington Post, and also posted pro-Medallion comments on financial blogs such as Seeking Alpha and Yahoo Finance.  Doing so is a practice known as 'stock-touting' which could be a potential securities law violation."  On behalf of Murstein, Medallion Financial's General Counsel again responded falsely to the reporter that "any comments she is alleged to have posted under an alias she would have posted unbeknownst to Medallion."  On January 27, 2017, the reporter responded with an email stating the Contractor "was responsible for posting the Huffington Post articles which you subsequently placed on your website.  It is obvious that you knew what she did.  This could potentially constitute a securities law violation."

**E.**    **Murstein Paid the Contractor Hush Money to Conceal His Scheme.**

107.    Although Murstein knew that the Contractor had posted under an alias, he texted the Contractor on November 26, 2016, after he had received the media inquiries, and asked her: "Why did you post articles under a fake name?"  The Contractor responded on the same day: "Because you asked me to not use my name.  Do you want me to switch it to my name?"

108.    On December 1, 2016, Murstein texted the Contractor:  "I'm trying to get you an agreement and get you paid extra money but it won't be ready until tmrw or Monday."

109.    On December 5, 2016, Murstein and the Contractor signed a Confidential Agreement and General Release (the "Release"), in which the company agreed to pay the Contractor $15,000 in exchange for the Contractor agreeing to release Medallion Financial from all claims.  The Release also required the Contractor to falsely affirm "that she was never instructed by [Medallion Financial] or any other Releasee to write any articles, blogs, posts or comments about Medallion under a pen name or false name."

110.    Fearing that the touting would be made public, on January 18, 2017, Murstein texted the Contractor: "Our lawyers are sending you a letter that you are telling people I told you to write under a false name.  First of all there is no reason to talk to people about that.  Plus you signed something that says you aren't supposed to be talking to anyone."

111.    Neither Medallion Financial nor Murstein ever disclosed to investors that for two years Murstein had engaged and paid multiple persons to promote anonomously Medallion Financial in numerous online forums.

## IV.    Declining Financial Performance Jeopardizes Medallion Financial's Loan Facilities.

112.    Prior to 2014, Medallion Financial had relationships with at least six banks that provided long-term revolving lines of credit that were secured in part by loans and taxi medallions held in various consolidated subsidiaries of Medallion Financial.  Beginning in 2015, these lenders began reducing the amounts Medallion Financial could borrow or have outstanding under the loans.

113.    From September 2015 through August 2016, most of these loan agreements were restructured or renegotiated, limiting Medallion Financial's ability to take on new debt and, in at

least one case, requiring additional collateral.  Some lenders reduced the size of the existing

credit line or required, for the first time, that Medallion Financial reduce the loan balance by

making payments of principal in addition to interest.

114.    The loan agreements with the six banks were critical to Medallion Financial's

business.  For example, the loan agreement with Bank A stated that the loan proceeds were to be

used "to finance the general corporate purposes of the Borrower in the ordinary course of

business."  And the proceeds from the Bank B revolving credit line were to be used "to provide

funding for Medallion loans to be made by the Borrower in New York City, Chicago and

Boston."

115.    The loan agreements with Bank A and Bank B defined an "event of default" as,

among other things, losses during certain periods.  Upon the occurrence of an event of default

under Bank A's or Bank B's loan agreement, that bank and the other four lenders would have the

right to accelerate the outstanding debt, requiring immediate repayment of the outstanding

principal and interest.

116.    The agreement with Bank A stated that Medallion Financial "shall not have

Earnings less than $0 (i) in each of two (2) consecutive fiscal quarters or (ii) for any fiscal year,"

and that any such "loss" would be an event of default.  As of September 30, 2016, the

outstanding principal amount of Bank A's loan to Medallion Financial was approximately $16

million.

117.    Under the agreement with Bank B, "a Consolidated Adjusted Net Loss for any

twelve month consecutive period" constituted an event of default.  As of September 30, 2016, the

outstanding principal amount of Bank B's loan to Medallion Financial was approximately $17.7

million.

118.    Medallion Financial's other loan agreements contained similar provisions that treated an event of default under a loan agreement with any other bank as an event of default.

119.    In April 2016, Medallion Financial issued $33.6 million in notes that paid 9% interest, which represented a much higher cost of funds than had been available under the revolving lines of credit, which provided funds at approximately 3%.  According to its Form 10-Q for the period ending June 30, 2016, the note proceeds were needed for "general corporate purposes, including repaying borrowings under its revolving credit facilities[.]"

120.    As of September 30, 2016, Medallion Financial had approximately $68 million in debt arising from the loans from the six banks—and was unlikely to find an alternative source of borrowing at comparable interest rates if the repayment of its existing facilities was accelerated.

121.    Certain Medallion Financial subsidiaries had their own loans, some of which were guaranteed by Medallion Financial subsidiary Medallion Funding, LLC, and had been used to acquire and/or operate Chicago taxi medallions.  The subsidiaries that owned and operated Chicago taxi medallions owed money to three lenders, one of which was Bank C.  The Bank C loans were secured by 61 of the 159 Chicago taxi medallions that Medallion Financial owned through its consolidated subsidiaries.

122.    For a decade, Bank C had repeatedly agreed to refinance and extend its loans to the Medallion Financial subsidiaries as they came due.

123.    In late September 2016, Bank C, departing from the prior course of dealing, demanded payment of the outstanding principal of the loans.  Bank C's reason for doing so was straightforward:  given the precipitous decline in the value of the Chicago medallion collateral from $330,000 in October 2013 to approximately $60,000 in October 2016, the collateral value of the loans no longer gave the bank adequate security.

124.     On September 29, 2016, a senior officer from Medallion Bank met with Bank C's Chief Executive Officer and offered concessions, which Bank C refused.  In October 2016, Murstein made a number of unsuccessful offers to restructure the loans with Bank C.

125.     The $8.8 million in loans with Bank C matured on October 17, 2016, and Bank C filed a lawsuit against Medallion Financial's subsidiaries on October 24, 2016.  As the Chief Executive Officer of Bank C explained in the course of subsequent litigation, "at maturity, the indebtedness far exceeds the value of the medallion collateral . . . making ill-advised any further extension or modification of the Notes absent additional collateral or other credit enhancements[.]"  Murstein was personally involved in the efforts of the Medallion Financial subsidiary to refinance or obtain an extension on the promissory notes.

126.     The Bank C lawsuit had an immediate impact.  Medallion Financial had been negotiating a $25 million private debt placement at the time, which the investment banking firm canceled as a result of the litigation.

127.     As Medallion Financial prepared its financial statements for the third quarter of 2016, it was scrambling to obtain waivers from numerous lenders, including not only the lenders for the Chicago medallion subsidiaries, but also the six banks who had issued revolving lines of credit to Medallion Financial itself.  Many of its loans agreements with lenders treated an event of default under any other agreement as an event of default.  As Murstein knew, unexpectedly having to repay one loan could easily lead to a "run on the bank" scenario, where other lenders suddenly accelerated their loans and demanded repayment as well.

128.     Medallion Financial ultimately was successful in obtaining waivers from other lenders in the aftermath of its subsidaries' failure to repay the Bank C loan.

129.    But given the declining performance of Medallion Financial's business generally, it was at risk of reporting a loss for the quarter and for the twelve months ending September 30, 2016, which would have violated the covenants in its agreement with Bank B.  Such a covenant violation, like the failure to repay Bank C, created a risk that many or all of the six lenders who had extended revolving lines of credit to Medallion Financial—banks to whom Medallion Financial owed approximately $68 million as of September 30, 2016—would accelerate their loans, requiring immediate repayment.

130.    And Murstein knew, from his experience with Bank C, the concerns about taxi medallion values could cause the six banks who had loaned money directly to Medallion Financial to enforce their rights under their loan agreements more aggressively than they had done in the past.

131.    In addition to creating a risk of violating Bank B's covenants immediately, reporting a loss would have set the stage for a default under the Bank A loan covenants the next quarter, if Medallion Financial experienced losses in both the third and fourth quarters of 2016 or for the full fiscal year.

**V.     Murstein's Scheme to Increase the Bank's Fair Value.**

132.    As discussed in paragraphs 33 through 38 above, from 2014 through 2017, Medallion Financial was required to estimate the fair value of Medallion Bank on a quarterly basis, to reflect that information in its financial statements, and to reflect any changes in valuation as part of its net increase or decrease in net assets (earnings or loss) for the period.

133.    Prior to 2015, Medallion Financial had estimated the Bank's fair value as the equivalent of the Bank's "book value," which represented the bank's assets minus its liabilities. Medallion Financial's Forms 10-K explained that it did so because "Medallion Bank had little

value beyond its recorded book value."  In other words, until 2015, Medallion Financial believed

that a third party would not be willing to pay more than the Bank's book value if Medallion

Financial were to sell the Bank.

134.    Among its reasons for believing that a third party would not be willing to pay

more than the Bank's book value, Medallion Financial cited "various regulatory restrictions that

were established at Medallion Bank's inception, by the FDIC and State of Utah."  These

restrictions included the fact that the Bank was not a full-service bank, so it could not offer

checking accounts, which are highly profitable for commercial banks; that the Bank had no retail

locations, no core deposits, did not provide residential mortgages, and did not provide credit

cards; and the fact that the Bank was required to maintain its capital at a minimum of 15% of its

average assets, which was a higher leverage ratio than that required of other banks.  In addition,

the Bank was "prohibited from entering into new business lines" without regulatory approval,

and regulatory restrictions on transfers of the Bank's charter also impacted the Bank's value.

### A.      The Valuation Firm Supports A Modest Increase in the Bank's Valuation.

135.    In 2015, Medallion Financial changed its approach to determining the fair value

of the Bank.  Specifically, it concluded, for the first time, that a third party likely *would* be

willing to pay more for the Bank than its book value.

136.    To support its change in approach, Medallion Financial hired a third-party

valuation firm (the "Valuation Firm") to perform a fair value analysis of the Bank for the 2015

fiscal year end.  The Valuation Firm was a specialist with substantial experience in bank

valuations.

137.    The Valuation Firm provided an opinion of the fair value of the Bank as of

December 31, 2015, which was consistent with the reported fair value in its Form 10-K for 2015.

The Form 10-K for 2015 reported Medallion Bank's fair value at about $152.1 million, and the

Form 10-Q for the second quarter of 2016 reported Medallion Bank's fair value at $166.4 million.  Both valuations, which were consistent with the values estimated by the Valuation Firm, were about 11% over book value.

**B.**     **Murstein Goads Other Financial Firms to Endorse His Valuation Number.**

138.     In October 2016, at a time when allowing Medallion Financial to report losses could result in defaults on the loan covenants, which Murstein understood could have serious consequences for Medallion Financial, Murstein sought to drive the Bank's fair value even higher above book value.  He therefore set out to manufacture an artificial market demand for Medallion Bank at the price that he determined.  To this end, Murstein initiated contact with four financial firms hoping to generate support for his valuation number.  Murstein did not tell these firms that the purpose of his contact was to generate support for an increased valuation with the Auditor and the Valuation Firm.

