UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                            :

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

        v.                    :   Case No. 1:21-cv-11125 (LAK)

MEDALLION FINANCIAL CORP.,
ANDREW MURSTEIN, LAWRENCE
MEYERS, and ICHABOD'S CRANIUM,
INC.,

           Defendants.

-----------------------------------------------------------x

 

**DEFENDANTS MEDALLION FINANCIAL AND ANDREW MURSTEIN'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page:

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 6

    A.    History Of The Company............................................................................ 6

    B.    The Valuation Allegations ......................................................................... 8

          1.    Medallion Reasonably And Responsibly Relied On Third-Party
               Valuations. ..................................................................................... 8

          2.    Medallion Amply Disclosed Information Regarding The Bank
               Valuation............................................................................................ 11

          3.    The Valuation of Chicago Medallions Was Appropriate And Fully
               Disclosed........................................................................................... 12

    C.    The Touting Allegations ........................................................................... 12

    D.    Procedural History ................................................................................... 13

LEGAL STANDARDS .................................................................................................... 13

ARGUMENT .................................................................................................................... 14

    A.    The SEC Fails To Adequately Plead Violations Of Sections 10(b) And
          17(a) Relating To Medallion's Reported Bank Valuations (Counts 1 & 2). ....... 14

          1.    The SEC Fails To Plead Any Misstatement Of Fact. ............................. 14

          2.    The Alleged Conduct Was Immaterial Given Medallion's
               Disclosures. ....................................................................................... 22

          3.    The SEC Fails To Adequately Allege Valuation-Related Scienter. ........ 23

          4.    The SEC Fails To Allege Money Or Property Was Obtained.   ............. 26

          5.    The Amended Complaint Fails To Allege The Statements At Issue
               Occurred In Connection With The Offer Or Sale Of Securities. ............. 27

    B.    The SEC Fails To Adequately Plead Violations Of Sections 10(b), 17(a),
          And 17(b) Relating To Alleged Touting (Counts 1, 2 & 4)............................... 28

          1.    Medallion And Murstein Had No Duty To Disclose Author
               Payments. ......................................................................................... 28

          2.    Neither Medallion Nor Murstein Made Any Alleged Misstatement
               Related To The Authors' Compensation. ............................................. 29

          3.    The SEC Fails To Plead Scheme Liability Because It Alleges Only
               One Subject On Which There Was An Omission Or Misstatement........ 30

          4.    The Alleged Compensation Information Was Not Material.................... 32

          5.    The SEC Fails To Adequately Allege Touting-Related Scienter. ........... 33

          6.    The SEC Fails To Adequately Allege Section 17(a)'s Independent
               Requirements. ................................................................................... 35

i

**TABLE OF CONTENTS**
(continued)

Page

C.      Aiding And Abetting Alleged Touting Are Not Adequately Pleaded
        (Count 4). ......................................................................................... 35

D.      The SEC Fails To Adequately Plead Violations Relating To Reporting,
        Books And Records, Internal Controls, Or Misleading The Auditor
        (Counts 5-7). ..................................................................................... 37

E.      The Requested Disgorgement And Officer/Director Bar Relief Should Be
        Stricken. ............................................................................................ 39

        1.      Disgorgement Is Unavailable In The Absence Of Ill-Gotten Gains. ....... 39

        2.      There Is No Legal Basis For An Officer And Director Bar Here. ........... 40

CONCLUSION ............................................................................................ 40

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
   2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ........................................................................31

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................................................................................30

*In re AmTrust Fin. Servs.., Inc. Sec. Litig.*,
   2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019).............................................................2, 15, 16

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009)..............................................................................13, 14

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................................25

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................................................................................33

*In re Barclays Bank PLC Sec. Litig.*,
   2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017)........................................................................19

*Basic Inc. v. Levinson*,
   485 U.S. 224, 108 S. Ct. 978 (1988)......................................................................................28

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   592 F. Supp. 2d 323 (W.D.N.Y. 2008) ..................................................................................26

*Bay v. Palmisano*,
   2002 WL 31415713 (E.D. La. Oct. 24, 2002) .......................................................................23

*Bd. of Tr. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F.
   App'x 353 (2d Cir. 2012)........................................................................................................25

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)....................................................................................................34

*Cloister E., Inc. v. N.Y.S. Liquor Auth.*,
   2021 WL 4443838 (S.D.N.Y. Sept. 28, 2021)........................................................................2

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
   2016 WL 4820635 (C.D. Cal. Aug. 31, 2016)........................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Cortina v. Avanex Life Scis. Corp.*,
2016 WL 7480415 (S.D.N.Y. Dec. 12, 2016) ......................................................28

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................................................24

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
228 F.R.D. 508 (S.D.N.Y. 2005) .........................................................................34

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)................................................................................15

*Fait v. Regions Fin. Corp.*,
712 F. Supp. 2d 117 (S.D.N.Y. 2010), *aff'd*, 655 F.3d........................................18

*Fed. Hous. Fin. Agency for Fed. Nat'l Morg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)............................................................................22, 32

*Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*,
2010 WL 5095294 (E.D. Wis. Dec. 8, 2010) .......................................................17

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
843 F.3d 1257 (11th Cir. 2016) .....................................................................31, 32

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
639 F. App'x 664 (2d Cir. 2016) .........................................................................29

*Geoffrey A. Orley Revocable Trust v. Genovese*,
2020 WL 611506 (S.D.N.Y. Feb. 7, 2020)...........................................................31

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002)..........................................................................21, 32

*Harris v. AmTrust Fin. Servs.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015).......................................................17, 18, 26

*Harris v. Mills*,
572 F.3d 66 (2d Cir. 2009)..................................................................................13

*Henry v. Champlain Enters., Inc.*,
445 F.3d 610 (2d Cir. 2006)................................................................................15

*Hou Liu v. Intercept Pharm. Inc.*,
2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ......................................................25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hunt v. Bloom Energy Corp.*,
   2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ......................................................18

*Hutchison v. Deutsche Bank Sec. Inc.*,
   647 F.3d 479 (2d Cir. 2011)........................................................................................32

*In re Ideanomics, Inc., Sec. Litig.*,
   2022 WL 784812, at *10 (S.D.N.Y. Mar. 15, 2022) ..............................................24

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135, 131 S. Ct. 2296 (2011).................................................................3, 29

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991)..........................................................................................2

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).......................................................................................30

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012).......................................................................14

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ..........................................................................24

*Liu v. SEC*,
   --- U.S. ---, 140 S. Ct. 1936 (2020)......................................................................5, 39

*In re Loewen Grp. Inc.*,
   2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) .........................................................23

*Lorenzo v. SEC*,
   --- U.S. ---, 139 S. Ct. 1094 (2019).....................................................................30, 31

*In re Lynn Tilton*,
   SEC Release No. 1182, 2017 WL 4297256 (Sept. 27, 2017)................................23

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014).........................................................................19

*Matusovsky v. Merrill Lynch*,
   186 F. Supp. 2d 397 (S.D.N.Y. 2002).......................................................................14

*Noto v. 22nd Century Grp. Inc.*,
   --- F.4th ---, 2022 WL 1633827 (2d Cir. May 24, 2022)....................2, 3, 28, 29, 30, 31, 33, 36

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................14, 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175, 135 S. Ct. 1318 (2015)...................................2, 15, 18, 19, 21, 22, 26

*Ortiz v. Canopy Growth Corp.*,
    537 F. Supp. 3d 621 (D.N.J. 2021) ...............................................................26

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)..............................................................31

*Perry v. Mary Ann Liebert, Inc.*,
    2018 WL 2561029 (S.D.N.Y. June 4, 2018) .....................................................15

*In re Platinum-Beechwood Litig.*,
    453 F. Supp. 3d 645 (S.D.N.Y. 2020)..........................................................16, 17

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ....................................................31

*Purgess v. Sharrock*,
    33 F.3d 134 (2d Cir. 1994)........................................................................30

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) ..................................................4, 25

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................4, 14, 34

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
    573 F.3d 98 (2d Cir. 2009)....................................................................23, 24

*SEC v. AIC, Inc.*,
    Case No. 3:11-cv-00176 (E.D. Tenn. 2011) ......................................................10

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012).......................................................................35

*SEC v. Bankatlantic Bancorp, Inc.*,
    2013 WL 12009694 (S.D. Fla. Nov. 14, 2013).....................................................17

*SEC v. Berry*,
    2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) .................................................39, 40

## TABLE OF AUTHORITIES
(continued)

Page(s)

*SEC v. Cedric Kushner Promotions, Inc.*,
   417 F. Supp. 2d 326 (S.D.N.Y. 2006)............................................................38, 39

*SEC v. City of Victorville*,
   2014 WL 12588688 (C.D. Cal. Oct. 14, 2014)....................................................40

*SEC v. Collector's Coffee Inc.*,
   2021 WL 1956369 (S.D.N.Y. May 17, 2021) ......................................................39

*SEC v. DiMaria*,
   207 F. Supp. 3d 343 (S.D.N.Y. 2016)................................................................27

*SEC v. Espuelas*,
   905 F. Supp. 2d 507, 525 (S.D.N.Y. 2012)........................................................38

*SEC v. Jankovic*,
   2017 WL 1067788 (S.D.N.Y. 2017)..................................................................27

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011)................................................................31

*SEC v. Lee*,
   720 F. Supp. 2d 305 (S.D.N.Y. 2010)................................................................31

*SEC v. Lucent Techs., Inc.*,
   610 F. Supp. 2d 342 (D.N.J. 2009) ..................................................................31

*SEC v. Madsen*,
   2018 WL 5023945 (S.D.N.Y. Oct. 17, 2018) ....................................................32

*SEC v. Monarch Funding Corp.*,
   192 F.3d 295 (2d Cir. 1999)............................................................................14

*SEC v. Obus*,
   693 F.3d 276 (2d Cir. 2012)............................................................................34

*SEC v. Patel*,
   61 F.3d 137 (2d Cir. 1995)..........................................................................5, 40

*SEC v. Paulsen*,
   2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020)................................................35, 36

*SEC v. Pentagon Cap. Mgmt.*,
   612 F. Supp. 2d 241 (S.D.N.Y. 2009)................................................................14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*SEC v. Razmilovic*,
  738 F.3d 14 (2d Cir. 2013)..................................................................................39

*SEC v. Rio Tinto plc*,
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ......................................35, 37, 38

*SEC v. Rio Tinto plc*,
  2021 WL 818745 (S.D.N.Y. Mar. 3, 2021, *motion to certify appeal granted* 2021 WL
  1893165 (S.D.N.Y. May 11, 2021)..................................................................30, 31

*SEC v. Sequential Brands Grp.*,
  2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021).......................................................38

*SEC v. Stanard*,
  2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ....................................................5, 40

*SEC v. Stiefel Labs. Inc.*,
   Litigation Release No. 24828, 2020 WL 3034612 (June 5, 2020) ..........................9

*SEC v. Stoker*,
  865 F. Supp. 2d 457 (S.D.N.Y. 2012)....................................................................27

*SEC v. StratoComm Corp.*,
  2 F. Supp. 3d 240 (N.D.N.Y. 2014) ......................................................................27

*SEC v. Syron*,
  934 F. Supp. 2d 609 (S.D.N.Y. 2013)..............................................................26, 27

*SEC v. Warner*,
  652 F. Supp. 647 (S.D. Fla. 1987) ........................................................................27

*SEC v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017)....................................................................27

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019).....................................................................22

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010).....................................................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308, 127 S. Ct. 2499 (2007).................................................2, 3, 23, 26

