UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

v.

MEDALLION FINANCIAL CORP. *et al.*,

*Defendants.*

21 Civ. 11125 (LAK)

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO DISMISS AMENDED COMPLAINT
OF DEFENDANTS LAWRENCE MEYERS
AND ICHABOD'S CRANIUM, INC.**

Dated: New York, New York
June 2, 2022

HILARY B. MILLER
(HM-4041)
500 West Putnam Avenue – Suite 400
Greenwich, Connecticut 06830-6096
(203) 587-7000
hilary@miller.net

*Attorney for Defendants
Lawrence Meyers
and Ichabod's Cranium, Inc.*

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ........................................................................ **ii**

**TABLE OF AUTHORITIES** ................................................................. **iii**

**INTRODUCTORY STATEMENT** ........................................................ **1**

**BACKGROUND** ....................................................................................... **3**

    Meyers ...................................................................................................... 3
    Medallion ................................................................................................. 3
    The Short Attack .................................................................................... 4
    Meyers Is Hired ...................................................................................... 6


**ARGUMENT** ............................................................................................ **8**

    POINT I
    PLAINTIFF'S RULE 10b-5 CLAIM IS LEGALLY INSUFFICIENT ....................... 8
    A. The SEC Fails To Allege A False or Misleading Statement by Meyers .......... 8
    B. The 10b-5 Count Lacks The Requisite Particularity. .................................... 10
    C.  The Complaint Fails to Connect Meyers' Writings With the Purchase
    or Sale of Securities. ....................................................................................... 11

    POINT II
    PLAINTIFF'S TOUTING CLAIM MUST BE DISMISSED ................................. 12

    POINT III
    ADOPTION OF FACTS AND ARGUMENT OF MEDALLION
    AND MURSTEIN ...................................................................................... 16


**CONCLUSION** ....................................................................................... **16**

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................................ 11, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 11

*Ind. Elec. Workers' Pension Tr. Fund v. Millard*, 2007 U.S. Dist. LEXIS 54203 (S.D.N.Y. July 24, 2007) ........................................................................ 12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) ......................................................................................... 9

*Ramzan v. GDS Holdings, Ltd.*, No. 19-cv-9154 (LAK), 2020 U.S. Dist. LEXIS 61452 (S.D.N.Y. Apr. 7, 2020) ..................................................................... 2

*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) .................................................. 11

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) .................................... 15

*SEC v. Gorsek*, 222 F.Supp.2d 1099 (C.D. Ill. 2001 ................................................... 13

*SEC v. Liberty Capital Grp. Inc.*, 75 F. Supp. 2d 1160 (W.D. Wash. 1999) .............. 13

*SEC v. Thompson*, 238 F.Supp.3d 575 (S.D.N.Y. 2017) ............................................ 13

*SEC v. Zandford*, 535 U.S. 813 (2002) ....................................................................... 12

*Smith v. United States Cas. Co.*, 197 N.Y. 420, 90 N.E. 947 (1910) ......................... 10

## Statutes

15 U.S.C.  § 77q(b) ........................................................................... 8, 12, 13

15 U.S.C. § 78j(b) ............................................................................... 8, 11, 14

17 C.F.R. §  240.10b-5 ...................................................................... 8, 9, 10, 11

## Other Authorities

Rule 12(b)(6), *Fed.R.Civ.P* ............................................................................ 3, 11

Rule 9(b), *Fed.R.Civ.P.* .............................................................................. 3, 10, 11, 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>*v.*<br><br>MEDALLION FINANCIAL CORP. *et al.*,<br><br>*Defendants.* | 21 Civ. 11125 (LAK) |

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS AMENDED COMPLAINT
## OF DEFENDANTS LAWRENCE MEYERS
## AND ICHABOD'S CRANIUM, INC.

### INTRODUCTORY STATEMENT

The "shorts" attacked Medallion Financial Corp. in late 2014.

The attack had the usual attributes of a short attack: first, a group of short sellers, acting in concert, acquired a substantial short position in Medallion's stock; then, after the short position was in place, the shorts spread negative publicity about Medallion in order to induce investor panic and drive down its stock price. The shorts also appear to have engaged compensated "bashers," who passed themselves off as investors, to make asperse comments about Medallion on internet message boards in or-

der to panic individual investors into selling and further driving down the stock price.[1]

Defendant Lawrence Meyers, a crisis-communications and public relations consultant, observed the adverse articles about Medallion in trade press and recognized a short attack in process. He cold-called Medallion's president, Andrew Murstein, and pitched his services to Murstein to assist Medallion in publicizing the true facts about Medallion's markets and prospects.

