**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                                    **Plaintiff,**

                         **-against-**                                        **No. 21-cv-11125 (LAK)**

**MEDALLION FINANCIAL CORP.,**
**ANDREW MURSTEIN,**
**LAWRENCE MEYERS**
**and ICHABOD'S CRANIUM, INC.,**

                                    **Defendants.**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE AMENDED COMPLAINT**

David Stoelting
Karen Willenken
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Attorneys for Plaintiff
(212) 336-0174 (Stoelting)
(212) 336-0174 (Willenken)
stoeltingd@sec.gov
willenkenk@sec.gov

August 30, 2022

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS.................................4

    I. Defendants ...................................................................................................4

    II.    Medallion Financial's Declining Financial Situation .................................5

    III.    Murstein and Meyers' Touting of Medallion Financial's Stock...................7

        A.    The Agreement Between Medallion Financial and Ichabod's
            Cranium ...............................................................................................8

        B.    Meyers' Articles and Comments Concerning Medallion Financial .....8

        C.    Sarah Frigo's Continuation of Meyers' Activities...............................10

    IV.    Medallion Financial's Third Quarter 2016 Valuation Increases..................11

        A.    The Third Quarter 2016 Valuation ......................................................12

        B.    The Third Quarter 2016 Public Disclosures ........................................16

    V.    Misrepresentations About Non-Bank, Medallion-Related Assets ...............17

    VI.    Medallion Financial's Fourth Quarter 2016 Disclosures and Dramatic
        Further Increase in the Bank's Valuation....................................................18

    VII.  Medallion Financial's 2017 Disclosures and Valuations of the Bank .........19

    VIII. Medallion Financial's Lack of Internal Controls Over Financial
        Reporting.....................................................................................................19

STANDARD OF REVIEW ....................................................................................20

ARGUMENT ........................................................................................................21

    I. The AC Adequately Alleges That the Medallion Defendants Violated
    Antifraud Provisions of the Federal Securities Laws by Manipulating
    and Misrepresenting the Value of Medallion Financial's Assets.................21

        A.    Applicable Legal Standards..................................................................23

        B.    The AC Alleges that the Valuations Did Not Comply with GAAP. ....24

C.    The AC Adequately Alleges Murstein's Scienter with Respect to
the Valuation Scheme and Related Misrepresentations and
Omissions. .................................................................................26

1.    The AC Alleges Compelling Evidence of Conscious
Misbehavior. ........................................................................27

2.    The AC Alleges a Particularized Motive. ...........................................28

D.    Whether Fact or Opinion, Medallion Financial's Valuations and
Related Disclosures Were Materially Misleading as Alleged. ............................29

1.    Certain Bank Valuation-Related Statements Were Misleading
Facts—Not Opinions. ...............................................................29

2.    The Misleading Bank Valuation Opinions Are Actionable. ...........................31

3.    The Bank Valuation Misstatements Were Material. ..................................33

4.    Medallion Financial's Description of Its Process for Valuing Its
Medallion-Backed Loan Portfolio Was a Misleading Statement
of Fact. ............................................................................35

5.    Medallion Financial's Statements about the Chicago Medallion
Valuation Were Materially Misleading Opinions. ....................................35

E.    The AC Adequately Alleges Violations of Section 17(a) of the
Securities Act. .......................................................................37

1.    The Statements Were "In the Offer or Sale" of Securities. ............................37

2.    The Medallion Defendants Obtained Money or Property................................38

II.    The AC Adequately Alleges Primary and Secondary Violations of
Securities Act Section 17(b), Exchange Act Section 10(b) and Rule
10b-5 Thereunder. ............................................................................39

A.    The AC Adequately Alleges That the Medallion Defendants
Acted With Scienter and that They Aided and Abetted Meyers'
Touting. ..............................................................................41

1.    The AC Adequately Alleges Scienter With Respect to Touting.....................41

2.    The AC Adequately Alleges that the Medallion Defendants
Aided and Abetted Meyers' Violations of Section 10(b) and
Rule 10b-5.........................................................................44

B.   The AC Adequately Alleges That the Medallion Defendants
     Committed Fraud Under Section 10(b) and Rule 10b-5 Through
     Fraudulent Touting. ......................................................................45

     1.   Murstein and Medallion Financial Were Makers of the Touters'
          Statements. .......................................................................45

     2.   The AC Sufficiently Alleges That Meyers' Misrepresentations
          Were Material. ...................................................................46

C.   The Touting Scheme Is More Than Repackaged Misleading
     Disclosures. .................................................................................47

D.   The AC Alleges Meyers' Misconduct with Particularity and in
     Connection With the Purchase or Sale of Securities. .............................49

E.   The Meyers Defendants Violated Securities Act Section 17(b),
     and the Medallion Defendants Aided and Abetted These
     Violations. ...................................................................................50

III.  The AC Adequately Alleges That Medallion Financial Violated Books-
      and-Records and Internal Controls Provisions and Murstein Aided and
      Abetted These Violations. ....................................................................53

A.   The AC Adequately Alleges Deficient Books and Records ..............................53

B.   The AC Adequately Alleges Deficient Internal Accounting
     Controls. .....................................................................................54

C.   The AC Adequately Alleges Murstein Aided and Abetted Section
     13 Violations. ................................................................................56

IV.   The AC Adequately Alleges That Murstein Deceived the Auditor. ............................57

V.    The Motion to Strike the Claims for Disgorgement and an Officer-and-
      Director Bar Should Be Denied. ............................................................58

CONCLUSION.........................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC*, 446 U.S. 680, 100 S. Ct. 1945, 1955 (1980) ........................................... 24

*Altimeo Asset Mgt. v. Qihoo 360 Tech. Co. Ltd.*,
   19 F.4th 145 (2d Cir. 2021) ................................................................... 33, 47

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) ............................................... 20

*Baum v. Harman Int' Ind., Inc.*, 557 F. Supp. 3d 289 (D. Conn. 2021) ....................................... 29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................... 20, 21

*Cortina v. Anavex Life Sciences Corp.*, No. 15-cv-10162-JMF
   2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .................................................. 45, 53

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ........................................... 33

*Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015) ......................... 25, 26

*Howard v. Everex Sys., Inc.* 228 F.3d 1057 (9th Cir. 2000) ........................................... 29

*In re AmTrust Financial Svcs., Inc. Sec. Litig.*, No. 17-cv-1545-LAK,
   2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ........................................................ 31

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 17-cv-1580-LGS,
   2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021) ....................................................... 25

*In re Loewen Group, Inc.*, No. 98-cv-6740,
   2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ....................................................... 29

*In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014) ................... 36

*In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547 (S.D.N.Y. 2007) ................................... 21

*In re Puda Coal Secs. Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) ............................ 45

*In re U.S. Aggregates, Inc. Sec. Litig.*, No. 01-cv-1688-CW,
   2003 WL 252138 (N.D. Cal. Jan 24, 2003) ........................................................ 29

*International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022) ..................... 21

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135,
   131 S.Ct. 2296 (2011) ........................................................................... 45

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ...................................... 48

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ........................................ 58

*Lorenzo v. SEC*, — U.S. —, 139 S. Ct. 1094 (2019) .................................................... 48

*Noto v. 22nd Century Group, Inc.*, 35 F.4th 95 (2d Cir. 2022).................................................... 49

*Omnicare, Inc. v. Laborer Dist. Council Constr. Ind. Pension Fund*,
  575 U.S. 175, 135 S. Ct. 1318 (2015).................................................... 30, 31, 32, 36

*PR Diamonds, Inc. v. Chandler,* 364 F.3d 671 (6th Cir. 2004) .................................................... 29

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ........................................ 43

*Rabkin v. Lion Biotechnologies, Inc.*, No. 17-cv-02086-SI,
  2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ........................................ 47

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .................................................... 44

*SEC v. Bankatlantic Bancorp, Inc.*,
  2012 WL 1936112 (S.D. Fla. May 29, 2012) ........................................ 54

*SEC v. Berry*, No. 07-cv-04431-RMW,
  2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ........................................ 59

*SEC v. Buntrock*, No. 02-cv-2180,
  2004 WL 1179423 (N.D. Ill. May 25, 2004) ........................................ 58

*SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375 (D. Colo. 2004) .................................................... 59

*SEC v. Caserta*, 75 F. Supp.2d 79 (E.D.N.Y. 1999).................................................... 28

*SEC v. Cole*, No. 12-cv-8167-RJS,
  2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015).................................................... 39

*SEC v. Contrarian Press, Inc.*, No. 16-cv-6964-VSB,
  2019 WL 1172268 (S.D.N.Y. Mar. 13, 2019) .................................................... 48

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009) ........................................ 44

*SEC v. DiMaria*, 207 F. Supp. 3d 343 (S.D.N.Y 2016).................................................... 57

*SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008).................................................... 26

*SEC v. Fenster*, 929 F.Supp. 1346 (D. Colo. 1996).................................................... 60

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019).................................................... 46

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) .................................................... 24

*SEC v. Hopper*, No. 04-cv-1054,
     2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ............................................................ 58, 59

*SEC v. Liberty Cap. Grp. Inc.*, 75 F. Supp. 2d 1160 (W.D. Wash. 1999) ..................................... 51

*SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708 (D. N.J. 2005) ................................................. 25

*SEC v. Mintz*, No. 07-cv-1027-KMH,
     2008 WL 11408489 (S.D. Tex. Feb. 5, 2008) ......................................................... 59

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ................................................. 24

*SEC v. Mudd*, 885 F. Supp. 2d 654 (S.D.N.Y. 2012) .......................................................... 37, 38

*SEC v. Musella*, 748 F. Supp. 1028 (S.D.N.Y. 1989) ........................................................ 43

*SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970) ........................................ 32

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ................................................................... 59

*SEC v. Reserve Mgt. Co., Inc.*, 732 F. Supp. 2d 310 (S.D.N.Y. 2010) ..................................... 29

*SEC v. Retail Pro, Inc.*, No. 08-cv-1620-WQH,
     2010 WL 1444993 (S.D. Cal. Apr. 9, 2010) ........................................................... 56

*SEC v. Rio Tinto, plc*, 41 F.4th 47 (2d Cir. 2022) .......................................................... 47, 48

*SEC v. Ripple Labs, Inc.*, No. 20-cv-10832-ATS-N,
     2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ........................................................... 56

*SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1 (D. D.C. 2017) ...................................... 38, 54, 55, 57

*SEC v. Sandoval*, No. 17-cv-20301,
     2018 WL 11353292 (S.D. Fla. Apr. 11, 2018) ......................................................... 39

*SEC v. SeeThru Equity, LLC*, No. 18-cv-10374-LSS,
     2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ........................................................... 46

*SEC v. Sells*, No. 11-cv-4941-CW,
     2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ......................................................... 60

*SEC v. Sequential Brands Grp., Inc.*, No. 20-cv-10471-JPO,
     2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) ..................................................... passim

*SEC v. Smith*, No. 05-cv-941-CAS,
     2008 WL 11336814 (C.D. Cal. Feb. 28, 2008) ......................................................... 33

*SEC v. Stanard*, No. 06-cv-7736-GEL,
     2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ......................................................... 57, 59

*SEC v. Stratocomm Corp.*, 2 F. Supp. 3d 240 (N.D.N.Y. 2014) .................................................. 46

*SEC v. StratoComm Corp.*, 652 Fed. Appx. 35 (2d Cir. 2016)................................................... 32

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)..................................................... 50

*SEC v. Tourre*, No. 10-cv-3229-KBF,
    2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ................................................................... 39

*SEC v. Wall St. Pub'g Inst., Inc.*, 851 F.2d 365 (D.C. Cir. 1988)................................................ 50

*SEC v. Warner*, 652 F. Supp. 647 (S.D. Fla. 1987) ..................................................................... 38

*SEC v. Yang*, 999 F. Supp. 2d 1007 (S.D.N.Y. 2013) ................................................................. 43

*SEC v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899 (2002)........................................................ 50, 51

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ................................................. 26

*Slue v. N.Y. Univ. Med. Ctr.*, 409 F. Supp. 2d 349 (S.D.N.Y. 2006)............................................ 58

*United States v. Cuevas Pimentel*, 815 F. Supp. 81 (D. Conn. 1993)........................................... 44

*United States v. Erickson,* 601 F.2d 296 (7th Cir. 1979) ............................................................. 28

*United States v. Evangelista*, 122 F.3d 112 (2d Cir. 1997) ......................................................... 28

*United States v. Naftalin*, 441 U.S. 768,
    99 S. Ct. 2077 (1979)................................................................................................. 37

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938) ................................................................... 44

*Universal Health Servs., Inc. v. United States*, 579 U.S. 176,
    136 S. Ct. 1989 (2016).............................................................................................. 30

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083,
    111 S. Ct. 2749 (1991).............................................................................................. 35

*Zinaman v. USTS N.Y. Inc.*, 798 F. Supp. 128 (S.D.N.Y. 1992) .................................................. 58

**Statutes**

Section 12(b) of the Securities Exchange Act of 1934 ..................................................... 4

Section 13(a) of the Securities Exchange Act of 1934 ............................................... 4, 56

Section 13(b)(2)(A) of the Securities Exchange Act of 1934,
     15 U.S.C. § 78m(b)(2)(A) ................................................................... 53, 54

Section 13(b)(2)(B) of the Securities Exchange Act of 1934,
     15 U.S.C. § 78m(b)(2)(B) ................................................................... 53, 54

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) .................................. 21, 23, 38

Section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b) ............................. 39, 41, 50, 53

**Rules**

Rule 9(b) of the Federal Rules of Civil Procedure ........................................................ 21

Rules 10b-5(a) and (c) under the Securities Exchange Act of 1934,
     17 C.F.R. § 240.10b-5(a) and (c) ........................................................... 41, 48

Rule 10b-5 under the Securities Exchange Act of 1934,
     17 C.F.R. § 240.10b-5 ........................................................................... passim

Rule 12(b)(6) of the Federal Rules of Civil Procedure ............................................... 20

Rule 12(f) of the Federal Rules of Civil Procedure ..................................................... 58

Rule 13b2-2 under the Securities Exchange Act of 1934,
     17 C.F.R. § 240.13b2-2 ......................................................................... 57

**Other Authorities**

*In re Lynn Tilton*, SEC Release No. 1182,
     2017 WL 4297256 (Sept. 27, 2017) ......................................................... 34

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this omnibus memorandum of law in opposition to two separate motions to dismiss the Amended Complaint filed by (1) Defendants Medallion Financial Corp. ("Medallion Financial") and Andrew Murstein ("Murstein") (together, the "Medallion Defendants") (DE 80, 81, 82) and (2) Defendants Lawrence Meyers ("Meyers") and Ichabod's Cranium, Inc. ("Ichabod's Cranium") (together, the "Meyers Defendants") (DE 84, 85). For the reasons set forth below, the motions should be denied.[1]

## PRELIMINARY STATEMENT

This is a fraud case arising from the deceptive conduct, misleading statements and half-truths of Murstein—a founder, a large shareholder, and the president of Medallion Financial, a public company whose core business for decades had been making loans collateralized by taxi medallions. As the value of the taxi medallions steadily increased through 2013, Medallion Financial generated reliable profits and dividends to its shareholders. With the emergence of ridesharing apps, however, Murstein for the first time faced an unexpected and existential threat to his company. In response, as the AC alleges, Murstein violated the federal securities laws by orchestrating two schemes intended to bolster the company's battered stock price, avoid catastrophic defaults on loan covenants, and protect his own personal financial stake and reputation.

