# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-4003
Tel:  +1 212 556 2100
Fax:  +1 212 556 2222
www.kslaw.com

Randy Mastro
Partner
Direct Dial:  +1 212 827 4019
rmastro@kslaw.com

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    9-6-2023
```

August 29, 2023

By Hand Delivery & U.S. Mail

Honorable Lewis A. Kaplan
United Stated District Court
Southern District of New York
500 Pearl Street
New York, NY 10007



RECEIVED
AUG 29 2023
JUDGE KAPLAN'S CHAMBERS

> Re:  **Securities and Exchange Commission v. Medallion Financial Corp., et al.,**
> **Case No. 21-cv-11125 (S.D.N.Y.) (LAK)**

Defendants Medallion Financial Corp. ("Medallion") and Andrew Murstein (collectively, the "Defendants") respectfully submit this letter to address new relevant authority from the Second Circuit in *New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo* ("*AmTrust*"), Case No. 20-cv-1643, 2023 WL 5419147 (2d Cir. Aug. 23, 2023), that, for the reasons explained here, supports Defendants' pending motion to dismiss the SEC's Amended Complaint (Dkt. No. 80 ("MTD"); Dkt No. 45 ("Compl.")).

*AmTrust* supports dismissal of the SEC's claims here in two ways. First, the alleged fraud in this case concerns statements of opinion, and the Second Circuit clarified the general rule that opinions typically are not actionable as fraud under the federal securities laws, *except* in the following limited circumstances, none of which applies here: (1) if "'the speaker did not hold the belief she professed,'" (2) if the opinion "contain[ed] embedded statements of fact that are untrue," or (3) where "the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *AmTrust*, 2023 WL 5419147, at *6  (slip op. at 20) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)). In contrast to the complaint at issue in *AmTrust*, the Amended Complaint here fails to plead allegations falling within any of these limited exceptions.

*AmTrust* concerned an alleged statement of opinion that contained "embedded statements of fact" that were allegedly untrue. In *AmTrust*, the defendants expressed opinions based on an accounting standard (ASC 605-20-25-3) that generally requires revenue to be recognized over time except where there exists "sufficient historical evidence" indicating that the costs of performing

August 29, 2023
Page 2

services under a contract are incurred on other than a straight-line basis.[1] *Id.* at *9 (slip op. at 26). The defendants recognized revenue up front, in a manner they claimed was consistent with the existence of "historical evidence" justifying such an approach, but plaintiffs alleged that "*no historical evidence*" existed. *Id.* at *9 (slip op. at 27–28) (emphasis added). Here, in contrast, the SEC does not allege any actionable statement of opinion premised on an accounting standard requiring "historical evidence" or any other "embedded fact." Rather, the accounting standards at issue here require fair valuation judgments, without reference to any similar "embedded fact." Indeed, the Amended Complaint here concedes in numerous respects that investors would have understood Defendants' expression of opinion was merely that—by, for example, noting that the market for taxi medallions and medallion-backed loans was disordered and illiquid in 2016 and 2017. *See* Compl. ¶¶ 40–42, 152. Thus, the SEC's Amended Complaint fails to allege any untrue "embedded fact" in Defendants' expression of opinion, let alone one that would have misled any reasonable investor.

Nor can the SEC rely on either of the other two exceptions to the general rule that statements of opinion are not actionable. As explained in Defendants' reply brief in support of their motion to dismiss, the Amended Complaint fails to allege that Defendants disbelieved the valuations in question. Dkt. No. 94, at 5–6. Similarly, the Amended Complaint fails to adequately allege that Defendants conveyed false facts or omitted material information that misled reasonable investors about Medallion's basis for the valuations. *Id.* at 6–7. In light of the generic and objectively true statements that Medallion made, a reasonable investor would not expect to be told details of ancillary discussions with valuation firms, such as that other potential work was discussed but never promised. *See, e.g.*, Compl. ¶ 141. And unlike the materially erroneous financial statements that AmTrust restated, Medallion has not restated any of its financial statements because they are not materially misstated and Medallion's auditors stand by their unqualified audit opinions.

Second, *AmTrust* dismissed claims requiring scienter for reasons that are instructive. Scienter presents a high bar, and that is particularly so where, as here, Defendants' alleged misrepresentation is a statement of opinion. Like the plaintiff in *AmTrust*, the SEC here has failed to adequately plead that Defendants had the motive and opportunity to commit fraud. Medallion's statements about having received advice from valuation firms and external indications of interest were objectively true. *See* Medallion MTD at 18–21. Moreover, while the SEC alleges that Defendants' alleged desire was to sustain "the appearance of corporate profitability," *AmTrust* instructs that this is not in itself the kind of incentive or motivation that raises an inference of scienter. *AmTrust*, 2023 WL 5419147, at *13 (slip op. at 38) (citing *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)). And while the SEC argues that it sufficiently pleaded scienter based on allegations of "conscious misbehavior" in the form of Defendants not following an auditor's non-binding "advice" and not disclosing certain information to the auditor, *AmTrust* affirmed that the standard for pleading "conscious misbehavior" is far higher than what the SEC alleges here: "scienter based on conscious misbehavior requires a showing of deliberate illegal

---

[1] ASC 605-20-25-3 provides: "[R]evenue from separately priced extended warranty or product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis."

August 29, 2023
Page 3

behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Id.* at *13 (slip op. at 39) (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (alterations adopted)). Put simply, the Amended Complaint fails to adequately allege scienter, and the SEC's claims should be dismissed on that basis as well.

A copy of the Second Circuit's decision is attached here as **Exhibit A**.

Respectfully,

*/s/ Randy Mastro*

Randy Mastro

Encl.

Cc:     David Stoelting, Esq.

# EXHIBIT A

20-1643-cv
New England Carpenters Guaranteed Annuity and Pension Funds v. AmTrust Financial Services, Inc.

# United States Court of Appeals
## For the Second Circuit

August Term, 2020

(Argued: June 4, 2021        Decided: August 23, 2023)

Docket No. 20-1643-cv

———————————————

NEW ENGLAND CARPENTERS GUARANTEED ANNUITY AND
PENSION FUNDS,

Lead Plaintiff-Appellant,

STANLEY NEWMARK, IRVING LICHTMAN REVOCABLE LIVING TRUST,
JUPITER CAPITAL MANAGEMENT,

Plaintiff-Movant-Appellants,

SHARON ALBANO, Individually and On Behalf of All Others Similarly
Situated,

Consolidated-Plaintiff-Movant-Appellant,

JOHN SACHETTI, Individually and On Behalf of All Others Similarly
Situated,

Consolidated-Plaintiff,

JOEL RUBEL, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

DONALD T. DECARLO, SUSAN C. FISCH, ABRAHAM GULKOWITZ, GEORGE KARFUNKEL, JAY J. MILLER,

Consolidated-Defendants-Appellees,

AMTRUST FINANCIAL SERVICES, INC., BARRY D. ZYSKIND, RONALD E. PIPOLY, JR., BDO USA, LLP, RBC CAPITAL MARKETS, LLC, UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., KEEFE, BRUYETTE & WOODS, INC., MORGAN STANLEY & CO. LLC,

Defendants-Appellees.

—————————————————

Before:

LOHIER, NARDINI, Circuit Judges, and KOVNER, Judge.[*]

The Appellants, investors in the securities of AmTrust Financial Services, Inc., appeal from a judgment of the United States District Court for the Southern District of New York (Kaplan, J.) dismissing their complaint for failure to state a claim under Sections 11, 12, and 15 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 against AmTrust, various AmTrust corporate officers and board members, AmTrust's outside auditor, and multiple underwriters of AmTrust's sale of securities.  The District Court determined that certain public misstatements relating to AmTrust's recognition of revenue generated by its extended warranty contracts and the expenses associated with its payment of discretionary employee bonuses were non-actionable statements of opinion.  We conclude that these misstatements of opinions were actionable under the circumstances alleged in the Appellants' complaint.  We identify no error in the District Court's dismissal of the Appellants' remaining claims.  We therefore **AFFIRM** in

———————————————

[*] Judge Rachel P. Kovner, of the United States District Court for the Eastern District of New York, sitting by designation.