139.     The contacts followed a similar pattern.  An email by Murstein would propose a future transaction involving a sale of all of a piece of the Bank at a number dictated by Murstein.  Murstein would then ask for something in writing expressing support for his valuation number.  At that point, the discussions about a transaction would go no further because Murstein's purpose was not to negotiate the transaction, but rather to mislead the Valuation Firm and the Auditor.

140.     On October 17, 2016, Murstein sent Investment Bank A and Investment Bank B identical emails stating that:  "[W]e were approached by an investment bank asking if we are interested in selling a minority stake in our bank to their client. . . .  I think we should pursue this or possibly sell it to another investor.  Using other potential comps our bank would be worth well

over $300 million. . . .  [C]ould you quickly put together a rough valuation for our bank. . . .
Once we review it [the valuation] we can discuss engaging your firm."

141.     Within days, Investment Banks A and B—incentivized by the prospect of
investment banking fees—both responded.  Investment Bank A  emailed Murstein a letter and
summary that stated that "it is reasonable to assume a valuation range of $185MM - $325MM"
and that $300 million was "a reasonable proxy for a control sale price" but that this view was
"tempered by regulatory uncertainty" that any transaction would receive approval.  Investment
Bank B responded with a "potential valuation analysis" listing a range of valuations of the Bank
up to $371 million.

142.     Next, on October 28, 2016, Murstein emailed the president of another Utah
industrial bank and asked:  "Do you feel that you would be able to value Medallion Bank at $200
million?"  Murstein repeated his request in another email to the industrial bank on October 29,
2016:  "[S]end me an email Monday saying your [sic] interested in discussing a valuation above
$200 mill[ion] with us.  I personally think it's worth a lot more but if I get the email saying that
we can discuss everything on the phone or in person."

143.     On October 30, 2016, the bank president emailed Murstein a one-sentence
response:  "We are good at 200."

144.     The industrial bank never pursued the transaction with Murstein, but internal
emails show it was highly skeptical the Bank should be valued at $200 million.  In late
November 2016, the industrial bank prepared an offer letter to be sent to the Bank's Board of
Directors offering $123.7 million in cash—not $200 million—to purchase the Bank.  The draft
letter, which was not sent, noted that this proposed offer was "lower than our previously
submitted indication of interest" but stated that this was appropriate given recent financial

disclosures by Medallion Financial.  In an internal email dated November 21, 2016, an employee

of the industrial bank stated:  "I think Murstein used us, when he requested we give him a $200

million value on the bank so that he could justify not writing it down[.]"

145.    Murstein's final effort at generating support for his valuation occurred in

December 2016, when Murstein tried to revive stalled negotiations with a consumer lender over

a loan participation program.  Murstein introduced a new term into the deal which would require

the consumer lender to acquire a 2% interest in the Bank, and that for this purpose "Medallion

Bank will be valued at 10 times 2017 projected earnings of $35,000,000 or $350,000,000."

146.    On December 13, 2016, Murstein emailed the consumer lender that "the

investment in the bank is a big part of the deal for us."  As Murstein stated in an internal email

dated December 15, 2016, "[T]he valuation that the bank will receive [from the consumer lender]

is very high. . . .  [I]t should also greatly help the parent[ ]  company stock price."

147.    In late December 2016, however, the consumer lender notified Murstein that it

was ending the negotiations, but would consider revisiting the small equity investment if another

loan participation or partnership arrangement between the parties could be arranged in the future.

148.    Murstein tried to use these contacts as support for his increased valuations.

Murstein never told the Auditor, however, that he initiated these contacts and provided the

valuation numbers to the firms.  Murstein also did not tell the firms that he would provide their

responses to the Auditor as support for the increased valuation.

149.    The Auditor, however, emailed Murstein on October 24, 2016, that Investment

Bank A's summary was "a 'pitch' document with appendices rather than a valuation" and "does

not support the increase in value in the 3rd quarter of 2016."  In an October 31, 2016, email to

Murstein, the Valuation Firm dismissed Investment Bank B's analysis as "a pitch document" not justifying an increase in the Bank's fair value.

150.    Regarding the industrial bank, Murstein forwarded the "good at 200" email to his CFO and declared: "[t]his is the final clincher.  [The industrial bank] has been talking to us about buying our bank and just sent this email of at least two hundred million dollars.  This should be an easy valuation for us to convey to the auditors."  Murstein then forwarded this email chain to the Auditor.  The Auditor, however, responded that the "good at 200" email "doesn't offer much context" and asked for more information "that would make this a bonafide offer."

151.    A Medallion Bank official was also skeptical of the proposed deal with the consumer lender, and advised Murstein in a December 15, 2016, email that "it would be best to resolve our medallion problems before we enter into the strategic partnership business," which he estimated would be twelve months in a best case scenario.

152.    Murstein disagreed, prompting a Bank executive to be more candid to Murstein: "Volatility is the enemy of this mission. . . .  The volatility introduced by ride-share means that, in the best case, the bank only loses millions of dollars working through it. Worst case, we lose *hundreds* of millions-and the odds of this outcome remain too high. . . .  The strategic partnerships business adds to the volatility of the bank. . . .  [T]he reputation/regulatory/legal/operational risks remain enormous in our eyes."

153.    Murstein, however, was not primarily interested in the strategic partnerships but rather in generating support, however tenuous, for an increased valuation of the Bank that would elevate Medallion Financial's stock price and avoid defaults on its covenants.

### C.  **For 3Q 2016, Murstein Pressures the Valuation Firm to Increase Fair Value.**

154.    When the Auditor told Murstein that another fair-value opinion was needed for the third quarter of 2016, Murstein sought to have the Valuation Firm increase the Bank's value to $193 million.

155.    On October 31, 2016, the Valuation Firm emailed Murstein that:

[T]here is not material information that [the Valuation Firm] can place significant weight on in changing our prior valuation methodology to conclude with a higher value.  The potential sale of the Bank to a third party could receive significant weight if you were far along in a transaction in terms of diligence, vetting with the regulators, and the presence of at least a term sheet and/or definitive agreement.

156.    On November 1, 2016, Murstein wrote the Valuation Firm:  "I would like to give this one more shot before we throw our long term relationship away.  I assume if we signed a letter of intent…stating the value of Medallion Bank would be a minimum of $200 million you would be able to sign off on our valuation."

157.    The Valuation Firm, however, told Murstein, over several emails, that the purported transactions were too tenuous to form the basis of any valuation analysis—noting specifically that any sale would first need to include due diligence, including a review of the Bank's loans.

158.    On November 1, 2016, Murstein responded that the Valuation Firm was "going out of [its] way not to be reasonable" and that the Valuation Firm's refusal to accept Murstein's valuation evidence "will now greatly effect [sic] our relationship going forward."

159.    Despite Murstein's pressure, the Valuation Firm refused to increase the fair value of the Bank, and responded to Murstein that "we have prior valuations that have been reviewed and approved by the Board . . . based on lower earnings . . . and there does not appear to be rationale to change the multiple, such as lower perceived risk . . ."  The Valuation Firm also told

Murstein that a valuation analysis had to "consider that the recent trajectory of asset quality and earnings is negative."

160.    In an internal email dated November 1, 2016, an executive at the Valuation Firm was more explicit:  "[W]e have ample recent evidence that medallion loans are souring (Signature Bank, BankUnited, etc.). . . .  Noncurrent loans have increased 101 basis points in one quarter alone since your last valuation. . . .  This is a strong argument for value of the bank declining, not increasing."  In another internal email dated November 2, 2016, an executive at the Valuation Firm wrote:  "Unfortunately at this point, if you have not done so already, you have to let him [Murstein] know that unless he is agreeable to [the Valuation Firm] independently valuing Medallion Bank, he is going to have to go elsewhere.…  Wish I had another solution but I think we have lost the client to maintain our integrity and avoid potential liability."

### D.    Rejecting the Auditor's Advice, Murstein Fires the Valuation Firm.

161.    On November 1, 2016, after the Valuation Firm refused to provide a valuation of $193 million for Medallion Financial's third quarter Form 10-Q, Murstein fired the Valuation Firm.

162.    Murstein fired the Valuation Firm against the advice of the Auditor.  On October 21, 2016, the Auditor emailed Murstein:  "[The Valuation Firm] is necessary.  On a quarter to quarter basis the methodology should not change.  Especially when supporting an increase of this size, we will need additional support."  On October 24, 2016, the Auditor emailed Murstein that "your current valuation firm" should "conclude on a value."

163.     The Valuation Firm also advised Murstein of the importance of maintaining consistency in an October 31, 2016 email: "we are tied to the prior valuation methodology in the absence of compelling new information that we would be required to consider."

164.     On November 2, 2016, Murstein emailed the Auditor that he was "done with [the Valuation Firm.]"  Murstein—after complaining that the Auditor was "costing us significant dollars to obtain these valuations"—then misrepresented to the Auditor the reasons that he fired the Valuation Firm:  "They have been difficult to work with for quite some time.  They are too small for a transaction of this size."

165.     The Auditor pushed back, telling Murstein:  "The key here is to bridge the gap from your prior quarter's valuation, and utilize known methods (hopefully consistent methods) from the prior quarter to evaluate the fair value for this quarter. . . .  I would recommend that you continue to utilize the same third party specialist quarter-after-quarter."

166.     Murstein rejected his Auditor's advice, and did not disclose to the Auditor that he fired the Valuation Firm because it refused his demand to increase the Bank's fair value.

167.     GAAP principles (ASC 820-10-35-25) provide that "[v]aluation techniques used to measure fair value shall be applied consistently."

168.     By firing the Valuation Firm and using a new firm that used different assumptions and inputs from what had previously been used, without justification or evidence that it would produce a value more representative of the Bank's fair value, Murstein and Medallion Financial violated GAAP.

**E.     Murstein Entices Investment Bank C Firm to Provide a Valuation.**

169.     After firing the Valuation Firm, Murstein immediately began opinion-shopping for a more compliant firm.

170.     On November 1, 2016, Murstein sent Investment Banks A and B, as well as a

third investment bank ("Investment Bank C"), identical emails stating:

> Do you think you can issue something like this report [attaching the Valuation Firm's 2Q
> 2016 report] indicating the bank is now worth at least 1.3 times book value or $193
> million.  I believe it is worth substantially more but that is the minimum amount that
> needs to be confirmed right now for us to work with you to potentially sell a portion of
> the bank.  Thank you.

171.     Investment Banks A and Bank B did not respond to Murstein's email.

172.     An employee of Investment Bank C, however, responded within minutes:  "I have

little doubt that we can."

173.     Investment Bank C did not typically provide valuation opinions for public

company audits.  It agreed to do so largely because of the incentive offered by Murstein to "sell a

portion of the bank," which was much more lucrative than providing a valuation.

174.     The *quid pro quo* arrangement that Murstein offered—providing a pre-determined

valuation number dictated by Murstein in exchange for investment banking work—was not

disclosed to the Auditor or to investors.