*In re Teva Sec. Litig.*,
  2021 WL 1197805 (D. Conn. Mar. 30, 2021) ......................................................31

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Thor Power Tool Co. v. Comm'r*,
    439 U.S. 522, 99 S. Ct. 773 (1979)........................................................................15

*Turner v. MagicJack VocalTec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014).............................................................34

*Va. Bankshares Inc., v. Sandberg*,
    501 U.S. 1083, 111 S. Ct. 2749 (1991)............................................................2, 22

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021)...................................................................32

*Yukos Cap. S.A.R.L. v. Feldman*,
    2016 WL 4940200 (S.D.N.Y. Sept. 14, 2016).........................................................2

*Zagami v. Cellceutix Corp.*,
    2016 WL 3199531 (S.D.N.Y. June 8, 2016) ....................................................29, 30

## STATUTES

15 U.S.C. § 77q(b) ...........................................................................28, 29, 33, 36

15 U.S.C. § 77t(e) .......................................................................................5, 40

15 U.S.C. § 78u(d)(2) ...................................................................................5, 40

## OTHER AUTHORITIES

S. Rep. No. 95-114 (1977).....................................................................................37

## RULES

Fed. R. Civ. P. 9(b) .......................................................................................6, 14

Fed. R. Civ. P. 12(b)(6)..............................................................................2, 13, 14

## INTRODUCTION

This is a case that never should have been brought.  After a five-year investigation, the Securities & Exchange Commission ("SEC") has grossly overreached here.  It charges Medallion Financial with securities fraud and seeks an officer/director bar against its president, Andrew Murstein, based on six-year-old allegations of non-recurring conduct that cannot constitute securities fraud as a matter of law or justify the draconian relief sought here.  The SEC, facing a meritorious motion to dismiss, chose to evade it by amending its pleading.  In a vain attempt to shore up the infirmities in its case, the SEC added more than 80 paragraphs of largely repetitive allegations, as well as a novel theory of scienter untethered to any aspect of its lengthy investigation or original pleading.  But the SEC's "Hail Mary" falls flat, and the fatal flaws in its case remain.

The SEC charges two alleged "fraud" schemes, both of which are contravened by controlling precedent warranting dismissal here.  One involves the SEC's disagreement with the estimated value Medallion reported for certain assets—particularly, a Utah bank (Medallion Bank or "the Bank").  The SEC claims that the Bank estimate was fraudulent, even though it is undisputed that: (i) an independent valuation firm prepared it and stands by its work; (ii) the Company's independent auditors reviewed the valuation and stand by their audit opinions; (iii) the Company amply disclosed the multiple assumptions and methodologies used in arriving at that figure; (iv) the value reported was lower than others estimated and offered to purchase the Bank at the time; and (v) the Bank has greatly appreciated in value since, having just reported record results in both assets and earnings.  *See* ¶¶ 136-37, 142-43; Ex. 4 ("2021 8-K") at 1; Ex. 5 ("2016 10-K") at F-34-F-35; Exs. 6, 7, A, B, C.[1]  The SEC's valuation claims fail as a matter of law because they boil down to

---

[1]  Citations to "¶ [Paragraph Number]" are to the Amended Complaint (Ex. 1).  Medallion's Annual Reports are cited as "[Year] 10-K" and Quarterly Reports as "10-Q [Date]."  Citations to "Ex. __" are to the exhibits attached to the accompanying Declaration of Randy Mastro ("Decl."), including excerpts from cited SEC filings.

disagreements regarding the application of subjective accounting standards and principles relating to valuation estimates that are inherently judgment-based.[2]   As this Court has recognized, such subjective valuation judgments are non-actionable opinions, not statements of fact, for purposes of alleging securities fraud under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 135 S. Ct. 1318 (2015), and its progeny, including *In re AmTrust Financial Services., Inc. Securities Litigation*, 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) (Kaplan, J.).  Moreover, the Company's extensive disclosures regarding valuation methodologies and inputs render any alleged misstatements immaterial.  *See Va. Bankshares Inc., v. Sandberg*, 501 U.S. 1083, 1097, 111 S. Ct. 2749, 2760 (1991) ("publishing accurate facts . . . can render a misleading proposition too unimportant to ground liability").

The SEC's second alleged fraud scheme involves largely pseudonymous blogging on "chat" sites six years ago responding to short sellers' smears.  ¶ 2.  The SEC claims these postings amounted to fraudulent touting because the independent bloggers retained by the Company failed to disclose they were paid.  *See* Counts 1, 2 & 4.  The Second Circuit's decision last week in *Noto v. 22nd Century Group Inc.*, --- F.4th ---, 2022 WL 1633827, at *5 (2d Cir. May 24, 2022), requires dismissal of this claim because "[an] issuer who merely pays an author to write positive articles

---

On a Rule 12(b)(6) motion, a district court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007), including "public disclosure documents required by law to be filed, and actually filed, with the SEC," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  Even "when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it . . . relies and which is integral to the complaint, the Court nevertheless may consider the document in deciding the defendant's motion to dismiss."  *Cloister E., Inc. v. N.Y.S. Liquor Auth.*, 2021 WL 4443838, at *8 (S.D.N.Y. Sept. 28, 2021) (Kaplan, J.) (quotations omitted); *see also Yukos Cap. S.A.R.L. v. Feldman*, 2016 WL 4940200, at *2 (S.D.N.Y. Sept. 14, 2016) (Kaplan, J.) (court may consider "any documents relied upon by the plaintiff in bringing the suit").

[2]   Another asset that receives newfound focus in the SEC's amended pleading is Medallion's modest portfolio of approximately 150 Chicago medallion loans.  *See* ¶¶ 26-38, 193-224.  But the estimated valuation of that portfolio was similarly rooted in accounting judgments, was determined using a cash flow analysis that comports with accounting guidelines, and, regardless, could not be considered material here.  *See infra* at 18-19, 22-23.

on a stock does not, without more, violate" securities laws.  That outcome is even clearer where, as here, the posts at issue were largely opinions or otherwise factually accurate, commentators posted on websites in which they promoted their financial self-interest in stocks and commonly used pseudonyms, and the author at issue expressly admitted he was "long" on "TAXI."  Exs. 26, 27.[3]  Furthermore, the Amended Complaint does not allege—because it cannot—that Medallion or Murstein had a duty to make that compensation disclosure, because, as the Second Circuit held just last week, "only an article's maker, not its benefactor, has a duty to disclose that it was paid for."  *Id.* at *4.  Indeed, misstatement liability is limited to "the maker of a statement," and the Amended Complaint fails to allege that Medallion or Murstein "made" any such misstatement or directed it.  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S. Ct. 2296, 2302 (2011); *see also Noto*, 2022 WL 1633827, at *2, *5 (allegations were insufficient even where "it was 'clear'" that the CEO defendant "knew" of a touting violation and exercised "some input" into the content posted, but not "ultimate authority").  Moreover, any alleged omission or misstatement regarding compensation on these financial "chat" sites, posted largely by pseudonymous authors acknowledging their bias, cannot have been material to investors.

Several other defects are common to both fraud claims.  The Amended Complaint does not come close to adequately pleading scienter in connection with either alleged scheme.  Fraud, subject to heightened pleading standards, requires that courts draw both culpable and non-culpable inferences from the facts alleged.  *See Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510.  Here, the allegations themselves and Medallion's SEC filings undermine any plausible inference of fraud.  For example, while the SEC would have this Court believe that the advent of ride-share apps like

---

[3]  "TAXI" was Medallion's stock ticker name at the time, meaning the author (Defendant Meyers) disclosed in the same posts at issue here his self-interest that he held Medallion stock and intended to remain invested in the Company.  Medallion's stock ticker name subsequently was changed to "MFIN."  ¶ 19.

Uber and Lyft caught Medallion by surprise and so devastated its business that it resorted to fraud (¶ 2), in reality, Medallion had long before diversified its business to substantially reduce its earlier concentration on taxi medallion lending (¶ 28).  Before this alleged conduct even occurred, Medallion was already drawing "approximately 80% of [its] earnings . . . [from] outside of the medallion lending area."  Ex. 8 ("2014 8-K") at 2.  The Company's bank valuation was supported by independent valuation firms and auditors, further defeating any plausible inference of fraud.  And on the touting issue, neither Medallion nor Murstein are alleged to have profited in any way from these posts and comments, so that cannot be the basis for alleging motive.  *See Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004).  Similarly, the Amended Complaint fails to plead that any of this alleged conduct affected Medallion's stock price.  In fact, the Company's stock price declined during this period.  ¶ 5; *see also* Ex. 9.  And the SEC's last-ditch attempt in its amended pleading to conjure a motive—that Medallion supposedly inflated valuations because it feared defaulting on loans that could trigger a "run on the bank" (¶ 5)—is unsupported by any documentary evidence or testimony in the SEC's investigative file, and it is completely belied by public filings confirming that *every* bank excused Medallion's default *before* the bank valuation was even reported.  Ex. 10 ("Q3 2016 10-Q") at 63; 2016 10-K at 55.  Regardless, "alleged motivation to maintain compliance with the covenants in the Company's credit agreements is plainly inadequate to support an allegation of intent to commit fraud."  *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018).

Nor does the Amended Complaint allege that Medallion or Murstein received *any* money or property as a result of either alleged scheme, as required to plead a claim under Section 17(a)(2). And the Amended Complaint similarly fails to plead that any misstatements allegedly made in connection with the valuation or touting at issue here related to an offer or sale of securities, or

were even made contemporaneous with a securities offer or sale, as required under Section 17(a). The SEC's other scattershot allegations of books and records, recordkeeping, and internal controls violations are also insufficiently pleaded because there was no material misrepresentation or omission of fact in the first place. *See* Counts 5-7. They are, furthermore, undermined by the robust disclosures in Medallion's public filings, including complete audited financial statements for the Bank; year-over-year summaries of changes in valuation techniques and inputs used in fair value measurements of assets; and the listing of every single loan, valuation, and collateral in the Medallion Loan Portfolio. *See infra* Statement of Facts Sec. B.2. Moreover, it is telling that Medallion has never issued a restatement or been required to do so by its independent auditors.

Finally, the SEC's requested remedies are legally deficient and should be stricken. The SEC seeks disgorgement, but fails to plead any "ill-gotten gains" from this alleged conduct. *See Liu v. SEC*, --- U.S. ---, 140 S. Ct. 1936, 1942 (2020). The SEC seeks to bar Murstein from serving as a public company officer or director, even though he has led Medallion through many crises over the past three decades (including 9/11, the 2008 recession, and the pandemic), and is accused of long-ago conduct, with no prospect of recurrence.[4] An officer/director bar would be inappropriate here, given Murstein's "otherwise unblemished career," *SEC v. Stanard*, 2009 WL 196023, at *33 (S.D.N.Y. Jan. 27, 2009), and the absence of any other allegations of "unfitness to serve as an officer or director," *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (quotation omitted). Without cognizable Section 10(b) and 17(a)(1) claims, an industry bar is unavailable as a matter of law. *See* 15 U.S.C. § 77t(e); 15 U.S.C. § 78u(d)(2).