Medallion hired Meyers to do just that. Ultimately, pursuant to the engagement, as the SEC alleges, Meyers wrote over 100 articles  and over 900 comments — more than 1,000 altogether — primarily internet posts, about the markets in which Medallion competes. Some of them were written pseudonymously. Only approximately 20 of these items even mentioned Medallion, and hardly any of those 20 items remotely attributed favorable investment characteristics to Medallion's stock. None of them suggested or urged investors to purchase Medallion's stock.

Meyers did his own research. Everything Meyers wrote about the industry, the market and Medallion was true or represented Meyers' honest opinion about such matters; the Securities and Exchange Commission's amended complaint herein does not allege otherwise.

But no good deed goes unpunished. In this action, the SEC asserts several counts primarily or exclusively against defendants other than Meyers. The claims against Meyers are only two, and they are at once narrow and fuzzy: a vague Rule 10b-

---

[1]This Court is no stranger to such shenanigans. *Ramzan v. GDS Holdings, Ltd.*, No. 19-cv-9154 (LAK), 2020 U.S. Dist. LEXIS 61452 (S.D.N.Y. Apr. 7, 2020) (Kaplan, *J.*)

5 claim (Count II), and unspecified violations of the anti-touting provisions of the Securities Act (Count III).

Meyers and his wholly owned co-defendant, Ichabod's Cranium, Inc., now move to dismiss the claims against them pursuant to Rules 9(b) and 12(b)(6), *Fed.R.Civ.P.* In doing so, the Meyers defendants — Meyers and Ichabod's Cranium, Inc. — incorporate by reference and adopt in its entirety the memorandum of law of Medallion and Murstein in support of their own motion to dismiss the amended complaint.

For the reasons hereinafter set forth, the claims against the Meyers defendants should dismissed.

## BACKGROUND

### Meyers

Lawrence Meyers is a writer whose activities at relevant times have focused on so-called "crisis" communications; he has over 14 years of public-relations experience. Prior to his engagement by Medallion, his clients had been primarily trade associations for disfavored industries (such as fragrances and payday lending) and, to a lesser extent, public interest groups. He had had only one prior publicly traded client, for which he did non-financial public-relations work.

### Medallion

Medallion's business and history are described in its own brief, which description the Meyers defendants adopt. In summary, Medallion was formerly exclusively a col-

lateralized taxi-medallion[2] lender. As such, the value of its collateral would have been seriously threatened by the advent of ride-sharing services like Uber and Lyft. But by 2014, due to the success of previous diversification efforts, approximately 80% of Medallion's earnings were derived from non-medallion lending. Medallion has been progressively diversifying and reducing its taxi-medallion exposure (to less than 1% of its loan portfolio at the time of commencement of this action).

**The Short Attack**

In December 2014, Medallion was under siege from short sellers. A particularly aggressive "short" had reconfigured its portfolio to profit from any misfortune that might befall Medallion; and after doing that, he went about causing as much misfortune for Medallion as he possibly could.

He ultimately published 33 negative articles about the company; see, e.g., Hickman, James F., "The Downside For Medallion Financial Only Just Beginning," *Seeking Alpha* (Dec. 14, 2014), *available at* https://seekingalpha.com/article/2768055-the-downside-for-medallion-financial-only-just-beginning (last visited June 1, 2022; paywalled).[3]

---

[2]A taxi medallion is a transferable license allowing a taxicab to operate as such. New York and several other cities employ medallions in taxicab licensing. The value of taxi medallions has historically been preserved by a government-imposed limited supply, and historically owners of medallions held a monopoly in the street-hailing market.

[3]A non-paywalled version of this work is available at http://www.hvmcapital.com/-taxi.pdf.

Despite unassailable evidence to the contrary, Hickman and his fund, HVM Capital, asserted — and continued to assert[4] — that Medallion was facing near-certain bankruptcy as a result of unlimited market entry by Uber, Lyft and other rideshare services for which no medallions were necessary (or which openly flouted laws requiring medallions).