The pattern of deceptive conduct alleged in the AC began in late 2014, when Murstein hired Meyers, a public relations consultant whose website boasted of his willingness to use "guerilla PR tactics" to "launch an asymmetrical, sustained, multi-front assault" on clients'

---

[1] This brief uses the following conventions: "AC" means the SEC's Amended Complaint filed April 26, 2022 (DE 45); "¶ __" refers to paragraphs of the AC; and "App." means the Appendices attached to the AC. "MFC Br." means the brief (DE 81) filed in support of Defendants Medallion Financial and Murstein's motion; "Meyers Br." means the brief (DE 85) filed in support of Defendants Meyers and Ichabod's Cranium's motion.

opponents while avoiding "any detectable connection" to the client. Murstein, desperate to silence the online voices that were raising questions about Medallion Financial's viability, agreed to pay Meyers $5,000 per month for his services. The contract Murstein and Meyers signed stated that Meyers would "partner" with Medallion Financial and that all articles and blog posts were required to receive "prior written approval" from Murstein, who also directed the content of many of Meyers' articles and identified online targets for Meyers to confront. As Murstein knew, Meyers used multiple aliases and personas in his postings to deceive investors into believing that his views had widespread support. As Murstein also knew, Meyers never disclosed that he was acting as Medallion Financial's paid agent.

In 2016, as Medallion Financial's stock price remained at an all-time low, Murstein launched a separate scheme that involved a series of deceptive and improper actions—including opinion-shopping, extending financial incentives to a valuation firm to get it to quote a higher valuation figure and deceiving Medallion Financial's auditors—designed to further Murstein's goal of boosting the carrying value of Medallion Financial's most valuable asset, Medallion Bank. Murstein almost single-handedly caused the fair value of the Bank to skyrocket from $166.4 million to $280 million in the last two quarters of 2016. Murstein achieved this dramatic increase through fraud. And the value of the Bank was not the only misleading disclosure: the company also incorrectly reported its fair-value procedures for medallion-backed loans held outside the Bank and inflated the value of Chicago medallions it owned.

The Defendants now ask this Court—on a motion to dismiss, in which the pleaded facts must be accepted as true and all plausible inferences drawn in the SEC's favor—to find that the AC's allegations are insufficient. In doing so, the Medallion Defendants largely bypass the well-pleaded factual allegations in the AC and seek to create an alternative factual narrative that

contradicts the SEC's factual allegations. The Court should reject Defendants' improper attempt to litigate factual disputes at this stage of the case—those disputes are ones that a jury should decide at trial. As for Defendants' legal arguments, addressed below, they are meritless.

The Medallion Defendants make two principal legal arguments on the valuation-related claims. First, they argue that all of the representations at issue were merely "non-actionable" opinions. The AC, however, more than adequately alleges statements that qualify as misleading under the *Omnicare* test, whether they are viewed as fact, opinion, or a mix of both. The Medallion Defendants also argue that Murstein reasonably relied on advice from the company's auditor and that the auditor "stands by" its opinion. This affirmative defense—which, like any such defense, cannot be considered on a motion to dismiss—is premature, but in any event the AC alleges that the Medallion Defendants failed to disclose material information to the auditor.

The Meyers Defendants' primary argument is that Meyers' conduct does not fall within the scope of the federal anti-touting statute because his writings did not "describe a security." However, the AC's extensive allegations that Meyers promoted Medallion Financial (whether by name or otherwise) and its stock without disclosing the payments he received from the company more than suffice to state a claim under the statute. In addition, the pattern the AC describes of frequent posts on a website targeted at investors, using multiple aliases to create a misleading impression that the views expressed were shared by a large group of people with diverse backgrounds, alleges fraud. And case law makes clear that, in that context, the Meyers Defendants' failure to disclose compensation is material.

In sum, the AC more than adequately states claims for the securities laws violations (primary and aiding-and-abetting liability) it alleges. The motions to dismiss should be denied.

## THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS

### I.    Defendants

Defendant Medallion Financial is a New York City-based company whose common stock, registered with the SEC under Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act"), is publicly traded. ¶ 19. Medallion Financial files periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act and the rules thereunder. *Id*. Medallion Bank (the "Bank"), a wholly-owned subsidiary of Medallion Financial, is a Utah industrial bank. ¶ 22. During the relevant period, Medallion Financial reflected its interest in the Bank as an asset on its balance sheet and updated the Bank's "fair value" each quarter. *Id*., ¶ 34. Medallion Financial was required to estimate the fair value of its investments, including its interest in the Bank and its other unconsolidated subsidiaries, on a quarterly basis. ¶¶ 34-35.

Defendant Murstein is a founder, director, president and chief operating officer of Medallion Financial. ¶ 20. Murstein was paid approximately $3.54 million for 2014, $3.56 million for 2015, $1.92 million for 2016, and $2.23 million for 2017, and his compensation package for those years included salary, bonus, restricted stock awards, country club membership, a driver, a car lease, parking, car insurance and social club memberships. *Id*. As of April 15, 2016, Murstein and his father Alvin Murstein, who is Medallion Financial's chief executive officer (CEO), owned or controlled over 3.4 million shares, or nearly 14%, of Medallion Financial's common stock, while each of the other named executives and directors owned less than 1%. *Id.* Murstein has been profiled in magazines and newspapers as the public face of Medallion Financial. *Id.*

When it became a public company in 1996, Medallion Financial reported that its "principal focus was the origination and servicing of loans financing the purchase of taxi

medallions and related assets." ¶ 25. Taxi medallions are city-issued licenses to operate a taxi and pick up street hails. ¶ 23.

Defendant Meyers is the owner and sole director of Defendant Ichabod's Cranium, which, from at least 2014 through 2016, did business under the name Asymmetrical Media Strategies ("Asymmetrical Media"). ¶ 21. Asymmetrical Media's website offered "guerilla PR tactics to deliver our clients' messages" and promised an "asymmetrical, sustained, multi-front assault" on clients' opponents. ¶ 44. It also offered to "employ any strategy or tactic you desire" and promised to "operate without any detectable connection to you," resulting in a "stealth mission to undermine" opponents' positions. *Id.*

## II.    Medallion Financial's Declining Financial Situation

From late 2014 through 2017, both Medallion Financial and its unconsolidated subsidiary, the Bank, had substantial portfolios of medallion-backed loans. ¶¶ 31, 32. In addition, a consolidated Medallion Financial subsidiary owned taxi medallions issued by the City of Chicago. ¶¶ 27, 31. From the end of 2014 through the end of 2017, the value of a taxi medallion in New York City decreased from $805,000 to $315,000. ¶ 41. As the market value of the medallions that collateralized these loans decreased, these loans became riskier. ¶¶ 29, 31, 32. By 2015, Medallion Financial had become a target of short-sellers, who posted sharply negative discussions on financial websites and blogs. ¶¶ 2, 43, 59-62. In 2016 and 2017, the Bank experienced loan losses that significantly reduced its net income. ¶ 42.

Each year from 2015 through 2017, Medallion Financial and the Bank both experienced declines in the value of their medallion-backed loan portfolios. ¶¶ 31-32. As the Bank recognized losses on its medallion-backed loan portfolio, its net income declined—from over $23 million in each of 2014 and 2015, to less than $5 million in each of 2016 and 2017. ¶ 42. With such limited

net income, the Bank could not distribute cash to its sole shareholder, Medallion Financial, which, in turn, had to stop paying dividends to its shareholders in late 2016. ¶ 42. As a result, Medallion Financial's share price fell from $17 in 2013 to $3 in 2015. ¶¶ 5, 40.

Declines in the value of taxi medallions also affected Medallion Financial's ability to borrow money to fund its corporate operations and to make loans. ¶ 114. Prior to 2014, Medallion Financial had relationships with at least six banks that provided long-term revolving lines of credit, which Medallion Financial used for general corporate funding purposes and which were secured in part by loans and taxi medallions. ¶ 114. Beginning in 2015, these lenders began reducing the amounts Medallion Financial could borrow or have outstanding under the loans. ¶ 112. As these lenders limited additional borrowings, Medallion Financial was forced to borrow at a high interest rate through a debt offering to the public in April 2016. ¶ 119.

As Medallion Financial was closing the books for the third quarter of 2016 in November that year, it was in danger of violating the financial performance covenants in two of its six bank credit facilities. Some of these credit facilities required that Medallion Financial avoid reporting a loss in multiple consecutive quarters, for a fiscal year, or for any trailing twelve-month period. ¶¶ 116-17. Because these agreements with lenders had cross-default provisions stating that a default on one loan agreement also constituted an event of default with other banks, Medallion Financial faced a risk that, if it defaulted on the covenants with one bank, all six debt facilities, on which it owed $68 million, would be accelerated. ¶¶ 115, 120, 129. Murstein was aware of this risk of cross-defaults and feared a "run on the bank." ¶¶ 127, 130.

Murstein's experience with Metropolitan Bank ("MetBank," referred to in the AC as "Bank C"),[2] a lender that had provided funding to Medallion Financial subsidiaries in connection with the Chicago medallions those subsidiaries owned, made the danger clear. Historically, MetBank had been willing to renew its loans, but in October 2016, recognizing the loans were no longer supported by the value of the underlying medallion collateral, MetBank refused to do so. ¶¶ 122-23. Medallion Financial ultimately succeeded in obtaining waivers from other lenders in the aftermath of its subsidiaries' failure to repay the MetBank loan. ¶ 128. But Medallion Financial's negotiations with MetBank, in which Murstein was personally involved, made clear that changes in the value of medallions might prompt its lenders to enforce their rights under their loan agreements more aggressively than they had done in the past. ¶¶ 125, 130.

## III.   Murstein and Meyers' Touting of Medallion Financial's Stock

Meyers contacted Murstein after seeing negative articles about Medallion Financial on Seeking Alpha, an investing web site, and Meyers offered to help communicate a more positive message to the "investment community."[3] Meyers Br. at 6. In late 2014, Murstein hired Meyers and Ichabod's Cranium (doing business as Asymmetrical Media) to provide "various public relations, marketing and communications services, such as articles [and] blog posts…in order to influence public opinion with regard to company issues." ¶ 47. The Asymmetrical Media website advertised its "guerilla PR tactics," which allowed clients to "operate without any detectable connection to you." ¶ 44. In exchange for a monthly retainer of $5,000, Meyers offered to be "constantly writing about" Medallion Financial and "bashing Uber." ¶ 45.

---

[2] The AC masked the identities of certain non-parties. This brief, where helpful for clarity, refers to persons and entities by their actual names, and indicates in parentheses how the person or entity was referenced in the AC. Attached as App. A is a key identifying each person and entity whose identity was masked in the AC.

[3] "Alpha" is a "term used in investing to describe an investment strategy's ability to beat the market." *See* https://www.investopedia.com/terms/a/alpha.asp#:~:text=Alpha%20(%CE%B1)%20is%20a%20term,to%20systematically%20earn%20returns%20that (last visited Aug. 29, 2022).

A.      **The Agreement Between Medallion Financial and Ichabod's Cranium**

At the time he caused Medallion Financial to enter into the agreement with Meyers,

Murstein shared a draft with Medallion Financial's general counsel, Jeffrey Yin. ¶ 46. Yin knew

that the SEC was likely to view any statement made by Meyers as the company's own, so the

final agreement provided that all "articles, blog posts, etc." must be approved in writing by both

Medallion Financial's President (Murstein) and its legal department." ¶¶ 48-49b. It also included

a requirement that Meyers would "comply with all applicable laws and regulations…, including,

but not limited to, the Securities Act of 1933 and the Securities Exchange Act of 1934 and the

rules and regulations promulgated thereunder." ¶ 49c.

B.      **Meyers' Articles and Comments Concerning Medallion Financial**

Consistent with his promise to Murstein to be "constantly writing about" Medallion

Financial, Meyers published over 100 articles on Medallion Financial, the taxi industry, and the

ride-sharing industry between December 2014 and June 2016. *See* App. A. He typically wrote

multiple articles each month, including at least 17 in January 2015 (using three aliases in

addition to his own name), 11 in February 2015 (using own name plus two aliases), and 13 in

June 2015 (using own name plus three aliases). App. A. Murstein and Meyers intended the

frequent posting, and the use of aliases with different purported backgrounds, to convey the

misleading impression that the opinions Meyers expressed were more widely held, popular, and

supported by relevant expertise than they actually were. ¶¶ 56, 69.

Twenty-three of Meyers' articles specifically mentioned Medallion Financial; of those,

17 were on websites—Seeking Alpha or InvestorPlace—focused on discussing potential

investment opportunities. Several of his articles' titles mentioned financial metrics such as

"undervalued," "earnings" and "book value" in regard to "Medallion Financial" or the

"Medallion Financial Industry"; two titles referred to recent periodic report filings by the

company; and over 25 titles that did not explicitly reference Medallion Financial referred by name to individuals who had written negative articles about Medallion Financial, calling them "shady" and accusing them of racism or lying. See App A. Meyers' publications argued "that Medallion Financial was grossly undervalued" and that the stock "could again reach the price of $15 to $17 per share." ¶ 52. For example, in an article on Seeking Alpha, Meyers wrote that that "[t]here is no reason why TAXI stock should be selling below $10…. TAXI stock should trade back to $15 once the market realizes it has overreacted." ¶ 53.

Meyers also posted over 900 comments on Seeking Alpha that related to articles discussing Medallion Financial or other taxi medallion lenders. Many of these were posted in response to his own articles, which themselves described Medallion Financial's securities; others were posted in response to articles by writers who articulated a negative thesis about Medallion Financial. The AC provides the titles of the Seeking Alpha articles on which Meyers (as himself or an alias) commented and the number of times he commented on each. *See* ¶¶ 53, 59-61. The titles of many of these articles make clear that the authors were discussing Medallion Financial, albeit at times with the phrase "medallion financial industry" rather than "Medallion Financial Corp." For example, Meyers commented 98 times on his own article titled "You Can't Go Long Uber By Shorting The Taxi Medallion Financial Industry," 103 times on an article titled "Medallion Financial Corp. Loses Its Largest Institutional Investor" (including by claiming "the short thesis has blown up"), 64 times on an article titled "Medallion Financial's Recovery No Surprise, A Sign Of Positive Long-Term Prospects," and 81 times on an article titled "For Medallion Financial, The Future Is Arriving." AC ¶¶ 58, 60 & App. B.