2

substantial part, **VACATE** in part, and **REMAND** the case for further
proceedings.

> ANDREW S. LOVE (Susan K. Alexander, Robbins
> Geller Rudman & Dowd LLP, San Francisco, CA;
> Samuel H. Rudman, David A. Rosenfeld, Mark T.
> Millkey, William J. Geddish, Avital O. Malina,
> Robert D. Gerson, Vincent M. Serra, Robbins Geller
> Rudman & Dowd LLP, Melville, NY; Jeremy A.
> Lieberman, Pomerantz LLP, New York, NY; Thomas
> J. McKenna, Gainey McKenna & Egleston, New
> York, NY; Kim E. Miller, Kahn Swick & Foti, LLC,
> New York, NY, *on the brief*), Robbins Geller Rudman
> & Dowd LLP, San Francisco, CA, *for* Plaintiffs-
> Appellants.

> STEVEN M. FARINA (John S. Williams, Matthew J.
> Greer, *on the brief*), Williams & Connolly LLP,
> Washington, D.C., *for* Defendants-Appellees
> AmTrust Financial Services, Inc., Barry D. Zyskind,
> Ronald E. Pipoly, Jr., Donald T. DeCarlo, Susan C.
> Fisch, Abraham Gulkowitz, George Karfunkel, and
> Jay J. Miller.

> TIMOTHY E. HOEFFNER (Jason D. Gerstein, Ludwig
> von Rigal, *on the brief*), McDermott Will & Emery
> LLP, New York, NY, *for* Defendant-Appellee BDO
> USA, LLP.

> GREGG L. WEINER (Christopher Thomas Brown,
> Ropes & Gray LLP, New York, NY; William T.
> Davison, Ropes & Gray LLP, Boston, MA), Ropes &
> Gray LLP, New York, NY, *for* Defendants-Appellees
> Morgan Stanley & Co. LLC, Citigroup Global
> Markets Inc., UBS Securities LLC, RBC Capital
> Markets, LLC, and Keefe, Bruyette & Woods, Inc.

LOHIER, *Circuit Judge*:

When is a statement of opinion that reflects some subjective judgment nevertheless actionable under the federal securities laws?

On April 4, 2017, AmTrust Financial Services, Inc., one of the country's largest publicly traded property and casualty insurers, restated five years of its financial results to correct what it acknowledged were significant errors in its annual and quarterly reports filed with the Securities and Exchange Commission ("SEC").  Among other things, AmTrust disclosed that it had improperly recognized most of the expected revenue from certain extended warranty contracts at the start rather than over the life of the contracts. AmTrust also reported that it had improperly accounted for certain discretionary employee bonuses by treating the bonuses as expenses in the year they were paid rather than the year they were earned by employees.

AmTrust's restatement spurred the Appellants in this case, all investors in AmTrust securities,[1] to sue AmTrust, its officers (the "Officer Defendants," and, together with AmTrust, the "AmTrust Defendants"), members of its

---

[1] The named plaintiffs are New England Carpenters Guaranteed Annuity and Pension Funds, Stanley Newmark, Irving Lichtman Revocable Living Trust, Jupiter Capital Management, Sharon Albano, John Sachetti, and Joel Rubel.

4

board of directors (the "Director Defendants"),[2] its former auditor,[3] and

certain underwriters of AmTrust securities (the "Underwriter Defendants"),[4]

for misstating the company's financial condition and results in violation of

Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), and

Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act") and the corresponding Rule 10b-5.

The United States District Court for the Southern District of New York

(Kaplan, J.) dismissed the third amended complaint (the "Complaint") under

Federal Rule of Civil Procedure 12(b)(6), holding that none of the

misstatements were actionable under the securities laws.  We agree with the

District Court's dismissal of the claims relating to most of the misstatements,

and we therefore AFFIRM in substantial part.  But as we explain below, we

disagree with the District Court's dismissal of the Appellants' claims under

---

[2] The Officer Defendants are Barry D. Zyskind (at all relevant times AmTrust's President and Chief Executive Officer ("CEO")) and Ronald E. Pipoly Jr. (at all relevant times AmTrust's Executive Vice President and Chief Financial Officer ("CFO")).  The Director Defendants are Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller.

[3] BDO USA, LLP ("BDO").

[4] RBC Capital Markets, LLC, UBS Securities LLC, Citigroup Global Markets Inc., Keefe, Bruyette & Woods, Inc., and Morgan Stanley & Co. LLC.

Sections 11, 12(a)(2), and 15 of the Securities Act against AmTrust, its officers and directors, and the Underwriter Defendants related to AmTrust's accounting for revenue generated by its extended warranty contracts and the expenses associated with discretionary employee bonuses. We therefore VACATE the judgment insofar as it dismisses those claims and REMAND to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

### I.   <u>Factual Background</u>

The following facts, which we assume to be true for purposes of this appeal, are drawn from the Complaint and the documents it incorporates by reference. <u>See</u> <u>Litwin v. Blackstone Grp., L.P.</u>, 634 F.3d 706, 708 (2d Cir. 2011).

AmTrust provides workers' compensation, commercial automobile insurance, general liability, and extended service and warranty coverage. As relevant to this appeal, AmTrust promotes and markets extended service plans ("ESPs")—essentially extended warranties. AmTrust receives two types of revenue from its ESP business. First, AmTrust and its subsidiaries sell contractual liability insurance to various retailers, covering the obligations that the retailers assume as part of the ESPs. Second, retailers pay AmTrust

"for marketing and administrative services," including "call center services," related to the ESPs.  Joint App'x 67, 82.  During the relevant time, AmTrust "recognize[d] revenue related to promotion, marketing and administration services at the time of the sale of ESP[s]" but "defer[red] a portion of service revenue based upon an estimate of administrative services to be provided in future periods."  Joint App'x at 82.

Starting in 2010, AmTrust made a number of acquisitions that fueled much of its corporate growth.  The acquisition most relevant to this appeal closed in 2010, when AmTrust bought Warrantech, a publicly traded company focused on providing ESPs and warranty programs for retailers, dealers, distributors, and manufacturers that became, after the acquisition, a core part of AmTrust's business.  Prior to the acquisition, the SEC had investigated Warrantech's practice of recognizing the full amount of the revenue it received from its ESPs and other service contracts at the time the contract was entered and the initial sale of services commenced (we will at times refer to this as the "time-of-sale" approach).  The SEC had instructed Warrantech instead to recognize the revenue generated by those contracts on a straight-line basis over the life of the contracts.  Warrantech publicly

announced that it would comply with the SEC's guidance, abandoned its time-of-sale approach, and revised its method of recognizing revenue relating to the ESPs. For reasons that are unclear, AmTrust, though aware of the SEC's prior guidance to the contrary, reverted back to the original time-of-sale approach after it acquired Warrantech.

From 2012 to 2016 the price of AmTrust stock, which traded on the NASDAQ Global Market, skyrocketed. The company's gross written premiums, a central measure of its financial condition, grew from $2.75 billion to $7.95 billion. Yet as early as 2013, financial commentators and analysts began speculating publicly about AmTrust's actual financial condition. One commentator reported that AmTrust may have used accounting gimmicks to inflate its earnings and net equity. A financial journal, Barron's, questioned AmTrust's accounting practices.

The bad press failed to slow AmTrust's growth. In November 2015 AmTrust filed a preliminary prospectus supplement and prospectus supplement with the SEC announcing an offer of 5 million shares of common stock (the "November 2015 Offering") pursuant to a registration statement filed on June 11, 2015 (the "2015 Registration Statement"). The transaction,

underwritten by Defendants Citigroup Global Markets Inc. ("Citigroup") and

Morgan Stanley & Co. LLC ("Morgan Stanley"), occurred on November 11,

2015 and raised $320 million.  In September 2016 AmTrust filed another

preliminary prospectus supplement and prospectus supplement under the

2015 Registration Statement, this time announcing that the company planned

to offer American depositary shares in a transaction (the "September 2016

Offering") underwritten by Morgan Stanley, UBS Securities LLC ("UBS"),

RBC Capital Markets, LLC ("RBC"), and Keefe, Bruyette & Woods, Inc.