175.     In order to reach the valuation number that Murstein demanded for the third

quarter Form 10 Q, Investment Bank C did not use assumptions and inputs that were consistent

with the Valuation Firm's earlier reports.  Instead, Investment Bank C changed key assumptions,

including the discount rate used to estimate the present value of future cash flows, in order to

obtain the higher fair-value number that Murstein directed.

### F.     The Misleading Last-Minute Justifications for the Bank's Increased Value

176.     Due to Murstein's abrupt firing of the Valuation Firm and hiring of Investment

Bank C, Medallion Financial had to rush to meet its filing deadline for its Third Quarter 2016

10-Q, which was scheduled to be filed on November 9, 2016.

177.    On November 9, 2016, the Auditor emailed Murstein that the "due date of the [Form 10-]Q is today" and the Auditor still had not received "management's valuation memo that specifically deals with the reasons for the [Bank's] increase in [fair] value this quarter[.]"

178.    The Third Quarter 2016 Valuation Memo, signed by Murstein, was emailed to the Auditor that afternoon, just hours before the Form 10-Q became public.

179.    Also on November 9, 2016, the auditors for the first time received a draft of the Third Quarter 2016 10-Q that described Medallion Financial's justifications for increasing the Bank's estimated fair value.

180.    Medallion Financial's Third Quarter 2016 10-Q's Management's Discussion and Analysis ("MD&A") provided three justifications for the increases in the Bank's fair value:

    a.    "In the second quarter of 2015, we first became aware of external interest in Medallion Bank and its portfolio assets at values in excess of their book value. Expression of interest in Medallion Bank from both investment bankers and interested parties has continued through 2016"; and

    b.    "[I]n the third quarter of 2016 there was a court ruling involving a marketplace lender that the Company believes heightens the interest of marketplace lenders to acquire or merge with Utah industrial banks."

181.    The MD&A further stated that Medallion Financial had "engaged a valuation specialist to assist the Board of Directors in its determination of Medallion Bank's fair value."

182.    These false and misleading disclosures in the MD&A appear to have originated with the valuation memorandum that Murstein signed in November 2016, and that was provided to the Auditor just before the third quarter Form 10-Q was filed.

183.     Murstein was involved in the preparation of Medallion Financial's statements in the Form 10-Q about valuation.  On November 7, 2016, he reviewed a draft of the Form 10-Q, which attributed the increase in the Bank's value solely to the "external interest in the Bank and its assets at values exceeding their book values.  On November 9, 2016—the day the Form 10-Q was filed—Medallion Financial's General Counsel emailed the engagement partner at the Auditor with revised proposed disclosure that included the third quarter 2016 court ruling and more details on the purported expressions of interest in the Bank.  When the Auditor responded with comments, they were forwarded to Murstein for approval.

184.     Both the reasons for the Bank's significant valuation increase, and the statement about the role of the "valuation specialist" in determining the Bank's fair value, were false or misleading, as Murstein knew or recklessly disregarded.  A reasonable investor would find the company's explanations of the reasons for the Bank's increases in fair value, and the role of a third party valuation specialist, to be material.

185.     *First*, Murstein knew that the "expressions of interest" from third parties were not appropriate as a basis for a fair value calculation.  This is what the Valuation Firm and the Auditor told him.  No sale ever occurred, and none of the purported bids went beyond the rote recital of Murstein's inflated valuation number.  None of the third parties even conducted due diligence.  In fact, the "expressions of interest" were manufactured by Murstein not to sell the Bank but to create the illusion of genuine market interest in order to justify the Bank's inflated fair value.  Murstein omitted this material fact from his disclosures to Medallion Financial's auditors and, as he knew or recklessly disregarded, this material fact was not included in Medallion Financial's Third Quarter 2016 Form 10-Q.  To the extent that Medallion Financial's disclosures reflected opinions about the "interest" of third parties and/or the relevance of such

"interest" to the Bank's valuation, those opinions were not honestly held and/or knowingly or recklessly omitted material facts whose omission made the opinion statement misleading to a reasonable person reading the statement fairly and in context and without all material information.

186.    *Second*, the "court ruling" the MD&A referred to, *Consumer Financial Protection Bureau v. CashCall, Inc.,* No. 15-cv-7522-JFW (C.D. Cal. Aug. 31, 2016), had nothing to do with the Bank.  As emails show, on the afternoon of November 9, 2016—the same day the Form 10-Q was filed—the reference to the *CashCall* decision was inserted as a last-minute rider to the MD&A.  Medallion Financial did not conduct a meaningful inquiry concerning the likely impact of the court ruling, or its relevance to the interest of marketplace lenders in acquiring Utah industrial banks, before including this statement in the Third Quarter 2016 10-Q.  Rather, the statement in the Form 10-Q about the significance of the court ruling reflected an off-the-cuff judgment.

187.    *Third,* the disclosure that Medallion Financial used "a valuation specialist" was false and misleading.  In fact, Medallion Financial used three different valuation firms that used different methods and inputs.  The disclosure also omits, among other things, that Murstein fired the Valuation Firm against the Auditor's advice, hired Investment Bank C by offering it banking work in exchange for valuing the Bank at a certain number.

188.    In addition, the failure to disclose the process by which the valuation specialist was retained, and the fact that its retention for both the valuation engagement and potential future investment banking work depended on its willingness to support Murstein's desired valuation, was a material omission that rendered Medallion Financial's statement about the fair value of the Bank misleading.  Medallion Financial either did not honestly believe the valuation they

included in the Third Quarter Form 10-Q, or they knowingly or recklessly omitted material facts whose omission made the opinion statement misleading to a reasonable person reading the statement fairly and in context.

189.     These false and misleading disclosures in the MD&A closely track the valuation memorandum that Murstein signed in November 2016, and that was provided to the Auditor just before the third quarter Form 10-Q was filed.

G.     **The Valuation Scheme Avoided a Default on the Loan With Bank B.**

190.     If Medallion Financial had not increased the Bank's fair value for the third quarter of 2016, and had simply used the same $166 million that it had reported for the second quarter of 2016, then it would have incurred a loss of approximately $4 million for the twelve months ended September 30, 2016, which would have violated the Bank B's covenant described in ¶ 117 above.  In addition, they would have incurred a loss of approximately $22 million for the third quarter of 2016.

191.     The chart below illustrates the impact on Medallion Financial's net earnings or loss from the artificial inflation in the Bank's value.  The "As Reported" column is derived from amounts reported in Medallion Financial's periodic reports for the last quarter of 2015 and the first three quarters of 2016.  The "adjustment" and "as adjusted" columns reflect the results that would have occurred if the Bank had maintained the $166 million valuation used for the second quarter of 2016, instead of increasing it.

|  | Twelve Months Ended September 30, 2016 (in thousands) | | |
|  | As Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Net investment income (loss) | $    1,387 | | $    1,387 |
| Net Realized Gains (Losses) | (947) | | (947) |
| Net change in unrealized appreciation on Medallion Bank and other controlled subsidiaries | 47,763 | $    (27,365) | 20,398 |
| Net change in unrealized appreciation (depreciation) other investments | (24,834) | | (24,834) |
| Net increase (decrease) in net assets | $    23,369 | $    (27,365) | $    (3,996) |

## VI.   Medallion Financial Failed to Take Into Account Key Facts Concerning the Fair Value of its Non-Bank Medallion-Related Assets.

192.    During 2016, both Medallion Bank and Medallion Financial had loans that were collateralized by taxi medallions in both New York and Chicago.  In addition to these loans, Medallion Financial also owned some Chicago medallions outright.  In 2016, the value of medallions was declining precipitously, but the drop was particularly significant in the Chicago medallion market.

### A.    Medallion Fails to Account for Changes in Chicago Medallion Prices.

193.    As of September 30, 2016, the Bank and Medallion Financial assumed that the fair value of Chicago taxi medallions was $120,000, which was almost twice the price at which transactions had occurred during the quarter.  Medallion Financial and Murstein knew about the actual transactions because, among other reasons, they closely monitored transactions occurring in the market place.

194.    As Medallion Financial and Murstein were aware, including from the negotiations with Bank C and other sources, sufficient and readily available comparable sales data suggested that Chicago medallions had a value of $60,000 or $65,000 each as of September 30, 2016. Murstein was also aware, based on reports it had received from an investor analyst firm and

other sources, that at least one comparable bank had already reduced the value of its Chicago medallions to $60,000 each.

195.    On October 27, 2016, the Bank filed a report, which was available to the public and reviewed by banking regulators, referred to as "Call Report."  The Call Report indicated that the Bank had a reserve for loan losses of approximately $32.6 million.  This reserve estimated the amount of loans on the Bank's balance sheet that it was unlikely to be able to collect.  In calculating its loan loss reserve, the Bank had used an estimate, provided to it by Medallion Financial, of $120,000 for the collateral value of a Chicago taxi medallion.  This is the price at which the Bank assumed it could sell the medallion if it took ownership of the medallion due to a borrower defaulting on the loan.  Any proceeds it received would reduce or possibly cover any losses the Bank would otherwise incur due to non-payment of the loan.

196.    On November 8, 2016, as Medallion Financial was finalizing its Form 10-Q filing for the period ending September 30, 2016, Murstein and other Medallion Financial executives were notified that the FDIC and/or UDFI, the Bank's regulators, had expressed concern about ███

██████████████████████████████████████████████

████████████████████.  They were warned that the regulators were

Redacted - FDIC/UDFI Material

███████████████████████████████████████ They were

told that the Bank had argued that the "recorded Chicago market sales weren't true or at arm's length transactions," but that the bank regulators ████████████ and would not ████████████

████████████████████████████████

197.    Medallion Financial did not have, Redacted - FDIC/UDFI Material ,

evidence that the Chicago market sales were not true arm's length transactions.  Nevertheless,

when estimating the value of its Chicago taxi medallions and its loans backed by Chicago taxi medallions, Medallion Financial assumed a market price per medallion of $120,000.

198.     Despite the known sales transactions indicating a value far lower than $120,000, Medallion Financial estimated the fair value of the Chicago taxi medallions it owned at $120,000 each.  Medallion Financial and Murstein disregarded comparable sales when calculating the fair value of the Chicago medallions in an effort to avoid materially impacting Medallion Financial's financial statements.

199.     Medallion Financial also assumed a value of $120,000 per Chicago taxi medallion when estimating the fair value of the Chicago medallion-backed loans in its portfolio.  Because the fair value of these loans depended in part on the value of their collateral, the use of an inflated market price for the Chicago medallions backing these loans resulted in an inflated valuation for the loans.

200.     Murstein signed a valuation memo, provided to the Auditor on November 9, 2016 (the "Third Quarter 2016 Valuation Memo"), that stated that the average sales price of a Chicago taxi medallion in November 2016 was $64,700.  Asserting that the market was "illiquid at this moment," the memo stated that Medallion Financial had valued its 159 Chicago medallions using cash flow models.  The memo also stated that the company's own cash flow models generated a value of approximately $105,000; it did not explain why the higher value of $120,000 was used.