The SEC spent five years investigating every aspect of Medallion's financial reporting. Now, not content with the record it created over those five years, it is abusing the civil discovery

---

[4]   The Company's public filings no longer require it to report the Bank's value (¶ 22), and it ceased using independent contractors to write posts in 2016 (*see, e.g.*, ¶ 72).

process to try to salvage its failing case, showering the landscape with more than 30 subpoenas since this action was filed.  Yet all it has to show for it—*even after* amending its complaint in the face of Medallion's motion to dismiss—is this insufficient pleading, full of rhetoric, but lacking the "particularity" required to plead fraud.  *See* Fed. R. Civ. P. 9(b).  The SEC's investigative file, which it had to turn over in ongoing discovery in this case, confirms its claims are meritless: the independent professionals involved in estimating and auditing the Bank's value told the SEC they stand by their work and the reported valuations were "reasonable," "fair," and "appropriate."[5]  On that basis alone, the SEC never should have pleaded this bank valuation as a fraud claim at all.  Moreover, it has miscast as "fraud" inconsequential and otherwise accurate blogging by independent parties retained by the Company, simply because the pseudonymous authors failed to disclose their compensation.  At most, that was a foot fault by others that should not have resulted in charges against Medallion and Murstein at all, let alone "fraud" charges.  In short, none of this alleged conduct can serve as a proper basis for a fraud claim or an officer/director bar.

Accordingly, for all of the reasons explained here, the SEC's Amended Complaint against Medallion and Murstein should be dismissed with prejudice in its entirety.

## STATEMENT OF FACTS[6]

### A.    History Of The Company

Medallion is a quintessential New York business.  In 1937, a Polish immigrant (Leon Murstein) purchased a New York City taxi medallion and earned a living driving a taxi cab.  Ex. 11.  One cab grew into a fleet, and when no bank would provide financing to would-be buyers,

---

[5]  *See* Exs. B at 103:9-17, C at 61:10-62:22.  While this dismissal motion is not predicated on such testimony, the SEC knew from the testimony it elicited from Medallion's independent auditors at Mazars and from the independent experts at Berenson who did the bank valuation that *all* of these independent professionals stand by their work, audits and valuations that the SEC now purports to put at issue.  *See* Exs. A, B, C.

[6]  This Statement of Facts is drawn from the allegations in the Amended Complaint and documents cognizable on a motion to dismiss.  While the Amended Complaint is riddled with misleading and false allegations, these allegations are assumed true for the purposes of the motion to dismiss.

Medallion issued them loans.  *Id.*  The business grew into one that offered low-interest-rate loans through the Small Business Administration ("SBA") to immigrants and minorities otherwise denied credit.  *Id.*  Leon's grandson, Andrew Murstein, now Medallion's president and chief operating officer, has overseen its transformation since 1990 into a diversified bank and finance company that includes commercial and consumer lending.[7]

In 1987, Medallion began diversifying its portfolio beyond taxi medallion loans.  Ex. 13 ("1998 10-K") at 8.  Murstein had the foresight to form and charter Medallion Bank in 2003 and develop it into the Company's most valuable asset, engaging in profitable consumer and commercial lending.  ¶¶ 22, 42.  Murstein was able to use Medallion's bank charter to create value for the business in a new way, detached from taxi medallions.  For example, financial technology companies ("FinTech companies") across the country, though proliferating, needed access to an established financial institution with a bank charter to originate even the most basic consumer loans, and the Bank provides such services, among others.  Ex. 14.  Because of the decades-long push to diversify, Medallion was poised to weather the industry-wide impact from rideshare apps.  ¶ 1.  Indeed, by "2014, approximately 80% of [Medallion's] earnings came outside of the medallion lending area," 2014 8-K at 2.  Between 2014 and 2017, the amount invested outside medallion loans increased by over a third, while the amount invested in medallion loans decreased by over 50%.  ¶ 32.  By the end of 2021, taxi medallion loans comprised less than 1% of Medallion's loan portfolio, Ex. 15 ("2021 10-K") at 5, down from 76% when Medallion went public, Ex. 16 ("1996 10-K") at 7, with the Bank reporting record net income of $70 million on a diversified portfolio, as well as a return on equity of 29.1%, 2021 8-K at 1.

---

[7]  Over the years, Medallion's distinguished board members have included New York Governor Mario Cuomo, baseball legend and Presidential Medal of Freedom recipient Hank Aaron, and Connecticut Governor and United States Senator Lowell Weicker.  Ex. 12.

**B.**     **The Valuation Allegations**

In consultation with its independent auditor (*see*, *e.g.*, ¶ 154), and as detailed in Medal-lion's periodic public filings, *see*, *e.g.*, Ex. 17 ("2013 10-K") at 38—though not legally required—Medallion engaged outside valuation firms to assist in the valuation of Medallion Bank.  Through-out the relevant period, Medallion's valuation of the Bank had been consistently supported by multiple valuation specialists.  *See*, *e.g.*, 2016 10-K at 49.  Medallion's auditor reviewed the val-uation reports and Medallion's estimate of the Bank's value every quarter and provided unqualifi-ed audit opinions on Medallion's financial statements at year-end.  *See* Ex. 18 ("2020 10-K") at F-16; 2016 10-K at F-56; Ex. 19 ("2017 10-K") at 62.

**1.**     **Medallion Reasonably And Responsibly Relied On Third-Party Valu-ations.**

From 2015 through November 1, 2016, RP Financial was Medallion's third-party valua-tion firm, ¶¶ 136, 161, and it provided a fair-value opinion in 2015 which formed the basis for Medallion's disclosures, ¶ 137.  Based on the valuations, Medallion reported the Bank's fair value at $152.1 million in 2015, and at $166.4 million for the second quarter of 2016.  ¶ 137.

By the third quarter of 2016, numerous indicators supported an increase in the value of the Bank.  After Medallion was approached by an investment bank interested in purchasing a portion of the Bank, Murstein conducted diligence with other investment banks with which Me-dallion had historically worked to get their guidance on the market value of the Bank.  ¶ 140. Murstein emailed both Sandler O'Neill ("Sandler") and Keefe, Bruyette & Woods ("KBW"), leading bank specialists, for their input, and asked them to value the Bank.  ¶ 140.  Given these firms' familiarity with the Bank and FinTech companies' interest in industrial loan company ("ILC") lenders such as the Bank, Sandler and KBW promptly provided Medallion with analyses of the estimated value of the Bank using common valuation methodologies.  ¶ 141.  Both firms

estimated the value of the Bank at ranges substantially above RP Financial's estimates: Sandler estimated between $185 million and $325 million, and KBW estimated up to $371 million. ¶ 141; Ex. 21.[8]  At the same time, Medallion engaged with WebBank, also a Utah industrial loan bank, regarding a potential minority investment in the Bank.  ¶ 142.  After receiving relevant financial information on the Bank, WebBank confirmed in writing its interest in acquiring a minority interest in the Bank at a minimum overall valuation of $200 million.  ¶¶ 142-43.[9]

The valuations and offers from four reputable firms reasonably led Medallion to believe that the Bank's fair value was significantly higher than RP Financial's estimate.  Medallion provided the valuation estimates and analyses from Sandler and KBW, as well as information on WebBank's investment interest in the Bank, to RP Financial.  ¶ 148.  Despite the numerous and consistent indications of a substantial increase in value, RP Financial believed only a modest increase was warranted, ¶ 159, which concerned Medallion.  RP Financial appeared to be ignoring the estimates of value from investment banks and market participants who were better informed as to the latest mergers and acquisitions activity involving comparable industrial loan banks. ¶ 158.  Also, Murstein was concerned about *undervaluing* the Bank at the same time Medallion might be repurchasing company stock, as Medallion had recently extended the terms of its share repurchase program, Ex. 22 ("2016 8-K"), and the SEC has alleged fraud when companies repurchase stock while having received indications from third parties of higher valuations.[10]

---

[8]   While RP Financial's final estimated valuation was $166.7 million, the "high end" of the range it provided—$637 million—was far *higher* than that of Sandler and KBW.  Ex. 20.

[9]   Although the SEC has pointed to an internal WebBank draft letter, dated November 28, 2016, that contemplated a revised offer below $200 million, it was never sent to Medallion.  ¶ 144.  Moreover, the SEC was well aware that Medallion and Credify negotiated extensively through contract drafts for Credify to purchase a portion of the Bank based on the Bank's value of $350 million.  Ex. 6.

[10]   *See, e.g.*, *SEC v. Stiefel Labs. Inc.*, Litigation Release No. 24828, 2020 WL 3034612 (June 5, 2020) (obtaining judgment against company for defrauding shareholders by repurchasing company stock when the company had received interest from private equity firms in buying stock in the company at significantly higher valuations).

Murstein sent KBW and Sandler the last RP Financial valuation report, and asked if they could provide a similar report confirming the higher valuations they had previously provided. ¶ 170.  Murstein also reached out to a highly qualified merchant bank and advisory firm, Berenson, seeking a valuation opinion, which Berenson provided.  ¶¶ 170, 172.  It estimated the value of the Bank to be between $191 million and $271 million.  ¶ 222; Ex. 7.  In its next 10-Q, Medallion estimated the value of the Bank at $193 million—nearly the lowest end of Berenson's range. ¶ 222; Q3 2016 10-Q at 32, 36, 38, 39; *see also* Ex. 23 (chart showing all Q3 2016 valuations or offers for the Bank, all contained in the SEC's investigative file).  For year-end 2016, Berenson estimated the value to be between $262 million and $309 million, and Medallion estimated the value at $280 million.  ¶ 232; 2016 10-K at F-13, F-34, F-42.  After the 2016 election, market values of financial companies, like the Bank, increased substantially in anticipation of deregulation and tax cuts.  Ex. 24. [11]  In 2017, Medallion began using Delta Financial [12] as its valuation firm.  2017 10-K at F-34.  At year-end, Medallion estimated the value of the Bank at $290 million, only a slight increase from the year prior, and at the bottom of Delta Financial's estimated range of $290 to $350 million.  *Id*. at F-36, F-41, F-44, F-46; ¶ 240.  The Bank has seen record financial performance since.  2021 8-K at 1.

---

[11]   While this motion is not predicated on any testimony given during the SEC's investigation, the SEC cannot deny, because it elicited the testimony, that the independent professionals involved here flatly rejected the SEC's theory that the Bank's reported valuation they endorsed resulted from "pressure."  ¶ 227.  Indeed, Berenson's managing director swore to the SEC that "we're going to do our work and however it comes out," that's what's reported.  Ex. B at 102:4-12.  Moreover, Medallion's independent auditor from Mazars similarly testified that he "was comfortable with" Berenson's engagement, he is "obviously sensitive" to appearances, and he would never condone anything untoward, because, as he put it, "Medallion Financial as an audit is less important" than the "integrity of the firm and my own license."  Ex. A at 351:10-14, 395:8-17.  Moreover, both the Mazars and Berenson witnesses swore to the SEC they stood by their work, testifying that "overall . . . it appeared to be reasonable," and resulted in a "range" for this Bank's value that they "th[ought]" was "fair and appropriate."  Ex. C at 61:10-62:22; Ex. B at 103:9-17, 124:10-12.

[12]   The principal of Delta Financial, Timothy Hurley, has served as a valuation expert witness for the SEC in an enforcement action.  *See SEC v. AIC, Inc.*, Case No. 3:11-cv-00176 (E.D. Tenn. 2011).

## 2.  Medallion Amply Disclosed Information About The Bank Valuation.

Medallion's periodic reports contained extensive disclosures of the Bank's valuation, including the use of a valuation specialist and the significant observable and unobservable inputs that Medallion factored into its analysis.  These disclosures provided ample information to support the Bank's increased value.  For example, note 3 of Medallion's financial statements presented the Bank's financial performance, including, among other things, summary balance sheets and income statement information.  2016 10-K at F-65-F-68.  Medallion also disclosed the Bank's complete audited financial statements, as well as disclosures concerning "Fair Value of Assets and Liabilities," in particular the valuation of unobservable assets—and presented a year-over-year "summary of changes in fair value of the Company's level 3 assets and liabilities," including changes in value of the Bank.  *Id.* at F-30-F-35; F-56-F-73.  The disclosures also contained a year-over-year comparison of the "valuation techniques and significant unobservable inputs used in recurring Level 3 fair value measurements of assets and liabilities," including the Bank.  *Id.* at F-34-F-35.