Other shorts collaborated with Hickman in bashing Medallion's stock on this basis.

Meyers and other analysts of the market disbelieved the shorts' theory about Medallion's future. In addition to Medallion's successful diversification away from taxi-medallion lending, which the shorts refused to acknowledge, Meyers held the belief that the low prices being charged by Uber and Lyft were unsustainable, insofar as the rideshare companies were losing money on every ride and would ultimately be required to raise prices in order to stop hemorrhaging cash; after raising prices, such rideshare rides would then be priced at or above the charges of medallion cabs. Moreover, medallion-cab operators had developed their own smartphone apps that would allow them to be effective competitors for rideshare operators.

Many other market participants shared Meyers' views that Medallion was being unfairly attacked and that rideshare services were unsustainable at 2014 price levels.

---

[4]See, HVM Capital publication summary (2017), *available at* http://hvmcapital.com/taxi-medallion.php (last visited June 1, 2022).

Ultimately, Meyers' views about the unsustainable pricing of rideshare services and about Medallion's limited exposure to falling medallion prices were vindicated by subsequent events.

**Meyers Is Hired**

Meyers, a subscriber to the investing web site *Seeking Alpha*, had seen both long-form and "chat" negative articles about Medallion; and he observed all the ear-marks of a short attack in progress. In December 2014, he reached out to Murstein, Medallion's president, to offer his public-relations assistance in communicating the true facts about Medallion and its markets to the investment community. Very quickly, Meyers was hired and began writing about the rideshare market, its unsustainability and its impact on the traditional taxicab business.

All told, Meyers wrote, according to the SEC, over 1,000 articles, web posts and "chat" responses in online forums like *Seeking Alpha*. One of his earliest works, and typical of his efforts, is "Taxi Medallion Financial Industry Grossly Undervalued: Uber Threat Vastly Overstated," *Seeking Alpha* (Jan. 5, 2015), available at https://seekingalpha.com/article/2798855-taxi-medallion-financial-industry-grossly-undervalued-uber-threat-vastly-overstated (last visited March 20, 2022; paywalled).[5] Another example of Meyers' work is "Why Uber Faces a Rough Road Ahead," *Observer*

---

[5]An ungated reprint of this article is available at https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:c39f41fe-8bb3-3e00-9d56-b365fc34fe7e.

(Jan. 13, 2016), available at https://observer.com/2016/01/why-uber-faces-a-rough-road-ahead (last visited March 20, 2022).

It is noteworthy that these articles and web posts, like the vast majority of Meyers' work, *do not mention Medallion's securities at all*. As noted above, the SEC's enumeration of Meyers' writings (Appendices A and B to the Amended Complaint), only 22 of Meyers' "over 1,000" writings mention Medallion at all. No writing is identified in those appendices that is purported to "describe" Medallion's securities, the statutory standard for a touting claim under Section 17(b) of the Securities Act.

Meyers was paid approximately $65,000 for his work.[6]

On this motion, the Court is constrained to consider as true the facts set forth in the SEC's complaint. But those facts do not meet the pleading standards for the wrongs asserted by the SEC. All of the contents of Meyers' writings were either factually correct or represented his genuine and honestly-held opinions — and the SEC's complaint does not allege otherwise. Moreover, and more importantly, with immaterial exceptions, Meyers' writings do not "describe" Medallion's securities, an indispensable element of a violation of Section 17(b) of the Securities Act.

Medallion and Murstein, in their moving papers, point out that Meyers alone authored and was responsible for the contents of his writings, and Meyers agrees with

---

[6]Given the low stakes in the claims against Meyers, especially in light of the likelihood that only a small portion, if any, of his compensation could be required to be disgorged, one must wonder why he is named as a defendant at all. Perhaps it is because, when Meyers was examined by the SEC during the investigative phase of this matter, Meyers asserted his right under the Fifth Amendment not to testify regarding certain matters, upon the advice of his predecessor counsel. He will not assert a Fifth Amendment privilege in this action.

that description and notes that, while he, on rare occasion, received suggestions from Murstein, Meyers alone had ultimate authority over the contents of his writing. While Meyers' contract with Medallion called for Medallion to approve Meyers' writings prior to publication, in practice the parties did not follow that procedure. And, while Murstein suggested topics for Meyers and responded to occasional questions from Meyers, he did not direct Meyers' work. Likewise, Murstein never directed or suggested that Meyers should conceal that he was being compensated by Medallion; to the contrary, the disclosure of Meyers' compensation was never discussed with Murstein.