Medallion Financial paid Meyers approximately $65,000 in exchange for his writings. ¶¶ 50-51. Meyers never disclosed the compensation he received from Medallion Financial. ¶ 70. In

some of his articles, he affirmatively misrepresented that he had not received compensation for the article and had "no business relationship with any company whose stock" was mentioned. ¶¶ 53, 70; App. A. He did not identify himself as associated with Asymmetrical Media or otherwise involved in the public relations business; instead, he referred to himself, depending on the alias used, as a "contrarian investor"; as "president of PDF Broker, Inc." or "PDL Capital"; as a person who has "been in the taxi industry for more than 30 years"; or as a reporter, journalist or financial analyst. App. A. In some cases, Meyers used an alias to praise articles or comments that Meyers had published under his own name. ¶ 55, 61.

Murstein worked closely with Meyers on the content of his articles and comments, and Murstein received hyperlinks to some of the resulting publications—sometimes directly from Meyers and other times from colleagues or from his subscription to news alerts for articles concerning Medallion Financial that were posted on Seeking Alpha and other investment news sites. ¶¶ 58, 62, 64, 65, 66, 67. As a result, Murstein knew or recklessly disregarded that Meyers, in his articles and posts, did not disclose the compensation he received from Medallion Financial and at times posted using aliases and/or false claims about his employment status. ¶ 71.

C.      **Sarah Frigo's Continuation of Meyers' Activities**

In early 2016, Murstein hired Sarah Frigo ("Frigo," referred to in the AC as the "Contractor") to post articles on Medallion Financial's behalf. ¶¶ 73-74. Murstein knew that Frigo then began publishing under an alias and provided a "fake resume" on sites where she posted content. ¶¶ 75-82. On at least one occasion, Murstein explicitly told Frigo not to use her real name. ¶ 86. Frigo published numerous articles and comments on websites from May 2016 through November 2016. ¶ 83.

Frigo's articles parroted content that Murstein or Meyers provided to her. ¶¶ 82, 85, 87-92. On several occasions, Murstein acknowledged that the purpose of Frigo's online activity was

to boost Medallion Financial's stock price; in some cases, he instructed her to write about the price at which Medallion Financial's stock should trade or what Medallion Bank was worth. ¶¶ 90-92, 96. Murstein gave Frigo specific instructions on where to post and what to say. ¶¶ 84-85, 90-92. He reviewed at least some of her articles before they were published and others after they were published. ¶¶ 93-94. Murstein knew that Medallion Financial compensated Frigo for publishing her articles, many of which he reviewed prior to and/or after publication. ¶¶ 93-94. He also constantly monitored the investing websites on which she published. *See, e.g.*, ¶¶ 67, 72, 76, 84-85. Murstein knew or recklessly disregarded that none of Frigo's online articles and posts disclosed that compensation, based on his review of her articles. ¶¶ 83, 93-94, 97.

When reporters contacted Medallion Financial in November 2016 and January 2017 about Frigo's use of aliases to post positive articles on Medallion Financial, Murstein lied to them by, among other things, denying that he knew Frigo was using an alias. ¶¶ 100-106. He also paid Frigo hush money to conceal his scheme. ¶¶ 107-10.

## IV.  Medallion Financial's Third Quarter 2016 Valuation Increases

Prior to 2015, Medallion Financial's financial statements treated the Bank's fair value as equivalent to its "book value"—the Bank's assets minus liabilities. ¶ 133. Because the Bank was subject to numerous restrictions not common for other banks, Medallion Financial's Board of Directors regularly concluded that the Bank had "little value beyond its recorded book value." ¶¶ 133-34. In 2015, however, as Medallion Financial was forced to begin recognizing losses on its Chicago medallions and on its medallion-backed loan portfolio (¶¶ 31-32), Medallion Financial decided for the first time that the Bank's fair value was higher than its book value. ¶ 135. Medallion Financial hired a third-party valuation firm—RP Financial (the "Valuation Firm"), a specialist with substantial experience in bank valuations—to perform a fair value

analysis of the Bank. ¶ 136. RP Financial provided Medallion Financial with fair value estimates for the Bank at year-end 2015 and the second quarter of 2016 that were approximately 11% over the Bank's book value. ¶ 137.

In October 2016, as Medallion Financial was closing its books and preparing its financial statements for the quarter ending September 30, 2016, Medallion Financial was in danger of violating the covenants in its loan agreement with BankUnited, N.A. ("Bank B"), which stated that a "Consolidated Adjusted Net Loss for any twelve consecutive month period" would be an event of default. ¶ 117. Medallion Financial could only report a net gain over the twelve months ending September 30, 2016, by increasing its valuation of Medallion Bank. ¶ 191. If Medallion Financial had valued the Bank at $166 million, as it had done in the previous quarter based on RP Financial's estimate, it would have reported financial results that violated Bank B's financial performance covenant. *Id*. It also would have set the stage for violating a financial covenant in its agreement with Sterling Bank ("Bank A"), which treated losses in two consecutive quarters as an event of default, the next quarter. ¶¶ 117, 131. A violation of Bank United or Sterling Bank's covenants would have permitted the other lenders to accelerate their loans, requiring immediate repayment. ¶¶ 115, 129. As Murstein had recently experienced when trying to refinance existing loans with MetBank, which had lent money to certain Medallion Financial subsidiaries, changes in the value of taxi medallions had made lenders more aggressive about enforcing their rights under loan agreements that included such medallions as collateral. ¶ 130.

A. **The Third Quarter 2016 Valuation**

Against this backdrop, Murstein undertook a scheme to inflate the fair value at which Medallion Financial carried its interest in Medallion Bank on its balance sheet, triggering an increase in Medallion Financial's quarterly income that would offset Medallion Financial's losses on the rest of its operations. ¶¶ 38, 138, 191. Under GAAP ASC-820, "fair value" is

defined as the "price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions." ¶ 36. This standard required Medallion Financial to estimate the price at which it could sell the Bank to a third party, even if it did not actually intend to sell the asset. *Id*.

Murstein set out to generate purported third-party offers to purchase the Bank and to convince RP Financial and Medallion Financial's auditors that these purported offers justified an increase in the Bank's valuation. ¶¶ 138-43. To do so, Murstein reached out to investment banks Sandler O'Neill ("Sandler"/"Investment Bank A") and Keefe, Bruyette & Woods ("KBW"/"Investment Bank B") on October 17, 2016, asking them to "put together a rough valuation" of the Bank while suggesting it "would be worth well over $300 million." ¶ 140.

Later in October, Murstein contacted a representative of WebBank (the "consumer lender"), another Utah industrial bank, asking: "Do you feel that you would be able to value Medallion Bank in excess of $200 million?" ¶ 142. The next day, he followed up, writing:

> [S]end me an email Monday saying your [sic] interested in discussing a valuation above $200 mill[ion] with us. I personally think [the Bank is] worth a lot more but *if I get the email saying that* we can discuss everything on the phone or in person."

*Id*. (emphasis added).

In each communication with these third parties, Murstein suggested investment banking work or a transaction could be discussed if he got the valuation figure he wanted. ¶¶ 140, 142. Each entity replied with positive, but vague or qualified, value indications. ¶¶ 141, 143.

Medallion Financial's audit firm, WeiserMazars LLP (the "Auditor"), advised Murstein that the indications of value he received in response to his inquiries were inadequate to form the basis for a fair value estimate. ¶¶ 149, 150. The Auditor told Murstein that it would require a fair value opinion from a valuation specialist to support Murstein's desired increase in the Bank's fair value for the third quarter 2016, recommended that Medallion Financial use the same

valuation specialist as in the previous quarter, and noted that "[o]n a quarter to quarter basis the methodology should not change." ¶ 162.

Murstein then pressured the valuation specialist, RP Financial, to provide a valuation at his desired price. ¶¶ 154-58. Murstein provided the valuation specialist with information about the KBW estimate and the WebBank "offer" at $200 million, but RP Financial (and the Auditor) rejected these as support for an increase in value: they told Murstein that the WebBank offer was too tenuous to form the basis of a valuation, especially because it had been made without due diligence. ¶¶ 150, 155, 157. The valuation specialist concluded: "[W]e have prior valuations that have been reviewed and approved by the Board…and there does not appear to be rationale to change the multiple, such as lower perceived risk." ¶ 159. The valuation specialist also pointed out that "the recent trajectory of asset quality and earnings is negative." *Id*. Despite significant pressure from Murstein, RP Financial refused to sign off on Murstein's proposed valuation. ¶¶ 154-59, 163. Murstein then fired RP Financial. ¶¶ 161-66.

Upon learning that Medallion Financial had fired RP Financial, the Auditor encouraged him to continue with RP Financial, writing: "The key here is to bridge the gap from your prior quarter's valuation, and utilize known methods (hopefully consistent methods) from the prior quarter to evaluate the fair value for this quarter.… I would recommend that you continue to utilize the same third party specialist quarter-after-quarter." ¶ 165. Murstein ignored this advice from the Auditor about the importance of consistency, and he proceeded to opinion shop for a more compliant firm.

Murstein sent identical emails to three investment banks, including Sandler and KBW, and made clear that he was offering a *quid pro quo*: investment banking work in exchange for

issuing a valuation opinion at the number Murstein wanted. ¶¶ 169-70. He attached RP

Financial's second quarter 2016 valuation report and wrote in these emails:

> Do you think you can issue something like this report indicating the bank is now worth at least 1.3 times book value or $193 million. I believe it is worth substantially more but that is the minimum amount that needs to be confirmed right now for us to work with you to potentially sell a portion of the bank.

¶ 169. Sandler and KBW did not respond to Murstein's email. ¶ 171. The third investment bank,

Berenson & Co. ("Berenson"/"Investment Bank C"), did not normally perform valuation work,

but it agreed to do so in hopes of winning Medallion Financial's more lucrative investment

banking business. ¶¶ 172-74. In arriving at its valuation opinion, which was consistent with the

$193 million number Murstein had demanded, Berenson used valuation assumptions that were

different from RP Financial's in key respects. ¶ 175.

Murstein concealed from the Auditor the truth regarding his reasons for firing RP

Financial and hiring Berenson. He told the Auditor that he fired RP Financial because it had

"been difficult to work with for quite some time" and was too small. ¶¶ 161-66. Murstein then

signed a management representation letter in connection with the Form 10-Q filing for the third

quarter of 2016, in which he represented: "We did not give or cause any instructions to be given

to specialists regarding the values or amounts derived in an attempt to bias their work, and we

are not otherwise aware of any matters that have had an impact on the independence or

objectivity of the specialists." ¶ 263. This representation was false. In fact, Murstein had given

instructions to Berenson regarding the Bank's minimum fair value and offered investment

banking work to bias the valuation opinion. ¶ 264. In addition, in Medallion Financial's

valuation memorandum (the "3Q16 Valuation Memo"), on which the Auditor relied to support

the Bank's valuation increase, Murstein falsely represented that WebBank had "contacted the

Company *unsolicited* to acquire the Bank and indicated" a value over $200 million. ¶ 269

(emphasis added). In fact, however, the entity had only communicated an interest at that value after Murstein specifically requested that it do so. ¶¶ 142-43.

### B.      The Third Quarter 2016 Public Disclosures

As part of Medallion Financial's process for finalizing its Form 10-Q disclosures, Murstein signed the 3Q16 Valuation Memo provided to Medallion Financial's Auditor to support the valuation. The Auditor did not receive that memo, nor a draft of the Form 10-Q that described Medallion Financial's justifications for increasing the Bank's estimated fair value, until the day the Form 10-Q was filed. ¶¶ 177-78, 183.

The Form 10-Q, like Murstein's 3Q16 Valuation Memo, stated that Medallion Financial had "engaged a valuation specialist to assist the Board of Directors in its determination of Medallion Bank's fair value" and attributed the increase in the Bank's value to "external interest in the bank" from "both investment bankers and interested parties," and to a "court ruling…that the Company believes heightens the interest of marketplace lenders to acquire or merge with Utah industrial banks." ¶ 180. As discussed above, however, the evidence of "external interest in the bank" consisted primarily of outbound inquiries from Murstein to the third parties and was not appropriate as a basis for a fair value calculation. None of the firms had done due diligence before providing his requested numbers. ¶ 185. Medallion Financial did not disclose this fact. In addition, Medallion Financial did not disclose that it had not conducted a meaningful inquiry before stating in its Form 10-Q that it believed the "court ruling" was likely to increase third-party interest in acquiring the Bank. ¶ 186. Finally, Medallion Financial did not disclose that Murstein had changed valuation firms from one quarter to the next because he rejected the previous firm's value opinion, that he had directed the new valuation firm to value the Bank at or above a certain number, or that he had induced the new firm to provide a favorable valuation by promising to consider it for investment banking work if the firm complied. ¶¶ 170, 184-88.

16

**V.      Misrepresentations About Non-Bank, Medallion-Related Assets**

Medallion Financial's Form 10-Q for the third quarter of 2016 also was misleading because it improperly accounted for some of the assets it held outside the Bank. First, Medallion Financial overvalued its portfolio of 159 Chicago taxi medallions. ¶¶ 31, 192-98. Second, Medallion Financial misleadingly described its process for valuing the medallion-backed loans it held outside the Bank.

*First*, Medallion Financial and Murstein were aware that recent transaction data reflected a value of $65,000 at most, as of September 31, 2016, for a Chicago taxi medallion and that at least one comparable bank had reduced the value of Chicago medallions it owned to $60,000 each. ¶ 194. Despite having no evidence that the reported transactions were not true arm's length transactions, Medallion Financial ignored the available sales data and valued its Chicago medallions at $120,000 each. ¶¶ 197-98. Murstein signed a valuation memorandum that not only failed to establish that the recorded medallion transfer prices were not orderly transactions that should be given little weight under ASC 820, but also failed to explain why Medallion Financial used a value of $120,000, rather than the lower $105,000 generated by its internal cash flow models. ¶ 200. Medallion Financial's disclosure on this point was misleading, because it suggested that relevant transactions did not exist or were not relevant, and because it did not disclose that Medallion Financial's cash flow analysis suggested a lower valuation than the $120,000 used. ¶ 203.