("KBW").  The prospectus supplement accompanying the September 2016

Offering incorporated by reference AmTrust's annual financial report on

Form 10-K for the year ending December 31, 2015, its 10-Q report for the

quarter ending March 31, 2015, and various other reports the company had

previously filed with the SEC.  The September 2016 Offering raised $278.2

million.

AmTrust's prospects took a turn for the worse in 2017.  In February and

March 2017 AmTrust announced that accounting errors had prompted it to

delay the filing of its 10-K for the year ending December 31, 2016 and that it

needed more time to complete its consolidated financial statements.  On April

9

4, 2017, AmTrust finally filed its Form 10-K for 2016.  The 2016 10-K included

restated financial results for the years ending December 31, 2012, 2013, 2014,

2015, and 2016, as well as each interim period during 2015 and 2016.  The

restatement revealed that the company's income and earnings had been

significantly overstated since 2012.[5]

     The restatement identified two material accounting errors.  First,

according to a press release that AmTrust issued describing the errors,

AmTrust had mistakenly relied on the "upfront recognition of a portion of

warranty contract revenue associated with administration services, . . . instead

of deferring recognition of the revenue over the life of the contract."  Joint

App'x 208.  In other words, AmTrust had "historically recognized the

majority of revenue related to administrative services at the time of sale of

ESP," but had "revised its application of the revenue recognition guidance to

---

[5] To use the annual financial results for 2015 as an example, the errors meant that
income before other income, income taxes, equity in earnings of unconsolidated
subsidiaries and non-controlling interest was overstated by 16.79 percent; income
before income taxes, equity in earnings of unconsolidated subsidiaries and non-
controlling interest was overstated by 17.04 percent; net income was overstated by
11.56 percent; net income attributable to AmTrust common stockholders was
overstated by 12.62 percent; diluted earnings per share was overstated by 12.45
percent; comprehensive income was overstated by 22.94 percent; and
comprehensive income attributable to AmTrust Financial Services, Inc. was
overstated by 23.55 percent. See Joint App'x 213–14.

record revenue related to administration services on a straight-line basis over the term of the ESP contracts." Joint App'x 80. The second accounting error was that discretionary employee "bonuses . . . were expensed in the year paid but . . . should have been accrued [as an expense] in the year earned based on" accepted accounting standards. Joint App'x 208. The restatement also identified other "miscellaneous adjustments" to AmTrust's financial statements that the company concluded were not material.[6] Joint App'x 208.

## II.    **Procedural Background**

The Appellants commenced this putative class action in March 2017, after AmTrust first publicly disclosed the accounting errors at issue in this case. Although there are two slightly different class periods during which the Appellants purchased AmTrust securities—the first between February 14, 2013 and April 10, 2017 (the "AmTrust Class Period") and the second between March 3, 2014 and April 10, 2017, during which BDO served as AmTrust's outside auditor (the "BDO Class Period")—for our purposes, the distinction is immaterial. The Appellants eventually filed a second amended complaint asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act, 15

---

[6] Although the Appellants challenged other statements below, they do not press those arguments on appeal and, as a result, we do not consider them.

U.S.C. §§ 77k, 77l(a)(2), 77o, Sections 10(b) and 20(a) of the Exchange Act, 15

U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5.  The District

Court dismissed the second amended complaint without prejudice,

concluding for the most part that the alleged misstatements were

nonactionable statements of opinion.  The Appellants filed a third amended

complaint (the operative complaint here), which the District Court also

dismissed, largely for the same reasons, this time with prejudice.

This appeal followed.

## DISCUSSION

We review the District Court's dismissal under Rule 12(b)(6) <u>de novo</u>,

accepting all factual allegations as true and drawing all reasonable inferences

in favor of the Appellants.  <u>Olagues v. Icahn</u>, 866 F.3d 70, 74 (2d Cir. 2017).

### I.    The Securities Act Claims Against the AmTrust Defendants and the Director Defendants

We begin with the Appellants' claims against the AmTrust Defendants

and the Director Defendants under Sections 11 and 15 of the Securities Act, as

well as their claims against AmTrust under Section 12(a)(2) of the Securities

Act.  The Act requires that companies issuing securities make a "full and fair

disclosure of information" in connection with a public offering.  <u>Pinter v.</u>

Dahl, 486 U.S. 622, 646 (1988); see Fed. Hous. Fin. Agency for Fed. Nat'l

Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 98 (2d Cir. 2017). The

Act aims to protect investors and to "achieve a high standard of business

ethics in the securities industry." Lorenzo v. SEC, 139 S. Ct. 1094, 1103 (2019)

(quotation marks omitted); see also SEC v. First Jersey Sec., Inc., 101 F.3d 1450,

1466 (2d Cir. 1996). It thus permits purchasers of a public company's

securities to sue the company and certain corporate officers for any material

misstatements or for the omission of material information in the company's

registration statements filed with the SEC.

> Section 11 of the Act, for example, provides:

>> In case any part of the registration statement,
>> when such part became effective, contained an
>> untrue statement of a material fact or omitted to
>> state a material fact required to be stated therein or
>> necessary to make the statements therein not
>> misleading, any person acquiring such security
>> . . . [may] sue.

15 U.S.C. § 77k(a); see Omnicare, Inc. v. Laborers Dist. Council Const. Indus.

Pension Fund, 575 U.S. 175, 179 (2015). So "[i]n the event of such a misdeed,

the statute provides for a cause of action by the purchaser of the registered

security against the security's issuer, its underwriter, and certain other

statutorily enumerated parties." <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 358 (2d Cir. 2010). "Section 15, in turn, creates liability for individuals or entities that 'control[ ] any person liable' under section 11." <u>Id.</u> <u>(quoting</u> 15 U.S.C. § 77o). And as relevant to this appeal, Section 12(a)(2) similarly imposes liability on any person who offers or sells a security by means of a prospectus containing material misrepresentations or omissions.[7]

Appellants' principal challenge under the Securities Act relates to the two accounting errors described above that AmTrust identified in its restatement as materially affecting its reported income during the relevant

_____

[7] Section 12(a)(2) provides, in relevant part:

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a)(2).

time: (1) its recognition of revenue from administration services based on the time-of-sale approach; and (2) its decision to record discretionary bonus payments as expenses the year in which they were paid rather than the year in which the bonuses were actually earned.

Relying largely on the Supreme Court's decision in <u>Omnicare</u> and our decision in <u>Fait v. Regions Financial Corp.</u>, 655 F.3d 105 (2d Cir. 2011), the District Court determined that AmTrust's financial statements reflected the exercise of subjective judgment and were thus non-actionable statements of opinion. <u>Cf</u>. <u>Omnicare</u>, 575 U.S. at 184 (noting that an executive who expressed "a view, not a certainty" "could not be liable for a false statement of fact"). We respectfully disagree with this particular conclusion of the very able and experienced District Judge, who did not have the benefit of our latest guidance in this area. <u>See</u> <u>Abramson v. Newlink Genetics Corp.</u>, 965 F.3d 165 (2d Cir. 2020).

In <u>Fait</u>, we explained that "when a plaintiff asserts a claim under section 11 or 12 based upon a [defendant's alleged] belief or opinion . . . liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." <u>Fait</u>, 655 F.3d

at 110.  But we have since recognized that the Supreme Court in <u>Omnicare</u>, which was decided after <u>Fait</u>, unequivocally "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." <u>Abramson</u>, 965 F.3d at 175. By pointing out that a statement of opinion, even if believed, may nonetheless be actionable if it contains a factual misstatement or is rendered misleading by the omission of material facts, <u>Omnicare</u> expanded the scope of issuer liability for statements of opinion.  Nevertheless, <u>Fait</u> continues to guide us in distinguishing between a statement of fact and a statement of opinion in the first place.