201.     GAAP requires that an entity use appropriate valuation techniques, maximizing the use of relevant observable inputs when estimating an asset's fair value.  ASC 820 categorizes inputs used to estimate fair value as either level 1, level 2 or level 3, with level 1 being the most observable, level 2 less observable, and level 3 considered unobservable.  Prices from

transactions that occur in an active market are considered "level 1" inputs.  In a market that is not active, such transaction prices are considered "level 2" inputs.  Unless the entity preparing the financial statements has determined that a transaction is not "orderly," however, it "shall" take into account, and give some weight to, the transaction price.

202.    As noted in paragraph 197 above, Medallion Financial did not maintain records showing why the transaction prices for Chicago medallions in and around the third quarter of 2016 should not be used as inputs to the fair value of the Chicago medallions.

203.    In its Third Quarter Form 10-Q, Medallion Financial disclosed that it had valued 154 Chicago taxicab medallions at $18,480,000, or $120,000 per Chicago medallion.  It misleadingly suggested, however, that "[t]ransfer prices of Chicago medallions" were "N/A" as of September 30, 2016.  This disclosure was misleading because it suggested that relevant transactions did not exist or were not relevant.  In addition, it omitted the material facts that relevant transactions had occurred during the quarter, that Medallion Financial had no evidence demonstrating that the transactions were disorderly, and that Medallion Financial had ignored them without a reasonable basis for doing so.

204.    Although the Third Quarter Form 10-Q disclosed that Medallion Financial had used "cash flow analysis" to value the Chicago loans, it did not disclose that the cash flow analysis suggested a fair value of as much as $15,000 lower, per medallion, than the $120,000 value actually used in preparing Medallion Financial's financial statements for the quarter.

**B.**    **Failure to Estimate Fair Value for Performing or Slightly Overdue Loans.**

205.    Medallion Financial also failed to consider the factors described in its periodic reports when estimating the fair value of its medallion-backed loans.

206.    According to its annual and quarterly periodic filings from 2015 through 2017, Medallion Financial considered "the nature and realizable value of any collateral, the portfolio company's earnings and its ability to make payments on its indebtedness, the markets in which the portfolio company does business, comparison to publicly traded companies, discounted cash flow, comparable sales and valuations of companies similar to the portfolio company, regulatory factors that may limit the value of the portfolio company, and other relevant factors."

207.    As Murstein's November 2016 valuation memorandum states, however, Medallion Financial calculated the value of loans at par (*i.e.*, the amount of outstanding principal) so long as the loans were performing.  Medallion Financial concluded that loans were performing if the loan payments were not more than ninety days past due and/or lacked other indicia of distress (such as bankruptcy of the borrower or troubled debt restructuring).  Not only was this approach inconsistent with Medallion Financial's disclosures to investors, it also was contrary to fair-value accounting principles, which required all loans to be fair valued, regardless of their payment status.

208.    Given the significant decline in the value of medallions—the collateral for the loans—throughout 2016 and 2017, this valuation methodology did not approximate fair value. Medallion Financial nevertheless claimed, in its financial statements filed with the Commission, that its loans were "considered investment securities under the 1940 Act" and "reported at fair value" in accordance with ASC 820.

209.    The summary of significant accounting policies in Medallion Financial's Form 10-Q for the third quarter of 2016 (the "Third Quarter 2016 10-Q") stated:  "In determining the fair value [of the loans], the Board of Directors considers factors such as the financial condition of the borrower, the *adequacy of the collateral*, individual credit risks, cash flows of the

borrower, *market conditions for loans* (e.g. values used by other lenders and any active bid/ask market), historical loss experience and the relationships between current and projected market rates and portfolio rates of interest and maturities."  (Emphasis added.)

210.    Medallion Financial, however, failed to do such a fair value analysis, even when it was aware that both the "adequacy of the collateral" and "market conditions for loans" had deteriorated significantly.  Importantly, Medallion Financial had sales data that showed the value of taxi medallions—the collateral that supported its medallion-backed loans—had declined in both of the company's major markets, New York and Chicago.  Between the end of 2014 and the end of 2017, New York medallion sales prices had declined by approximately 60 percent, and Chicago prices had declined by over 80 percent.

211.    Medallion Financial and Murstein knew or recklessly disregarded that Medallion Financial was not carrying the medallion-backed loans at fair value but was instead significantly overvaluing the loans given their significantly increased risk profile.  Medallion Financial's reported weighted average loan-to-value ratios climbed to over 130%—meaning that the outstanding loan principal was substantially higher than the collateral value and indicating that the loan was significantly riskier than it had been in 2014, when the ratio had been approximately 60%.  Medallion Financial and Murstein knew that other holders of medallion-backed loans had begun to mark their loans down to collateral value, even when those loans were less than 90 days past due.

212.    Medallion Financial knew that the loans were significantly riskier by 2016 and that market conditions had significantly worsened but failed to consider that changing landscape when calculating the value of its loans.

213.    Medallion Financial knew that its public disclosures were inconsistent with its actual practices concerning the valuation of medallion-backed loans that were performing or less than 90 days past due.  Murstein, who was on Medallion Financial's Investment Committee and signed the valuation memoranda provided to the Auditor, knew it too.

**VII.    Additional Misleading Disclosures in the 2016 Form 10-K.**

214.    Murstein and Medallion Financial continued the valuation scheme, and the failure to fair value loans that were up to 90 days past due, as they finalized the company's financial statement and periodic report for the quarter and fiscal year ending December 31, 2016.

   **A.    The Bank Regulators Concluded** Redacted - FDIC/UDFI Material

215.    In July 2016, the FDIC and UDFI conducted a two-week "visitation" to assess Redacted

216.    In the Fall of 2016, the FDIC and the UFDI conducted a joint examination of Medallion Bank.

217.    After concluding their examination, the FDIC and UFDI issued a Safety and Soundness Report of Examination dated January 27, 2017 (the "Report").  The Report states that Redacted - FDIC/UDFI Material

The Report also stated that Redacted - FDIC/UDFI Material ," and that Redacted - FDIC/UDFI Material

218.    The Report also noted a Redacted - FDIC/UDFI Material in the value of Chicago medallions, and noted that management had Redacted - FDIC/UDFI Material

**Redacted - FDIC/UDFI Material**. The Report further stated, however, that **Redacted - FDIC/UDFI Material**.” The Report also stated that the **Redacted - FDIC/UDFI Material** The Report recommended that **Redacted - FDIC/UDFI Material**

219.    The Report also raised **Redacted - FDIC/UDFI Material**

220.    As a member of Medallion Bank's Board of Directors, Murstein was required to sign and date the Reports attesting that he "personally reviewed the contents."

221.    Based on the bank regulators' feedback, on January 24, 2017, the Bank filed a restated Call Report for the period ending September 30, 2016.  The restated call report showed an increase in the Bank's loan loss reserve from $32,673 to $43,767 and a decrease in the Bank's reported income before income taxes from $21,820 to $10,726.

222.    After the Bank restated its Call Report and increased its loan loss reserve, Investment Bank C was asked to consider whether the change impacted its estimate of the fair value of the Bank.  Investment Bank C had originally estimated a fair value in the range of $191 million to $271 million, and Medallion Financial had used $193 million—close to the bottom of

the range—as the value of the Bank when it calculated Medallion Financial's quarterly results. As Medallion Financial had noted in its Form 10-Q for the third quarter of 2016, however, a change in that estimate might require the company to change that valuation and amend its quarterly filing.

223.    After the Call Report was restated, Investment Bank C decreased its estimate of fair value to $156 million to $250 million.  Medallion Financial concluded that an amendment to its Form 10-Q was not necessary, because the valuation used in the original Form 10-Q was within the revised range.  However, Medallion Financial's reported valuation for the Bank was roughly "41% up the range" of Investment Bank C's revised valuation, whereas it had been at the low end of the original range.

224.    Although it did not amend its Form 10-Q based on the change in the Bank's reported income and loan loss reserves, Medallion Financial did disclose in its Form 10-K for the year ending December 31, 2016 that "[i]n connection with a recent examination, the regulators required Medallion Bank to take additional loan loss reserves for the quarter ended September 30, 2016 and to file a restatement of its previously filed regulatory report for such period in January 2017."

**B.      Medallion Financial Filed a Misleading Form 10-K for 2016.**

225.    As the end of the fiscal year approached, the bank loan covenants discussed in paragraphs 112 through 127 above remained a concern for Medallion Financial.  Sticking with the approach used by the Valuation Firm in 2015 and early 2016 would have risked violating not only Bank B's covenant, which treated "a Consolidated Adjusted Net Loss for any twelve month consecutive period" as an event of default, but also Bank A's covenant, which treated a loss in any fiscal year as a default.

226.    For the quarter ending December 31, 2016, Medallion Financial increased the valuation of Medallion Bank from $193 million to $280 million.  The overall increase totaled approximately $110 million in only six months, which meant that the fair value had changed from approximately 11% greater than book value to more than double book value.

227.    The increase in the value of the Bank to $280 million as of December 31, 2016, was again driven by Murstein's pressure on Investment Bank C.  Murstein had already determined the value he wanted to report for the Bank and conveyed that value to Investment Bank C before they had done the valuation analysis.  Because of the continued deterioration of medallion values, in this quarter, another $27 million increase would not be sufficient to avoid a loss for the year.  Even with the $87 million increase of the Bank's value during the quarter, Medallion Financial only recorded a net increase in net assets of $23.5 million for the year.

228.    The Bank's reported fair value as of December 31, 2016, of $280.6 million, was nearly four times greater than the market capitalization of its parent company, Medallion Financial, which was $73 million as of that date.

229.    The Bank's valuation for the period ending September 30, 2016, had been approximately "41% up the range" of the revised estimate provided by Investment Bank C after the required restatement of the Bank's loan loss reserve.  In a late January 2017 email exchange between Murstein and Medallion Financial's CFO, the two discussed the need for the valuation of the Bank for the following quarter, December 31, 2016, to also be 41% "up the range."  The CFO then told Murstein that "the $280 MM for this valuation needs to be roughly 41% up the range they derive as well."

230.    Murstein discussed potential valuation ranges with the CFO, concluding "[d]epends on the range, but for example $239 to $339 puts it right at 41%.  Other ranges would work too."

231.    Murstein then forwarded that email exchange to Investment Bank C, with the note "see [b]elow."

232.    Investment Bank C's report as of December 31, 2016, issued on March 1, 2017, concluded that the fair value of the Bank ranged from $262 million to $309 million.  (A value of $280 million was approximately 41% "up the range" provided by the Investment Bank.)

233.    Medallion Financial's 2016 Form 10-K, in its MD&A, gave the same three reasons for the increase in the value of the Bank as the third quarter Form 10-Q.  Like the Form 10-Q, it did not disclose the fact that the "expressions of interest" from third parties had been solicited and did not reflect offers made post due diligence; that management's purported opinion of the significance of the "court ruling" was an off-the-cuff view that lacked a reasonable basis; or that Murstein had provided Investment Bank C with specific instructions on the valuation he wanted their work to produce.