Thus, Medallion provided a detailed year-over-year comparison of the valuation techniques, unobservable inputs, methodologies, multiples, discount rate and the relative weighting of each methodology.  Its disclosures included the significant methodologies and inputs that underpinned the valuation of the Bank, both summary and complete detailed financial information on the performance of the Bank, and a year-over-year comparison of the changes in value and the significant inputs related to the determinations of value.  The disclosures also included a consolidated schedule of investments accompanying each periodic report, including the actual value it placed on each of its over 1,100 outstanding loans.  2017 10-K at F-39, F-47, Ex. 99-1.  These disclosures enabled any investor to assess Medallion's estimate of the value of the Bank.  Moreover, the SEC has not alleged that the valuation of the Bank moved the stock in any way, and in fact the stock declined during this period.  Ex. 9.

### 3. The Valuation of Chicago Medallions Was Appropriate And Fully Disclosed.

In 2016, the "value of medallions was declining precipitously" and the "drop was particularly significant in the Chicago medallion market," making valuing them a difficult exercise. ¶ 192. Consequently, Medallion disclosed that the Chicago medallion market was "unrepresentative of a liquid market" and would therefore be classified as a Level 3 asset. 2016 Q3 10-Q at 68; *see also id.* at 30-33. Medallion consistently used cash flow analysis to estimate the value of a Chicago medallion, and it continued to do so during this period. The cash flow model yielded a value around $105,000. ¶ 200. Medallion valued its relatively modest loan portfolio of approximately 150 Chicago medallions slightly above that value because the one arm's length sale of a Chicago medallion at that time was $200,000. On November 8, 2016, only one day before Medallion's 10-Q filing deadline, "the FDIC and/or UDFI . . . expressed concern" that the Chicago medallion valuation was too high. ¶ 196. Months later, those regulators "conclude[d] their examination" and issued a report confirming their earlier concern, in response to which Medallion immediately wrote down the value of the Chicago medallions in its next SEC filing, and disclosed the regulators' findings. ¶¶ 217, 221, 224; Ex. 29 ("Q1 2017 10-Q") at 70.

## C. The Touting Allegations

In 2014, Medallion was attacked by short sellers who published misleading, negative, and often anonymous, blog posts on "financial" sites about Medallion's business, attempting to decrease the stock price and increase the profits of their short positions. ¶¶ 2, 39. In December 2014, Lawrence Meyers, an expert in financial analysis and public relations who operated under the company Ichabod Cranium, reached out to Murstein and offered to help respond to the short sellers. ¶ 45. Murstein consulted his general counsel and outside counsel. ¶ 46. The consulting agreement with Meyers: (i) required him to comply with applicable securities laws; (ii) described

Meyers as an "independent contractor" "not authorized to act on behalf of the Company"; and (iii) required review and written sign-off by two Medallion officers prior to publication. ¶ 49; Ex. 25.

Meyers proceeded to publish factually accurate articles and opinion-based commentary regarding the taxi industry, typically under pseudonyms, often without even mentioning Medallion Financial by name. *See*, *e.g.*, Ex. 26. These posts revealed Meyers' financial self-interest in Medallion stock, for example, by indicating that the author was "long TAXI." Exs. 26, 27. Most of the postings were brief comments on message boards filled with sophomoric insults by anonymous commenters. *See* ¶ 58. The SEC does not allege that any of those postings had any impact on Medallion's stock; in fact, Medallion's stock price declined during this period. ¶ 5; Ex. 9. In 2016, Medallion retained another person—the "Contractor"—and Medallion's in-house counsel prepared an agreement similar to Meyers', which she signed. ¶ 73; Ex. 28. Murstein told the Contractor to speak with Meyers; the Contractor took direction from Meyers, particularly on how to get published online and post pseudonymously. ¶ 80. When the Contractor ceased working for Medallion, she signed a release and received a severance payment. ¶ 109.

## D.   Procedural History

Nearly five years ago, on June 12, 2017, the SEC issued a Formal Order of Investigation regarding Medallion, resulting in Medallion making numerous presentations and significant document productions to the SEC, and providing witness testimony. At the end of last year—over the holidays and with only one hour's notice to Medallion and its attorneys—the SEC filed this action. In response to Medallion's motion to dismiss, the SEC amended its complaint. ECF 34, 46.

## <u>LEGAL STANDARDS</u>

Under Rule 12(b)(6), while the Court accepts as true the factual allegations in a complaint, "mere conclusory statements," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)), and allegations "contradicted" by

documents referenced in a complaint "are insufficient to defeat a motion to dismiss," *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). Instead, the SEC must plead facts that "plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. Under Rule 9(b), a complaint must "state with particularity the circumstances constituting" the alleged fraud. *SEC v. Pentagon Cap. Mgmt.*, 612 F. Supp. 2d 241, 257 (S.D.N.Y. 2009). The SEC must "(1) specify the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent," and also "allege facts giving rise to a 'strong inference of fraudulent intent.'" *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted). This standard applies to *every* claim in the Amended Complaint because even the non-fraud claims are "premised on [the same] allegations of fraud," *Rombach*, 355 F.3d at 171, and "pertain to the exact same underlying events," *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 339 (S.D.N.Y. 2012). To state a claim for fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege that a defendant: (1) made a materially false statement or omission of material fact as to which there is a duty to speak, (2) with scienter, (3) in connection with the purchase or sale of a security. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). "Essentially the same elements are required" to state a 17(a) claim, though scienter is not required for subsections 17(a)(2) or 17(a)(3). *Id.*

## ARGUMENT

**A.    The SEC Fails To Adequately Plead Violations Of Sections 10(b) And 17(a) Relating To Medallion's Reported Bank Valuations (Counts 1 & 2)**

**1.    The SEC Fails To Plead Any Misstatement Of Fact.**

The Amended Complaint fails to adequately plead any misstatement of fact for two reasons. First, changes in the Bank valuations were based on differing subjective judgments and, therefore, are non-actionable opinions. Second, the other identified statements were accurate.

14

### a.    The Valuations Were Non-Actionable Opinions.

In *Omnicare*, the Supreme Court held that statements of opinion generally cannot give rise to securities fraud liability.  575 U.S. at 184, 135 S. Ct. at 1326.  Applying *Omnicare*, this Court has since held that alleged misstatements are non-actionable opinions—even where they "concern at bottom financial data presented in the company's consolidated financial statements and the accounting principles applied to produce or arrive at that data"—where the determination of the financial data "involved a subjective evaluation."  *AmTrust*, 2019 WL 4257110, at *12, *14.  The same is true here.  The Amended Complaint alleges that Medallion made misstatements regarding the fair value of the Bank and its modest Chicago medallion loan portfolio.  But "[t]here is no universally infallible index of fair market value"—instead, there is a "range of prices with reasonable claims to being fair market value."  *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) (citation omitted).  This is a case where fair value is determined based on "resulting data" born from "relevant accounting guidance call[ing] for the exercise of judgment."  *AmTrust*, 2019 WL 4257110, at *14 (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011)).  Indeed, the SEC *admitted* that Medallion's "approach to determining the fair value of the Bank" was "subjective" and "malleable" under relevant accounting principles.  Complaint ¶ 89. [13]

"Accountants long have recognized that 'generally accepted accounting principles' ["GAAP"] are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions.  [GAAP], rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."  *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544, 99 S. Ct. 773, 787 (1979) (citation omitted).  Importantly, "if the relevant accounting guidance

---

[13]  Tellingly, the SEC deleted this admission from its Amended Complaint.  But the SEC cannot now run from its original allegations, which are "properly considered by the court when evaluating the plausibility of [plaintiff's] claims."  *Perry v. Mary Ann Liebert, Inc.*, 2018 WL 2561029, at *4 (S.D.N.Y. June 4, 2018) (citation omitted).

called for the exercise of judgment, then the resulting data would be a statement of opinion." *AmTrust*, 2019 WL 4257110, at *14. The SEC points to a single GAAP provision that Medallion allegedly violated: Accounting Standards Codification ("ASC") 820. ¶¶ 167, 271. ASC 820, which is part of the Financial Accounting Standards Board's GAAP guidance, defines the fair value of an asset as the price the holder would receive from selling the asset in an orderly transaction at the measurement date, ASC 820-10-20, and it includes a hierarchy of inputs used to measure the fair value. Level 1 inputs are unadjusted quoted market prices in active markets for identical assets. Level 2 inputs are directly or indirectly observable inputs, other than Level 1 inputs. Level 3 inputs are unobservable inputs, ¶ 201, which here were the appropriate benchmark by which to determine fair value. For example, "[i]f the evidence indicates the transaction is not orderly, a reporting entity shall place little, if any, weight . . . on that transaction price." ASC 820-10-35-54J(a). Critically, the "fair value of an asset or a liability might be affected when there has been a significant decrease in the volume or level of activity for that asset or liability in relation to normal market activity for the asset or liability (or similar assets or liabilities)." ASC 820-10-35-54C.[14] Moreover, as was the case here, ASC 820 addresses changes to valuation techniques used to measure fair value and specifically authorizes a change in a valuation technique or its application—including, for example, a change in weighting—where such a change results in "a measurement that is equally or more representative of fair value in the circumstances." ASC 820-10-35-25.

Courts have made clear that fair value determinations subject to ASC 820 (and its precursor, FAS 157) involve the exercise of judgment. *See, e.g., In re Platinum-Beechwood Litig.*,

---

[14] *See also* ASC 820-10-55-90 to 92 (providing examples of situations in which observable prices for a transaction might not be relevant because of low market activity); FAS 157-3 (October 2008) ("[I]n cases where the volume and level of trading activity in the asset have declined significantly, the available prices vary significantly over time or among market participants, or the prices are not current, the observable inputs might not be relevant and could require significant adjustment.").

453 F. Supp. 3d 645, 648 (S.D.N.Y. 2020) (company hired to "opine" on reasonableness of "fair value estimates . . . in accordance with ASC-820"); *Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, 2010 WL 5095294, at *6 (E.D. Wis. Dec. 8, 2010) ("identifying fair value" in accordance with FAS 157 can be "extremely difficult, in that it involves the consideration of various valuation techniques and a hierarchy of 'inputs'").[15]  Even the primary author of FAS 157 has testified that "there is no mathematical formula to determine fair value," and "a certain amount of artistry is involved in the process."  *SEC v. Bankatlantic Bancorp, Inc.*, 2013 WL 12009694, at *6 n. 13 (S.D. Fla. Nov. 14, 2013).

Here, both RP Financial and Berenson used the same three conventional methodologies to value the Bank in accordance with ASC 820: (i) comparable company analyses, (ii) comparable transactions analyses, and (iii) discounted cash flow analyses.  Exs. 7, 20.  The difference in the valuation outcomes between RP Financial and Berenson arises from reasonable "judgment calls" among professionals in applying these methodologies.  Relatedly, the market for taxi medallions and medallion-backed loans became illiquid in 2016 into 2017, and the transactions that took place were often not "arm's length."  *See* ¶¶ 40-42.  The unpredictable emergence and effects of "ride-share" apps, moreover, "introduced" "volatility" into the valuation process.  ¶ 152.  In light of the role of medallions in the Bank's overall value, Medallion categorized the Bank as a Level 3 asset.  *See, e.g.*, 2016 10-K at F-32; 2017 10-K at F-35.  Consequently, determining fair value became even more difficult, requiring the exercise of judgment and discretion.