Meyers fully disclosed on numerous occasions that he had a "long" position in Medallion's stock (with the NASDAQ symbol "TAXI"), so Meyers' partiality was obvious — and nobody was misled. Some of Meyers' work was posted pseudonymously, which is a common practice at the web sites involved; the SEC does not allege any facts to support the notion that such pseudonymity resulted in any deception of investors.

For these and the reasons hereinafter set forth, the Meyers defendants' motion should be granted.

## ARGUMENT

### Point I

### <u>PLAINTIFF'S RULE 10b-5 CLAIM IS LEGALLY INSUFFICIENT</u>

**A. The SEC Fails To Allege A False or Misleading Statement by Meyers.**

The amended complaint tells a provocative "story," most of which has nothing to do with Meyers. But then it concludes that "Defendants violated and, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]." Amended Complaint, ¶279 (brackets in original).

All 271 paragraphs of the SEC's recitation of facts — including those unrelated to Meyers — are incorporated by reference in Count II, which is the SEC's Rule 10b-5 claim. There is only one problem with the 10b-5 count from Meyers' standpoint: it utterly fails to identify a single material misstatement or omission by Meyers.

To the extent that any statements by Meyers about Medallion are quoted at all in the amended complaint, they appear (or are referred to) in ¶51 *et seq*. But these are manifestly statements of opinion by Meyers that are not alleged by the SEC to represent anything other than his heartfelt beliefs. See, generally, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). Neither true statements nor good-faith opinions can, without more, form the basis for a Rule 10b-5 claim.

Nor can Meyers' mere use of various pseudonyms (Amended Complaint, ¶56 and *passim)* render his authentic expressions of opinion (whether positive or negative) subject to misstatement liability under Rule 10b-5, absent a false factual claim or clear deception. Meyers never falsely claimed to be any other living human being.

The SEC makes the entirely conclusory allegation that the non-existent persons that Meyers pretended to be were somehow more "credible" than Meyers himself (again, Amended Complaint, ¶56), but the SEC does not allege — nor could it — that the authors' identity was material to investors. The materiality of such pseudonymous authorship — in fora that are rife with pseudonymous postings by others — is neither

alleged nor demonstrated.[7] The SEC simply "puts the rabbit in the hat" and expects the

reader to be outraged by Meyers' pseudonymity.[8] No such outrage is appropriate.

Because the SEC fails to identify any statements of Meyers that were *materially*

false or misleading, including as to his own identity as an author, and how, Count II

must be dismissed.

## B. The 10b-5 Count Lacks The Requisite Particularity.

Count II sounds in fraud and, as such, is subject to the requirements of Rule

9(b), *Fed.R.Civ.P.* Rule 9(b) requires that averments of fraud be "state[d] with particu-

larity." To satisfy this requirement, the SEC must "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when

---

[7]There is a long tradition of pseudonymous authorship in the United States; see, e.g., *The Federalist Papers* (written by "Publius," a joint pseudonym of Alexander Hamilton, James Madison and John Jay). As to whether it is lawful for Meyers to assume and write under various pseudonyms, see, e.g., *Smith v. United States Cas. Co.*, 197 N.Y. 420, 90 N.E. 947 (1910):

> The elementary writers are uniform in laying down the rule that at common law a man may change his name at will. Mr. Throckmorton, in his article on Names in the Cyclopedia of Law and Procedure, says: "It is a custom for persons to bear the surnames of their parents, but it is not obligatory. A man may lawfully change his name without resort to legal proceedings, and for all purposes the name thus assumed will constitute his legal name just as much as if he had borne it from birth." ... "At common law a man may lawfully change his name, or by general usage or habit acquire another name than that originally borne by him, and this without the intervention of either the sovereign, the courts, or Parliament; and the common law, unless changed by statute." ... "One may legally name himself or change his name or acquire a name by reputation, general usage, and habit."

(Internal citations omitted.) The SEC provides no reason to deviate from this rule.

[8]The best the SEC can do on the pseudonymity-as-fraud claim is assert that a *newspaper reporter* was fooled about the number of commenters holding Meyers' stated view, a view which the SEC does not allege itself to have been inaccurate. Amended Complaint, ¶57. Nowhere does the SEC suggest that any actual *investors* were misled as to any material fact.