*Second*, with respect to the medallion-backed loans held outside the bank, Medallion Financial disclosed, in its annual and quarterly reports from 2015 through 2017, that it valued these loans by considering a number of factors, including the "nature and realizable value of any collateral" and the "portfolio company's earnings and its ability to make payments on its indebtedness." ¶ 206. In fact, however, Medallion Financial only took these factors into account

17

for loans that were not "performing," defined to include any loan that was not more than 90 days past due (unless the borrower had declared a bankruptcy or other troubled debt restructuring). ¶ 207. Fair value accounting rules, which Medallion Financial claimed it complied with, required it to evaluate these factors for all loans, whether performing or not. ¶¶ 207-08. Medallion Financial's failure to consider the collateral value of the medallion-backed "performing" loans was significant given that medallion sales prices declined significantly over the three-year period, meaning that the "realizable value of any collateral" supporting each loan had decreased. ¶¶ 210-12. Murstein, who was on Medallion Financial's Investment Committee and signed the valuation memoranda that described the company's true process for valuing these loans, knew or recklessly disregarded that Medallion Financial's public disclosures were misleading. ¶ 213.

## VI. Medallion Financial's Fourth Quarter 2016 Disclosures and Dramatic Further Increase in the Bank's Valuation

In the fourth quarter of 2016, Murstein continued to be motivated to keep the stock price as high as possible and to avoid defaulting on the loan covenants. ¶ 225. In an apparent effort to offset the impact of deteriorating medallion values during the quarter, Murstein decided to increase the Bank's fair value again. ¶ 227. He forwarded to Berenson an email between himself and Medallion Financial's chief financial officer (CFO) in which they discussed in detail the valuation they would like to use. ¶¶ 227, 229-32. The Form 10-K for the year ending December 31, 2016, gave the same reasons reflected in the third quarter 2016 Form 10-Q for the increase in the Bank's valuation and provided no insight into how those factors justified a substantial increase, in the fourth quarter of 2016, of $87 million—to $280 million. ¶ 227.

Most of this increase in the Bank's valuation was necessary to avoid defaulting on the covenant in Medallion Financial's agreement with Sterling Bank. Even with the increase, Medallion Financial reported a net increase in net assets of only $23.5 million for the fiscal year.

¶ 227. Under the Sterling Bank agreement, reporting a loss for the fiscal year would have been an event of default. ¶ 116.

The Form 10-K for the year ending December 31, 2016, also continued to misrepresent how Medallion Financial valued the medallion-backed loans it held outside the Bank. ¶ 235. Based on the allegations described above, Murstein knew or recklessly disregarded that the Form 10-K, which he signed, contained misleading information about the fair value of both the Bank and Medallion Financial's non-Bank medallion-backed loan portfolio. ¶¶ 234-36.

## VII.   Medallion Financial's 2017 Disclosures and Valuations of the Bank

Medallion Financial's Forms 10-Q for the first three quarters of 2017 and its Form 10-K for the 2017 fiscal year contained the same misrepresentations as the 2016 Form 10-K concerning the valuation of the Bank and of Medallion Financial's non-bank, medallion-backed loans. ¶ 242-47. Murstein signed the 2017 Form 10-K. ¶ 247.

During this time, Berenson helped Medallion Financial try to sell a minority interest in the Bank, but all Berenson could get were "junk bond priced deal[s]." ¶¶ 239, 244. A Berenson representative pointed out to Murstein that the "market interest" expressed was "more in line with your stock value" than with Murstein's expectations. ¶ 244.

Yet at year-end 2017, Medallion Financial reported a fair value of $290.5 million for the Bank, higher than its reported 2016 year-end value. ¶¶ 227, 240, 242. The 2017 valuations were misleading, because, as Murstein knew, medallion values were continuing to deteriorate, and Medallion Financial's failed efforts to find minority investors for the Bank demonstrated that its valuation was not consistent with what a willing and informed buyer would pay. ¶¶ 241, 244-46.

## VIII.   Medallion Financial's Lack of Internal Controls Over Financial Reporting

Murstein exercised almost exclusive control over the valuation of the entity's largest

single asset, the Bank. Medallion Financial did not have procedures in place to prevent a single individual, such as Murstein, from manipulating the Bank's valuation by firing the company's valuation specialist without input from other executives and directors of the company. ¶ 251. Murstein also was the sole signatory on the valuation memoranda provided to the Auditor to explain the company's valuation decisions. ¶ 268. And Medallion Financial lacked policies designed to ensure that persons responsible for financial reporting had full information about the "expressions of interest" on which Medallion Financial's estimates of the Bank's value were premised. ¶ 251. As president of Medallion Financial, chief credit officer, head of Medallion Financial's Investment Committee, and the signer of Medallion Financial's representation letters to the Auditor (¶ 261), Murstein was intimately involved in the design and implementation of these procedures, which had no checks on Murstein's authority.

Medallion Financial lacked effective policies and procedures for other aspects of its financial reporting, as well. For example, the company did not have procedures in place to ensure that a fair value analysis was performed with respect to all loans, including those that were no more than 90 days past due. ¶ 251. In addition, Medallion Financial's policies and procedures failed to detect and correct a material error in the company's reported loan-to-value ratio in its 2017 financial statements. ¶¶ 255-60.

## STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the AC need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must "accept[] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's

favor," and "'[f]act-specific questions cannot be resolved on the pleadings.'" *International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022). Dismissal is not warranted unless the plaintiff cannot provide the basis for its claims through factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## ARGUMENT

**I.     The AC Adequately Alleges That the Medallion Defendants Violated Antifraud Provisions of the Federal Securities Laws by Manipulating and Misrepresenting the Value of Medallion Financial's Assets.**

The AC alleges that Murstein violated Exchange Act Section 10(b) and Section 17(a) of the Securities Act of 1933 ("Securities Act") Section 17(a) by, among other things, hiring third parties to tout Medallion Financial's stock without disclosing their compensation, overvaluing the company's interest in Medallion Bank, signing a valuation memo in which the company disregarded sales of Chicago taxi medallions of which Murstein was aware, and knowingly or recklessly permitting the company to represent that it performed an analysis of the fair value of its medallion-backed loans while knowing that its actual practice was different for a significant subset of those loans. Because Murstein's knowledge and conduct should be imputed to Medallion Financial, these allegations are sufficient to support the AC's fraud claims against the entity. *See In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007) (Kaplan, J.) ("[P]rincipals typically are liable for torts and crimes committed by their agents acting within the scope of their authority. This long has been applied to impose *respondeat superior* liability in federal securities and criminal cases.").

21

The alleged conduct concerning the Bank's valuation was a scheme to defraud, independent of any resulting misleading statements in Medallion Financial's periodic reports. Although the Medallion Defendants argue that the SEC has not adequately alleged scienter with respect to the alleged scheme to inflate the Bank's valuation, they do not otherwise dispute that the conduct qualifies as a scheme for scheme liability purposes.

Instead, the Medallion Defendants emphasize the lack of motive evidence typically offered in private securities litigation, where direct evidence of conscious behavior or recklessness typically is sparse, and largely ignore the AC's allegations of Murstein's conscious behavior and involvement in key events. Thus largely sidestepping the well-pleaded scheme allegations, the Medallion Defendants argue that the valuations were consistent with GAAP. They also argue that the related misstatements in Medallion Financial's periodic reports concerning the Bank were accurate statements of fact, non-actionable and reasonable judgment calls, or immaterial in light of other disclosures made. These arguments are unavailing because the AC's allegations of GAAP violations should be accepted as true at this stage, and because the identified misstatements, including the valuation itself, were at best half-truths; each individual statement omitted material information necessary to make that statement not misleading, and both they and the ultimate opinion statement to which the individual statements related—the Bank valuation—omitted the material fact that Murstein had manipulated the process by which Medallion Financial arrived at that opinion. None of the other disclosures concerning the Bank cured these defects or rendered them immaterial.

The AC also alleges that Medallion Financial's periodic reports included misleading statements about the valuation of its 159 Chicago medallions and that Medallion Financial's fair value analysis for the medallion-backed loans it held outside the bank was inconsistent with

GAAP and with its disclosures to investors. The Medallion Defendants' limited arguments on these points mischaracterize the AC's allegations and should be disregarded.[4]

### A.     Applicable Legal Standards

Under Section 10(b) of the Exchange Act, it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 renders it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or…omit…a material fact necessary in order to make the statements made…not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

Under Securities Act Section 17(a), it is "unlawful for any person in the offer or sale of any securities" to "(1) employ any device, scheme, or artifice to defraud; or (2) to obtain money or property by means of any untrue statement of material fact or any omission to state material fact necessary in order to make the statements made…not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

To establish liability under Section 10(b), the SEC "is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a

---

[4] As a general matter, the Medallion Defendants' "Statement of Facts" presents numerous "facts" for which it cites to the AC, but the cited paragraphs do not support the entire factual assertion. For example, their brief cites to paragraph 140 of the AC for the assertion that Sandler O'Neill and Keefe, Bruyette & Woods were "leading bank specialists"; to paragraph 142-143 of the Amended Complaint to support their assertion that WebBank "receiv[ed] relevant financial information on the Bank" before emailing that it was good at 200; and to paragraphs 170 and 172 to support the assertion that that Berenson & Co. was a "highly qualified merchant bank and advisory firm." MFC. Br. at 8-9. The cited paragraphs of AC, however, do not support the quoted portions of the factual assertions.

material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). With the exceptions discussed in Section I.E below, the elements of a claim under Section 17(a)(1) are "[e]ssentially the same" as under Section 10(b) and Rule 10b-5. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). However, scienter is not an element under subsections (2) and (3) of Section 17(a). *Id.*; *see Aaron v. SEC*, 446 U.S. 680, 701-702, 100 S. Ct. 1945, 1955 (1980).

### B.    The AC Alleges that the Valuations Did Not Comply with GAAP.

The AC alleges that Murstein engaged in a scheme to dramatically increase the fair value of the Bank—Medallion Financial's most valuable asset by far—from $166 million in the second quarter of 2016 to approximately $280 million for the fourth quarter of 2016, and then to $290 million by year-end 2017. The scheme involved numerous deceptive acts by Murstein, including soliciting uninformed, soft bids from financial firms and misrepresenting these bids to Medallion Financial's valuation firm and Auditor; firing the valuation firm against the Auditor's advice; opinion-shopping for a firm that would meet Murstein's demands in exchange for undisclosed financial inducements; and concealing these critical facts from the Auditor. None of these actions was consistent with GAAP's fair value principles under ASC 820-20-55-1, which required that valuation techniques "be applied consistently." ¶ 271.

As a result of Murstein's scheme to obtain "support" for his desired increase in the Bank's valuation, Murstein persuaded the Auditor to go along with substantial valuation increases at a time when the "recent trajectory of asset quality and earnings" at the Bank had been negative, according to valuation specialist RP Financial. ¶ 159. The resulting valuations of $193 million for the third quarter of 2016 and $280 million for the end of the 2016 fiscal year were higher than what a reasonable, unbiased specialist would have concluded. The AC alleges that the valuations were inflated by approximately $27 million as of September 30, 2016

24

(¶¶ 159-60, 190-91) and $110 million at year-end 2016 (¶ 234). The valuations continued to be

inflated throughout 2017, even as Medallion Financial tried and failed to find investors for the

Bank at its purported fair value, and as the investment bankers—the ones who had provided the

inflated 2016 valuations—observed that the offers received from third parties were "substantially

different than your expectations and more in line with [Medallion Financial's low] stock value."

¶¶ 243-45.

The Medallion Defendants assert in conclusory fashion that "Medallion and its

accountants complied with GAAP." MFC Br. at 25. But the AC alleges otherwise, and whether

Medallion Financial's financial statements complied with GAAP is a factual determination

inappropriate for decision on a motion to dismiss. *See SEC v. Lucent Techs., Inc.*, 363 F. Supp.

2d 708, 715 (D. N.J. 2005) ("[W]hether a defendant's accounting practices were consistent with

GAAP was a question of fact, thereby rendering it inappropriate to grant a motion to dismiss a

securities fraud claim based on that ground."); *see also In re Chicago Bridge & Iron Co. N.V.*

*Sec. Litig.*, No. 17-cv-1580-LGS, 2021 WL 3727095, at *6 (S.D.N.Y. Aug. 23, 2021) (claim that

defendant's "external auditors reviewed its disclosures and deemed them reasonable, and that the

SEC closed an investigation into [defendant's] accounting practices…at most show[s] that a

material issue of fact exists as to whether…[there] were in fact misstatements").

The Medallion Defendants point to the lack of a restatement as evidence that

"Medallion's independent auditors and valuation firms stand by their work"—implicitly asking

the Court to draw inferences in favor of the defense about why no restatement has occurred.

Their brief then quotes a decision in a private securities litigation, *Harris v. AmTrust Fin. Servs.,*

*Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015): "In the absence of a restatement,…carping

about Defendants' application of GAAP…does not permit the Court to infer that the Defendants

committed accounting fraud." MFC. Br. at 25. The brief's artful ellipses mask the alternative

basis on which that court said it *could* have found a violation of GAAP: "[A]llegations pointing

to objective facts that Defendants' accounting methods violated GAAP." 135 F. Supp. at 172.

The AC offers exactly such "objective facts," including Murstein's decision to fire RP Financial

for refusing to agree with his valuation (¶¶ 154-59, 161), his improper and undisclosed attempts

to influence Berenson's valuations (¶¶ 170-75), and the provision of GAAP that requires

consistency in the inputs used to determine a valuation (¶ 167). Indeed, a court in this district has

held that an argument that a company's "independent auditors, in full knowledge of the SEC's

allegations, have not backed away from their finding[s]" was "not cognizable on a motion to

dismiss." *SEC v. Sequential Brands Grp., Inc*., No. 20-cv-10471-JPO, 2021 WL 4482215, at *8

(S.D.N.Y. Sept. 30, 2021).

### C.   The AC Adequately Alleges Murstein's Scienter with Respect to the Valuation Scheme and Related Misrepresentations and Omissions.

The Medallion Defendants argue that the AC fails to allege scienter adequately with

respect to either the valuation scheme or the related misrepresentations. In fact, however, the AC

alleges facts that support the requisite "strong inference" of fraudulent intent. This strong

inference can be established "(a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d

1124, 1128 (2d Cir. 1994) (emphasis added). In evaluating the allegations, the Court should draw

all plausible inferences in the SEC's favor. The standard applicable in private actions under the

Private Securities Litigation Reform Act—that the inference of scienter is "cogent and at least as

compelling as any opposing inference—does not apply here. *See, e.g., SEC v. Dunn*, 587 F.

Supp. 2d 486, 501 (S.D.N.Y. 2008).