So what distinguishes a fact from an opinion under the federal securities laws?  In general, a fact is "a thing done or existing or an actual happening," while an opinion is "a belief, a view, or a sentiment which the mind forms of persons or things." <u>Omnicare</u>, 575 U.S. at 183 (quotation marks omitted).  A statement of fact "expresses certainty about a thing," while a statement of opinion does not. <u>Id.</u>  Statements of opinion often include qualifying language (like "I believe" or "I think") that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting

16

the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact. See id. at 183–84.

But not all statements of opinion include such qualifying language. In Fait, for example, we held that unqualified estimates of goodwill and loan loss reserves were statements of opinion because the estimates were clearly "subjective . . . rather than objective factual matters." Fait, 655 F.3d at 111 (quotation marks omitted). Certain statements address issues so plainly subjective, we reasoned, that the statement is one of opinion not just by virtue of the words used but also because of the nature of the information conveyed. In Fait, we characterized the inquiry as turning on whether the relevant statement reflects the speaker's determination of "a matter of objective fact" or instead expresses the speaker's judgment about a matter that lacks "any objective standard." Id. at 109–10 (quotation marks omitted). The latter statement, we said, is "inherently subjective." Id. at 113.

The rule we articulated in Fait was narrowly invoked in the context of estimates of goodwill and loan loss reserves, both of which we characterized as inherently requiring a substantial exercise of judgment. Estimates of

17

goodwill "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed." Id. at 110.  Absent "any objective standard such as market price that" the company "should have but failed to use in determining" the value of its assets, "an estimate of the fair value of those assets will vary depending on the particular methodology and assumptions used." Id. at 110–11.  Likewise, in Omnicare, the Supreme Court described an opinion variously as a statement that "in ordinary usage . . . does not imply . . . definiteness . . . or certainty," or as a statement that "rest[s] on grounds insufficient for complete demonstration."  575 U.S. at 183 (quotation marks omitted).

If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist.  Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities provisions at issue here.  See Omnicare, 575 U.S. at 189–90 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts.")  This is true even if most of the existing facts cut against the statement.

18

But opinions lead double lives.  Most obviously, as the Supreme Court clarified in <u>Omnicare</u> and our Court more recently observed in <u>Abramson</u>, an opinion may implicitly convey "facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." <u>Omnicare</u>, 575 U.S. at 188.  In the context of a securities transaction, a reasonable investor expects that opinion statements "rest on some meaningful . . . inquiry," "fairly align[] with the information in the issuer's possession at the time," and do not "reflect baseless, off-the-cuff judgments," <u>id.</u> at 188–90; <u>see</u> <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1093 (1991) (noting that even "conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading").  If, for example, "a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then the issuer may be liable under Section 11's omissions clause even though the statements convey an opinion.  <u>Omnicare</u>, 575 U.S. at 189.  "By increasing the ability of plaintiffs to plead material omissions with respect to statements of

19

opinion. . . , <u>Omnicare</u> reduced the significance of district courts' classification

of statements as those of fact or opinion." <u>Abramson</u>, 965 F.3d at 176.

      Opinions are thus actionable under Section 11 of the Securities Act not

only when "the speaker did not hold the belief she professed," <u>Omnicare</u>, 575

U.S. at 185–86, but also if the statement of opinion contains embedded

statements of fact that are untrue, or the statement omits information whose

omission conveys false facts about the speaker's basis for holding that view

and makes the opinion statement misleading to a reasonable investor, <u>id.</u> at

186–88; <u>see</u> <u>Abramson</u>, 965 F.3d at 175; <u>Fait</u>, 655 F.3d at 111 (noting that

opinion "statements may be actionable if they misstate the opinions or belief

held, or, in the case of statements of reasons, the actual motivation for the

speaker's actions, and are false or misleading with respect to the underlying

subject matter they address" (emphasis omitted)).  The standard for opinion

liability presents "no small task for an investor" seeking to plead that an

opinion is misleading.  <u>Omnicare</u>, 575 U.S. at 194.

      So one of the more straightforward ways a statement of opinion may be

actionable is if it contains an embedded statement of fact that is not true.  In

other words, the opinion may be false or misleading if the embedded fact is

not one as to which reasonable minds can differ.  This occurs where, for example, there is an accepted method for assessing whether the statement is true, but the statement is not justified by the accepted method and clearly contradicts the facts on which it purports to rest.  Consider the following example from <u>Abramson</u>:

> A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.'  If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete 'statement of a material fact' . . . can be proven false.

<u>Abramson</u>, 965 F.3d at 175.

Statements of opinion are also actionable as false or misleading under Section 11's omission clause if the opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement[of opinion] itself."  <u>Omnicare</u>, 575 U.S. at 188; <u>see</u> <u>Abramson</u>, 965 F.3d at 175 ("[P]laintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false.").  "With respect to this [alternative] basis for challenging a statement of opinion,

<u>Omnicare</u> held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." <u>Abramson</u>, 965 F.3d at 175.

Mindful of these background principles, we conclude that the Appellants have stated a claim under Section 11 of the Securities Act against the AmTrust Defendants and the Director Defendants based on AmTrust's past recognition of revenue for extended warranty contracts using the time of sale approach, as well as its practice of recording discretionary bonuses as expenses when they were paid rather than earned.[8] For the same reasons, we vacate the District Court's dismissal of the Appellants' Section 12(a)(2) claims against AmTrust arising from the same misstatements.  See <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d at 359.

---

[8] The District Court dismissed the Appellants' control-person liability claim under Section 15 of the Securities Act against AmTrust's officers and directors because it found no primary liability under Section 11.  Because we conclude that the Appellants have stated a claim for primary liability for the statements about the accounting treatment of warranty contracts and bonuses, we vacate the District Court's dismissal of the corresponding Section 15 claims against Zyskind, Pipoly, DeCarlo, Fisch, Gulkowitz, Karfunkel, and Miller and remand for further proceedings consistent with this opinion.  See <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d at 358 (noting that "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[] 11").

22

The Appellants claimed that the Defendants were also liable for improper reporting of acquisition costs, foreign exchange gains and losses, software costs, interest expenses, intercompany transactions, and other accounting-related statements. They do not challenge the District Court's dismissal of those claims on appeal, and we therefore affirm the judgment insofar as it dismissed the claims. We focus instead, as do the Appellants, on the claims relating to the extended warranty contracts and the bonuses.

## A. The Extended Warranties

We turn first to AmTrust's practice of recognizing "upfront" most of the revenue generated from its extended warranty contracts during the relevant time. In a March 2017 media release, AmTrust clarified that this revenue recognition practice was "based on the interpretation of ASC [Accounting Standards Codification] 605, Revenue Recognition, used in the previously filed financial statements related to multiple-element revenue recognition." Joint App'x 670. The company conceded, however, that it should have instead "deferr[ed] recognition of the revenue over the life of the

contract."[9]  Joint App'x 670.  The restatement acknowledged that the time-of-sale approach resulted in material misstatements regarding AmTrust's income and revenue associated with the warranty contracts.  Specifically, it explained:

> The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP.  However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts.  This correction of an error, <u>which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods</u>, required a restatement of the Company's previously issued financial statements.

Joint App'x 568 (emphasis added).

On appeal, AmTrust describes its initial representations about the revenue related to administrative services for ESPs as statements of opinion,

---

[9] The Accounting Standards Codification ("ASC") is the "source of authoritative generally accepted accounting principles," commonly referred to as "GAAP," published by the Financial Accounting Standards Board ("FASB") "to be applied by nongovernmental entities" such as AmTrust.  Financial Accounting Standards Board, <u>Accounting Standards Codification: Overview and Background</u> 105-10-05-1 (2020), https://asc.fasb.org/1943274/2147479442; <u>see also</u> <u>Ind. Pub. Ret. Sys. v. SAIC, Inc.</u>, 818 F.3d 85, 93 (2d Cir. 2016) (relying on FASB standards as a source of GAAP).