234.    As Murstein knew or recklessly disregarded, Medallion Financial's reported fair value for Medallion Bank was overstated by approximately $110 million at year-end 2016.

235.    As Murstein also knew or recklessly disregarded, Medallion Financial's Form 10-K was inaccurate when it represented that the company engaged in a fair value analysis of its medallion portfolio, when, in fact, it did not perform a fair value analysis for most loans that were up to 90 days past due.

236.    Murstein signed the 2016 Form 10-K in his capacity as President and member of the Board of Directors.

**VIII.    False and Misleading Disclosures in Medallion Financial's
2017 Forms 10-Q and 10-K.**

237.    For the second quarter of 2017, Investment Bank C provided another report but made clear that the report was not an independent fair-value determination:  "For the avoidance of doubt, the Analysis is a mathematical exercise based on a series of inputs provided by the Company and represents neither an opinion as to the value nor a fair market valuation of the Bank on the part of [Investment Bank C]."

238.    In fact, all of Investment Bank C's valuation reports were mere "mathematical exercises" that did not take into consideration the poor credit quality of the Bank's loan portfolio. Instead, Investment Bank C simply accepted management's projections.  As a result, the Bank's fair value rose to $286 million by the second quarter of 2017, more than double the Bank's book value.

239.    On July 11, 2017, Murstein sent Investment Bank C an angry email criticizing it for failing to generate any offers for the Bank, stating that: "You were engaged to sell a minority piece in the bank. That's why you took on the project."

240.    Murstein fired Investment Bank C in late July 2017, and Medallion Financial hired yet another firm to provide a valuation opinion—the third such firm in less than one year. This firm's opinion tracked Investment Bank C's approach, and the Bank reported a fair value of $290.5 million by year-end 2017.

241.    Murstein knew that medallion values were continuing to deteriorate in 2017.  A consultant retained by Murstein reported to him in August 2017 that "there continues to be deterioration in values as indicated by arms length transfers in NYC and Chicago," and that "the survivability of the medallion system" was at stake.  The consultant estimated medallion values at $150,000 for New York City medallions and $10,000 for Chicago medallions.

242. The dramatic increases in the Bank's fair value of its common stock, as compared to book value, is summarized below (numbers are in millions):

|  | 6/30/16 | 9/30/16 | 12/31/16 | 3/31/17 | 6/30/17 | 9/30/17 | 12/31/17 |
|---|---|---|---|---|---|---|---|
| Fair Value | 166.5 | 193.9 | 280.6 | 284.4 | 286.0 | 290.7 | 290.5 |
| Book Value | 149.9 | 149.0 | 135.6 | 139.3 | 140.6 | 145.2 | 137.9 |
| Ratio | 111% | 130.1% | 207% | 204.1% | 203.4% | 200.2% | 210.7% |

243. Medallion Financial's 2017 Forms 10-Q and 10-K 2017 each gave, in the MD&A section of the report, approximately the same three reasons for the increase in the value of the Bank as the third quarter Form 10-Q. Like the Form 10-Q, they did not disclose the fact that the "expressions of interest" from third parties had been solicited and did not reflect offers made post due diligence; that management's purported opinion of the significance of the "court ruling" was an off-the-cuff view that lacked a reasonable basis; or that Murstein had provided Investment Bank C with specific instructions on the valuation he wanted their work to produce.

244. These explanations, however, were even more misleading by the time the Form 10-Q for the second quarter of 2017 was filed, on August 9, 2017. Fair value is intended to measure the price at which a willing buyer and a willing seller would enter into a transaction. By August 2017, however, it was apparent that there were no willing buyers to be found. As noted above, Murstein knew from Investment Bank C that there was almost no market interest in acquiring even a portion of the Bank, other than in a "junk bond priced deal." As Investment Bank C told Murstein: "[C]learly the market reaction to the capital raise was substantially different than your expectations and more in line with your stock value."

245. As Murstein knew or recklessly disregarded, Medallion Financial's reported fair value for Medallion Bank was overstated by approximately $85 million at year-end 2017.

246. In addition, throughout 2017, as Murstein also knew or recklessly disregarded, Medallion Financial's periodic reports were inaccurate when they represented that the company

performed a fair value analysis on its loan portfolio, when, in fact, it did not perform a fair value analysis for most loans that were up to 90 days past due.

247.     Murstein signed the 2017 Form 10-K in his capacity as President and member of the Board of Directors.

## IX.     **Books and Records and Internal Controls Violations.**

248.     Medallion Financial was required to make and keep books, records and accounts, which accurately reflect the values of its assets.

249.     Medallion Financial was also required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things transactions are executed in accordance with management's general or specific authorization, and that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

250.     To this end, Medallion Financial was required to establish procedures designed to prevent errors and irregularities.

251.     As evidenced by the conduct described above, the company did not have such procedures.  For example, the company did not have procedures in place to ensure that all persons responsible for the accuracy of the financial statements had full information about the "expressions of interest" on which Medallion Financial's estimates of the value of the Bank were premised.  As another example, the company did not have procedures in place to ensure that a fair value analysis was performed with respect to all loans, including those that were no more than 90 days past due.  Finally, the company did not have procedures in place to prevent a single individual, such as Murstein, from manipulating the valuation of the Bank by firing the

company's Valuation Specialist without input from other executives and directors of the copmany.

252.    Medallion Financial's internal accounting controls were not properly designed to implement an appropriate valuation methodology and procedures to value Medallion Financial's loans or the Bank consistent with GAAP, in a number of respects.

**A.    The Fraudulent Valuations of the Bank and of the Chicago Medallion Portfolio Rendered Medallion Financial's Books and Records Materially Misleading.**

253.    *First*, Medallion Financial's valuation of the Bank, as well as its disclosures in its periodic reports and corresponding earnings releases furnished as exhibits to Forms 8-K, was inflated for the periods ending September 30, 2016, December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017.  Accordingly, its books and records for each of those periods contained material misstatements.

254.    *Second*, Medallion Financial's valuation procedures did not adequately take into account the decline in the value of medallions.  Furthermore, Medallion Financial did not have sufficient internal accounting controls to analyze the application of the valuation techniques being used in the valuations of the Bank to ensure they were being done on a consistent basis.  And Medallion Financial's documentation concerning its valuation decisions and reporting disclosures was inadequate.

**B.    Medallion Financial Inaccurately Calculated its 2017 Loan to Value Ratio.**

255.    *Third*, Medallion Financial did not have adequate procedures in place to ensure that the calculations in its filings were consistent with its descriptions of those calculations.  Specifically, Medallion Financial made misleading statements regarding the method by which it calculated the loan to value ("LTV") ratios for its loans in its 2017 financial statements.  The LTV ratio is material because it gives investors the ability to estimate the extent to which the

loans are over- or under-collateralized.  Under-collateralized loan portfolios are significantly

riskier to the lender because there is not enough collateral to collect against if the debtors default

on the loans.  An LTV ratio greater than 100% indicates the portfolio is under-collateralized.

256.    In both its 2016 and 2017 Forms 10-K, Medallion Financial claimed to calculate

LTV ratios on a gross loan balance—meaning that the managed unrealized depreciation or

allowance was not included in the calculation.  The amount of managed unrealized depreciation

on these loans during this time period was significant—approximately $63 million for both 2016

and 2017.  For both 2016 and 2017, Medallion Financial claimed that the LTV ratios were

approximately 130 percent.

257.    In Item 1 of its Form 10-K for the year ended December 31, 2017, Medallion

Financial claimed that its weighted average LTV of loans collateralized by taxi medallions was

131% compared to 129% at December 31, 2016.  The Form 10-K stated that "[t]hese ratios also

do not factor in the [] unrealized depreciation on these loans of $62,723,000 and $63,252,000 as

of December 31, 2017 and 2016, respectively."

258.    These statements were false and misleading.  For the 2017 Form 10-K, Medallion

Financial actually calculated the LTV on a net basis—meaning that the approximate $63 million

in unrealized depreciation or allowance was included prior to calculating the LTV ratio.

259.    Medallion Financial's misstatement regarding LTV in its 2017 Form 10-K

misleadingly gave the appearance that the LTV ratios remained stable, at approximately 130%,

for the periods ending in 2016 and 2017.

260.    If Medallion Financial had calculated the 2017 LTV ratio consistently with the

2016 LTV calculation, and in the way described in its 2017 Form 10-K, the LTV ratio would

have been 155%. That increase in LTV ratio from approximately 130% in 2016 to approximately

155% in 2017—a significant increase in LTV ratio—would have shown the decline in the collateral supporting for Medallion Financial's and the Bank's loans during that time period.

### C.     Murstein Aided and Abetted the Books and Records Violations.

261.    As Medallion Financial's President and Chief Operating Officer, and as head of the Investment Committee and Chief Credit Officer, Murstein knowingly or recklessly failed to ensure that Medallion Financial kept accurate books and records through the recording of inaccurate valuations for the Bank, the medallion-backed loans, Chicago medallions and LTV disclosures.

262.    Medallion Financial failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.  Murstein knowingly or recklessly aided and abetted Medallion Financial's books and records and internal accounting controls violations.

### X.        Murstein Deceived the Auditor.

263.    On November 9, 2016, Murstein signed a management representation letter in connection with the Form 10-Q filing for the third quarter of 2016.  The letter was provided to the Auditor, and, among other things, represented that:

> "[W]e agree with the findings of . . . valuation specialists . . . used.  We did not give or cause any instructions to be given to specialists regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the specialists."

264.    This representation was false.  In fact, Murstein had given instructions to Investment Bank C regarding the Bank's minimum fair value and offered investment banking work to bias the valuation opinion.

265.    Murstein also signed management representation letters in connection with

Medallion Financial's filings for the period ended December 31, 2016, March 31, 2017, June 30,

2017, September 30, 2017 and December 31, 2017.

266.    The management representation letters signed by Murstein also stated that:

- Interim consolidated financial statements were "prepared in conformance with U.S. Generally Accepted Accounting Principles";
- "[W]e have designed our internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting";
- "We have no knowledge of any fraud, suspected fraud, or allegations of fraud affecting the Company involving management…where fraud could have a material effect on the interim consolidated financial statements"; and
- "There are no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated interim financial statements."

267.    Murstein knew or was reckless in not knowing that each was these representations

was false.  Murstein knew or recklessly disregarded the GAAP violations; the internal controls

failures; the misrepresentations and omissions in the MD&A; and his failure to disclose his and

the company's role in the touting scheme.

268.    Murstein was also the sole signatory for the valuation memoranda provided to the

Auditor to explain the reasons behind Medallion Financial's valuation decisions.  Murstein

signed the valuation memoranda for Medallion Financial's filings for the period ended December

31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017

269.    Murstein's November 2016 valuation memoranda emphasizes the summaries

Murstein solicited from Investment Banks A and B as supporting the increased valuation, even

though the Valuation Firm and the Auditor told Murstein that the summaries were insufficient.