While the Amended Complaint miscasts these varying judgments as a binary choice between right and wrong, the law is clear: The "Amended Complaint does not plausibly allege a

---

[15]  One court suggested plaintiffs asserting a violation of FAS 157 should "consider including a statement from an expert witness in the complaint" because "the reality may be that unless such allegations are included in the complaint the court will have no way to determine whether the pleaded facts give rise to a reasonable belief that the defendants violated GAAP."  *Fulton Cty.*, 2010 WL 5095294, at *6 n.3.

misstatement of fact; at best it alleges a difference of opinion regarding the reasonableness of [the company's] actuarial or accounting assumptions." *Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 173 (S.D.N.Y. 2015). This is so even if the Bank valuations were "attributable to . . . '*unreasonable*' [accounting] assumptions," *id.* (emphasis added)—which they were not. Indeed, Medallion's 10-K and the reports from RP Financial and Berenson explicitly refer to the valuations as "opinions." 2016 10-K at 49 ("We . . . receive an *opinion* regarding the valuation from an independent third party . . . ."); *id.* at F-56 (auditor stating, "In our *opinion*, the financial statements referred to above present fairly . . . the financial position of the Bank . . . ."); Ex. 20 ("It is our *opinion* that . . . the aggregate fair value of the common stock of the Medallion Bank was $166.7 million."); Ex. 7 ("It is our *opinion* that . . . the aggregate fair value of the Bank was between $191 million and $271 million.") (emphases added). It "matters under *Omnicare* that [the financial reports] . . . were explicitly identified as opinions" because "a reasonable person 'recognizes the import of words like "I think" or "I believe," and grasps that they convey some lack of certainty as to the statement's content.'" *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *14 (N.D. Cal. Sept. 29, 2021) (quoting *Omnicare*, 575 U.S. at 187, 135 S. Ct. at 1328). These Bank valuations are non-actionable opinions.

As for the Chicago medallions, "the drop" in the "value of medallions" was "particularly significant in the Chicago medallion market." ¶ 192. Given this volatility, Medallion disclosed that the Chicago medallion market was "unrepresentative of a liquid market" and would therefore be considered a Level 3 asset, whose valuation, like that of the Bank, required the exercise of judgment and discretion. Q3 2016 10-Q at 30-33, 68; *see also Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 122 (S.D.N.Y. 2010) (Kaplan, J.), *aff'd*, 655 F.3d at 105 (valuing assets that are "not traded on the New York Stock Exchange or some other efficient market" will be "a matter

of judgment and opinion").  This timing undermines any inference of fraud: Medallion learned of the regulators' "concern" just before filing, received their written feedback months later, and, in response, immediately wrote down the value of Chicago medallions and disclosed the regulators' concerns.  ¶ 196, Q1 2017 10-Q at 70. [16]  In any event, "[c]ourts have held repeatedly that a company is not compelled to disclose every communication it has with a regulator—even when . . . a regulator has informed a company of deficiencies in its operations.  This is especially true where there has been no official regulatory action."  *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *17 (S.D.N.Y. Sept. 13, 2017) (citation omitted).  Still, as the SEC acknowledges, Medallion "did disclose" that "regulators required Medallion Bank to take additional loan loss reserves" as a result of the Chicago medallion valuation.  ¶ 224.

### b.   Other Statements At Issue Were Accurate And None Of The *Omnicare* Exceptions Apply.

The remaining alleged valuation-related misstatements cannot support a fraud claim, and the SEC's attempt to invoke the narrow *Omnicare* exceptions is unavailing.  Statements of opinion are only actionable if: (1) the speaker does not actually hold the stated opinion; (2) the opinion contains false "embedded statements of fact"; or (3) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, [ ] if those facts conflict with what a reasonable investor would take from the statement itself."  575 U.S. at 184, 185, 189, 135 S. Ct. at 1326, 1327, 1329.  These narrow exceptions are inadequately alleged.  Instead, the SEC's own allegations and cited documents demonstrate the accuracy of all three statements.

---

[16]  Even if Medallion had valued Chicago medallions at $60,000 for Q3 2016, which the SEC claims was appropriate, such a valuation would have only constituted a 1.5% reduction of assets, which "undercuts an inference of fraud." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 286, 295 (S.D.N.Y. 2014) (A mark down of "less than five percent" of the "company's net loss" "undercuts an inference of fraud").

The first statement at issue is: "Expression of interest in Medallion Bank from both investment bankers and interested parties has continued through 2016." ¶ 180(a). [17]  But the Amended Complaint acknowledges that there were interested parties in 2016.  *See* ¶¶ 141, 143, 149 (various banks communicating with Murstein regarding potential sale).  And documents incorporated by reference further underscore this interest in the Bank.  *See*, *e.g.*, Ex. 30 ("We would consider making an equity investment in Medallion Bank under similar terms . . . ."); Ex. 6 (draft agreement for Credify to purchase Bank at $350 million).  The Amended Complaint alleges that, "[t]o the extent that Medallion Financial's disclosures reflected opinions about the 'interest' of third parties and/or the relevance of such 'interest' to the Bank's valuation, those opinions were not honestly held and/or knowingly or recklessly omitted material facts . . . ." ¶ 185.  The SEC conflates two distinct issues: the *valuations* are opinion statements because they were the product of accounting principles that require the exercise of judgment, as previously explained.  The statement regarding interest in the Bank was not an opinion—it was accurate.

The second statement at issue is: "[I]n the third quarter of 2016 there was a court ruling involving a marketplace lender that the Company believes heightens the interest of marketplace lenders to acquire or merge with Utah Industrial banks." ¶ 180(b).  That decision—*Consumer Financial Protection Bureau v. CashCall, Inc.*, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016)—had a significant impact on the FinTech industry, as corroborated by numerous law firm client alerts, Ex. 31, because it portended that FinTech companies would have to partner with banks and ILCs, like Medallion Bank, in order to originate the loans and financial products those FinTech companies were able to source.  The Amended Complaint does not allege what makes

---

[17]  The SEC's original complaint alleged that it was inaccurate to say such interest "continued through 2016 and 2017," Complaint ¶ 151(a), but its Amended Complaint drops the reference to 2017, effectively conceding that, in fact, expressions of interests did occur in 2017.  ¶ 180.

the statement false or why the ruling would not have affected the Bank.  Its sole theory is that because this case was added to the Management Discussion and Analysis ("MD&A") the day the 10-Q was filed, Medallion must not have conducted a meaningful inquiry into the case's impact.  ¶ 186.  But *CashCall* was decided over two months prior, and commentary on its impact was available shortly thereafter; thus, Medallion had ample time to consider its impact.

The third alleged misstatement is: Medallion "engaged a valuation specialist to assist the Board of Directors in its determination of Medallion Bank's fair value."  ¶ 181.  Again, this is true.  *See* 2016 10-K at 49, 55, 58.  The Amended Complaint alleges (cursorily) that the statement was rendered false because Medallion did not disclose certain *additional* information—that it "used three different valuation firms that used different methods and inputs," "hired [Berenson] by offering it banking work in exchange for valuing the Bank at a certain number," and "fired [RP Financial] against the Auditor's advice."  ¶ 187.  But Medallion had no duty to disclose this additional information, and in any event, it *did* disclose all valuation techniques and unobservable inputs used.  2016 10-K at F-34-F-35.  This alleged misstatement is also immaterial; when "considered together and in context," it would not "affect the total mix of information."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

The SEC adds a conclusory allegation regarding the third alleged misstatement: that an *Omnicare* exception applies because Medallion did not honestly believe the valuation, knowingly or recklessly omitted material facts whose omission made the opinion statement misleading, or made a material omission by failing to disclose that Berenson was offered banking work in exchange for its valuation.  ¶ 188.  The SEC's last-ditch effort to rehabilitate its valuation claim fails.  First, the SEC admits that Murstein "personally" "believe[d]" that the Bank was worth "substantially *more*" than $200 million.  ¶¶ 142, 170 (emphasis added).  Therefore, "the

facts alleged do not come close to the facts in other cases where courts have found that a defendant affirmatively disbelieved (or recklessly credited) a statement of opinion," for example, where "Officer Defendants understood that the publicly reported numbers were at odds with [their] internal analyses, and [they] believed that the internal analyses more accurately reflected the actual financial condition of the company." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 396 (S.D.N.Y. 2019) (citation omitted) (dismissing claims for failure to plead *Omnicare* exceptions). Next, the SEC does not allege the second exception applies, instead, it jumps to the third: that the valuation opinions omitted material facts. But the sole alleged omitted "fact" is the conclusory, false, and already-debunked allegation of a *quid pro quo* agreement with Berenson. ¶ 188. Moreover, pleading the third exception is "no small task," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts"—that is, "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. at 189-90, 194, 135 S. Ct. at 1329, 1332. A reasonable investor would not expect to be told the details of discussions with valuation firms, including that other potential work between Medallion and valuation firms was discussed (but not promised, ¶ 141).

### 2. The Alleged Conduct Was Immaterial Given Medallion's Disclosures.

The extensive disclosures render any alleged misstatements regarding valuation of the Bank and Chicago Medallions immaterial. *See Sandberg*, 501 U.S. at 1097, 111 S. Ct. at 2760 ("publishing accurate facts . . . can render a misleading proposition too unimportant to ground liability"). An omission or statement is material only if "a reasonable investor would view it as significantly altering the 'total mix' of information made available." *Fed. Hous. Fin. Agency for Fed. Nat'l Morg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 146 (2d Cir. 2017) (brackets and citation omitted). The periodic reports contained substantial disclosures concerning Medallion's valuation of the Bank, including Medallion's use of outside valuation firms, the

methodologies used, the significant observable and unobservable inputs used in the methodolo-
gies, and the relative weighting of each methodology.  2016 10-K at F-34-F-35.  Critically, the
2016 10-K at F-56-F-57 contained the *complete audited financial statements for the Bank*, from
which any investor could have assessed its value.  And similarly extensive disclosures were made
regarding the valuation of the medallion loan portfolio: its methodology for valuing medallion-
backed loans; the actual value placed on every single loan, along with the key terms of those loans;
the value assigned to the underlying taxi medallion collateral; and the fact that there was no active
market for medallion loans.  *See supra* Facts Sec. B.  *Even if* the "treatment of . . . fair value on
the financial statements did not comply with GAAP," which it did, "this did not alter the total mix
of information available to [ ] investors . . . so that the misrepresentation or omission was not
material." *In re Lynn Tilton*, SEC Release No. 1182, 2017 WL 4297256, at *49 (Sept. 27, 2017).[18]

### 3.    The SEC Fails To Adequately Allege Valuation-Related Scienter.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*,
551 U.S. at 319, 127 S. Ct. at 2507 (citation omitted).  Courts analyzing securities fraud pleadings
do not draw all inferences in favor of a plaintiff; rather they compare the culpable and non-culpable
inferences from the facts alleged to determine whether "the inference of scienter [is] cogent and at
least as compelling as any opposing inference."  *Id*. at 324, 2510; *Slayton v. Am. Express Co.*, 604
F.3d 758, 766 (2d Cir. 2010).  Scienter can be shown either by demonstrating (i) facts showing
that defendants had both motive and opportunity to commit fraud; or (ii) facts that constitute direct
or strong circumstantial evidence of intentional misbehavior or recklessness, *Novak*, 216 F.3d at
307, meaning either "deliberate illegal behavior," *id*. at 308, or "a state of mind approximating

---

[18]   *See also In re Loewen Grp. Inc.*, 2004 WL 1853137, at *13-14 (E.D. Pa. Aug. 18, 2004) (dismissing claims
because, where "method of accounting is disclosed" in 10-Ks, any allegedly misstated results arising therefrom
are "not material"); *Bay v. Palmisano*, 2002 WL 31415713, at *3, *9 (E.D. La. Oct. 24, 2002) (granting motion
to dismiss where company "repeatedly and precisely disclosed to investors its method for recognizing revenue").

actual intent and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis removed).