-10-

the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted).

The SEC fails to specify the particular misstatements or omissions about Medallion that were made, to whom they were made, when they were made, by whom they were made, and why they were false. As a result, the Meyers defendants are left to guess what is it that the SEC contends they did wrong. Of the "over 1,000" (Amended Complaint, ¶50) works of authorship created by Meyers, the SEC fails to identify which ones are alleged to contain a misstatement or omission of material fact, what that misstatement or omission is, and why the matters about which Meyers wrote were false or misleading in any material respect.

The lack of detail regarding Meyers' purported misdeeds renders the complaint deficient not only under Rule 9(b), but also under Rule 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 [2007]). The complaint simply fails to connect Meyers' writings with a material misstatement or omission or other violation of Rule 10b-5 and therefore lacks facial plausibility.

## C.  The Complaint Fails to Connect Meyers' Writings With the Purchase or Sale of Securities.

Both Section 10(b) of the Securities Exchange Act and Rule 10b-5 require that a violation take place "in connection with the purchase or sale of any security . . . ." 15

U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. This provision has been held to require that the conduct complained of must coincide with the purchase or sale of securities. *SEC v. Zandford*, 535 U.S. 813, 822 (2002). In other words, there must be a transactional nexus between the misconduct alleged and a transaction in securities. *Ind. Elec. Workers' Pension Tr. Fund v. Millard*, 2007 U.S. Dist. LEXIS 54203 (S.D.N.Y. July 24, 2007) ("[F]raud is 'in connection with' a purchase or sale when there is a 'transactional nexus' between the fraud and the transaction."). Count II of the complaint does not allege any conduct of the Meyers defendants related to, or having a nexus with, the purchase or sale of securities and must therefore be dismissed.

## Point II

## PLAINTIFF'S TOUTING CLAIM MUST BE DISMISSED

Count III of the complaint alleges a violation of Section 17(b) of the Securities Act, which provides:

> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, *describes such security* for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b) (emphasis added).

This is the federal anti-touting statute. Its purpose is to require stock promoters to disclose their compensation, or to "protect the public from [persons] that purport to give an unbiased opinion, but which in actuality are being paid for it." *SEC v. Thomp-*

*son*, 238 F.Supp.3d 575, 590 (S.D.N.Y. 2017). To assert a claim under this statute, the SEC must allege: (i) that Meyers published or circulated a communication, (ii) that the communication *described a security*, (iii) that Meyers did so for consideration, and (iv) that Meyers did not disclose in the communication both the fact of his receipt of consideration and the amount received. *SEC v. Gorsek*, 222 F.Supp.2d 1099, 1105 (C.D. Ill. 2001).

A communication is insufficient to constitute a violation of this statute if it fails to "describe [a] security." A communication that merely describes an industry, competitive factors within the industry, the strengths and weaknesses of competitors, or even mentions an issuer by name ("Apple's computers are better than IBM's") does not constitute a violation of Section 17(b) without something more.[9] Very few of Meyers' articles mentioned Medallion by name, and hardly any mentioned Medallion's stock. None of his articles urged the purchase of Medallion's stock — the actual mischief that Section 17(b) was intended to proscribe.

---

[9]The case at bar is distinguishable from *SEC v. Liberty Capital Grp. Inc.*, 75 F. Supp. 2d 1160 (W.D. Wash. 1999). The *Liberty* defendants argued that they did not "describe securities," but they were alleged to have listed the issuers in a newsletter and website featuring the issuers as "picks" and "hot stocks"; the court determined that such listings sufficed for purposes of Section 17(b). In contrast, Meyers does not describe the securities of Medallion; he does not suggest that Medallion's stock is a "pick" or "hot" or otherwise should be bought; and even when his writings *mention* Medallion, the context in which his articles and other writings appear is vastly different. If a public relations agent can be required to make a compensation disclosure merely because he mentions the name of a public traded company (e.g., "Apple's computers are better than IBM's"), the entire public relations industry is in big trouble.