1.  **The AC Alleges Compelling Evidence of Conscious Misbehavior.**

The AC alleges direct and compelling evidence of conscious misbehavior. Quoting emails, the AC alleges that Murstein was told by RP Financial and the Auditor that consistency in approach was critical under GAAP (¶¶ 162-63) and that "valuations" offered by investment banks or potential counterparties who had not yet agreed on terms or performed due diligence were virtually worthless as indications of the Bank's fair value (¶¶ 150, 155-57). Rejecting this advice, Murstein fired RP Financial and hired Berenson, to whom he had offered a financial inducement to provide a higher valuation. The AC also alleges that the Auditor encouraged Medallion Financial to remain with RP Financial for consistency as required by GAAP (¶ 162) and that not only did Murstein fail to disclose his *quid pro quo* offer to Berenson, but he also lied to the Auditor about why he replaced RP Financial with Berenson. ¶¶ 164, 263. This evidence is more than sufficient to allege Murstein's conscious misbehavior or at least recklessness.

The Medallion Defendants nevertheless argue that scienter cannot be inferred because "indications of interest from third parties" supported the Bank's higher valuation, and it "would be reasonable" for the company to worry about undervaluing the Bank. MFC Br. at 25. This argument is unpersuasive because Murstein solicited these "indications of interest" as part of his scheme to inflate the Bank's value. In addition, Murstein had been told by RP Financial that, because these third parties had not performed any due diligence of the Bank's loans, their views of the Bank's potential value deserved little weight. ¶¶ 142-47, 157. Even assuming the unalleged fact that Murstein was concerned about the Bank's potential undervaluation, this advice from RP Financial should have assuaged such concerns. In short, while the Medallion Defendants claim that the "only plausible inference" from the AC's allegations is that Murstein believed the reported valuation was proper, an inference that he knowingly manipulated the valuation process is far more plausible, particularly given his lies to the Auditor.

The Medallion Defendants also argue that Murstein's reasonable reliance on Berenson and the Auditor negates any inference of scienter. MFC Br. at 25, 36. There are three glaring flaws in this argument. First, Murstein did not "rely" on any of these professionals. On the contrary, the AC alleges that he manipulated them into reaching the conclusion he wanted and that the Auditor's conclusions were based in part on Murstein's lies. Second, Murstein cannot shift the blame for his company's misleading statements to others. "If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance." *United States v. Erickson,* 601 F.2d 296, 305 (7th Cir. 1979). Finally, a "reliance on the auditor" defense would require the Medallion Defendants would need to show that they made complete disclosures to the Auditor, sought advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith. *SEC v. Caserta*, 75 F. Supp.2d 79, 94-95 (E.D.N.Y. 1999); *see also United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997) (rejecting defense of reliance on accountant's advice in tax evasion case when defendant's conduct was contrary to advice). The AC alleges, however, that Murstein failed to disclose relevant information to the Auditor and rejected the Auditor's advice not to fire RP Financial.

## 2.  The AC Alleges a Particularized Motive.

Although unnecessary to adequately allege scienter given the extensive evidence of Murstein's conscious misbehavior, the AC also alleges facts from which the Court can infer that Murstein had a motive to commit securities fraud. As the AC clearly alleges, Medallion Financial had loan agreements with six banks, at least two of which required it to meet certain financial performance metrics. If Murstein had acceded to RP Financial's determination that no increase in the Bank's valuation was warranted for the quarter ending September 30, 2016,

Medallion Financial would have been in breach of one of these covenants as of that date. *See* ¶¶ 114-20, 129, 190-91. While the Medallion Defendants cite cases for the proposition that the need to comply with debt covenants generally is too common and generic to demonstrate motive, many cases have held that the threat of violating a specific covenant *can* be considered in evaluating motive. See *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 690 (6th Cir. 2004); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *In re Loewen Group, Inc.*, No. 98-cv-6740, 2004 WL 1853137, at *21 (E.D. Pa. Aug. 18, 2004); *In re U.S. Aggregates, Inc. Sec. Litig.*, No. 01-cv-1688-CW, 2003 WL 252138, *2-4 (N.D. Cal. Jan 24, 2003).

Murstein also had direct and personal motives to commit fraud to preserve his personal wealth and reputation as the "public face" of Medallion Financial. *See Baum v. Harman Int' Ind., Inc.*, 557 F. Supp. 3d 289, 296 (D. Conn. 2021) (allegations that defendants had a "financial incentive" to commit fraud were sufficient to establish motive); *SEC v. Reserve Mgt. Co., Inc.*, 732 F. Supp. 2d 310, 320-321 (S.D.N.Y. 2010) ( "enormous reputational stake" and "direct, personal financial stake" in company sufficient to find a motive to commit fraud).

### D.    Whether Fact or Opinion, Medallion Financial's Valuations and Related Disclosures Were Materially Misleading as Alleged.

The deceptive conduct described above led to a number of false or misleading statements in Medallion Financial's Forms 10-Q and 10-K concerning the valuation of the Bank. The Medallion Defendants argue that these statements were non-actionable opinions and in any event immaterial. But whether fact or opinion, these statements were materially misleading and otherwise actionable, as discussed below.

#### 1.    Certain Bank Valuation-Related Statements Were Misleading Facts—Not Opinions.

The AC alleges not only that the Medallion Defendants made statements about the Bank's valuation but also that Medallion Financial made misleading statements about why it

chose those valuations—that the increases were driven by expressions of "interest in the Bank," the significance of a certain judicial opinion, and the involvement of the valuation specialist. ¶¶ 184-89. Each of these purported justifications for the valuation is a statement of fact that the AC alleges is at least a misleading half-truth. "[H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3, 136 S. Ct. 1989, 2000 & n.3 (2016) (noting that this principle applies in the securities law context). The statement about the "expressions of interest" was misleading because they were not true expressions of interest—Murstein had manufactured those expressions of interest, and he had been informed by RP Financial and the Auditor that they were inadequate to justify increasing the Bank's valuation. ¶ 185. The statement about the judicial decision was misleading because "Medallion Financial did not conduct a meaningful inquiry concerning the likely impact of the court ruling, or its relevance" to the value of the Bank, before describing it as a basis for increasing the Bank's valuation. ¶ 186. Among the omissions that may make even an opinion statement misleading are a failure to disclose "facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare, Inc. v. Laborer Dist. Council Constr. Ind. Pension Fund,* 575 U.S. 175, 188, 135 S. Ct. 1318, 1328 (2015). And the disclosure that Medallion Financial used "a valuation specialist" was misleading because it actually used a series of valuation specialists, one of which was fired because it would not support the company's desired valuation. ¶ 187. Finally, all of these purported justifications omitted the material fact that the primary reason for increasing the value of the Bank was not any of the stated justifications, but rather was a desire to offset losses elsewhere in Medallion Financial's financial statements.

30

## 2.  The Misleading Bank Valuation Opinions Are Actionable.

The Medallion Defendants devote page after page (MFC Br. at 14-17) to the unremarkable assertion that the statements about the Bank's valuation involved judgment calls and were, therefore, statements of opinion. They cite *Omnicare, Inc. v. Laborer Dist. Council Constr. Ind. Pension Fund*, which held that a statement of opinion may be actionable under any one of several circumstances: (1) where the speaker does not honestly hold the stated opinion; (2) where the opinion includes an "embedded statement of fact" that the speaker knows to be false; *or* (3) where the opinion omits to state facts necessary to make its statement of opinion not misleading. 575 U.S. 175, 187-88, 135 S. Ct. 1318, 1327-28 (2015).[5] The Medallion Defendants argue that the SEC "admits" that Murstein personally believed that the Bank was worth "substantially more" than its stated valuation; that it "does not allege" that the second exception applies; and that its only basis for alleging the third exception is the "debunked" *quid pro quo* argument. MFC Br. at 19-21. None of these assertions fairly describes the AC's allegations or the plausible inferences that can be drawn from them.

*First*, the AC does not admit that Murstein personally believed the valuations were accurate. The cited paragraphs of the AC (¶¶ 142, 170) contain no such admission and merely quote hearsay statements Murstein made in his emails asking WebBank and the investment banks to support his preferred valuation numbers. The most plausible inference from the AC's allegations is that Murstein did *not* believe what he said in those emails. Indeed, if he did believe

---

[5] The Medallion Defendants mischaracterize a prior decision of this Court, suggesting that it held that "alleged misstatements [in financial statements] are non-actionable opinions" any time they "involved a subjective evaluation." *See* MFC Br. at 14, citing *In re AmTrust Financial Svcs., Inc. Sec. Litig.*, No. 17-cv-1545-LAK, 2019 WL 4257110, at *12, *14 (S.D.N.Y. Sept. 9, 2019). But that decision did not hold that statements involving a subjective evaluation were "non-actionable," but rather that they should be treated as opinion statements under the *Omnicare* framework. The decision recognized that an accounting-related opinion could be misleading if defendants "knew at the time that their accounting…was wrong, recklessly disregarded that possibility, or failed to conduct a meaningful inquiry into the proper way in which to account for" certain items. *Id.* at 22.

in the valuations' accuracy, why did he lie to the Auditor (¶¶ 263-69)? In short, this is a disputed inference for a jury to decide; the AC adequately alleges the first *Omnicare* prong.

*Second*, the AC alleges misleading "embedded facts" that make Medallion Financial's ultimate opinion statement about the Bank's valuation misleading—contrary to the Medallion Defendants' argument. As described above in Section I.D.1, the Medallion Defendants made misleading factual statements about the purported justifications for the valuation. These misleading statements were embedded in the valuation and therefore rendered the valuation opinion misleading under the second *Omnicare* prong.

*Third*, among the omissions that may make even an opinion statement misleading under the third *Omnicare* prong is a failure to disclose "facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare*, 575 U.S. at 188. The AC adequately alleges this prong: it pleads that the Medallion Defendants' statements that Medallion Financial complied with GAAP and valued the Bank at "fair value" were inconsistent with the facts in Murstein's possession. Murstein knew his conduct was not consistent with GAAP's requirement of consistency in fair value measurement because the Auditor told him so (¶¶ 162-168). *See Sequential Brands*, 2021 WL 4482215, at *7 (denying motion to dismiss where company's "determination not to recognize a goodwill impairment did not fairly align with the information it had in its possession at the time").[6]

The Medallion Defendants assert, with respect to the third *Omnicare* prong, that the allegation that the Bank valuation resulted from a "*quid pro quo* agreement with Berenson" is

---

[6] Even if each of the opinion statements individually contained a kernel of truth, taken together, their omissions created a false and misleading impression to a reasonable investor about the basis for Medallion Financial's opinion concerning the write-up of the Bank's fair value. "[U]ntrue assertions, ambiguous statements, and half-truths can render a statement misleading." *SEC v. StratoComm Corp.*, 652 Fed. App'x 35, 37 (2d Cir. 2016) (citing *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 75–77 (2d Cir. 1970)).

"conclusory, false, and already-debunked." MFC Br. at 21. But their only citation for this factual

assertion is AC paragraph 188, which says nothing of the kind. The AC alleges that Murstein

explicitly conditioned potential future investment banking work on a valuation above a certain

threshold. While the Medallion Defendants emphasize that such work was not "promised," the

AC alleges that Berenson was given investment banking work in early 2017. ¶¶ 239, 244. A jury

easily could find an implied *quid pro quo* on these facts. *See SEC v. Smith*, No. 05-cv-941-CAS,

2008 WL 11336814, at *4-5 (C.D. Cal. Feb. 28, 2008) (finding SEC's evidence of *quid pro quo*

sufficient to support jury verdict despite lack of written agreement and purported innocent

explanations).

### 3.  The Bank Valuation Misstatements Were Material.

The Medallion Defendants argue that any misleading statements made in Medallion

Financial's periodic reports could not have been material in the context of other disclosures it

made. MFC Br. at 22. Because materiality is a mixed question of fact and law, materiality

determinations are rarely appropriate on a motion to dismiss or indeed before trial. *See, e.g.,*

*Altimeo Asset Mgt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021). Only if

misstatements or omissions are "so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance" may immateriality justify

dismissal. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). The Medallion

Defendants fall far short of demonstrating that this standard is met because of the "other

disclosures" made.

Without directly quoting from the periodic reports, the Medallion Defendants claim that

the "periodic reports contained substantial disclosures concerning Medallion's valuation of the

Bank," including the "methodologies used," as well as the "*complete audited financial*

*statements for the Bank*." *Id.* (emphasis in original). Thus, Defendants conclude, "*[e]ven if* the

"treatment of…fair value on the financial statements did not comply with GAAP," the GAAP violations "did not alter the total mix of information available to [ ] investors…so that the misrepresentation or omission was not material." *Id*. (citing *In re Lynn Tilton*, SEC Release No. 1182, 2017 WL 4297256, at \*49 (Sept. 27, 2017)). But the Medallion Defendants' brief and supporting declaration fail to make even a plausible claim that the material the company disclosed was an adequate substitute for an accurate and fairly described valuation.

The Medallion Defendants do not explain how an investor could use the "complete audited financial statements for the Bank" to discover the inflation in the company's valuation of the Bank. The alleged fact that the Auditor required Medallion Financial to hire a valuation specialist to provide an opinion on the fair value of the Bank for the third quarter of 2016, ¶ 154, strongly suggests that estimating its fair value involves more than reviewing its financial statements. As for the "methodologies used," the Medallion Defendants cite only to an excerpt of the 2016 10-K, which discloses that a number of methodologies were used, but does not disclose key details, such as whether the calculations were based on actual or projected earnings. The Medallion Defendants further fail to mention that in the Form 10-Q for the third quarter of 2016, when the scheme to inflate the Bank's value began, the disclosure of the methodology was far more limited and opaque, providing only a percentage "premium on portfolio assets." *Compare* DE 82-5 at 12-13 (fiscal year 2016 10-K) and DE 82-7 at 6 (third quarter 2016 10-Q). And again, the Medallion Defendants fail to describe how anyone, without access to non-public information, could not only fully understand how Medallion Financial had reached its opinion on the valuation of the bank, but also perform an independent assessment of its value.

Accordingly, the MFC Defendants' suggestion that "any investor could have assessed" the Bank's value from Medallion Financial's disclosures is unsupported. Even if it were

accurate, however, the Supreme Court has pointed out that "a misleading statement will not []

lose its deceptive edge simply by joinder with others that are true," unless the true statements

"discredit the other one so obviously that the risk of real deception drops to nil." *Virginia*

*Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S. Ct. 2749, 2760 (1991). If only a

"financial analyst" could "spot the tension" between the disclosed and undisclosed facts,

"whatever [was] misleading [would] remain materially so." *Id.*

### 4. Medallion Financial's Description of Its Process for Valuing Its Medallion-Backed Loan Portfolio Was a Misleading Statement of Fact.