not fact, because its determination of when to recognize the revenue associated with ESPs was a subjective judgment call.  In particular, AmTrust explains that its pre-restatement decision to recognize this revenue upfront was "based on its interpretation of the accounting guidance regarding 'multiple-element revenue recognition,'" including ASC 605-25-25-5. AmTrust Br. 31.  ASC 605-25-25-5 governs when a "delivered item or items shall be considered a separate unit of accounting."  Under that accounting standard, revenue from these multi-element arrangements (also known as bundled contracts or sales) can be recognized upon delivery only if the contracts or services "have value to the customer on a standalone basis."  ASC 605-25-25-5(a), superseded by Accounting Standard Update No. 2014-09 (May 28, 2014).  Lastly, AmTrust observes that a contract or service has "value on a standalone basis if [it is] sold separately by any vendor or the customer could resell [it] on a standalone basis."  Id.

The company suggests that assessing value to the customer on a standalone basis — that is, determining whether the administrative services revenue received from vendors who administer the warranty programs is separable from revenue generated by the warranty coverage provided to

25

customers — is an inherently subjective enterprise.  The problem with this argument is that AmTrust has never actually contended that its customers can resell the administrative services associated with the warranty contracts at issue here on a standalone basis or that vendors are able to sell them separately.  Nothing in the Complaint suggests that doing so is even possible, and although AmTrust maintains that there are other ways to determine a contract's "value on a standalone basis" under the services section of ASC 605 that require judgment calls, nothing in the text of ASC 605, including ASC 605-25-55-1, on which AmTrust also relies, refers to other methods for determining value.

In further support of their respective arguments, both the Appellants and AmTrust turn to ASC 605-20-25-3, which provides:

> [R]evenue from separately priced extended warranty or product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period except in those circumstances in which <u>sufficient historical evidence indicates</u> that the costs of performing services under the contract are incurred on other than a straight-line basis.

ASC 605-20-25-3 (emphasis added), superseded by Accounting Standards Update No. 2014-09 (May 28, 2014).  On one hand, the Appellants suggest that

ASC 605-20-25-3 establishes an objective standard that generally requires the recognition of this revenue on a straight-line basis.  On the other hand, AmTrust defends the District Court's decision by relying on the exception contained in ASC 605-20-25-3, claiming that the determination of whether historical evidence is sufficient to permit non-straight-line treatment is "a quintessential question of judgment" and that the standard is thus inherently subjective.  AmTrust Br. 30–31.

For its part, the District Court concluded that the restated financial statements were non-actionable opinions because determining the sufficiency of historical evidence that would support incurring costs on a non-straight-line basis "inherently requires a subjective judgment as to whether the exception applies."  Spec. App'x 89.  As the District Court itself recognized, however, the determination that AmTrust's statements are opinion, not fact, is not necessarily the end of the analysis.  Spec. App'x 42 ("The claim will survive . . . if plaintiffs have alleged adequately that the statement was an untrue or misleading statement of opinion."); see Abramson, 965 F.3d at 176.

The Appellants respond that they have alleged the objectively determinable absence of historical evidence necessary to support the non-

27

straight-line accounting approach that AmTrust applied. <u>See</u> Joint App'x 152

("ASC Topic No. 605 . . . does not permit the method of recognition employed

by AmTrust without historical evidence demonstrating the appropriateness of

such method, historical evidence AmTrust acknowledges it never

possessed."). AmTrust's reliance on the sufficiency of historical evidence to

justify its accounting treatment, the Appellants contend, runs headlong into

the Complaint's allegation, which at this stage we accept as true, that there

was in fact <u>no</u> historical evidence to support its approach.

We agree with the Appellants that subjective judgments about the

sufficiency of historical evidence to support a particular accounting treatment

presuppose the existence of <u>some</u> historical evidence. Indeed, AmTrust now

acknowledges that it should have recorded revenue for its warranty contracts

on a straight-line basis in reliance on ASC 605-20-25-3. And no one disputes

that GAAP permits time-of-sale recognition only if <u>some</u> historical evidence

justified doing so. At the pleading stage, we think the alleged absence of such

evidence, if accepted as true, means that AmTrust's representations about the

warranty contract revenue reported in its historical consolidated financial

statements misled investors to conclude that the company was aware of some

historical evidence in support of recognizing the revenue on a non-straight-line basis, when in (alleged) fact it was not.  In other words, AmTrust is plausibly alleged to have "sa[id] one thing and [held] back another." Omnicare, 575 U.S. at 192.

We therefore conclude that AmTrust's financial statements relating to the warranty contract revenue reported in its historical consolidated financial statements were actionable statements of opinion under Section 11, and we vacate the District Court's dismissal of the Appellants' Section 11 claims against the AmTrust Defendants and the Director Defendants arising from those statements.

## B. The Discretionary Bonuses

We turn next to AmTrust's practice of expensing certain discretionary employee bonuses in the year the bonuses were paid rather than the year the bonuses were earned.

According to the Complaint, in its restatement AmTrust "admitted that the financial statements it issued to investors during the relevant period were presented in violation of GAAP by failing to timely accrue compensation related expenses."  Joint App'x 83.  Specifically, AmTrust explained that:

> In prior years, the Company had expensed
> discretionary bonuses paid to its employees in the
> year the bonuses were paid because the Company
> did not consider the discretionary bonuses to be
> "probable," which is the standard required for
> accrual.    Upon review of ASC 270, Interim
> Reporting,    and    ASC    450,    Contingencies,
> management determined that its application was
> incorrect because, even though the bonuses were
> discretionary, the bonuses should have been
> estimated and expenses assigned to interim
> periods so that the interim periods bear a
> reasonable portion of the anticipated annual
> amount.

Joint App'x 83.

The parties agree that ASC 450 applies to determine how to account for
these bonuses.  Under ASC 450-20-25-2, companies should expense costs
when it is "probable" that a liability has been incurred and when "[t]he
amount of loss can be reasonably estimated" within a range.[10]  AmTrust
asserts that its decision to expense bonuses in the period they were paid
rather than earned in its previously issued consolidated financial statements
is a classic exercise of subjective judgment.  Suggesting to investors that it is
not "probable" that the company would pay bonuses at a future time is, the

_____

[10] See also ASC 450-10-55-3 ("Amounts owed for services received. . . are not
contingencies even though the accrued amounts may have been estimated; there is
nothing uncertain about the fact that those obligations have been incurred.")

company asserts, merely stating a non-actionable opinion.  Even assuming

without deciding that these are statements of opinion, we are not persuaded.

In our view, there is some reason to conclude that the Appellants have

plausibly alleged that AmTrust's method of deferring the recognition of

expenses related to bonuses until the bonuses were paid (thus delaying the

charge to income) was objectively improper rather than an exercise of

subjective judgment.  In particular, the Appellants allege that AmTrust had a

practice of paying bonuses.  The Complaint thus plausibly alleges that there

was no basis to conclude that the continued payment of earned bonuses was

not "probable" and that such bonuses therefore could not be expensed when

earned.  There is no dispute that the bonuses at issue on appeal were earned

during the relevant periods and, as AmTrust's restatement eventually

acknowledged, that they should have been expensed during those periods.

Although multiple accounting standards may have been relevant to

determining when to expense a bonus, all of the standards in play here

support the position that the bonuses should have been expensed in the year

31

they were earned, not the year they were paid.[11]  We are not aware of a GAAP

provision on which AmTrust relied that suggests otherwise.  And the fact that

these GAAP standards, together or alone, are subject to misreading,

misinterpretation, or misapplication, as happened here, does not necessarily

mean that they entail an exercise of subjective judgment.