The memorandum also states that the Utah industrial bank—the source of the "good at 200"

email—"contacted the Company unsolicited to acquire the Bank and indicated a value of over

$200 mill." This was false: the email was not "unsolicited" because Murstein initiated the contact, and no offer at all was made for the Bank.

270.    Murstein's valuation memoranda for 2017 also refer to "a potential minority investor in Medallion Bank at a $350 million valuation to purchase a 0.57% of Medallion Bank." As described above, that transaction was part of a larger partnership arrangement that was not being negotiated, and Murstein's representation that he was "currently negotiating the terms of such an agreement" was misleading.

## XI.    <u>GAAP Violations</u>

271.    Medallion Financial violated GAAP's fair value principles, including ASC 820-20-55-1 ("objective of fair value measurement is to estimate the price . . . to sell the asset . . . under current market conditions"); ASC 820-10-35-25 ("valuation techniques . . . shall be applied consistently"); ASC 820-10-35-24 ("reporting entity shall use valuation techniques that are appropriate in the circumstances . . . maximizing the use of observable inputs"); ASC 820-10-35-54E ("reporting entity shall include appropriate risk adjustments"); ASC 820-10-55-8 ("fair value measurement should include a risk premium reflecting . . . the uncertainty inherent in cash flows"); ASC 820-10-35-54D ("analysis of the transactions or quoted process is needed"); ASC 820-10-35-54J-c ("reporting entity . . . shall take into account the transaction price"); and ASC 820-10-35-54G (even if "significant decrease in the volume or level of activity . . . the objective of a fair value measurement remains the same"). Murstein know or should have known, or was reckless in disregarding, these violations.

## <u>TOLLING AGREEMENTS</u>

272.    In 2019, 2020 and 2021, Medallion Financial, Murstein and Meyers signed tolling agreements entered into with the Commission. Each tolling agreement specifies a period of time

(a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Medallion Financial, Murstein and Meyers] authorized, instituted, or brought by . . . the Commission . . . arising out of the [Commission's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ." Each tolling agreement further provides that the Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

273.     Collectively, these agreements tolled the running of any limitations period or any other time-related defenses alleged in this Complaint from October 21, 2019 through December 31, 2021, a period of at least 803 days (as to Medallion Financial and Murstein), and from October 16, 2019 through December 31, 2021, a period of at least 808 days (as to Meyers)

**<u>FIRST CLAIM FOR RELIEF</u>**
**(Defendants Medallion Financial and Murstein)**
**Violations of Section 17(a) of the Securities Act**

274.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein.

275.     By engaging in the conduct described above, Defendants Medallion Financial and Murstein, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the

circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

276.    By engaging in the foregoing, Defendants Medallion Financial and Murstein violated, and unless restrained and enjoined, will continue violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**(Defendants Medallion Financial, Murstein, Meyers, and Ichabod's Cranium)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

277.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein.

278.    By engaging in the conduct described above, the Defendants, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities on a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

279.    By engaging in the foregoing, the Defendants violated and, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**(Defendants Meyers and Ichabod's Cranium)**
**Violations of Section 17(b) of the Securities Act**

280.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein.

281.     By engaging in the conduct described above, Defendants Meyers and Ichabod's Cranium, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspapers, articles, letters, investment services or communications which, though not purporting to offer securities for sale, described such securities for a consideration received or to be received, directly or indirectly, from an issuer, underwriter or dealer without fully disclosing the receipt past or prospective of such consideration and the amount thereof.

282.     By engaging in the foregoing conduct, Defendants Meyers and Ichabod's Cranium violated, and unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

### FOURTH CLAIM FOR RELIEF
**(Defendants Medallion Financial and Murstein)**
**Aiding and Abetting Violations of Section 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

283.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein.

284.     By engaging in the conduct described above and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Medallion Financial and Murstein, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendants Meyers' and Ichabod's Cranium's, and other uncharged touters, primary violations of Section 17(b) of the Securities Act [15 U.S.C. §

77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], because they knowingly or recklessly provided substantial assistance to Defendants Meyers' and Ichabod's Cranium's, and other uncharged touters', violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

285.   Unless restrained and enjoined Defendants Medallion Financial and Murstein will continue aiding and abetting violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF
**(Defendant Medallion Financial)**
**Violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder**

286.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein.

287.   By engaging in the conduct described above, Defendant Medallion Financial (a) failed to make and keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of assets; and (b) failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were executed in accordance with management's general or specific authorization; transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

288.   By engaging in the conduct described above, Medallion Financial failed to file with the Commission such financial reports as the Commission has prescribed, and medallion

Financial failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading,

289.    By engaging in the foregoing conduct, Defendant Medallion Financial violated and, unless retrained and enjoined, will continue violating Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. § 78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.FR. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13].

**SIXTH CLAIM FOR RELIEF**
**(Murstein)**
**Aiding and Abetting Violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder**

290.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein.

291.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Murstein, singly or in concert, directly or indirectly, aided and abetted, and is therefore also liable for Defendant Medallion Financial's primary violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. § 78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.FR. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13], because he knowingly or recklessly provided substantial assistance to Defendant Medallion Financial's violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. § 78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.FR. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13].

292.    Unless restrained and enjoined Defendant Murstein will continue aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. § 78m(a), (b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.FR. §§

240.12b-20, 13a-1, 13a-11 and 13a-13].

## SEVENTH CLAIM FOR RELIEF
### (Murstein)
### Violations of Rule 13b2-2 of the Exchange Act

293.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 271, as if fully set forth herein.

294.    By engaging in the conduct described above, Defendant Murstein, directly or

indirectly: (a) made or caused to be made materially false or misleading statements to an

accountants; or (b) omitted to state, or caused another person to omit to state, material facts

necessary in order to make statements made, in light of the circumstances under which such

statements were made, not misleading, to an accountant in connection with (1) an audit, review,

or examination of financial statements required by the Exchange Act or rules thereunder; or

(2) the preparation of filing of a document or report required to be filed with the Commission.

295.    By engaging in the foregoing conduct, Defendant Murstein violated and, unless

restrained and enjoined, will continue violating Rule 13b2-2 of the Exchange Act [17 C.FR. §§

240.13b2-2].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final

Judgment:

a) finding the Defendants violated the federal securities laws and rules promulgated

thereunder as alleged against them herein;

b) permanently restraining and enjoining the Defendants and their agents, servants,

employees and attorneys and all persons in active concert who receive actual notice of the

injunction and each of them from, directly or indirectly, violating or aiding and abetting

violations of the federal securities laws alleged in this complaint;

c) ordering the Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts;

d) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

e) permanently barring Defendant Murstein from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

(f) granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  New York, New York
      April 26, 2022

                  Respectfully submitted,

                  /s/ David Stoelting

By:   _____

                  Sheldon L. Pollock
                  Celeste Chase
                  David Stoelting
                  Paul Kim
                  Karen Willenken
                  Olivia Zach
                  *Attorneys for Plaintiff*
                  U.S. Securities and Exchange Commission
                  New York Regional Office
                  200 Vesey Street, Suite 400
                  New York, New York 10281-1022
                  Tel: (212) 336-0174 (Stoelting)
                  Email: stoeltingd@sec.gov

**Appendix A**

To Amended Complaint filed April 26, 2022, in *SEC v. Medallion Financial Corp., et al.* , 21-cv-11125-LAK (SDNY)

*Below is a list of articles posted or published on various internet websites by Larry Meyers (in some cases, using an alias) while he was being paid to make these postings pursuant to the consulting agreement signed by Meyers and Defendant Andrew Murstein. For each article, the two columns on the right indicate: 1) what, if anything, the article said about the author being compensated by MFC and/or about his professional experience (categories A through G); and 2) how the article related to Medallion Financial (categories 1 through 5).*

**Category Keys:**

A - Contains disclosure that the author wrote the article himself, that it expresses his own opinions, and that he is not receiving compensation for it (in some cases, adds "other than from Seeking Alpha"). Also states that the author has no business relationship with any company whose stock is mentioned in this article.

B - Lawrence Meyers disclosure that references PDL Capital, alternately described as "a specialty lender focusing on consumer finance," "an entity that helps finance the sale of distressed assets to private-equity firms and another businesses," or suggests that PDL/the author is a "value, special situations, long-term horizon, small-cap" investor. Usually says Meyers is CEO of PDL Capital.

C - Discloses on the website's "About" page:  "Welcome to Taxi Truths, a new blog from Isaac Howe.  I've been in the taxi industry for more than 30 years in NYC, in many capacities.   Taxi Truths is intended to provide readers with the truth about the taxi situation in America, primarily NYC."

D - Author describes himself as a "reporter," "journalist," "investigative journalist" or "policy and financial analyst."

E - Author suggests that he is a "[s]pecial situations, contrarian, event-driven, dividend growth investing" investor.

F - No disclosure

1 - Mentions Medallion Financial (the entity) or its ticker symbol explicitly.

2 - Discusses posts about MFC by short sellers and other critics, such as HVM Capital, James Hickman, Gordon Gossage and/or Jordan Wathen, or those individuals' backgrounds.

3 - Discusses flaws in Uber's or Lyft's business model or practices.

4 - Discusses taxi / rideshare industry generally.

5 - Mentions Murstein, the "medallion financial industry," "a specialty lender" known for medallion lending, "taxi lender" or similar phrase.

| ID | Date | Article Title | Publication | Author | Categories A - F | Categories 1 - 5 |
|---|---|---|---|---|---|---|
| 1 | 01/05/2015 | Taxi Medallion Financial Industry Grossly Undervalued: Uber Threat Vastly Overstatd | SeekingAlpha | Larry Meyers | A | 1 |
| 2 | 01/11/2015 | You Can't Go Long Uber by Shorting the Taxi Medallion Financial Industry | SeekingAlpha | Larry Meyers | A | 1 |
| 3 | 01/12/2015 | The Shady Short Sellers Attacking A Lender | BloggerNews | Clark Reilly | F | 2 |
| 4 | 01/12/2015 | Shady Short Sellers Scrub Social Media | BloggerNews | Clark Reilly | F | 2 |
| 5 | 01/13/2015 | James Hickman, Shady Short Seller Confesses to Financial Misdeeds | BloggerNews | Clark Reilly | F | 2 |
| 6 | 01/15/2015 | 7 Questions for James Hickman, Shady Short Seller & Financial Felon | BloggerNews | Clark Reilly | D | 2 |
| 7 | 01/16/2015 | Lyft Paying for Shady Short Seller Report | BloggerNews | Clark Reilly | F | 2 |
| 8 | 01/20/2015 | Shady Short Seller James Hickman Tries to Silence BloggerNews | BloggerNews | Clark Reilly | D | 1 |
| 9 | 01/21/2015 | Taxi Truths 1/21/15: 95%+ NYC Taxi Occupancy | BloggerNews | Isaac Howe | C | 1 |
| 10 | 01/22/2015 | Shady Short Seller James Hickman Confesses to Misrepresnetation | BloggerNews | Clark Reilly | F | 2 |
| 11 | 01/22/2015 | Taxi Truths 1/22/15: "Only Suckers Are Rideshare Drivers" | BloggerNews | Clark Reilly | F | 4 |
| 12 | 01/23/2015 | Taxi Truths 1/23/15: No Taxi Medallion Defaults at Signature Bank | BloggerNews | Issac Howe | F | 4 |
| 13 | 01/24/2015 | Industry Vet: Rideshare Threat to Taxi Medallions Vastly Overstated | SeekingAlpha | Larry Meyers | A | 1 |
| 14 | 01/26/2015 | Taxi Medallions Are Safe Because Uber Will Implode | SeekingAlpha | Frederick Steier | A and E | 1 |
| 15 | 01/28/2015 | Taxi Truths 1/27/15: "A Debt is a Promise" | BloggerNews | Isaac Howe | F | 4 |
| 16 | 01/28/2015 | Taxi Truths 1/27/15: "My Garage is Empty" | BloggerNews | Isaac Howe | F | 4 |
| 17 | 01/29/2015 | Taxi Truths 1/29/15: "Homeless" | BloggerNews | Isaac Howe | F | 3 |