For motive and opportunity, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation" are insufficient. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (citing *Novak*, 216 F.3d at 307-08). Plaintiffs must allege that Defendants benefitted from the fraud in "some concrete and personal way." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 241 (S.D.N.Y. 2012) (Kaplan, J.) (citation omitted). Here, the SEC does not allege (nor could it) that Murstein or Medallion had a legally cognizable motive to commit fraud. For example, the SEC does not (and could not) allege that Murstein sold any Medallion stock during the relevant period. *See id.* at 241-42 (no allegations that "individual stock sales by corporate insiders . . . occurred," which "precludes any strong inference of scienter"); *see also In re Ideanomics, Inc., Sec. Litig.*, 2022 WL 784812, at *10 (S.D.N.Y. Mar. 15, 2022) (scienter not pleaded where plaintiff did not allege that defendant "sold his . . . stock" and "realized a profit"). Moreover, conclusory allegations that Murstein "intended to present a more favorable picture of Medallion Financial," sought to "generate support for his valuation," and "set out to manufacture market demand" are exactly the types of "[m]otives that are common to most corporate officers" that fall short of fraud. ¶¶ 138, 145; *see Lions Gate*, 165 F. Supp. 3d at 22. This is especially so here, where Murstein "personally" believed the bank is "worth a lot more" than $200 million. ¶ 142. And his compensation is not even alleged to be tied to Medallion's performance.

In a desperate attempt to salvage its misguided valuation claim, the SEC now suggests, for the first time in five years, a newfound theory—namely, that one default with Metropolitan Bank motivated Murstein and Medallion to commit fraud in order to avoid cross-defaults with other

banks.  ¶¶ 112, 125.  Not so.  All banks explicitly waived any potential default or event of default triggered by the Metropolitan Bank default *before* the valuation filings in question, negating any possible motive.  *See* 2016 10-K at 55; Q3 2016 10-Q at 63; ¶ 128; *see also* Ex. 32.  Their new theory is all the more undermined by the fact that there is nothing in the SEC's investigative file, now turned over through discovery, that supports it in any way.  In any event, as a matter of law, "alleged motivation to maintain compliance with the covenants in the Company's credit agreements is plainly inadequate to support an allegation of intent to commit fraud."  *Reilly*, 2018 WL 3559089, at *15; *see also, e.g.*, *Bd. of Tr. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (defendant's "need to comply with various financial covenants in its loan agreements is [ ] deficient as a motive allegation as they are common to most companies").

As for conscious misbehavior or recklessness, the SEC alleges in a conclusory fashion that Murstein "knew or recklessly disregarded the GAAP violations; the internal controls failures; [and] the misrepresentations and omissions in the MD&A."  ¶ 267.  But it is devoid of factual support for these bare allegations.  Moreover, because the Amended Complaint does not plead motive and opportunity, the SEC's allegations of conscious behavior or recklessness "must be correspondingly greater"—a burden the Amended Complaint fails to meet.  *Hou Liu v. Intercept Pharm. Inc.*, 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020) (Kaplan, J.).

Medallion and its accountants complied with GAAP in determining the fair value of the Bank.  Critically, Medallion's independent auditors and valuation firms stand by their work, and told the SEC so.  That much is evident from the fact that Medallion has never issued a restatement of its 10-Ks or 10-Qs—something it would have had to do if a material mistake had been made.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y.

2004).  "In the absence of a restatement, . . . carping about Defendants' application of GAAP . . . does not permit the Court to infer that the Defendants committed accounting fraud."  *Harris*, 135 F. Supp. 3d at 172.  Murstein's reliance on these professionals was wholly reasonable, and negates any inference of scienter.  Even where an *Omnicare* exception is adequately alleged—which, here, it is not—when "an independent auditor evaluated [defendant's] financial statements and approved of them" that, "in itself, weighs heavily against scienter."  *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 678 (D.N.J. 2021) ("[I]t is difficult to conclude that plaintiffs have behaved recklessly in omitting to inform investors facts when trained financial professionals investigating the company did not conclude that such a disclosure was necessary.").  *See also In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) (finding it "noteworthy" for scienter analysis that defendant's auditors "did not question [the company's] accounting practices").

As the Supreme Court has explained, courts must consider not only possible inferences in the SEC's favor, but also any "plausible opposing inferences," and particularly all "nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 323-24, 127 S. Ct. at 2509-10.  Medallion's extensive disclosures in its public filings undermine any inference of fraud.  Such disclosures would have made no sense if anyone at Medallion thought the valuations were fraudulent.  Moreover, Murstein was concerned about *undervaluing* the Bank given the SEC's prior enforcement actions against companies repurchasing stock while having received indications from third parties of *higher* valuations.  *See supra* at 9.  The only inference to draw is that Medallion and Murstein believed their reported bank valuation was proper.

### 4.     The SEC Fails To Allege Money Or Property Was Obtained.

To state a claim under Section 17(a)(2), the SEC must allege that Defendants "obtain[ed] money or property by means of" the alleged wrongdoing.  *SEC v. Syron*, 934 F. Supp. 2d 609, 637 (S.D.N.Y. 2013).  But the Amended Complaint fails to allege that either Medallion or Murstein

obtained *anything* as a result of those reported valuations.  The SEC does not allege, for example, that Medallion's stock price increased based on the alleged misstatements.  And with regard to Murstein, while it alleges that he received a "compensation package" for the relevant years, ¶ 20, it does not suggest he received more compensation because of the alleged misstatements, *see Syron*, 934 F. Supp. 2d at 639 (finding that "the requirement of personal gain *inheres* in the word 'obtain'").[19]  In fact, his compensation substantially *decreased* during this time period.  Ex. 33.

### 5.      The Amended Complaint Fails To Allege The Statements At Issue Occurred In Connection With The Offer Or Sale Of Securities.

Section 17(a) requires that any alleged misconduct be "in the offer or sale of any securities."  Even under the more liberal interpretation requiring only that the alleged misstatements are contemporaneous with an offer or sale of securities, *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, at 258-59 (N.D.N.Y. 2014), the SEC fails to allege that the alleged misstatements and the offer or sale of securities "coincide[d]."  *Id*.  And under the stricter reading, in which Section 17(a) is violated only where "the alleged fraud [is] used directly in the offer or sale of securities," *SEC v. Warner*, 652 F. Supp. 647, 650 (S.D. Fla. 1987), the SEC's allegations clearly do not suffice.  Defendants respectfully submit that the stricter interpretation, while the minority position, more properly gives effect to the difference in statutory language between Section 17(a)'s "in the offer or sale of" and Section 10(b)'s "in connection with the purchase or sale of any security."

---

[19]  *See also SEC v. Wey*, 246 F. Supp. 3d 894, 914-15 (S.D.N.Y. 2017) (applying the standard set forth in *Syron*); *SEC v. Jankovic*, 2017 WL 1067788, at *15 (S.D.N.Y. 2017) ("[I]t 'is essential' that the SEC prove that a defendant 'has obtained . . . money or property himself.'") (citation omitted); *SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016) (following *Syron*); *but see, e.g.*, *SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012).

**B.     The SEC Fails To Adequately Plead Violations Of Sections 10(b), 17(a), And 17(b) Relating To Alleged Touting (Counts 1, 2 & 4)**

**1.     Medallion And Murstein Had No Duty To Disclose Author Payments.**

The primary basis for the SEC's touting claims is a singular alleged omission or misstatement in articles and blog posts—namely, that Medallion paid the authors to promote its stock.  *See e.g.*, ¶¶ 50, 83.  Tellingly, however, the Amended Complaint does not allege—because it cannot— that Medallion or Murstein had a duty to disclose this purported omission.  Paying consultants to write articles and comments on finance websites is neither illegal nor misleading, and any duty to disclose such payment fell solely on the authors.  It is well-established that "silence, absent a duty to disclose," is not actionable fraud.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 987 n.17 (1988).  It is similarly well-established that the law "imposes a duty to disclose payment" only on "the promoter who receives payment, but *not* on the issuer who hired and paid the promoter." *Cortina v. Avanex Life Scis. Corp.*, 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 12, 2016); *see also* 15 U.S.C. § 77q(b).  In fact, the Second Circuit reaffirmed this principle last week.

In *Noto*, plaintiffs alleged that corporate defendants had engaged in an "illegal stock promotion scheme" by paying authors to write promotional articles about the company and concealing the fact they paid the authors for the articles.  2022 WL 1633827, at *1.  Noting that an issuer who "merely pays an author to write positive articles on a stock does not, without more, violate" Section 17(b) of the Securities Act, the Second Circuit affirmed dismissal of a Section 10(b) fraud claim premised on such allegations.  *Id.* at *4-6.  The Second Circuit acknowledged allegations that defendants "provided content for, edited, reviewed, and/or approved those articles," but held that "only an article's maker, not its benefactor, has a duty to disclose that it was paid for." *Id.* at *4. Here, as in *Noto*, the Amended Complaint does not allege that Medallion or Murstein authored any promotional article or comment, and thus neither had a duty to disclose payment to the authors.

28

Indeed, the SEC alleges only that "*Meyers* never disclosed the compensation he received," and that "*the Contractor* . . . never disclosed [her] compensation."  ¶¶ 50, 83 (emphases added); *see also* ¶ 99 (similar regarding PR firm).  "[A]bsent a duty to disclose," Medallion and Murstein are not liable for the omission of others.  *Basic*, 485 U.S. at 239 n.17, 108 S. Ct. at 987 n.17.

## 2.  Neither Medallion Nor Murstein Made Any Alleged Misstatement Related To The Authors' Compensation.

The SEC's misstatement theory is equally unavailing.  Contrary to the allegations, *see* ¶¶ 71, 97, posting anonymously is legal, *see*, *e.g.*, 15 U.S.C. § 77q(b).  To the extent that the Amended Complaint alleges that Meyers or a PR firm, as independent contractors, misstated their compensation, *see* ¶¶ 64, 99, liability for those misstatements is confined to "the maker of a statement," as the party with "ultimate authority" and "control" over it. *Janus*, 564 U.S. at 142-43, 131 S. Ct. at 2302.  Any alleged compensation disclosure misstatement was not made by Medallion or Murstein.  The Amended Complaint not only attributed any alleged misstatement directly to Meyers or the PR firm, it also falls far short of what is necessary to establish that Medallion or Murstein had the "ultimate authority" and "control" in making it.  *See* ¶¶ 58, 62-66, 99.  At most, the Amended Complaint alleges that Murstein "suggest[ed] what to say," but it fails to plead that he was "significantly involved in preparing" any misstatement, which in itself would also be insufficient. *Janus*, 564 U.S. at 142, 148, 131 S. Ct. at 2302, 2305.  Indeed, in *Noto*, the Second Circuit held that even where the defendant allegedly "reviewed and approved statements" that were "copied and repeated by the promotional articles," it was insufficient to demonstrate the control essential to maker liability.  2022 WL 1633827, at *5.  *See also*, *e.g.*, *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) ("[A]llegations that [a statement] was drafted with the approval and input of some [ ] Defendants is not sufficient to demonstrate the control essential to maker liability."); *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *7 (S.D.N.Y.