Even where the SEC quotes at length in the Amended Complaint from Meyers'
writings, these quotations fail to "describe … security[ies]" of Medallion. For example,
the SEC avers:

> Meyers' articles and comments also argued for a much higher value for
> Medallion Bank. In an article dated August 5, 2015, entitled "Medallion
> Financial Delivers Again. Will the Market Ever Learn?" posted to Seeking
> Alpha, Meyers (using an alias) wrote that "Medallion Bank is arguably
> worth $595 million. If we include realized losses, the Bank made $27 mil-
> lion, and is worth $459 million. Yet Medallion Financial Corporation car-
> ries the Bank at around $160 million."

Amended Complaint, ¶54. Here, Meyers refers in a factually correct manner to the
earnings of Medallion's bank subsidiary, and he states his heartfelt opinion of the val-
ue of the subsidiary; he does not "describe" the "security[ies]" of the parent company.
Without such "describing," there can be no Section 17(b) violation.

Likewise, the SEC accurately quotes Meyers regarding industry trends:

> Meyers commented on the article, describing Short Seller A as "oblivious"
> to the "headwinds that face rideshare." In another comment he wrote:
> "Trying to spin data and frighten investors doesn't prove your thesis cor-
> rect. It's putting band-aids on the seeping wounds." He repeatedly
> claimed that the "conversation is over" and that "the short thesis has
> blown up."

Amended Complaint, ¶60. Again, pointing out factual errors in assumptions made by a
short seller *about the industry as a whole* do not rise to the level of "describing" securi-
ties of Medallion.

The Amended Complaint adds additional detail and color to the SEC's touting
claims against the Meyers defendants, but it does not set forth any material instances
of actual touting of Medallion's stock.

Like Section 10 of the Exchange Act, Section 17 of the Securities Act is an anti-fraud statute; its title is "Fraudulent interstate transactions." As such, Meyers is entitled to the protections of both Rule 9(b), *Fed.R.Civ.P.*, and *Iqbal*, 556 U.S. at 662, that require the SEC to particularize the wrongs complained of and show how each of Meyers' writings meets the four elements of Section 17(b).

Because of the "kitchen sink" nature of the SEC's complaint, Meyers is unable to ascertain which of his purported "over 1,000" (Amended Complaint, ¶50) articles is alleged by the SEC to have violated Section 17(b), or to determine the nature of each purported violation, because merely "mentioning" Medallion is not a violation of Section 17(b). Rather, Section 17(b) requires that the defendant have "described … securities" of the issuer in question – and in a favorable way that urges their purchase.

This inquiry is relevant not only to the immediate defense of this matter on the merits but also ultimately to the defense of the SEC's demand for disgorgement. To the extent that Meyers received a flat amount of compensation for performing both legal (i.e., writing at least 980 articles and comments *that failed to mention Medallion at all*) and putatively illegal acts on behalf of Medallion (arguably some immaterial portion of the other approximately 20 articles and comments), any disgorgement must be limited to the portion of that compensation that was ill-gotten and is "connected" to a violation. See, e.g., *SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989).[10]

---

[10]"Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing. The remedy may well be a key to the SEC's efforts to deter others from violating the securities laws, but disgorgement may not be used punitively. Therefore, the SEC generally must distinguish be-

…(cont'd)

Accordingly, Count III is insufficient as pled and must be dismissed as against the Meyers defendants.

POINT III

## ADOPTION OF FACTS AND ARGUMENT OF MEDALLION AND MURSTEIN

The Meyers defendants adopt in their entirety and incorporate by reference the statement of facts and argument put forth by defendants Medallion and Murstein in their memorandum of law in support of their motion to dismiss the amended complaint.

## CONCLUSION

For all of the reasons hereinabove set forth, the Meyers defendants respectfully request that this Court grant their motion and that this matter be dismissed in its entirety as to them.

Dated: New York, New York
        June 2, 2022

*s/Hilary B. Miller*
HILARY B. MILLER (HM-4041)
500 West Putnam Avenue – Suite 400
Greenwich, Connecticut 06830-6096
(203) 587-7000
hilary@miller.net

*Attorney for Defendants*
*Lawrence Meyers*
*and Ichabod's Cranium, Inc.*

/Users/HBMFRANCE/Documents/Documents/Meyers, Lawrence/17 Meyers brief re motion to dismiss amended complaint.doc (June 2, 2022 at 12:45:00 Rev. 30)

---

(cont'd)...

tween legally and illegally obtained profits." *First City*, 890 F.2d at 1231 (internal citations omitted).