The AC alleges that Medallion Financial calculated the value of medallion-backed loans

in its portfolio at par as long as they were no more than 90 days overdue and were not showing

other obvious indicia of distress, such as bankruptcy. ¶ 207. Its periodic reports, however,

described an apparently robust valuation process that took into account the adequacy of the

collateral for each loan and the market conditions for loans, and did not describe a limitation of

the review to loans that were more than 90 days overdue. ¶ 206. The AC alleges that excluding

loans less than 90 days overdue was inconsistent with ASC 820. ¶¶ 207-08. The Medallion

Defendants' factual assertion that Medallion Financial disclosed "its methodology for valuing

medallion-backed loans" (MFC Br. at 22) cannot be accepted as true given these allegations in

the AC, which reflect a material discrepancy between the disclosed methodology and the actual

one. And the additional disclosures described in the Medallion Defendants' brief did not include

the number of days, if any, by which each loan payment was overdue, so even a financial analyst

could not have spotted this discrepancy.

### 5. Medallion Financial's Statements about the Chicago Medallion Valuation Were Materially Misleading Opinions.

As to the 159 Chicago taxi medallions, the AC alleges Medallion Financial had, and

should have considered in its analysis under ASC 820 for the third quarter of 2016, "sufficient

and readily available" evidence of market transactions at prices far lower than the valuation it

used. *See* ¶¶ 194-95, 198-202. GAAP required the company to take these transactions into

account. *Id.* Because Medallion Financial did not do so, its valuation of the medallions did not

"fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at

187-88, 135 S. Ct. at 1327-28. In addition, the third quarter 2016 Form 10-Q misleadingly stated

that Chicago medallion transfer prices were "N/A." This statement that observable inputs were

"not available" and/or "not applicable" was misleading, whether considered an opinion or a fact,

because it did not "fairly align[] with the information in the issuer's possession at the time." See

*Omnicare*, 575 U.S. at 188. According to the AC, Chicago medallion transfers had occurred;

their prices were available and should have been considered applicable. ¶ 203.

The Medallion Defendants focus on the AC's allegation about a contact from banking

regulators and argue that the feedback was received "just before filing" and was not required to

be disclosed. MFC Br. at 18. This argument misses the point: the AC alleges that the same

information about medallion sales in the marketplace that caused regulators to question the

valuation Medallion Financial assigned to the medallions was already in the company's

possession when it prepared its financial statements, but was ignored "in an effort to avoid

materially impacting" the financial statements. ¶¶ 193-94, 198.

The Medallion Defendants also argue, in a footnote, that the quantitative impact on

Medallion Financial's "assets" from properly valuing the Chicago medallions would have been

only a "1.5% reduction of assets."  MFC Br. at 18 n.11. The case they cite for support, however,

*In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 286, 295 (S.D.N.Y. 2014),

states that an earnings net loss of less than five percent "undercuts an inference of fraud." The

Medallion Defendants do not claim that the impact on Medallion Financial's "earnings" from the

inflated valuation was less than 5%, and they do not cite to the AC for any such claim. The AC, in fact, alleges that the fraudulent valuations, including of the Chicago medallions, materially and adversely impacted earnings and that the purpose of maintaining the inflated valuation for the Chicago medallions was to avoid "materially" impacting the financial statements. *See* ¶¶ 190, 198, 253.

### E.    The AC Adequately Alleges Violations of Section 17(a) of the Securities Act.

The Medallion Defendants argue that the alleged fraudulent statements were not made "in the offer or sale of any securities," and that the AC fails to allege that Defendants "obtaine[d] money or property" by means of the alleged wrongdoing. MFC Br. at 26-27. The AC's allegations are sufficient on both points.

### 1.    The Statements Were "In the Offer or Sale" of Securities.

Section 17(a) of the Securities Act requires that the wrongful conduct be "in the offer or sale of any securities." The Supreme Court has stated that the phrase "in the offer or sale of any securities" is "expansive enough to encompass the entire selling process." *United States v. Naftalin*, 441 U.S. 768, 773, 99 S. Ct. 2077, 2081-82 (1979). Section 17(a) does not require that the fraud occur during "any particular phase of the selling transaction." *Id*. Rather, Section 17(a) "was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." *Id*. at 778. As another court in this district has held, the requirement that a fraud under Section 17(a) be "in the offer or sale" of securities is satisfied when the company's stock was publicly traded during the relevant period, since courts can take "judicial notice of the fact that a common stock listed on the NYSE is intended…to be sold and exchanged.'" *SEC v. Mudd*, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) (citation omitted); *see also, e.g., SEC v. RPM Int'l, Inc*., 282 F. Supp. 3d 1, 29

(D. D.C. 2017) ("Many courts have concluded that an allegation that the company's stock was publicly traded is sufficient to plead this element under Section 17(a)(2).") (citing cases).

The Medallion Defendants urge the Court to ignore the views of a majority of courts by adopting a narrow reading of the offer or sale requirement of Section 17(a) that was articulated in a 1987 case from the Southern District of Florida, *SEC v. Warner*, 652 F. Supp. 647, 650 (S.D. Fla. 1987) (requiring that the alleged fraud be used "directly" in the offer or sale of securities). MFC Br. at 27. The court should decline to follow *Warner* and instead should follow the standard articulated by Judge Crotty in *Mudd* and by courts in other districts—namely that allegations that the company's stock was publicly traded suffice to plead this element under Section 17(a)(2). Under this standard, the AC's allegations adequately plead the "in the offer or sale" element. The allegation that Medallion Financial's common stock was publicly traded on the NASDAQ exchange during the relevant period, ¶¶ 18-19, 25, satisfies this prong.

In addition, the AC alleges that Medallion Financial provided restricted stock awards from 2014 through 2017. ¶ 20. Securities issued through a restricted stock plan may be considered "offered for sale" in exchange for the "value" of the employment relationship. *Sequential Brands*, 2021 WL 4482215, at *5. On a motion to dismiss, the plan's existence should suffice; the "fact-intensive" question of whether issuances under such a plan fully meet the requirements of Section 17(a) "is more properly resolved at a later stage of the litigation." *Id*.

Finally, the touting conduct occurred "in the offer or sale" of securities because Medallion Financial conducted a $33.6 million bond offering in April 2016—a time period that coincided with the ongoing deceptive publications by Meyers. ¶¶ 50, 73-97, 119.

### 2. The Medallion Defendants Obtained Money or Property.

The Medallion Defendants argue that they did not "obtain money or property," as required for liability under Section 17(a)(2), pointing out that the company's stock price did not

increase and the AC does not allege that the conduct increased Murstein's compensation. They are incorrect. As to Medallion Financial, the requirement is satisfied by bond offerings and issuances of restricted stock that coincided with the fraudulent conduct. ¶¶ 20, 119. *See SEC v. Sandoval*, No. 17-cv-20301, 2018 WL 11353292, at *3, 9-10 (S.D. Fla. Apr. 11, 2018) (sale of $600 million bond offering after defendants' falsely certified the company's financial statements satisfied § 17(a)(2)). As to Murstein, a plausible inference can be drawn that his bonus and restricted stock awards (¶ 20) were influenced by the misstated financial performance of the company. The defendant need not receive a "fraud bonus" or additional compensation for participating in the fraudulent conduct. *SEC v. Cole*, No. 12-cv-8167-RJS, 2015 WL 5737275, at *7 (S.D.N.Y. Sept. 19, 2015) (citing *SEC v. Tourre*, No. 10-cv-3229-KBF, 2014 WL 61864, at *4 (S.D.N.Y. Jan. 7, 2014)).

II.     **The AC Adequately Alleges Primary and Secondary Violations of Securities Act Section 17(b), Exchange Act Section 10(b) and Rule 10b-5 Thereunder.**

The AC alleges that, by participating in a touting scheme, all Defendants violated Exchange Act Section 10(b) and Rule 10b-5 thereunder, that the Meyers Defendants violated Securities Act Section 17(b), and that the Medallion Defendants aided and abetted those violations. ¶¶ 14(a), (c). Section 17(b) makes it unlawful for any person to "publish, give publicity to, or circulate any…article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security," in exchange for consideration from an issuer, without disclosing that consideration. 15 U.S.C. § 77q(b). For purposes of these allegations, Meyers' conduct and scienter should be imputed to Ichabod's Cranium, and Murstein's should be imputed to Medallion Financial. *See, e.g., Parmalat Sec. Litig.*, 474 F. Supp. 2d at 550-51.

The AC alleges that Meyers, at Murstein's direction, embarked on a campaign of making frequent online posts that were deceptive because they failed to disclose Meyers' connection to Medallion Financial and created a misleading impression about how widely held, popular, and factually supported Meyers' purported opinions were. None of these posts disclosed that Meyers was being paid, and many of them involved the use of aliases and misleading descriptions of Meyers' background. Although not all of the writings explicitly discussed Medallion Financial or its securities, all of them discussed facts relevant to a potential purchaser of Medallion Financial's securities, and all were written with the express purpose of influencing such potential purchasers' decisions.

Defendants make a series of scattershot arguments as to the fraud and touting claims against them. For purposes of Section 10(b) and Rule 10b-5, the Medallion Defendants argue that the AC fails to allege scienter or the elements of aiding and abetting as to the touting-related conduct and thereby ignore the AC's allegations. And the Meyers Defendants argue that the SEC's allegations somehow lack particularity and fail to connect Meyers' writings with the purchase or sale of securities—though his writings were targeted at investors. For purposes of liability under Rule 10b-5(b), the Meyers Defendants argue that the AC "utterly fails to identify a single material misstatement or omission" by Meyers—despite the omission of compensation information. He also joins in the arguments of the Medallion Defendants, who claim that the omission of information about Meyers' compensation was "immaterial as a matter of law," MFC Br. at 31, despite case law to the contrary. The Medallion Defendants further argue that they had no duty to disclose Meyers' compensation and that aiding and abetting liability is inadequately pled, arguments that have no merit for the reasons detailed in the sections below.

Defendants' only additional argument as to liability under Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder is the Medallion Defendants' argument, in which Meyers joins, that the AC alleges only a single misstatement—the claim that Meyers was not compensated—rather than a scheme. This argument oversimplifies the AC's claims and ignores its substantial allegations of deceptive conduct.

As to liability under Securities Act Section 17(b), the Meyers Defendants argue that Meyers' writings did not "describe a security"—though his writings targeted investors and appeared on investment websites—while the Medallion Defendants argue that they had no duty to disclose his compensation. While the case law on these points is limited, any reasonable interpretation of the statute should cover Meyers' conduct, as described further below, and there can be little doubt that the Medallion Defendants substantially assisted it.

**A.    The AC Adequately Alleges That the Medallion Defendants Acted With Scienter and that They Aided and Abetted Meyers' Touting.**

**1.   The AC Adequately Alleges Scienter With Respect to Touting**

For purposes of liability under Section 10(b) and Rules 10b-5(a), (b) and (c), the Medallion Defendants contend that the AC fails to establish their scienter because "there are no allegations showing that Medallion or Murstein was contemporaneously aware of, and consciously disregarded, any improper touting," and because his "motivation was to set the record straight, not to mislead." MFC Br. at 33. The AC, however, provides ample evidence that Murstein was at least reckless concerning what Meyers was doing and its risk of misleading investors. Murstein hired Meyers, whose website advertised that he would use "guerilla PR tactics" that allowed clients to "operate without any detectable connection to you." ¶ 44. Meyers told Murstein he would "constantly" write about Medallion Financial and "bash Uber"—actions that would not be necessary if the sole purpose of the agreement was to present a reasoned

argument in favor of the company's prospects. The AC alleges that Murstein received hyperlinks to some of Meyers' many publications and that he received email alerts to Seeking Alpha articles on Medallion Financial. ¶¶ 58, 62, 64, 66, 67. Accordingly, he either knew or was reckless in not knowing that Meyers, consistent with his website's promise, was "constantly" writing about Medallion Financial and Uber, and that he was doing so through aliases. For example, Murstein received links to a Seeking Alpha article published under the name "Frederick Steier," which misleadingly stated that the author had no relationship to Medallion Financial and was not being compensated for the article; the content of the article repeated many points that Murstein had asked Meyers to make. ¶¶ 62-67. Whether Murstein believed that the arguments he directed Meyers to make merely corrected inaccurate information provided by others, or were themselves misleading, is irrelevant; it is sufficient that he knew, or was reckless in not knowing, that investors were being misled about Meyers' relationship to Medallion Financial and the compensation he received for expressing his opinions.

Murstein's alleged behavior with Frigo, and in particular his response after her connection to Medallion Financial became known to the press, further illustrates his scienter. If, as Murstein assured a reporter, he genuinely believed that "it is not illegal because everything in the articles is public information already," then he would have forthrightly disclosed the fact that Frigo had been writing pseudonymously at his request and that she had been paid to do so. Instead, he denied having any knowledge of her activities, ¶¶ 101-03, and paid Frigo to falsely affirm "that she was never instructed" by Medallion Financial to write "any articles, blogs, posts or comments about Medallion under a pen name or false name." ¶ 109. His false exculpatory statements to reporters and attempted cover-up evidence consciousness of guilt, which has "independent probative value of scienter." *SEC v. Musella*, 748 F. Supp. 1028, 1040 (S.D.N.Y.

1989) (when questioned by an SEC investigator, defendant denied knowing a close friend when questioned about options purchase); *see also SEC v. Yang*, 999 F. Supp. 2d 1007, 1013 (S.D.N.Y. 2013) (a jury could infer consciousness of guilt from a trader's concealment of his trading activity from his employer).

The Medallion Defendants argue that this allegation is irrelevant and that the SEC "alleges that Medallion or Murstein learned of any improper touting in late November 2016 when the New York Post contacted Murstein—*after* the alleged touting had ended." MFC Br. at 33 (emphasis in original) (citing ¶¶ 100-04). That is not an accurate characterization of the AC, which explicitly alleges that Murstein knew of the improper touting earlier and provides specific facts from which the Court can infer that Murstein either knew or recklessly disregarded the details of the touting activity as it was happening. Accordingly, the allegations of the November 2016 events are not allegations that Murstein first learned at that time that the contractors he had hired were deceiving potential investors, but rather allegations that when *others* first learned of it, he tried to cover up his involvement.

The Medallion Defendants also suggest that Murstein could not have had scienter because "Meyers *admitted* in his motion to dismiss that he 'alone authored and was responsible for the contents of his writings' and that 'Murstein never directed or suggested that Meyers should conceal that he was being compensated by Medallion; to the contrary, the disclosure of Meyers' compensation was never discussed with Murstein.'" MFC Br. at 29 (emphasis in original). They cite a single case, *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994), for the proposition that this Court "can appropriately treat statements in briefs as binding judicial admissions of fact." That case, however, is part of a line of cases based on "the express language of Rule 801(d)(2)" of the Federal Rules of Evidence, which "provides that statements can be

43

used against a *party* if they were made by "a person authorized by the *party*' or by 'the party's agent or servant.'" *United States v. Cuevas Pimentel*, 815 F. Supp. 81, 84 (D. Conn. 1993) (emphasis in original). The Medallion Defendants cite no authority—and the SEC is aware of none—suggesting that a court can find a statement *in a defendant's brief* to be an admission *binding against a plaintiff*. The AC alleges more than sufficient evidence of Murstein's knowledge or recklessness, and factual admissions in Meyers' briefs cannot be used to contradict the AC's allegations against Murstein and thus Medallion Financial.