But we do not need to decide whether these financial statements are

statements of fact or, as AmTrust asserts, statements of opinion.  See

Abramson, 965 F.3d at 176.  Even if they are statements of opinion (because,

say, determining whether it is "probable" that the corporate officers would

exercise their discretion to pay the bonuses at a future time is a matter of

subjective judgment), we conclude that the statements are nonetheless

actionable because the Complaint adequately alleges that it was improbable

that the earned bonuses would not be paid.  Accepting that allegation as true

makes it quite plausible that the AmTrust Defendants did not base the

company's statements of probability on a "meaningful . . . inquiry," that their

statements did not "fairly align[] with the information in the issuer's

---

[11] Under ASC 450-10-55, bonuses should have been expensed as incurred during the relevant period.  ASC 710-10-25 likewise required AmTrust to expense an employee's right to be compensated when earned.  And ASC 270 required the bonuses to be expensed as incurred in interim periods.

possession at the time," and that there was no basis for AmTrust to state that the bonuses should be expensed in the year they were paid rather than earned.  Omnicare, 575 U.S. at 188-89.

For these reasons, we conclude that the Complaint states a claim under Section 11 against the AmTrust Defendants and the Director Defendants arising from AmTrust's misrepresentation of reported income in its historical consolidated financial statements based on the erroneous accounting treatment relating to bonus payments.

### C. SOX Certifications by AmTrust Executives

The remaining Section 11 claims against the AmTrust Defendants are a different matter.  They rest on certifications by company executives regarding, among other things, the accuracy of AmTrust's financial reporting, its conformity with GAAP, and the effectiveness of AmTrust's disclosure controls and procedures.  The District Court concluded that these certifications were non-actionable statements of opinion.  We agree.

First, the Officer Defendants, Zyskind (the CEO) and Pipoly (the CFO), attested to (1) the accuracy of AmTrust's financial reporting, (2) the effectiveness of the company's disclosure controls and procedures, and (3)

33

their disclosure of any weaknesses in internal controls over the company's

financial reporting in certifications mandated by Section 302 of the Sarbanes

Oxley Act ("SOX"), 15 U.S.C. § 7241(a); see also 17 C.F.R. §§ 240.13a-14,

240.13a-15, 240.15d-15.  Their certifications about the accuracy of AmTrust's

financial reporting, including that financial statements were prepared in

conformity with GAAP, signal that they are opinions by stating that they are

"based on [the] knowledge" of the officer.  See Joint App'x 103–04, 153.  There

is no allegation that the opinion is actionable on the ground that it was not

based on the officer's knowledge.[12]  Similarly, we conclude that the two other

challenged SOX certifications relating to (1) disclosure controls and

procedures, and (2) internal control over financial reporting contain language

that conveys management's subjective judgments about the company's

internal controls and thus constitute statements of opinion.

     The Appellants point to allegations that AmTrust later reversed course

and that its restatement acknowledged a failure of internal controls.  The

Appellants insist that the reversal compels the inference that the SOX

---

[12] For the reasons discussed below, we disagree with the Appellants that the
existence of the Warrantech SEC guidance letter demonstrates that the officers knew
the financial reports were false or misleading or did not comply with GAAP, even
with all reasonable inferences drawn in the Appellants' favor.

certifications were not believed when made.  But AmTrust's change of opinion, standing alone, does not mean that the original certified opinions were disingenuous.[13]  Nor is a genuinely held opinion that "turned out to be wrong" necessarily actionable.  Omnicare, 575 U.S. at 186.  In any event, as noted, the Complaint fails to adequately allege that the AmTrust executives who signed the certifications did not believe what they certified.

Finally, Appellants contend that the certifications were misleading because they falsely conveyed the existence of "'some meaningful . . . inquiry'" conducted by the certifying executives.  Appellants' Br. 42 (quoting Omnicare, 575 U.S. at 188).  But here too, the Complaint fails to allege any facts that establish a lack of meaningful inquiry, other than the fact that the certification turned out to be wrong.

For these reasons, we affirm the District Court's dismissal of the Appellants' Section 11 claims relating to the SOX certifications.

---

[13] The Appellants reference in passing on appeal that the SOX certifications contained embedded statements of fact.  See Appellants' Br. 41.  We conclude that the argument is abandoned because the Appellants have failed to develop it.  See Zhang v. Gonzales, 426 F.3d 540, 545 n.7 (2d Cir. 2005).

## II.    The Exchange Act Claims Against the AmTrust Defendants

The District Court also dismissed the Appellants' claims against the

AmTrust Defendants under Section 10(b) of the Exchange Act and Rule 10b-5.

To survive a motion to dismiss under these provisions, "a plaintiff must

allege that [each] defendant (1) made misstatements or omissions of material

fact, (2) with scienter, (3) in connection with the purchase or sale of securities,

(4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the

proximate cause of its injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493

F.3d 87, 105 (2d Cir. 2007); see also Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d

85, 93 (2d Cir. 2016).  Under the Private Securities Litigation Reform Act of

1995, moreover, a plaintiff must "state with particularity facts giving rise to a

strong inference that the defendant acted with [scienter]."  15 U.S.C. § 78u–

4(b)(2)(A).

In contrast to the Securities Act claims under Section 11, which do not

require a showing of scienter,[14] the central question with respect to the

---

[14] As we explained in Fait, "[w]hile issuers are subject to virtually absolute liability under section 11, the remaining potential defendants under sections 11 and 12(a)(2) [of the Securities Act] may be held liable for mere negligence." Fait, 655 F.3d at 109 (cleaned up).  And "in contrast to claims brought pursuant to section 10(b) of the [Exchange Act], claims under sections 11 and 12 do not require allegations of scienter." Id.

Appellants' claims under the Exchange Act is whether the Complaint

adequately "pleaded facts giving rise to a strong inference that the . . .

Defendants acted with 'scienter, a mental state embracing intent to deceive,

manipulate, or defraud.'" In re Advanced Battery Techs., Inc., 781 F.3d 638,

644 (2d Cir. 2015) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

U.S. 308, 319 (2007)).  Scienter may be established by alleging facts "(1)

showing that the defendants had both motive and opportunity to commit the

fraud or (2) constituting strong circumstantial evidence of conscious

misbehavior or recklessness."  ATSI Commc'ns, 493 F.3d at 99; see Set Cap.

LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021).  Any allegation of

conscious misbehavior or recklessness should be "viewed holistically and

together with the allegations of motive and opportunity" to determine

whether the complaint supports a strong inference of scienter.  Set Cap. LLC,

996 F.3d at 78.  Although "the requisite intent of the alleged speaker of the

fraud need not be alleged with great specificity," Chill v. Gen. Elec. Co., 101

F.3d 263, 267 (2d Cir. 1996), the "inference of scienter must be more than

merely plausible or reasonable—it must be cogent and at least as compelling

as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314;

see also In re Advanced Battery, 781 F.3d at 644; ECA & Loc. 134 IBEW Joint

Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir.

2009).

Keeping that standard in mind, we agree with the District Court that

the Complaint does not adequately allege that the AmTrust Defendants acted

with scienter.

First, the Complaint does not adequately plead scienter based on the

AmTrust Defendants' motive and opportunity to commit fraud.  Urging

otherwise, the Appellants rely on the AmTrust Defendants' financial

incentives to keep share prices high and to fuel the company's acquisition

strategy.  But the desire to sustain "the appearance of corporate profitability"

is not itself the kind of incentive or motivation that raises an inference of

scienter.  Chill, 101 F.3d at 268.  The Appellants also direct us to allegations

that Pipoly and other top executive officers (but, notably, not Zyskind or the

Board Defendants) sold a significant number of shares of AmTrust stock

during the AmTrust Class Period.  In doing so, however, the Appellants

acknowledge that Pipoly's significant selloff began several months before the

AmTrust Class Period, a fact that renders his stock sales during this class

period less unusual.  See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb

Co., 28 F.4th 343, 355 (2d Cir. 2022).