**Appendix A**

To Amended Complaint filed April 26, 2022, in *SEC v. Medallion Financial Corp., et al.*, 21-cv-11125-LAK (SDNY)

| ID | Date | Article Title | Publication | Author | Categories A - F | Categories 1 - 5 |
|----|------|---------------|-------------|--------|------------------|------------------|
| 18 | 02/02/2015 | Signature Bank: The Bank with a 245% Return | InvestorPlace | Lawrence Meyers | B | 1 |
| 19 | 02/03/2015 | Taxi Truths 2/2/15: "They all came back" | BloggerNews | Isaac Howe | F | 4 |
| 20 | 02/03/2015 | Has Shady Short Seller James Hickman Violated MA Law? | BloggerNews | Clark Reilly | F | 2 |
| 21 | 02/06/2015 | Taxi Truths 2/5/15: "Full Capacity" | BloggerNews | Isaac Howe | F | 4 |
| 22 | 02/09/2015 | NYC Data Proves Taxi Medallion Resilience; Rideshare Effect Negligible | SeekingAlpha | Larry Meyers | A and B | 1 |
| 23 | 02/09/2015 | Taxi Truths 2/9/15: NYC Taxi Data Shows No Rideshare Effects! | BloggerNews | Isaac Howe | F | 4 |
| 24 | 02/16/2015 | James Hickman, Shady Short Seller, Misdirects Again | BloggerNews | Clark Reilly | F | 2 |
| 25 | 02/17/2015 | "Blistering Accurate" Takedown of Shady Short Seller James Hickman | BloggerNews | Clark Reilly | F | 2 |
| 26 | 02/17/2015 | Taxi Truths 2/17/15: Taxi Lender's Record Earnings | BloggerNews | Isaac Howe | F | 2 |
| 27 | 02/17/2015 | Taxi Medallion Financial Industry Delivers Record Earnings with Zero Taxi Loan Losses | SeekingAlpha | Larry Meyers | A and B | 1 |
| 28 | 02/27/2015 | Shady Short Seller Gordon Gossage Caught Lying? Does He Work for Lyft? | BloggerNews | Clark Reilly | F | 2 |
| 29 | 03/01/2015 | Taxi Truths 3/1/15: Taxis Are Killing Lyft | BloggerNews | Isaac Howe | F | 3 |
| 30 | 03/02/2015 | Is Shady Short Seller Gordon Gossage an Anti-Semite? | BloggerNews | Isaac Howe | D | 2 |
| 31 | 03/04/2015 | Taxi Medallion Financial Industry Short-Sellers Continue Misdirection Campaign -- Ignore It | SeekingAlpha | Larry Meyers | A and B | 1 |
| 32 | 03/09/2015 | Insider Buys and The Pareto Rule Lift Taxi Medallions Over Rideshare | SeekingAlpha | Frederick Steier | A and E | 1 |
| 33 | 03/10/2015 | 3 Naked Puts for Profit Between Earnings Reports | InvestorPlace | Lawrence Meyers | F | 1 |
| 34 | 03/12/2015 | Taxi Truths 3/11/15: Drivers Are Employees? | BloggerNews | Isaac Howe | F | 3 |
| 35 | 03/13/2015 | Medallion Financial 10-K: Business As Usual | SeekingAlpha | Lawrence Meyers | A and B | 1 |
| 36 | 03/22/2015 | Death of the Taxi Industry is Greatly Exaggerated | Crain's | Lawrence Meyers | B | 1 |
| 37 | 04/17/2015 | Lyft Shill Gordon Gossage Admits: Drivers Barely Make Minimum Wage | BloggerNews | Clark Reilly | F | 1 |
| 38 | 05/19/2015 | Uber's Fate Is In The Hands of 12 People | Town Hall | Lawrence Meyers | F | 3 |
| 39 | 06/04/2015 | Jordan Wathen Proves the Greater Fool Theory | BloggerNews | Lawrence Meyers | F | 2 |
| 40 | 06/10/2015 | Taxi Truths 6/10/15: The Real Math Behind Taxi Loans | BloggerNews | Isaac Howe | C | 2 |
| 41 | 06/10/2015 | White Paper: Towards A Cost Estimate of A NYC UberX Driver | NYC Taxi News | Lawrence Meyers | F | 3 |
| 42 | 06/11/2015 | Fact-Checking the Taxi Medallion Market | SeekingAlpha | Frederick Steier | A and E | 1 |
| 43 | 06/15/2015 | White Paper Press Release on UberX Driver Expenses | PRNewsire | Lawrence Meyers | D | 3 |
| 44 | 06/15/2015 | Taxi Truths 6/15/15: UberX Drivers Lose 68% of Income | BloggerNews | Isaac Howe | C | 3 |
| 45 | 06/15/2015 | Driving UberX in NYC is a Terrible Deal: Say Goodbye to 68% of income | BloggerNews | Lawrence Meyers | C | 3 |
| 46 | 06/17/2015 | Taxi Truths 6/17/15: Another Blow To Uber | BloggerNews | Isaac Howe | C | 3 |
| 47 | 06/19/2015 | Facts That Taxi Medallion Critics Won't Address | BloggerNews | Lawrence Meyers | F | 2 |
| 48 | 06/23/2015 | Uber Has Lost The Taxi Battle In NYC | SeekingAlpha | Larry Meyers | A and B | 4 |
| 49 | 06/23/2015 | Take Jordan Wathen to the Woodshed | BloggerNews | Lawrence Meyers | F | 2 |
| 50 | 06/27/2015 | More Lies from James Hickman | BloggerNews | Lawrence Meyers | F | 2 |
| 51 | 06/29/2015 | How The Taxi Medallion Financial Industry Short-Selling Scheme Was Hatched | BloggerNews | Clark Reilly | F | 2 |
| 52 | 07/01/2015 | Jordan Wathen: Glutton for Embarrassment | BloggerNews | Lawrence Meyers | F | 2 |
| 53 | 07/01/2015 | Hidden Risks of an Uber IPO | SeekingAlpha | Lawrence Meyers | A | 3 |
| 54 | 07/02/2015 | Uber's Death by a Thousand Cuts | Town Hall | Lawrence Meyers | F | 3 |
| 55 | 07/02/2015 | Taxi Truths 7/1/15: A Great Analysis | BloggerNews | Isaac Howe | C | 1 |

**Appendix A**

To Amended Complaint filed April 26, 2022, in *SEC v. Medallion Financial Corp., et al.*, 21-cv-11125-LAK (SDNY)

| ID | Date | Article Title | Publication | Author | Categories A - F | Categories 1 - 5 |
|----|------|---------------|-------------|--------|------------------|------------------|
| 56 | 07/03/2015 | The Uber Lawsuit Deluge | TaxiTruths | TaxiTruths | C | 3 |
| 57 | 07/06/2015 | Shady Short Seller Gordon Gossage Commits Libel | BloggerNews | Clark Reilly | F | 2 |
| 58 | 07/09/2015 | Big Taxi Defeats Uber in NYC | Daily Caller | Lawrence Meyers | F | 3 |
| 59 | 07/11/2015 | Taxi Truths 7/11/15: | BloggerNews | Isaac Howe | C | 3 |
| 60 | 07/20/2015 | Shady Short Seller Gordon Gossage Runs for (to) Cover | BloggerNews | Clark Reilly | F | 1 |
| 61 | 07/22/2015 | Has Uber Peaked in NYC? | TaxiTruths | TaxiTruths | C | 3 |
| 62 | 08/04/2015 | Microsoft-Uber: Easy Money for MSFT, Not For You | InvestorPlace | Lawrence Meyers | B | 3 |
| 63 | 08/05/2015 | Is Microsoft Nuts for Investing in Uber | Wyatt Research | Lawrence Meyers | F | 3 |
| 64 | 08/05/2015 | Medallion Financial Delivers Again: Will the Market Ever Learn? | SeekingAlpha | Frederick Steier | A and E | 1 |
| 65 | 08/13/2015 | Uber Drivers, Beware | LifeZette | Lawrence Meyers | F | 3 |
| 66 | 08/14/2015 | "Financial Felon" James Hickman's Cover-Up! | BloggerNews | Clark Reilly | F | 2 |
| 67 | 08/17/2015 | Another Reason to Avoid the Uber IPO | InvestorPlace | Lawrence Meyers | B | 3 |
| 68 | 08/18/2015 | Once Again, NYC Data Shows Resilience of Taxi Medallions | SeekingAlpha | Larry Meyers | A | 3 |
| 69 | 08/24/2015 | Medallion Financial 10-Q: A Port in A Storm | SeekingAlpha | Frederick Steier | A or F* | 1 |
| 70 | 08/25/2015 | Cartoon Illustrates How Uber is Headed for Disaster | Press Release | Lawrence Meyers | F | 3 |
| 71 | 08/25/2015 | The Latent Racism of "Financial Felon" James Hickman | BloggerNews | Clark Reilly | F | 2 |
| 72 | 09/09/2015 | Has Uber Hit a Dead End in New York? Taxis Still Hog Midtown | TheStreet | Frederick Steier | F | 3 |
| 73 | 09/11/2015 | Uber Meets Taxis' Immovable Object; Market Equilibrium | The NY Observer | Lawrence Meyers | D | 3 |
| 74 | 09/21/2015 | Has "Financial Felon" James Hickman Been Fired? | BloggerNews | Clark Reilly | F | 2 |
| 75 | 09/21/2015 | Why The Motley Fool Should Fire Jordan Wathen | BloggerNews | Lawrence Meyers | F | 2 |
| 76 | 09/22/2015 | As Rivals Pair Up, Is the Expected Uber IPO in Trouble? | Wyatt Research | Lawrence Meyers | F | 3 |
| 77 | 09/23/2015 | Greater Fool Jordan Wathen Embarrasses Himself AGAIN! | BloggerNews | Lawrence Meyers | F | 5 |
| 78 | 09/23/2015 | There is No Way Uber Drivers Make More Than NYC Cabbies | InvestorPlace | Lawrence Meyers | B | 3 |
| 79 | 09/25/2015 | Uber's Future May Not Be As Rosy As You Think | TheStreet | Frederick Steier | F | 3 |
| 80 | 09/28/2015 | Aaron Elstein at Crain's Has Some Explaining To Do | BloggerNews | Lawrence Meyers | F | 3 |
| 81 | 10/23/2015 | Positive Developments in the Taxi Medallion Financial Industry | SeekingAlpha | Frederick Steier | A and E | 5 |
| 82 | 11/25/2015 | Westlake Financial: Uber's Shady New Partner | The NY Observer | Lawrence Meyers | D | 3 |
| 83 | 11/26/2015 | More Proof That Uber Drivers Are Leaving for Taxis | TaxiTruths | TaxiTruths | C | 3 |
| 84 | 12/04/2015 | Uber Pushing Bad Rental Car Deals on Drivers | TaxiTruths | TaxiTruths | C | 3 |
| 85 | 12/04/2015 | Jordan Wathen: King of Taxi Medallion BizarroWorld | BloggerNews | Lawrence Meyers | F | 2 |
| 86 | 12/05/2015 | Open Letter to Motley Fool Editors Re: Jordan Wathen | BloggerNews | Lawrence Meyers | F | 2 |
| 87 | 12/07/2015 | Breaking: Motley Fool Writer Jordan Wathen Caught In Lie | BloggerNews | Lawrence Meyers | F | 2 |
| 88 | 12/09/2015 | UPDATE: Motley Fool Retracts Jordan Wathen Article | BloggerNews | Lawrence Meyers | F | 2 |
| 89 | 12/10/2015 | The One Chart That Should Worry Uber and Hurts the Taxi Medallion Short-Selling Thesis | TheStreet | Lawrence Meyers | F | 1 |
| 90 | 12/11/2015 | The Truth About the NYC Medallion Foreclosure Sale | TaxiTruths | TaxiTruths | C | 2 |
| 91 | 12/12/2015 | Not All Taxi Medallion Financial Lenders Are Created Equal | TaxiTruths | TaxiTruths | C | 4 |
| 92 | 01/13/2016 | Why Uber Faces a Rough Road Ahead | The NY Observer | Lawrence Meyers | D | 3 |
| 93 | 01/27/2016 | As Stated, Uber Class Action is Still A Big Deal | TaxiTruths | TaxiTruths | C | 3 |