June 8, 2016) (similar).  Regardless of the SEC's pleading deficiencies, Meyers *admitted* in his motion to dismiss that he "alone authored and was responsible for the contents of his writings" and that "Murstein never directed or suggested that Meyers should conceal that he was being compensated by Medallion; to the contrary, the disclosure of Meyers' compensation was never discussed with Murstein."  ECF 38 at 7-8.  This Court "can appropriately treat statements in briefs as binding judicial admissions of fact."  *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994).  Thus, the SEC's compensation disclosure claim against Medallion and Murstein fails.

### 3.      The SEC Fails To Plead Scheme Liability Because It Alleges Only One Subject On Which There Was An Omission Or Misstatement.

The SEC attempts to repackage its deficient misstatement claim as "scheme" liability.  But that claim also fails as a matter of law.  The alleged "scheme" is, at its core, about a single subject on which there was the same alleged omission or misstatement, which "may not [be] cast . . . as claims" of scheme liability under Rule 10b-5(a) and (c) and related provisions.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).  Indeed, the Second Circuit in *Noto* rejected the claim that an alleged "illegal stock promotion scheme" could ground liability under Rule 10b-5(a) and (c).  2022 WL 1633827, at *7.  That is because scheme liability claims do not lie "where the sole basis for such claims is alleged misrepresentations or omissions."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *see also Lorenzo v. SEC*, --- U.S. ---, 139 S. Ct. 1094, 1103 (2019) (one who "neither makes nor disseminates false information" cannot be liable for scheme liability absent "some other form of fraud"); *SEC v. Rio Tinto plc*, 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021) ("The Court disagrees with the SEC's contention that *Lorenzo* holds that misstatements can form the basis for [scheme] liability."), *motion to certify appeal granted*

2021 WL 1893165 (S.D.N.Y. May 11, 2021).[20]  Rather, scheme liability requires an "inherently

deceptive act" beyond an alleged misstatement or omission.  *SEC v. Kelly*, 817 F. Supp. 2d 340,

344 (S.D.N.Y. 2011).  This long-standing rule forecloses scheme liability here.

Courts "routinely reject[ ] the SEC's attempt to bypass the elements necessary to impose

'misstatement' liability . . . by labeling the alleged misconduct a 'scheme' rather than a 'misstate-

ment.'"  *Id.* at 343 (citing cases).[21]  That is what the SEC attempts to do here.  After setting aside

the Amended Complaint's "touting scheme" label, this alleged "scheme" is nothing more than a

singular omission or misstatement related to the authors' compensation.[22]

Beyond alleging an omission or misstatement, the Amended Complaint does not allege any

deceptive conduct, such as executing manipulative stock trades, creating or financing a sham en-

tity, or running pump-and-dump schemes.  *See*, *e.g.*, *SEC v. Lee*, 720 F. Supp. 2d 305, 334

(S.D.N.Y. 2010) (providing examples).  As to the promoting itself, there is nothing inherently

deceptive or misleading about paying authors to tout a company's stock.  *Noto*, 2022 WL 1633827,

at *5 ("[An] issuer who merely pays an author to write positive articles on a stock does not, without

more, violate" securities laws).  The SEC also alleges that "the purpose of the touting activity was

to boost Medallion Financial's stock price," ¶ 96, but absent any allegation that Murstein sold or

attempted to sell Medallion stock, which he did not, the allegation amounts to, "at most, a 'pump'

---

[20]   *See also*, *e.g.*, *Geoffrey A. Orley Revocable Trust v. Genovese*, 2020 WL 611506, at *8 (S.D.N.Y. Feb. 7, 2020) (refusing to extend *Lorenzo* to a scheme based solely on "participation in the drafting of the [misleading] docu- ments at issue"); *In re Teva Sec. Litig.*, 2021 WL 1197805, at *6 (D. Conn. Mar. 30, 2021) (rejecting the argument that *Lorenzo* "abrogated the rule that 'scheme liability depends on conduct that is distinct from an alleged mis- statement'"); *but see Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *10-11 (S.D.N.Y. Mar. 30, 2021).

[21]   Courts have similarly reasoned that scheme liability cannot be used as a "back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5."  *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *11 (S.D.N.Y. Mar. 30, 2018) (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005)); *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 359 (D.N.J. 2009) (same).

[22]   *See*, *e.g.*, ¶ 50 ("Meyers never disclosed the compensation he received from Medallion Financial."); ¶ 70 (same); ¶ 83 ("The Contractor was paid by Medallion Financial but never disclosed that compensation."); ¶ 95 (same).

without a 'dump.'" *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1274 n.7 (11th Cir. 2016); *cf. SEC v. Madsen*, 2018 WL 5023945, at *3 (S.D.N.Y. Oct. 17, 2018) (SEC fails to allege "that the 'pump' part of [defendant's] 'pump-and-dump' scheme actually worked."). Here, there wasn't even a "pump." *See* Ex. 9. Accordingly, the scheme liability claim also fails.

### 4. The Alleged Compensation Information Was Not Material.

The alleged omitted or misstated compensation information was immaterial as a matter of law. An omission or statement is material only if "a reasonable investor would view it as significantly altering the 'total mix' of information made available." *Nomura Holding*, 873 F.3d at 146 (brackets and citation omitted). In assessing materiality, courts do not examine "whether isolated statements within a document were true" but rather, "whether [the alleged] representations or omissions, considered together and in context, would affect the total mix of information." *Halperin*, 295 F.3d at 357. And dismissal on the pleadings is appropriate on materiality grounds. *See, e.g.*, *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011); *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 624 (S.D.N.Y. 2021).

Here, context is everything. Both authors' writings consisted largely, if not entirely, of statements of opinion posted on niche financial "chat" sites. *See supra* at 12-13. Most of Meyers' were flippant pseudonymous comments in the comments sections of these sites, largely in response to short sellers' smears of Medallion. The Contractor's writings were for a piece; for example, she began an article with: "The business-blogging world has been running rampant with the news of Ubers' success as if it were some excited junior high schoolgirls who found out so-and-so's boy-friend made out with another girl- like O M G." Ex. 34. No reasonable investor, reading that purple prose, would have considered the Contractor's compensation to "significantly alter[ ] the

'total mix' of information made available." *Basic*, 485 U.S. at 231-32, 108 S. Ct. at 983.[23]  In a vain attempt to overcome its materiality shortcomings, the SEC adds repetitive allegations that only confirm that few of the articles even mention Medallion.  For example, "Appendix A" lists approximately 100 of Meyers' articles on a range of topics, yet ignores that only 20 or so actually mention Medallion by name.  *See* Ex. 1; *see also* 15 U.S.C. § 77q(b) (illegal touting must "describe[] [the] security" of the relevant company).  Meyers also repeatedly disclosed he was "long TAXI," *see supra* at 13, so any reasonable investor understood his orientation.[24]  And the only alleged misstatement by the PR firm was made in a *private* communication with a website.  ¶ 99.  The Second Circuit in *Noto*, moreover, found the non-disclosure of compensation "not to be" material, even though the defendant's "stock price more than tripled" after the articles were published.  2022 WL 1633827, at *2, *7.  That Medallion's stock price was not affected by the writings only "underscores that no reasonable investor would have considered such information material."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 578 (S.D.N.Y. 2013).

### 5. The SEC Fails To Adequately Allege Touting-Related Scienter.

As previously explained, scienter can be shown either by demonstrating (i) facts showing that defendants had both motive and opportunity to commit fraud; or (ii) facts that constitute direct or strong circumstantial evidence of intentional misbehavior or recklessness.  *See supra* at 23-26.  The Amended Complaint fails to satisfy either standard.

---

[23]  The SEC's prosecution of this limited pseudonymous blogging by these two independent contractors stands in sharp contrast to its decision to take no action against another company, Whole Foods, and its CEO, John Mackey, even though, over eight years, the CEO used pseudonyms to author more than 1,400 posts touting the company's performance and disparaging its competitors.  Mackey argued his pseudonymous blogging on financial "chat" sites, like here, could not possibly have been material, and the SEC apparently agreed, concluding its investigation without charging or even fining the company or its blogging CEO.  *See* Ex. 35; Decl. ¶ 34.

[24]  That one other source published an article citing Meyers' postings does not impact materiality.  ¶ 57.  Indeed, that one article merely discussed the ridesharing industry at large; it did not recommend investing in Medallion or otherwise demonstrate that anyone would have relied on Meyers' articles to make investment decisions.

The SEC has not alleged any facts demonstrating that Medallion or Murstein benefitted in any way from this alleged touting.  Nor does it allege that Murstein received any additional compensation as a result of the touting, or that he sold any Medallion stock.  Absent any such allegations, courts have found there is no motive pleaded.  *See*, *e.g.*, *Rombach*, 355 F.3d at 177 (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period"); *Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (that "high-ranking executives . . . did not sell stock" during the relevant period "rebuts an inference of scienter").  The SEC has also failed to plead scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *see supra* at 23-26.  Because there are no allegations showing that Medallion or Murstein was contemporaneously aware of, and consciously disregarded, any improper touting, the Amended Complaint fails to establish scienter as a matter of law.[25]  Moreover, the SEC admits this alleged touting was in response to short sellers' smears to level the playing field on financial "chat" sites. ¶ 2.  Thus, the motivation was to set the record straight, not to mislead.  Nor are there any allegations that, *before or during* the purported touting, Medallion or Murstein was aware of the authors' obligation to disclose their compensation.  In the scienter analysis, those are the only relevant timeframes.  *See SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (explaining scienter requirement concerns defendant's state of mind "at the moment of" his alleged misconduct); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 514 (S.D.N.Y. 2005) ("[A]llegations concerning after-the-fact events are immaterial to . . . state of mind.").  The SEC alleges that Medallion or

---

[25]   The Amended Complaint alleges that Murstein received email alerts from Seeking Alpha when Medallion was mentioned in an article.  ¶ 67.  But merely receiving "alerts" about some of the articles in question falls far short of establishing the "strong circumstantial evidence of conscious misbehavior or recklessness" required for scienter.  *Chill*, 101 F.3d at 268.

Murstein learned of any improper touting in late November 2016 when the New York Post contacted Murstein—*after* the alleged touting had ended.  *See* ¶¶ 100-04.  Alleged misstatements to reporters about the alleged touting *after* it ended (¶¶ 105-06) are legally irrelevant, as are alleged subsequent communications with, and a severance payment to, the Contractor (¶¶ 107-10).

### 6.  The SEC Fails To Adequately Allege Section 17(a)'s Independent Requirements.

The SEC fails to allege that Medallion or Murstein received any money or property as a result of the alleged touting, as Section 17(a)(2) requires.  *See supra* at 26-27.  For example, the SEC does not allege that Medallion's stock price or Murstein's compensation increased from any of these posts.  Nor does the SEC allege that either received any other money or property as a result of the posts.  Moreover, the Amended Complaint fails to satisfy Section 17(a)'s "in the offer or sale of any securities" requirement.  *See supra* at 27.  In other words, the SEC has failed to allege that these posts occurred in connection with the offer or sale of securities, much less that the alleged fraud was used directly in the offer or sale of securities.  *See id*.