### 2. The AC Adequately Alleges that the Medallion Defendants Aided and Abetted Meyers' Violations of Section 10(b) and Rule 10b-5.

The AC also adequately alleges that the Medallion Defendants aided and abetted Meyers' violations of Section 10(b) and Rule 10b-5. "In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary…party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)). The same allegations that demonstrate the Medallion Defendants' scienter also demonstrate their knowledge of the touting activity.

To satisfy the "substantial assistance" element, the SEC must establish that the aider and abettor "in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). The AC satisfies this requirement by alleging that Murstein, acting on Medallion Financial's behalf, hired Meyers, told him what to write, and did nothing to stop him after Murstein had received links to the articles Meyers wrote under his various aliases without

disclosing his compensation. The Medallion Defendants argue that Murstein assisted with "only "legal aspects of touting," MFC. Br. at 35, but as discussed in Section II.A.1 above, the AC contains extensive allegations of Murstein's knowledge of deceptive conduct in connection with the touting.

The Medallion Defendants quote *Cortina v. Anavex Life Sciences Corp.*, 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016), for the proposition that the law imposes a duty to disclose payment only on the promoter who receives it, not on the issuer who pays it. That case, however, involved only direct, not aiding and abetting, claims against the issuer. Before considering as a general matter whether a company has an affirmative duty to disclose all payments to promoters, the court found that the plaintiffs had offered only "bare assertions and conclusory statements" that the defendants had schemed or had been the maker of the promoters' statements. Here, as discussed in Sections II.A.1 and II.B.1, the AC adequately alleges both.

**B.      The AC Adequately Alleges That the Medallion Defendants Committed Fraud Under Section 10(b) and Rule 10b-5 Through Fraudulent Touting.**

**1.    Murstein and Medallion Financial Were Makers of the Touters' Statements.**

For purposes of primary liability under Section 10(b) and Rule 10b-5(b), Defendants argue that Murstein was not the "maker" of Meyers' statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S. Ct. 2296, 2302 (2011) (for purposes of Rule 10b–5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it"). MFC Br. at 28-29. Given Murstein's extensive oversight and his contractual right to approve each post, however, the AC adequately alleges that he was the "maker" of Meyers' statements, including his false statements about his identity, professional background and lack of compensation. *See, e.g.*, *In re Puda Coal Sec. Litig.*, 30 F. Supp. 3d 261, 267-68 (S.D.N.Y. 2014) ("maker" status of

45

underwriter sufficiently alleged where it drafted statement jointly and had the right to approve it); *SEC v. Stratocomm Corp.*, 2 F. Supp. 3d 240, 258 (N.D.N.Y. 2014) (company was the "maker" of marketing firm's document where it paid for it and approved its content). And for its scheme liability theory under Rule 10b-5(a) or (c) and for liability under Securities Act Section 17(a), the SEC is not required to prove that a defendant was the "maker of" a misleading statement. *SEC v. Fiore*, 416 F. Supp. 3d 306, 320-21 (S.D.N.Y. 2019).

### 2. The AC Sufficiently Alleges That Meyers' Misrepresentations Were Material.

The Medallion Defendants argue that the alleged compensation misstatement was not material because Meyers and Frigo's writings "consisted largely, if not entirely, of statements of opinion posted on niche financial 'chat' sites, in comment sections responding to short seller's smears of Medallion." MFC Br. at 31. They also describe one of Frigo's articles as "purple prose," and "most of" Meyers' comments "flippant," before summarily concluding that "no reasonable investor" could find it material whether these writers were being paid. *Id.* at 32-33. This argument misses the mark because "[m]isrepresentations regarding compensation received for promoting securities are recognized as material for purposes of the federal securities laws." *SEC v. SeeThru Equity, LLC*, No. 18-cv-10374-LSS, 2019 WL 1998027, at *4 (S.D.N.Y. Apr. 26, 2019).

Murstein, moreover, continued to pay his touters for nearly two years, presumably because he believed their postings were material to investors. The articles were presented to the public as independent analysis and journalism, with no connection to Medallion Financial, and none of the articles disclosed that they were written by a paid public relations firm under a contract with a Medallion Financial entity. As a result, "there is a substantial likelihood that a reasonable investor would have found the fact that the authors of the articles were paid to

promote [the issuer] to alter the total mix of information." *Rabkin v. Lion Biotechnologies, Inc.*, No. 17-cv-02086-SI, 2018 WL 905862, at *8 (N.D. Cal. Feb. 15, 2018). And materiality determinations are rarely appropriate before trial. *See, e.g., Altimeo Asset Ltd.*, 19 F.4th at 150-51.

### C.  The Touting Scheme Is More Than Repackaged Misleading Disclosures.

The Medallion Defendants also argue that the touting allegations do not qualify for "scheme" liability because there was only a "single subject on which there was the same alleged omission or misstatement" and because the AC otherwise "does not allege any deceptive conduct." MFC Br. at 29-31. Accordingly, they claim that the AC's scheme liability claims must fail because under Second Circuit precedent, including the recent decision in *SEC v. Rio Tinto, plc*, 41 F.4th 47 (2d Cir. 2022), scheme liability requires something more than misstatements and omissions. Defendants' characterization of the AC's allegations is, once again, misleading: the AC alleges deceptive acts beyond the simple omission of the touters' compensation and connection to Medallion Financial.

While the AC does allege that Meyers made a number of misleading statements, including that he was not affiliated with, or being compensated by, Medallion Financial, the touting scheme went beyond the misleading statements themselves. The sheer number of articles and comments, along with the use of multiple aliases, conveyed a false impression that Medallion Financial had more supporters than detractors. This goal was explicitly stated on the Asymmetrical Media website and in Meyers' communications with Murstein, as alleged in the AC. ¶¶ 44, 45. Similarly, the goal of saturating the market with content to manipulate public perception is made clear by Murstein's emailed directive to Frigo to "keep blogging and commenting positive stuff on Medallion."¶ 86. The frequent posting and use of aliases were conduct beyond the touters' specific misrepresentations, such as their claims about their

professional qualifications, their denial of any connection to Medallion Financial, and their claims not to have been compensated. And these acts are "the type of manipulative and deceptive acts that are prohibited by Rule 10b-5(a) and (c)." *SEC v. Contrarian Press, Inc.*, No. 16-cv-6964-VSB, 2019 WL 1172268, at *6 (S.D.N.Y. Mar. 13, 2019) (denying motion to dismiss); *see also Rabkin*, 2018 WL 905862, at *2, 16-17 (finding scheme liability where promoter published pseudonymous "bullish articles and blog entries" about the company on "investment websites," including Seeking Alpha); *In re CytRx Corp. Sec. Litig.*, No. 14-cv-1956-GHK, 2015 WL 5031232, at *12 (C.D. Cal. July 13, 2015) (finding scheme where articles were "well-timed" with "targeted content to artificially inflate the value of company stock" while covering up the company's involvement).

Nothing in the Second Circuit's recent *Rio Tinto* decision suggests that these deceptive actions can no longer be taken into account when evaluating scheme liability claims. In *Rio Tinto*, the Second Circuit resolved a "narrow" question: whether the Supreme Court's decision in *Lorenzo v. SEC*, — U.S. —, 139 S. Ct. 1094 (2019), which held that the "dissemination" of documents containing false statements or omissions may support a finding of scheme liability, abrogated the Second Circuit's previous holding, in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), that "misstatements and omissions alone are not enough for scheme liability." *Rio Tinto,* 41 F.4th at 53-54. Holding that *Lentell* was not abrogated by *Lorenzo*, the Second Circuit left for later consideration "[w]hether there are ramifications or inferences from *Lorenzo* that blur the distinctions between the misstatement subsections and the scheme subsections." *Id*. at 53-54. The outcome of the Medallion Defendants' motion, however, does not depend on any such nuanced considerations. As described above, Murstein's actions in hiring Meyers and the other touters, controlling what they responded to and how, paying them, and determining the

frequency of their posting activity, as well as encouraging them to use aliases, all constituted acts in furtherance of a deceptive scheme.

The Medallion Defendants also argue that *Noto v. 22nd Century Group, Inc*., 35 F.4th 95 (2d Cir. 2022) (affirming dismissal of fraud claims based on articles that did not disclose the authors' compensation from the issuer), dooms the SEC's claims. But *Noto*'s facts are different in at least two important respects. First, in *Noto*, the defendants were "indifferent as to whether the authors" disclosed they were being paid by the issuer, *id.* at 107, and there was no allegation that any aspect of the touters' writings, other than their failure to disclose their compensation, was misleading. By contrast, the AC alleges that Murstein encouraged his touters to write frequently about Medallion Financial's stock while hiding their connection to the company, including by using aliases. Second, in *Noto*, the articles' content was limited to "analysis and information derived from public filings, press releases, and statements by management." By contrast, the AC alleges that Meyers and other touters, with Murstein's knowledge, used aliases with misleading biographies and that Meyers' articles cross-referenced articles he wrote under his aliases to foster the false appearance that their views were popular. And, as the list of articles in Appendix A to the AC makes clear, the articles' content went far beyond Medallion Financial's public statements. For example, topics included attacks on the background and credibility of people who wrote negative articles and posts about Medallion Financial.

> **D.   The AC Alleges Meyers' Misconduct with Particularity and in Connection With the Purchase or Sale of Securities.**

Meyers's arguments about lack of particularity and connection to the purchase or sale of securities are meritless. As to particularity, the Meyers Defendants argue that the SEC "fails to specify the particular misstatements about Medallion" that were false. Meyers Br. at 11 (emphasis added). But the AC alleges in substantial detail that Meyers' conduct and statements

were deceptive and misleading, including his use of multiple aliases with ostensibly different backgrounds and his failure to disclose his compensation or any other aspect of his relationship to Medallion Financial. These well-pleaded deceptive acts are alleged with particularity.

As to the connection between his writings on financial websites and the purchase or sale of securities, the Supreme Court has held that the "in connection with the purchase or sale" requirement must be construed "not technically and restrictively, but flexibly to effectuate its remedial purpose." *SEC v. Zandford*, 535 U.S. 813, 819, 122 S. Ct. 1899, 1903 (2002). The fact that the touting conduct's stated goal was to help the "market" understand Medallion Financial's business, ¶ 44, and that the statements were made on investment websites, *see* App. A, which are a medium on which a reasonable investor would rely, are among the factors that show that the touting conduct occurred "in connection with" the purchase or sale of the stock of Medallion Financial, a publicly traded company. *See, e.g., SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860-862 (2d Cir. 1968) ("Rule 10b-5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media.").).

### E.   The Meyers Defendants Violated Securities Act Section 17(b), and the Medallion Defendants Aided and Abetted These Violations.

"By its terms, [Section 17(b) of the Securities Act] applies to 'any' person who publishes 'any' article which, 'though not purporting to offer a security for sale, describes such security for a consideration received…, directly or indirectly, from an issuer, underwriter, or dealer' without disclosing the consideration." *SEC v. Wall St. Pub'g Inst., Inc.*, 851 F.2d 365, 369 (D.C. Cir. 1988) (rejecting the defendants' "restrictive construction" of Section 17(b)). Section 17(b) prohibits such publication "without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof." 15 U.S.C. § 77q(b). Scienter is not an element of a

Section 17(b) violation. *See, e.g., SEC v. Liberty Cap. Grp. Inc.*, 75 F. Supp. 2d 1160, 1163 (W.D. Wash. 1999) ("the plain meaning of § 17(b) excludes an element of intent").

The Meyers Defendants argue that their writings did not "describe a security" because "[v]ery few" of the articles mentioned Medallion Financial by name, and "hardly any" mentioned its stock or "urged the purchase" of its stock. Meyers Br. at 13. They also argue they cannot be liable under Section 17(b) for failing to disclose their compensation or affiliation with Medallion Financial where Meyers wrote about the "industry as a whole" and about details of Medallion Financial's business, as distinct from its securities. *Id*. at 14. The Meyers Defendants cite only one case (and the SEC has been unable to identify any others) that discusses the standard for "describ[ing] securities": *Liberty Cap. Grp.*, 75 F. Supp. 2d at 1161. That case a violation of Section 17(b) was adequately alleged where articles described *companies* in "glowing" terms but did not refer to "those companies' *securities* themselves." *Id.*

Given the sparse case law analyzing what it means to "describe a security," this Court should interpret the term in accordance with the statute's purpose, which is to "prevent[ ] investors from mistaking self-interested for disinterested advice." *United States v. Wenger*, 427 F.3d 840, 850 (10th Cir. 2005); *see also Zandford*, 535 U.S. at 819 (courts should interpret Section 10(b) and Rule 10b-5 "flexibly" and broadly, rather than "technically [or] restrictively"). And that interpretation should comfortably include glowing articles about a publicly-traded company that are targeted to investors, including articles on investor websites such as Seeking Alpha. If "describ[ing]" a security meant that a touter must specifically mention a company's stock in order to fall under Section 17(b)'s purview, as the Meyers Defendants suggest, stock promoters could freely post their glowing pieces on investor websites to drive up a stock's price and carefully omit any mention of a company's stock or of the promoters' compensation from

the issuer. And investors would be none the wiser. The Court should reject such a cramped interpretation of Section 17(b).

Under any reasonable interpretation of "describ[ing]" a security, therefore, the AC more than suffices to state a Section 17(b) claim against the Meyers Defendants. Meyers and the other touters consistently and vehemently argued that Medallion Financial's prospects were rosy, that those of its competitors were dim, and that anyone arguing to the contrary was at least wrong, if not dishonest. These arguments were made primarily on investment websites, where the typical reader could be expected to have an interest in buying or selling Medallion Financial's stock, and many of these points were made in comments about articles that argued that the stock was overvalued.[7] For example, Meyers wrote on Seeking Alpha, in an article titled "Medallion Financial Delivers Again. Will the Market Ever Learn?" that the Bank's true worth was substantially higher than the value at which Medallion Financial carried the Bank. ¶ 54. While Meyers suggests that this argument has nothing to do with "the securities" of the parent company, Meyers Br. at 14, both the nature of the fact being discussed—the carrying value of the Bank—and the context—an article about the market's reaction to Medallion Financial's recent financial reports—make clear that he was suggesting the parent company's stock was likely to rise once the market "learned" the true value of the Bank. Plainly the purpose was to portray the parent company's stock in a favorable light for investors.