Nor does the Complaint allege facts that provide "strong circumstantial

evidence of conscious misbehavior or recklessness."  ATSI Commc'ns, 493

F.3d at 99.  We have explained that "[s]cienter based on conscious

misbehavior . . . requires a showing of deliberate illegal behavior, a standard

met when it is clear that a scheme, viewed broadly, is necessarily going to

injure."  Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 158 (2d Cir. 2012)

(quotation marks omitted).  Recklessness, meanwhile, entails "an extreme

departure from the standards of ordinary care . . . to the extent that the danger

was either known to the defendant or so obvious that the defendant must

have been aware of it."  ECA, 553 F.3d at 198 (quotation marks omitted).

None of the facts alleged in the Complaint—including the "magnitude" of the

restatement and the duration of the period it covered—satisfy these

requirements.  Joint App'x 213.  In determining whether the AmTrust

Defendants acted with scienter, it is not enough that it took a period of years

for AmTrust to acknowledge its significant accounting errors.

39

Finally, the Appellants argue that the AmTrust Defendants did not

believe their accounting judgments regarding the early recognition of revenue

on the administration-service fees connected to AmTrust's warranty program.

The Appellants allege that AmTrust knew its accounting treatment was

wrong because Warrantech, the company AmTrust acquired in 2010,

announced in its Form 10-K for the year ended March 31, 2006, that it had

changed its revenue-recognition practices regarding its warranty contracts in

response to SEC guidance.  In particular, the Complaint alleges that AmTrust

must have known, or recklessly disregarded, that the SEC earlier had advised

Warrantech that its time-of-sale approach was improper and that its warranty

business compelled a straight-line revenue recognition approach.  But we

think that AmTrust's subsequent resort to a time-of-sale approach for the

contracts, though wrong, is more plausibly explained by the changes to the

guiding accounting principles since 2006 to which AmTrust points us, or to

AmTrust's negligence.[15]  See AmTrust Br. 42–44.  Negligence, even in a

"heightened form," is not sufficient to allege scienter.  Novak, 216 F.3d at 312.

---

[15] The Appellants also call our attention to purported "red flags" in the form of press
coverage criticizing AmTrust's accounting practices generally, although none of the
press articles mentions the two central accounting issues that led to AmTrust's

For these reasons, we conclude that the Complaint fails to raise a strong inference of scienter, and we affirm the dismissal of the Appellants' claims against the AmTrust Defendants under Section 10(b) and Rule 10b–5.[16]  We also affirm the District Court's corresponding dismissal of the Appellants' 'control person' claim under Section 20(a) of the Exchange Act because such a claim is "necessarily predicated on a primary violation of securities law." Rombach v. Chang, 455 F.3d 164, 177–78 (2d Cir. 2004).

### III.  **The Securities Act Claims Against the Underwriter Defendants**

The Appellants also assert claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act stemming from the two securities offerings made pursuant to AmTrust's 2015 Registration Statement. The first is AmTrust's November 2015 Offering, underwritten by Citigroup and Morgan Stanley, of 5 million shares of common stock pursuant to a

---

restatement.  Given the generality of these media reports, we are not persuaded that they support an inference of scienter that is at least as compelling as any opposing inference of nonfraudulent intent.

[16] We have applied the holding in Omnicare to claims brought under Section 10(b) of the Exchange Act.  See Tongue v. Sanofi, 816 F.3d 199, 209–10 (2d Cir. 2016). Because, as we previously concluded, the Officer Defendants' certifications are non-actionable statements of opinion, we also affirm the dismissal of the Appellants' Section 10(b) claims based on these certifications.  See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67–68 (2d Cir. 2012) (noting that Section 10(b) and Section 11 claims "share a material misstatement or omission element").

preliminary prospectus supplement and a prospectus supplement. This

preliminary prospectus supplement and prospectus supplement, together

with the 2015 Registration Statement, incorporated by reference AmTrust's

annual financial report for 2014 and quarterly financial reports for the first

three fiscal quarters of 2015. The second offering is AmTrust's September

2016 Offering, underwritten by Morgan Stanley, RBC, UBS, and KBW, of 10

million depository shares pursuant to a preliminary prospectus supplement

and a prospectus supplement that, together with the 2015 Registration

Statement, incorporated by reference AmTrust's annual financial report for

2015 and quarterly financial reports for the first two quarters of 2016. Each of

the relevant financial reports contained overstated income numbers arising

from the time-of sale approach for the warranty contracts and the improper

expensing of bonuses.

As a threshold matter, three of the Underwriter Defendants—Morgan

Stanley, UBS, and KBW—contend that the Appellants lack standing to even

assert Section 12 claims against them in connection with the September 2016

Offering because the Complaint does not specifically allege that the

Appellants purchased securities from those underwriters.[17]  Under Section

12(a)(2), a plaintiff has standing to bring an action against the seller of a

security only if the plaintiff is "the person purchasing such security from

them."  Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 344 (2d Cir. 1987)

(quotation marks omitted); see also Freidus v. Barclays Bank PLC, 734 F.3d

132, 141 (2d Cir. 2013) ("In order to have standing under § 12(a)(2), . . .

plaintiffs must have purchased securities directly from the defendants."); 15

U.S.C. § 77l(a).  A "statutory seller" may include an underwriter who

successfully solicited the transfer of title from issuer to purchaser in exchange

for some financial gain.[18]  Morgan Stanley, UBS, and KBW assert that in a case

involving multiple underwriters of a single offering, the purchaser of a

security must in its pleadings specifically identify which underwriter sold the

---

[17] The Underwriter Defendants do not challenge Appellants' standing to sue the
underwriters of the November 2015 Offering—Citigroup and Morgan Stanley—or
their standing to sue RBC for the September 2016 Offering.

[18] In a similar vein, a purchaser of a security has standing to bring an action under
Rule 10b–5a against underwriters (and brokers, dealers, and non-issuer sellers) for
material misstatements about the security "if those entities made material
misstatements about the security, as long as the plaintiff[] purchased or sold the
securities about which the misstatements were made."  Menora Mivtachim Ins. Ltd.
v. Frutarom Indus. Ltd., 54 F.4th 82, 88 (2d Cir. 2022); see In re NYSE Specialists Sec.
Litig., 503 F.3d 89, 102 (2d Cir. 2007).

security at issue in order to have standing to sue that underwriter.  We have not yet addressed this question.

We conclude that the Appellants have adequately established standing under Section 12(a)(2) by alleging that they purchased securities pursuant to the "pertinent offering documents" or in the relevant offerings underwritten by the defendants.  In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) (Kaplan, J.).  Here, according to the Complaint, the Appellants bring their Section 12(a)(2) claims on their own behalf and on behalf of "other members of the Securities Act Class who purchased AmTrust common stock or [shares sold in connection with the September 2016 Offering] pursuant to the Prospectuses."  Joint App'x 132 (emphasis added). We can reasonably infer from these allegations that the Appellants acquired securities from the Underwriter Defendants in connection with the September 2016 Offering.  We are therefore satisfied that the allegations suffice to establish the Appellants' standing in this case.  See, e.g., John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736–38 (2d Cir. 2017) (noting that "general factual allegations of injury may suffice" to establish standing, "for on a

motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim" (cleaned up)).

Turning to the merits, the District Court dismissed the Appellants' Section 11 and Section 12 claims against the Underwriter Defendants, concluding that the Appellants had "fail[ed] to allege any untrue or misleading statements of material fact or opinion with respect to those claims." Spec. App'x 73. In other words, the District Court dismissed these claims, which it described as "identical to those of the Securities Act claims asserted against the AmTrust [D]efendants," for effectively the same reasons it dismissed the claims against the AmTrust Defendants. Spec. App'x 73. For reasons we have already provided, we disagree with the District Court's conclusion that the reported income statements related to AmTrust's warranty contracts and its employee bonuses were non-actionable opinions. Insofar as the District Court dismissed the Appellants' claims under Section 11 and Section 12(a)(2) against the Underwriter Defendants arising from those two categories of statements, we vacate the dismissal and remand for further

proceedings consistent with this opinion.  As to any remaining claims against

the Underwriter Defendants, we affirm the District Court's dismissal.