**Appendix A**

To Amended Complaint filed April 26, 2022, in *SEC v. Medallion Financial Corp., et al.*, 21-cv-11125-LAK (SDNY)

| ID | Date | Article Title | Publication | Author | Categories A - F | Categories 1 - 5 |
|----|------|---------------|-------------|--------|------------------|------------------|
| 94 | 01/28/2016 | ConnectOne Bank Reports No Taxi Medallion Losses | TaxiTruths | TaxiTruths | C | 4 |
| 95 | 02/12/2016 | Uber: The Hits Just Keep On Coming | SeekingAlpha | Frederick Steier | A or F* | 1 |
| 96 | 02/13/2016 | Is Shady Short Seller Gordon Gossage Dying? | BloggerNews | Clark Reilly | F | 2 |
| 97 | 02/21/2016 | Did Uber Collect A "Safe Rider's Fee" for Kalamazoo Shooter? | TaxiTruths | TaxiTruths | C | 3 |
| 98 | 04/07/2016 | What? Uber Lied About Background Checks? | TaxiTruths | TaxiTruths | C | 3 |
| 99 | 04/07/2016 | State of the NYC Taxi Medallion Financial Sector | SeekingAlpha | Frederick Steier | A or F* | 1 |
| 100 | 04/08/2016 | Women Call Chariot, Kick Uber to the Curb | TaxiTruths | TaxiTruths | C | 3 |
| 101 | 04/09/2016 | Salon Slams Uber | TaxiTruths | TaxiTruths | C | 3 |
| 102 | 04/11/2016 | Medallion Financial: Understated Book Value with A Significant Near-Term Upside Catalyst As Shorts Rush to Cover | SeekingAlpha | Frederick Steier | A or F* | 1 |
| 103 | 04/15/2016 | Free Money to Drive For Uber!  But Why? | TaxiTruths | TaxiTruths | C | 3 |
| 104 | 05/05/2016 | Has SeekingAlpha Been Bribed to Spike Pro-Taxi Stories? | BloggerNews | Clark Reilly | F | 2 |
| 105 | 05/09/2016 | Uber Leaves Austin Over - GASP - Regulations? | TaxiTruths | TaxiTruths | C | 3 |
| 106 | 05/10/2016 | Uber and Its Fig Leaf NYC "Guild" | TaxiTruths | TaxiTruths | C | 3 |
| 107 | 05/16/2016 | SeekingAlpha Refuses Comment on Anti-Taxi Bias | BloggerNews | Clark Reilly | F | 2 |
| 108 | 05/18/2016 | GOOGL Gets Into Ride-Hailing Despite Uber Investment | InvestorPlace | Lawrence Meyers | F | 3 |
| 109 | 06/10/2016 | Uber Drivers Run Screaming Back To Taxi Medallions | BloggerNews | Lawrence Meyers | F | 3 |

*\* The copies of these articles currently available to the Plaintiff do not indicate any disclosure concerning Frederick Steier's profession or compensation.  Plaintiff believes, however, that **all** articles on Seeking Alpha were required to have the Category A disclosure, and that for some reason the disclosure did not load and/or print when the specific copy available to it was saved.*

**Appendix B**

To Amended Complaint filed April 26, 2022, in *SEC v. Medallion Financial Corp., et al.* , 21-cv-11125-LAK (SDNY)

*The chart below lists each Seeking Alpha article related to Medallion Financial on which Larry Meyers or Frederick Steier, a Meyers alias, commented while Meyers was being paid to write about Defendant Medallion Financial Corp.  For each article, the columns on the right indicate the number of comments on the specified article.  Articles with no ID letter were authored by Meyers/Steier and are identified by number in Appendix A.*

| ID | Article Date | Article Title | Article Author | "Steier" | Meyers | Total |
|---|---|---|---|---|---|---|
| A | 12/18/2014 | The Downside For Medallion Financial Only Just Beginning | James Hickman | | 31 | 31 |
| | 01/05/2015 | Taxi Medallion Financial Industry Grossly Undervalued: Uber Threat Vastly Overstated | Larry Meyers | | 19 | 19 |
| B | 01/09/2015 | Taxi Medallions Face Obsolescence | James Hickman | | 20 | 20 |
| | 01/11/2015 | You Can't Go Long Uber By Shorting The Taxi Medallion Financial Industry | Larry Meyers | | 98 | 98 |
| C | 01/15/2015 | Medallion Financial Corporation Has Far More Than '28%' Exposure To Medallion Prices | James Hickman | | 58 | 58 |
| | 01/24/2015 | Industry Vet: Rideshare Threat To Taxi Medallions 'Vastly Overstated' | Larry Meyers | | 41 | 41 |
| | 01/26/2015 | Taxi Medallions Are Safe Because Uber Will Implode | Frederick Steier | 55 | 52 | 107 |
| D | 02/05/2015 | Medallion Financial Corp. Loses Its Largest Institutional Investor | James Hickman | 5 | 108 | 113 |
| | 02/09/2015 | NYC Data Proves Taxi Medallion Resilience; Rideshare Effect Negligible | Larry Meyers | | 29 | 29 |
| | 02/17/2015 | Taxi Medallion Financial Industry Delivers Record Earnings With Zero Taxi Loan Losses | Larry Meyers | | 11 | 11 |
| E | 02/23/2015 | Medallion Financial Q4 EPS Weaker Than Headlines, Current Market Trends Not Discussed | James Hickman | | 26 | 26 |
| F | 02/24/2015 | Medallion Financial's Recovery No Surprise, A Sign Of Positive Long-Term Prospects | Alan Goodman | | 64 | 64 |
| | 03/04/2015 | Taxi Medallion Financial Industry Short-Sellers Continue Misdirection Campaign - Ignore It | Larry Meyers | | 24 | 24 |
| | 03/09/2015 | Insider Buys And The Pareto Rule Lift Taxi Medallions Over Rideshare | Frederick Steier | | 27 | 27 |
| | 03/13/2015 | Medallion Financial 10-K: Business As Usual | Larry Meyers | | 10 | 10 |
| G | 03/19/2015 | News That Citibank Is Foreclosing On 90 Taxi Medallions; TLC On Record TNCs Are Welcome | James Hickman | 3 | 39 | 42 |
| H | | For Medallion Financial, The Future Is Arriving | Paulo Santos | | 81 | 81 |
| I | 06/04/2015 | Medallion Financial & Credit Unions Behind Above-Market Chicago Taxi Medallion Sales | James Hickman | 4 | | 4 |
| | 06/11/2015 | Fact-Checking The Taxi Medallion Market | Frederick Steier | 27 | | 27 |
| J | 08/03/2015 | Medallion Financial To Report Today - What Should Be Disclosed | James Hickman | 1 | | 1 |
| | 08/05/2015 | Medallion Financial Delivers Again. Will The Market Ever Learn? | Frederick Steier | 1 | | 1 |
| K | 08/06/2015 | Lack Of Disclosure And Commentary Again Biggest Takeaways From Medallion Financial's Earnings | James Hickman | 3 | | 3 |
| L | 08/12/2015 | Medallion Financial 10-Q: Asset Valuation Keys Q2 Earnings | James Hickman | 3 | 2 | 5 |
| | 08/18/2015 | Once Again, NYC Data Shows Resilience Of Taxi Medallions | Larry Meyers | 2 | 18 | 20 |
| | 08/24/2015 | Medallion Financial's 10-Q: A Port In A Storm | Frederick Steier | 5 | 5 | 10 |
| M | 08/28/2015 | Lenders Provide 100% Financing On Inflated Chicago Medallion Prices | James Hickman | 15 | 11 | 26 |
| | 10/23/2015 | Positive Developments In The Taxi Medallion Financial Industry | Frederick Steier | 4 | | 4 |
| N | 10/27/2015 | The Impact On Medallion Financial Of Uber Driver Pay | Gordon Gossage | 7 | | 7 |
| O | 01/04/2016 | Challenges Mounting For Medallion Financial Entering 2016 | James Hickman | 2 | | 2 |
| | 02/12/2016 | Uber: The Hits Just Keep On Coming | Frederick Steier | 10 | | 10 |
| | 04/07/2016 | State Of The NYC Taxi Medallion Financial Sector | Frederick Steier | 9 | | 9 |
| P | 04/08/2016 | Medallion Financial: Overstated Book Value With A Significant Near-Term Downside Catalyst Starting With Chicago In 1Q'16 | ValueSquared | 7 | | 7 |
| | 04/11/2016 | Medallion Financial: Understated Book Value With A Significant Near-Term Upside Catalyst As Shorts Rush To Cover | Frederick Steier | 26 | | 26 |
| | | **Grand Total** | | 189 | 774 | 963 |