## C.  Aiding And Abetting Alleged Touting Are Not Adequately Pleaded (Count 4)

To establish aiding and abetting liability, the SEC must allege: "(1) the existence of a securities law violation by the primary . . . party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."  *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *16 (S.D.N.Y. Mar. 18, 2019) (quoting *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012)).  The Second Circuit has "repeatedly held" that "the three components of the aiding and abetting test cannot be considered in isolation from one another."  *Apuzzo*, 689 F.3d at 214 (quotations omitted).  "[I]t is well-established . . . that mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance."  *SEC v. Paulsen*, 2020 WL 1911208, at *5

(S.D.N.Y. Apr. 18, 2020) (quotations omitted).  Rather, the alleged aider and abettor must "consciously assist the commission of the specific crime in some active way."  *Id.*

Because the SEC fails to allege any viable primary violation relating to touting, its aiding and abetting claim against Medallion and Murstein necessarily fails.  But even if it had alleged a primary violation, it has failed to allege that Medallion or Murstein was aware of or substantially assisted such violation.  The sole violation alleged is the authors' purported failure to disclose their compensation from Medallion.  The SEC nowhere alleges that the purported misstatement about compensation was contained in any of the drafts that were reviewed and approved; in fact, it alleges only that Meyers sent Murstein links to certain articles "after they were published."  ¶ 66.  The SEC likewise fails to allege that Medallion or Murstein substantially assisted in committing the alleged violation.  It is not enough to allege that Murstein assisted in the authors' touting.  Touting is legal.  *See Noto*, 2022 WL 1633827, at *5.  So is writing anonymously.  *See* 15 U.S.C. § 77q(b).  Instead, the SEC must allege that Murstein "consciously assisted" the authors in committing "the *specific* [violation]" alleged—namely, failure to disclose compensation.  *Paulsen*, 2020 WL 1911208, at *5 (emphasis added).  At most, the Amended Complaint alleges that Murstein assisted conduct that was itself lawful— posting pseudonymously—and several steps removed from the "specific [violation]" at issue. *Id.*; *see also, e.g.*, ¶ 3 (alleging that Murstein "paid Meyers to anonymously promote Medallion Financial online" and "hired a second person to tout anonymously"), ¶¶ 107-10 (communications with Contractor regarding maintaining anonymity).  Murstein's participation in only legal aspects of touting cannot give rise to liability.  Nor is there any allegation that Murstein was even aware that non-disclosure by the authors would be improper.  *Cf. Paulsen*, 2020 WL 1911208, at *8.

**D.    The SEC Fails To Adequately Plead Violations Relating To Reporting, Books And Records, Internal Controls, Or Misleading The Auditor (Counts 5-7)**

The SEC claims that Medallion violated (Count 5), and that Murstein aided and abetted violations of (Count 6), reporting, books and records, and internal controls rules (Sections 13(a) and 13(b)(2)(A) & (B) of the Exchange Act and related Rules).  The SEC also alleges that Murstein misled Medallion's auditor in violation of Rule 13b2-2 (Count 7).  All are inadequately pleaded.

To state a Section 13(a) reporting claim, the SEC must allege that the defendant made "materially false" statements in an SEC filing.  *Rio Tinto*, 2019 WL 1244933, at *17.  The only alleged false statements relate to valuation of the Bank and Chicago medallions; this claim fails for the same reasons that the underlying valuation claims fail.  *See supra* at 14-27; *see also Rio Tinto*, 2019 WL 1244933, at *17 (dismissing Rule 13a-1 claim).  The Amended Complaint ignores both the subjective nature of the valuation judgments and Medallion's extensive public disclosures, which listed every loan, valuation, and collateral of the Medallion Loan Portfolio and detailed that Medallion valued the performing medallion loans at par, *see* 2017 10-K at 20, Ex. 99.1; 2016 10-K at F-34, Ex. 99.1, as well as the actual value it placed on each of its outstanding loans, *see* 2017 10-K at F-39, F-47, Ex. 99.1; 2016 10-K at F-37, F-44-45, Ex. 99.1.  The SEC does not adequately allege falsity or materiality relating to the valuations.

The SEC also fails to allege violations of Section 13(b)(2).  The touchstone for liability under Section 13(b)(2) is "reasonableness" because "management must exercise judgment" and "necessarily estimate and evaluate the cost/benefit relationships of the steps to be taken in fulfillment of its responsibilities."  S. Rep. No. 95-114, at 8 (1977).  Thus, to state a claim for Section 13(b)(2)(A)—which requires an issuer of securities to "make and keep books, records, and accounts [that] . . . accurately and fairly reflect" the issuer's assets—the SEC must plausibly allege that it was unreasonable to value an asset at the price (or using the method) the defendant did.  *See*

*SEC v. Sequential Brands Grp.*, 2021 WL 4482215, at *8 (S.D.N.Y. Sept. 30, 2021).  But Medallion reasonably relied on Bank valuations that complied with GAAP and ASC 820.  *See supra* at 14-22.  Such reasonableness is underscored by the fact that Medallion never issued a restatement; the auditor and the valuation firms still stand by the valuations.  Medallion also valued the Chicago medallion loans consistent with GAAP, and immediately wrote down the asset values as soon as regulators issued their report, *see supra* at 18-19.

A similar deficiency dooms the SEC's alleged violation of Section 13(b)(2)(B), which requires the SEC to plead unreasonably inadequate internal accounting controls.  *See Rio Tinto*, 2019 WL 1244933, at *19.  Although the SEC alleges that Medallion did not have procedures in place to prevent Murstein "from manipulating the valuation of the Bank," ¶ 251, the purported record-keeping or internal controls violations *still* assume the impropriety of the underlying valuations, *see* ¶¶ 261-62; since those valuations were reasonable, the tack-on claims fail.  And "[t]he mere fact that accounting controls may have been circumvented does not state a [Section 13(b)(2)(B) claim]."  *Rio Tinto*, 2019 WL 1244933, at *19.

The SEC further fails to allege that Murstein aided and abetted any of these alleged violations (Count 6).  "Aiding and abetting claims under Section 13(a) require the same elements as aiding and abetting claims under Section 10(b) and Rule 10b-5."  *Id.* at *17.  The same is true of 13(b)(2).  *SEC v. Espuelas*, 905 F. Supp. 2d 507, 525 (S.D.N.Y. 2012).  First, Count 6 fails because there was no primary violation.  Second, the SEC does not allege that Murstein was aware of any violation by Medallion.  In any event, being "aware of [a] materially false valuation in various papers" is insufficient for aiding and abetting when the Amended Complaint does not allege any substantial assistance.  *Rio Tinto*, 2019 WL 1244933, at *18.  And third, merely alleging Murstein's position at Medallion is insufficient.  *Cf. SEC v. Cedric Kushner Promotions, Inc.*, 417

F. Supp. 2d 326, 335 (S.D.N.Y. 2006) (SEC's "general assertion" that defendant "must have known" of the primary violation based on his "duties at the [company]" was insufficient to establish aiding and abetting liability).

Finally, the SEC does not adequately plead that Murstein made material misrepresentations to Medallion's auditor. This alleged misstatement relies almost entirely on the validity of the SEC's other claims (*see*, *e.g.*, ¶¶ 265-70), which are without merit. To the extent they arguably do not, this information—such as the reason why Medallion changed valuation firms (¶ 164)—is immaterial. Tellingly, even with that alleged information, the auditors still stand by their opinions, and Medallion has never restated its financial results.

### E.    The Requested Disgorgement And Officer/Director Bar Relief Should Be Stricken

The Amended Complaint's requested remedies—in particular its requests for disgorgement and an officer/director bar—are legally deficient and unsupported by its factual allegations, and therefore should be stricken. *See SEC v. Berry*, 2008 WL 4065865, at *9 (N.D. Cal. Aug. 27, 2008) (striking prayer for relief when the "allegations in support of [the] request . . . were lacking").

### 1.    Disgorgement Is Unavailable In The Absence Of Ill-Gotten Gains.

The Amended Complaint fails to identify any "ill-gotten gains." *Liu*, 140 S. Ct. at 1942. In *Liu*, the Supreme Court restricted the SEC from seeking disgorgement "in excess of a defendant's net profits from wrongdoing." *Id*. at 1946. To support disgorgement, the SEC must allege "ill-gotten gains," *id*.—for example that the defendants misappropriated investor funds for personal use, *see*, *e.g.*, *SEC v. Collector's Coffee Inc.*, 2021 WL 1956369, at *3 (S.D.N.Y. May 17, 2021), or that they received additional performance-based compensation due to the alleged wrongful conduct, *see*, *e.g.*, *SEC v. Razmilovic*, 738 F.3d 14, 33 (2d Cir. 2013). The Amended Complaint is devoid of any such allegations. For example, it does not allege (nor could it) that Murstein ever sold stock in the periods at issue or profited in any way from the alleged conduct. Instead, even

after "an extensive investigation," the SEC simply does not (and cannot) include "any specific allegations to support [a] claim for disgorgement." *SEC v. City of Victorville*, 2014 WL 12588688, at *10 (C.D. Cal. Oct. 14, 2014).  Therefore, the demand for disgorgement should be stricken.  *See id.*; *see also Berry*, 2008 WL 4065865, at *9-10 (striking the SEC's prayer for disgorgement on a motion to dismiss for failure to allege any profit from the alleged misconduct).

### 2.     There Is No Legal Basis For An Officer And Director Bar Here.

The SEC's demand for an officer and director bar against Murstein is unsupported for two reasons.  *First*, it has no legal basis because the SEC has failed to adequately plead that he violated any scienter-based antifraud provision.  The language of both the 1933 and 1934 Acts limits the bar as a remedy to Section 17(a)(1) and Section 10(b) violations, respectively.  *See* 15 U.S.C. § 77t(e); 15 U.S.C. § 78u(d)(2).  Because the SEC's claims under these provisions fail, an officer and director bar is not available.  *Second*, the SEC fails to allege any facts "demonstrat[ing]" Murstein's "unfitness to serve as an officer or director." 15 U.S.C. § 77t(e).  There is no allegation, for example, that Murstein is a "repeat offender," that it is "likel[y] that misconduct will recur," *Patel*, 61 F.3d at 141, that he "benefitted through bonuses, salary, or stock sales" related to the alleged conduct, or that he has had anything other than "an otherwise unblemished career," *Stanard*, 2009 WL 196023, at *33-34.  In fact, for over 30 years, Murstein has led Medallion without incident to record earnings under the intense scrutiny of city, state, and federal regulators, including the NYC Taxi & Limousine Commission, the Utah Department of Financial Institutions, the Federal Deposit Insurance Corporation, the SBA, and the SEC itself.

### <u>CONCLUSION</u>

The SEC's Amended Complaint should be dismissed with prejudice in its entirety.

Dated: New York, New York

June 2, 2022

GIBSON, DUNN & CRUTCHER LLP


By: _/s/ Randy M. Mastro_____
Randy M. Mastro
Mark A. Kirsch
Akiva Shapiro
Seton Hartnett O'Brien
200 Park Avenue
New York, NY 10166
(212) 351-4000
rmastro@gibsondunn.com

*Attorneys for Medallion Financial Corp.*
*and Andrew Murstein*

DEBEVOISE & PLIMPTON, LLP

Andrew J. Ceresney
Lisa R. Zornberg
Michael W. Gramer
919 Third Avenue
New York, NY 10022
(212) 909-6000
aceresney@debevoise.com

*Attorneys for Andrew Murstein*

WALDEN MACHT & HARAN LLP

Jim Walden
Daniel Joseph Chirlin
250 Vesey St
27th Floor
New York, NY 10281
(212) 335-2030
jwalden@wmhlaw.com

*Attorneys for Andrew Murstein*