To hold that Meyers had no obligation to disclose his compensation from Medallion Financial merely because he used the term "Medallion Financial Industry" instead of "Medallion

---

[7] In an attempt to make the articles that specifically mentioned Medallion Financial appear to be outliers, Meyers distorts the allegations of the AC. While characterizing the Appendix to the AC as identifying 22 articles that "mention Medallion at all," he contrasts that number with the "over 1,000" writings by Meyers alleged in the AC. Meyers Br. at 7. But the "over 1,000" allegation includes over 900 comments, while the Appendix includes only 109 *articles* written by Meyers. *See* AC ¶ 50 and App. A and Section III.B of the Facts.

52

Financial Corp.," or because he made arguments about facts related to the value of its stock without (in most cases) explicitly suggesting the stock was undervalued, would eviscerate the protection that Section 17(b) was intended to provide. The AC therefore states a claim against the Meyers Defendants under Section 17(b).

The Medallion Defendants argue that they cannot be held liable for the Meyers Defendants' violations of Section 17(b), citing *Cortina*. That case, however, did not involve Section 17(b) claims or aiding and abetting. The court mentioned Section 17(b) only in the context of analyzing Section 10(b) claims. For the reasons discussed in Section II.A.2 above concerning Section 10(b), the AC adequately alleges aiding and abetting of the touting conduct.

## III.  The AC Adequately Alleges That Medallion Financial Violated Books-and-Records and Internal Controls Provisions and Murstein Aided and Abetted These Violations.

The AC alleges that Medallion Financial violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B), and that Murstein aided and abetted these violations. Defendants' primary argument in response is to deny the validity of the SEC's substantive fraud claims. As discussed above, however, the AC adequately alleges that Medallion Financial's books and records included valuations that violated GAAP, and that Murstein knew this.

### A.  The AC Adequately Alleges Deficient Books and Records

Exchange Act Section 13(b)(2)(A) requires an issuer of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). The AC alleges inaccuracies in Medallion Financial public filings for 2016 and 2017: (1) the reported valuation of Medallion Bank was materially false from the third quarter of 2016 through 2017 (¶¶ 225-247); (2) the valuations of medallion-backed loans held by Medallion Financial outside the Bank were not prepared in accordance with GAAP from 2015 through 2017 (¶¶ 205-213);

(3) the valuations of Chicago medallions were overstated in the third quarter of 2016 (¶¶ 193-204, 218); and (4) the loan-to-value ratio was inaccurate in its 2017 Form 10-K (¶¶ 255-260).

These allegations state a claim under Section 13(b)(2)(A). *RPM Int'l, Inc.*, 282 F. Supp. 3d at 33 (allegations of "alleged inaccuracies in the SEC filings are sufficient to state a claim under Section 13(b)(2)(A)"); *SEC v. Bankatlantic Bancorp, Inc.*, 2012 WL 1936112, at *23 (S.D. Fla. May 29, 2012) (finding § 13(b)(2)(A) violation where "the Complaint sufficiently allege[d] that Bancorp's records did not accurately reflect the disposition of its assets").

The Medallion Defendants contend that they "reasonably relied on Bank valuations that complied with GAAP and ASC 820," MFC Br. at 36, but they ignore the well-pleaded allegations that the valuations did not comply with GAAP and that Murstein manipulated, rather than relied upon, those valuations. They argue further that the lack of an allegation that the valuation firms or the Auditor "do not still stand by" the valuations proves the reasonableness of the Medallion Defendants' purported reliance. *Id*. But the reasonableness of their conduct is not an issue ripe for determination on a motion to dismiss, and in any event 'the actions of [defendant]'s auditors are not dispositive of this [Section 13(b)(2)(A)] claim, because '[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts.'" *Sequential Brands*, 2021 WL 4482215, at *8 (citation omitted).

### B.       The AC Adequately Alleges Deficient Internal Accounting Controls.

Section 13(b)(2)(B) requires issuers to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that…transactions are recorded as necessary…to permit preparation of financial statements in accordance with generally accepted accounting principles or any other criteria applicable to such statements, and…to maintain accountability for assets." 15 U.S.C. § 78m(b)(2)(B).

To state a claim, it is sufficient to allege that only a few "personnel possessed all of the material information…, and that there were insufficient internal checks on their authority and discretion when it came to disclosing or making judgments based on that information." *Sequential Brands*, 2021 WL 4482215, at *9 (citing *RPM Int'l, Inc*., 282 F. Supp. 3d at 34). In that regard, the AC alleges that Medallion Financial lacked policies designed to ensure that persons responsible for financial reporting had full information about the "expressions of interest" on which Medallion Financial's estimates of the Bank's value were premised. ¶ 251. Murstein was the sole signatory on the valuation memoranda provided to the Auditor to explain the company's valuation decisions, and Medallion Financial did not have procedures in place to prevent a single individual from manipulating the Bank's valuation and firing the company's valuation specialist. ¶¶ 162, 268.

The AC also alleges other deficiencies in Medallion Financial's controls. It alleges that Medallion Financial incorrectly reported its loan-to-value ratios for 2017 and that it failed to have adequate controls in place to ensure that its loan-to-value ratios were accurate. ¶¶ 255-260. The AC further alleges that Medallion Financial's valuation procedures "did not adequately take into account the decline in the value of medallions," that there were insufficient controls to ensure that valuation techniques were applied on a consistent basis, and that documentation concerning valuation decisions and reporting disclosures were accurate. ¶ 254. These allegations, too, are sufficient to demonstrate the reasons Medallion Financial's internal accounting controls were inadequate. The AC, therefore, identifies numerous weaknesses in Medallion Financial's internal controls systems. The Medallion Defendants' only response is to claim that these "tack-on claims fail" because the underlying valuations were "reasonable." MFC Br. at 37. As discussed in Section I.B above, however, the AC adequately alleges that the valuations did not

55

comply with GAAP; accordingly, they cannot have been "reasonable." Any argument to the contrary raises a factual dispute that is not ripe for decision.

C.      **The AC Adequately Alleges Murstein Aided and Abetted Section 13 Violations.**

Murstein further argues that the SEC fails to allege that he aided and abetted the Section 13 violations, asserting that the AC does not "allege that Murstein was aware of any violation by" Medallion Financial and that it does not "allege any substantial assistance." MFC. Br. at 37. For the purpose of demonstrating that an executive aided and abetted the strict liability provisions of Section 13(a), the SEC must demonstrate: (1) a primary violation by Medallion Financial; (2) knowledge of the violation or recklessness by Murstein; and (3) that Murstein substantially assisted in the violation. *See, e.g., SEC v. Ripple Labs, Inc*., No. 20-cv-10832-ATS-N, 2022 WL 762966, at *6 (S.D.N.Y. Mar. 11, 2022) (citing relevant cases). The SEC does not need to show that Murstein knew Medallion Financial's conduct violated the law or was otherwise improper; instead, "[a] knowledge of what [Murstein was] doing and the consequences of those actions suffices.'" *Id.* at *7-8 (quoting *SEC v. Falstaff Brewing Corp*., 629 F.2d 62, 77 (D.C. Cir. 1980)). *Id*.

With respect to scienter, "[e]vidence showing that a person misled company auditors can support a claim that the person knowingly circumvented a company's system of internal accounting controls." *SEC v. Retail Pro, Inc*., No. 08-cv-1620-WQH, 2010 WL 1444993, at *3 (S.D. Cal. Apr. 9, 2010) (CFO knowingly circumvented a system of internal controls "by knowingly submitting a false and/or misleading management representation letter to [his company's] auditors."). Here, as described above in Section I.C.1, the AC alleges facts showing that Murstein knew or recklessly disregarded that Medallion Financial was reporting valuations inconsistent with GAAP, including his lying to the Auditor. The Court can infer from these

allegations that Murstein had an active role in developing or applying the controls as to

valuation, that he sought to circumvent them, and that he thus substantially assisted Medallion

Financial's violations.

## IV.    The AC Adequately Alleges That Murstein Deceived the Auditor.

Rule 13b2-2 provides that "[n]o director or officer of an issuer shall, directly or

indirectly: (1) [m]ake or cause to be made a materially false or misleading statement to an

accountant in connection with…(i) [a]ny audit, review or examination of the financial statements

of the issuer required to be made pursuant to this subpart.…" 17 C.F.R. § 240.13b2-2. "Rule

13b2–2 does not require a showing of scienter." *SEC v. Stanard*, No. 06-cv-7736-GEL, 2009 WL

196023, at *29 (S.D.N.Y. Jan. 27, 2009).

The Defendants make only a *pro forma* argument for dismissal of this claim by stating

that it largely depends on the validity of the SEC's "other claims" and that any misrepresentation

about "the reason why Medallion changed valuation firms" was immaterial. MFC Br. at 38. The

AC, however, adequately alleges that Murstein deceived the Auditor by signing six management

representation letters in 2016 and 2017 that contained false representations, including that

Murstein did not seek to bias the work of the valuation specialists; that the financial statements

were prepared in accordance with GAAP; and that Murstein had no knowledge of any fraud or

suspected fraud. ¶¶ 263-67. "Misstatements in management representation letters…are sufficient

to state a claim for a violation of Rule 13b2-2." *SEC v. DiMaria*, 207 F. Supp. 3d 343, 361

(S.D.N.Y. 2016). Murstein also was the sole signatory to six valuation memoranda that were

provided to the Auditor, which contained false statements regarding the bases for the substantial

increases in the value of Medallion Bank. ¶¶ 268-270. These allegations more than suffice to

state a claim. *RPM Int'l,* 282 F. Supp. 3d at 35 (denying motion to dismiss Rule 13b2-2 claim

based on allegations that defendant "made statements in management representation letters to RPM's outside audit firm that were materially false or misleading").

## V.   The Motion to Strike the Claims for Disgorgement and an Officer-and-Director Bar Should Be Denied.

The Defendants argue that the SEC's claims for disgorgement and for an officer-and-director officer bar should be stricken. MFC Br. at 38-39. Although Defendants do not cite any rule authorizing a motion to dismiss a form of relief (rather than a legal claim), the applicable authority appears to be Federal Rule of Civil Procedure 12(f), which allows a court, in its discretion, to "strike from a pleading" any material that is "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f).

The Defendants argue that, at the motion-to-dismiss stage, the SEC must put forward evidence that would justify a disgorgement remedy to be imposed should the SEC prevail on its claims. MFC Br. at 38-39. This is not the standard. In the Second Circuit, a motion to strike should not be granted "unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("the courts should not tamper with the pleadings unless there is a strong reason for so doing"); s*ee also Slue v. N.Y. Univ. Med. Ctr.*, 409 F. Supp. 2d 349, 374 (S.D.N.Y. 2006) ("Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute.'") (quoting *Zinaman v. USTS N.Y. Inc*., 798 F. Supp. 128, 135 (S.D.N.Y. 1992)).

Courts have found it "untimely" to eliminate a disgorgement claim where "none of the defendants have yet been found liable for any securities violation." *SEC v. Buntrock*, No. 02-cv-2180, 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004); *see also SEC v. Hopper*, No. 04-cv-1054, 2006 WL 778640, at *16 (S.D. Tex. Mar. 24, 2006) (denying motion to dismiss

SEC's claims for relief as "premature"). The AC alleges that Murstein received significant compensation during the period in which Medallion Financial's financial results were inflated, including restricted stock and a bonus.  ¶ 20. This is sufficient at the pleading stage.

Defendants rely on a case from outside the Second Circuit, *SEC v. Berry*, No. 07-cv-04431-RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008), which involved quite different facts. In *Berry*, the disgorgement claim centered on backdated stock options the defendant received, and the court held that if the options were never exercised and were no longer in the defendant's possession, then "there is nothing for her to disgorge." *Id*. at *10 (granting motion to strike prayer for disgorgement without prejudice). Here, by contrast, the relationship between the fraud and Murstein's compensation is a factual question to be resolved at a later stage.

The Defendants' motion to strike the request for an officer-and-director bar similarly misses the mark. Notably, Defendants fail to cite any case in which a court struck a request for an officer-and-director bar at the motion-to-dismiss stage. Instead, Defendants cite two cases in which courts decided whether to impose an officer-and-director bar at the *end* of the case: *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (reversing the district court's permanent officer-and-director bar and remanding to permit consideration of a "conditional ban or a ban limited in time")); *Stanard*, 2009 WL 196023, at *35 (after a bench trial, court concluded "the factors weigh against an officer and director bar").

By contrast, courts that have considered requests to strike or dismiss a complaint's request for a bar have found them premature. *See Hopper*, 2006 WL 778640, at *16; *SEC v. Mintz*, No. 07-cv-1027-KMH, 2008 WL 11408489, at *10 (S.D. Tex. Feb. 5, 2008). See also *SEC v. C. Jones & Co*., 312 F. Supp. 2d 1375, 1382 (D. Colo. 2004) ("This issue [of whether the

facts supported the SEC's request for injunctive relief] must await resolution until after the SEC has had the opportunity to present evidence supporting its claims.") (citing *SEC v. Fenster*, 929 F.Supp. 1346, 1349 (D. Colo. 1996) (same)).

Assuming the SEC successfully proves some or all of the violations alleged, the Court will have a sufficient factual record to support all the requested relief. *SEC v. Sells*, No. 11-cv-4941-CW, 2012 WL 3242551, at *10 (N.D. Cal. Aug. 10, 2012) (denying defendant's motion to strike request for officer-and-director bar as "premature" at motion-to-dismiss stage).

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court deny the motions to dismiss in their entirety.

Dated:  August 30, 2022
         New York, New York

                                        Respectfully submitted,

                                        /s/ David Stoelting
                                        _____
                                        David Stoelting
                                        Karen Willenken

                                        ATTORNEYS FOR PLAINTIFF
                                        Securities and Exchange Commission
                                        100 Pearl Street, Suite 20-100
                                        New York, NY 10004-2616

**Appendix A**

| Term in Amended Complaint | Name |
|---|---|
| Bank A | Sterling Bank |
| Bank B | BankUnited, N.A. |
| Bank C | Metropolitan Bank |
| Investment Bank A | Sandler O'Neill |
| Investment Bank B | Keefe, Bruyette & Woods |
| Investment Bank C | Berenson & Co. |
| The audit partner | Charles Abraham |
| The Auditor | WeiserMazars LLP |
| The consumer lender | Credify |
| The industrial bank | WebBank |
| The Contractor | Sarah Frigo |
| The General Counsel | Jeffrey Yin |
| The PR Firm | Zlokower & Associates |
| The Valuation Firm | RP Financial |