### IV.     The Claims Against BDO, AmTrust's Outside Auditor

Finally, we address the Appellants' claims against AmTrust's outside

auditor, BDO, under Section 11 of the Securities Act in connection with BDO's

audit reports on AmTrust's financial statements and its system of internal

controls over financial reporting for each of the years ended December 31,

2013–15, and under Section 10(b) of the Exchange Act and Rule 10b-5 in

connection with its audit report for the year ending December 31, 2013 ("2013

Audit Opinion"), which was included in AmTrust's 2013 Form 10-K.

We begin with the Securities Act claims.  Section 11 provides in relevant

part that if "any part of the registration statement . . . contained an untrue

statement of material fact," anyone acquiring the associated security may sue

"every accountant . . . who has with his consent been named as having

prepared or certified any part of the registration statement or . . . any report or

valuation which is used in connection with the registration statement."  15

U.S.C. § 77k(a)(4).  BDO is thus responsible under Section 11 for any material

inaccuracy in the AmTrust registration statements that it certified, or in

financial reports incorporated in those statements.  Id.; see Miyahira v. Vitacost.com, Inc., 715 F.3d 1257, 1265 (11th Cir. 2013); Belizan v. Hershon, 495 F.3d 686, 692 (D.C. Cir. 2007); see also Herman & MacLean v. Huddleston, 459 U.S. 375, 381 n.11 (1983).

As BDO observes, the Appellants have not developed the argument in their opening brief challenging the District Court's dismissal of the Section 11 claim against BDO.  The challenge, if it can be called that, appears in a footnote.  See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("[A]n argument made only in a footnote [i]s inadequately raised for appellate review.").  Although the Appellants develop the argument somewhat in their reply brief, that is too little too late.  See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant . . . raised them in a reply brief.").  We thus conclude that the Appellants' challenge to the dismissal of the Section 11 claim against BDO is abandoned, we affirm the District Court's dismissal of that claim, and we proceed to examine the Exchange Act claims against BDO.

47

The Appellants contend that BDO is liable under Section 10(b) of the Exchange Act for the 2013 Audit Opinion, which stated that BDO had conducted its audit in accordance with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), and that the audit provided a reasonable basis for BDO to determine that AmTrust's financial statements were fairly presented.  Joint App'x 246–47.

On its face, the 2013 Audit Opinion appears in the same guise as the SOX certifications that we have already concluded are non-actionable opinions.  But the Complaint alleges some key facts that differentiate the audit opinion from those certifications.  The Appellants allege that the BDO engagement partner on the audit, Richard J. Bertuglia, and another BDO partner, John W. Green, in fact failed to complete the necessary checks and audit work papers before issuing the audit opinion; that they signed several audit work papers without reviewing them; and that they failed to verify that all the necessary audit work was performed before issuing the opinion.  The Appellants also allege that the SEC later found that (1) Bertuglia had violated the PCAOB standards by failing to supervise and exercise due professional care, properly examine journal entries for evidence of possible material

48

misstatement due to fraud, or perform sufficient tests of internal controls and substantive audit procedures to support their final opinion, and (2) Green violated PCAOB standards by failing to perform the appropriate engagement quality review.

We agree with the District Court that the Appellants have adequately alleged that BDO's audit opinion contained potentially actionable misstatements of opinion because the Complaint "render[s] it plausible that Bertuglia," who signed the audit opinion, "disbelieved the statement that the audit was conducted in accordance with the relevant PCAOB standards." Spec. App'x 78. The Appellants have also adequately alleged that BDO's statement that it "believe[d] [its] audits provide a reasonable basis for [its] opinion," Joint App'x 246–47, would lead a reasonable investor to conclude that BDO had conducted "some meaningful . . . inquiry," Omnicare, 575 U.S. at 188, when in fact, according to the Complaint, BDO never conducted such an inquiry.

But we also agree with the District Court that the Appellants' Section 10(b) and Rule 10b-5 claim against BDO must be dismissed because the

Complaint does not adequately allege that the misstatement in BDO's 2013

Audit Opinion was material.

> To state a claim under § 10(b) and the
> corresponding Rule 10b–5, a plaintiff must plead
> that the defendant, in connection with the
> purchase or sale of securities, made a materially
> false statement or omitted a material fact, with
> scienter, and that the plaintiff's reliance on the
> defendant's action caused injury to the plaintiff.

Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). "At the

pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging

a statement or omission that a reasonable investor would have considered

significant in making investment decisions." Id. at 161–62; see Basic Inc. v.

Levinson, 485 U.S. 224, 231–32 (1988). "[A] complaint may not properly be

dismissed . . . on the ground that the alleged misstatements or omissions are

not material unless they are so obviously unimportant to a reasonable

investor that reasonable minds could not differ on the question of their

importance." Ganino, 228 F.3d at 162 (quotation marks omitted); see Litwin,

634 F.3d at 717.

As the District Court concluded, the Complaint fails to allege any link

between BDO's misstatements in the 2013 Auditor Opinion and the material

50

errors contained in AmTrust's 2013 Form 10-K.  The audit statements to which the Appellants point were "so general" in this case "that a reasonable investor would not depend on [them] as a guarantee."  ECA, 553 F.3d at 206. Appellants' "claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  SAIC, 818 F.3d at 97–98 (quotation marks omitted). We do not mean to suggest that audit opinions will always fail the materiality test because the statements they contain are too general for investors to rely on.  Rather, in this case, as the District Court held, Appellants have failed "to allege any facts relevant to the way or ways in which BDO's failure to supervise, review, document, and perform in good faith the 2013 audit would have been significant to a reasonable investor in making investment decisions."  Spec. App'x 79.  We might have come to a different conclusion had such facts been alleged.

For these reasons, we affirm the District Court's dismissal of the Appellants' Exchange Act claims under Section 10(b) and Rule 10b-5 against BDO.

## CONCLUSION

To summarize:

1.  We vacate the dismissal of the Appellants' Section 11 claims against the AmTrust Defendants and the Director Defendants, the Section 12(a)(2) claims against AmTrust, and the Section 15 claims against the Officer Defendants and Director Defendants (Zyskind, Pipoly, DeCarlo, Fisch, Gulkowitz, Karfunkel, and Miller) relating to AmTrust's accounting for certain warranty contracts and bonuses.

2.  We vacate the dismissal of the Appellants' claims under Section 11 and Section 12(a)(2) against the Underwriter Defendants relating to AmTrust's accounting for certain warranty contracts and bonuses.

3.  We otherwise affirm the judgment of the District Court.

We have considered the Appellants' remaining arguments and conclude that they are without merit.  Accordingly, for the reasons set forth above, the judgment of the District Court is AFFIRMED in part and VACATED in part, and the case is REMANDED for proceedings consistent with this opinion.

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2023, I caused the foregoing letter to the Honorable Lewis A. Kaplan, United States District Court Judge for the Southern District of New York to be submitted to the Court by hand delivery and U.S. Mail, and to be served on David Stoelting, Esq. of the U.S. Securities and Exchange Commission, by hand delivery and U.S. Mail, at the following respective addresses:

Honorable Lewis A. Kaplan
United Stated District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

David Stoelting, Esq.
U.S. Securities and Exchange Commission
100 Pearl St., Suite 20-100
New York, NY 10004-2616

*/s/ Randy M. Mastro*
Randy M. Mastro

**KING & SPALDING LLP**
1185 Avenue of the Americas, 34th Fl.
New York, NY 10036
Tel:   (212) 556-2100
Fax:   (212) 556-2222
Email: rmastro@kslaw.com

*Counsel for Defendants Medallion*
*Financial Corp. and Andrew Murstein*