UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff,

            -against-                                    21-cv-11125 (LAK)

MEDALLION FINANCIAL CORP.,
ANDREW MURSTEIN, LAWERENCE
MEYERS, and ICHABOD'S CRANIUM, INC.,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION ON
## DEFENDANTS' MOTIONS TO DISMISS

            Appearances:

                         David Stoelting
                         Karen Willenken
                         SECURITIES AND EXCHANGE COMMISSION
                         *Attorneys for Plaintiff*


                         Randy M. Mastro
                         Mark A. Kirsch
                         KING & SPALDING LLP

                         Akiva Shapiro
                         Seton Hartnett O'Brien
                         GIBSON, DUNN & CRUTCHER LLP

                         *Attorneys for Defendant Medallion Financial Corp.*
                         *and Defendant Andrew Murstein*


                         Andrew J. Ceresney
                         Erol N. Gulay
                         DEBEVOISE & PLIMPTON, LLP

Jim Walden
Daniel Joseph Chirlin
WALDEN MACHT & HARAN LLP

*Attorneys for Defendant Andrew Murstein*

Hilary B. Miller
LAW OFFICES OF HILARY B. MILLER
*Attorneys for Defendant Lawrence Meyers and*
*Defendant Ichabod's Cranium, Inc.*

LEWIS A. KAPLAN, *District Judge.*

      The Securities and Exchange Commission ("SEC") brought this action against Medallion Financial Corp. ("Medallion Financial"), Andrew Murstein ("Murstein"), Lawrence Meyers ("Meyers"), and Ichabod's Cranium, Inc. ("Ichabod's Cranium") (collectively, "defendants") for alleged violations of federal securities laws.[1]  The heart of the case concerns the SEC's allegations that defendants perpetrated two fraudulent schemes to prop up Medallion Financial's stock price, first by illegally touting Medallion's financial strength and then by obtaining fraudulent valuations of Medallion Bank, a wholly-owned subsidiary of Medallion Financial.[2]  Defendants now move this Court to dismiss the Amended Complaint ("AC") for failure to state a claim upon which relief may be granted.[3]  For the reasons set forth below, defendants' motions are granted in part and denied in part.

---

[1]      Amended Complaint ("AC") ¶¶ 274-295.

[2]      *Id.* ¶¶ 1-14.

[3]      Dkt 80 (Medallion & Murstein Mot.); Dkt 84 (Meyers & Ichabod's Mot.).

*Facts*[4]

1.    *Background*

Defendant Medallion Financial is a publicly-traded company based in New York City.[5]  Its business consists primarily of issuing loans collateralized by taxi medallions through its wholly-owned subsidiary, Medallion Bank, which was formed and chartered in Utah in 2002.[6]  The company is run by defendant Andrew Murstein — the director, president, and chief operating officer of Medallion Financial and the grandson of its founder — alongside his father, Alvin Murstein, who serves as its CEO.[7]  Together, they owned nearly 14 percent of Medallion Financial's common stock as of April 2016.[8]

According to the AC, the taxi medallions collateralizing Medallion Bank's loan portfolio decreased substantially in market value from 2014 to 2017 due to increased competition from ride share companies, making those loans riskier and making the company a target of negative commentators and short-sellers.[9]  Medallion Bank's net income declined from over $23 million to

---

[4]     For purposes of these motions, the Court assumes the truth of plaintiff's allegations and draws all inferences favorable to plaintiff to which the allegations reasonably are susceptible.

[5]     AC ¶ 19.

[6]     *Id.* ¶¶ 22-25.

[7]     *Id.* ¶ 20.

[8]     *Id.*

[9]     *Id.* ¶¶ 31-32, 41-43, 59-62.

less than $5 million during that same period.[10]  This produced knock-on effects for Medallion Financial as well, which stopped paying dividends to its shareholders as its share price declined rapidly.[11]

Additionally, Medallion Financial struggled to obtain further credit from the six banks with which it had existing financial relationships, forcing the company to issue a public debt offering at a high interest rate in order to fund its operations.[12]  By 2016, Medallion Financial was at risk of violating covenants of its loan agreements with two of its banks by posting consecutive losses in its quarterly filings.[13]  Such an event would have accelerated payment on all $68 million of Medallion Financial's outstanding credit across all six banks due to cross-default provisions with each provider.[14]  Indeed, when a Medallion subsidiary failed to repay one of its loans in October 2016, Murstein and Medallion Financial had to obtain waivers from the other credit facilities in order to stave off a "run on the bank."[15]

---

[10]

Id. ¶ 42.

[11]

Id. ¶¶ 5, 40-42.

[12]

Id. ¶¶ 112, 114, 119.

[13]

Id. ¶¶ 116-17.

[14]

Id. ¶¶ 115, 120, 129.

[15]

Id. ¶¶ 122-23, 127.

2.     *The Touting Scheme*

Defendant Lawrence Meyers is a public relations professional and the owner and director of defendant Ichabod's Cranium, through which he offers clients "guerilla PR tactics" to disseminate their messages and undermine their opponents "without any detectable connection" back to the client.[16]  After reading damaging press online regarding Medallion Financial, the AC alleges that Meyers contacted Murstein in December 2014 to offer his help in countering the negative attention and promoting the company.[17]

Meyers and Medallion Financial then negotiated a consulting agreement, which Murstein sent to the company's general counsel for review.[18]  The general counsel recognized that Medallion Financial could be viewed as adopting Meyers' statements as its own if it engaged him to write articles and make social media posts on its behalf.  Thus, the parties amended the proposed agreement to require that Murstein and Medallion's legal department provide written approval of Meyers' writings in advance of publication.[19]  The parties also added to the agreement that Meyers would "comply with all applicable laws and regulations," including but not limited to the Securities Act and the Exchange Act.[20]

Signed on December 19, 2014, the final agreement provided Meyers with a $5,000

---

[16]     *Id.* ¶¶ 21, 44.

[17]     *Id.* ¶ 45.

[18]     *Id.* ¶ 46.

[19]     *Id.* ¶ 48.

[20]     *Id.* ¶ 49(c).

monthly retainer in exchange for providing "various public relations, marketing and communications services . . . in order to influence public opinion with regard to company issues."[21]  Subsequently, Meyers published more than 100 articles and over 900 comments championing Medallion Financial and its industry and attacking the ride-sharing business, receiving approximately $65,000 in compensation from Medallion Financial.[22]  He made these posts between December 2014 and June 2016 under both his own name and numerous pseudonyms, and at no point did he disclose that he was being compensated by Medallion Financial or identify himself as a public relations professional, instead characterizing himself as a journalist, analyst, contrarian investor, or CEO of "PDL Capital."[23]  Indeed, in some articles he even represented that he had "no business relationship with any company" he discussed — though he did occasionally disclose a financial self-interest in Medallion stock.[24]  All the while, Meyers coordinated with Murstein on the content of his writings and provided him with copies of their publications for his tracking and review.[25]

While many of Meyers' articles and comments discussed Medallion Financial and its business by name, numerous others referred to the company only indirectly, either by responding to the negative comments of other authors or by discussing the "medallion financial industry"

---

[21]
     *Id*. ¶ 47.

[22]
     *Id*. ¶ 50, App. A.

[23]
     *Id*. ¶¶ 55-56, 69-70.

[24]
     *Id*. ¶¶ 53-54, 64.

[25]
     *Id*. ¶¶ 58, 62-67.

generally.[26]  Nonetheless, Meyers' writings typically targeted the financial valuation of the company and its industry, including repeated references to Medallion Financial as "undervalued" and suggestions for a higher price for its stock.[27]  And Meyers employed publication strategies designed to portray these views as more widespread than they really were, in particular by commenting extensively on his own articles using pseudonyms and expressing agreement with their analyses, while simultaneously doing the opposite for articles that were negative on Medallion.[28]

In addition to Meyers, Murstein hired a contractor named Sarah Frigo to post articles and comments online from May to November 2016, similarly intending that her writings would boost Medallion Financial's image and stock price.[29]  Ms. Frigo also allegedly published under a pseudonym and provided readers with a fake resume of her background, at one point taking explicit direction from Murstein not to use her real name in publishing.[30]  And throughout this period, Ms. Frigo worked closely with Murstein on the content of her articles, with Murstein occasionally directing what she would write about and reviewing her articles both before and after publication.[31]

---

[26]

   *Id.* ¶¶ 51-64.

[27]

   *Id.* ¶¶ 53-54, App. A.

[28]

   *Id.* ¶¶ 55-56, 69.

[29]

   *Id.* ¶¶ 73-74, 83, 90-92.

[30]

   *Id.* ¶¶ 75-82, 86.

[31]

   *Id.* ¶¶ 82-85, 90-94.

3.      *The Fraudulent Valuation Scheme*

In 2015, just as Medallion Financial was beginning to sustain losses on its medallion loan portfolio, the company engaged an outside valuation firm — RP Financial ("RPF") — to perform an independent valuation of Medallion Bank.[32]  RPF provided fair value estimates for Medallion Bank of $152.1 million for year-end 2015 and $166.4 million for the second quarter of 2016.[33]  By the third quarter of 2016, however, Medallion Financial wished to report a significant increase in the valuation of Medallion Bank in order to avoid recording losses for the preceding twelve-month period and for the second consecutive quarter, which would have created a cascading set of defaults on the loan obligations to its six credit lending facilities.[34]

Against this backdrop, the AC alleges that Murstein contacted two investment banks, Sandler O'Neill ("Sandler") and Keefe, Bruyette & Woods ("KBW"), to generate estimated valuations of Medallion Bank that would justify a reported increase in its fair value.[35]  Murstein directed the banks that the valuation should be "well over $300 million" and suggested the prospect of engaging their banking businesses in return.[36]  Within days, both banks provided vague valuation

---

[32]

      *Id*. ¶¶ 135-36.

      Prior to hiring RPF, Medallion Financial had always listed Medallion Bank's fair value as simply its book value.

[33]

      *Id*. ¶ 137.

[34]

      *Id*. ¶¶ 115-117, 190.

[35]

      *Id*. ¶¶ 138-40.

[36]

      *Id*. ¶ 140.

ranges with high ends of over $300 million.[37]

   During the same period, Murstein contacted WebBank to generate a valuation for Medallion Bank with regard to a potential acquisition of or investment in the bank.[38]  Again, Murstein suggested a fair value estimate for WebBank to produce, telling its representative to email him that he was "interested in discussing a valuation above $200 mill[ion]" for Medallion Bank.[39] Two days later, the bank president emailed Murstein indicating his openness to such a valuation — however, internal WebBank emails from November 2016 showed an estimated fair value for Medallion Bank nearly 40 percent lower than Murstein's request, and highlighted WebBank's concern that Murstein had "used" them for his own ends.[40]

   Notwithstanding Murstein's efforts to raise Medallion Bank's purportedly independent valuation, the company's auditor, WeiserMazars LLP, would not accept these third-party estimates as the basis of its fair market valuation of Medallion Bank, instead suggesting that Medallion Financial re-engage RPF to maintain consistency in its methodology.[41]  RPF, too, did not accept the outside valuations as justification for Murstein's requests for a substantial increase in Medallion Bank's fair value, noting that the banks' estimates were made without due diligence and

---

[37]
  *Id*. ¶ 141.

[38]
  *Id*. ¶ 142.

[39]
  *Id*.

[40]
  *Id*. ¶¶ 143-44.

[41]
  *Id*. ¶¶ 149-50, 162.

10

that recent industry trajectories provided a negative outlook for the company.[42]  As a result, Murstein

fired RPF, despite further warnings from WeiserMazars.[43]

To replace RPF, Murstein contacted three investment banks — Sandler, KBW, and

Berenson & Co. ("Berenson") — asking that they perform a more formal financial valuation for

Medallion Bank.[44]  Murstein attached RPF's second quarter report to his email as an example and

requested a fair value for the bank of at least $193 million, and in exchange, he offered to work with

the bankers  "to potentially sell a portion of [Medallion Bank]."[45]  Only Berenson responded,

agreeing to perform the valuation — despite not ordinarily doing such work — in hopes of earning

future banking business from Medallion Financial.[46]  Ultimately, Berenson estimated Medallion

Bank's fair value to be between $191 million and $271 million for that quarter, and projected it for

year-end 2016 as between $262 million and $309 million.[47]

With Berenson's valuation in hand, Medallion Financial began to prepare its Form

10-Q filing for the third quarter of 2016.  In the process, Medallion Financial made numerous

representations regarding the valuation of Medallion Bank that the AC alleges were false or

---

[42]

  *Id*. ¶¶ 154-60.

[43]

  *Id*. ¶¶ 161-66.

[44]

  *Id*. ¶¶ 169-70.

[45]

  *Id*.

[46]

  *Id*. ¶¶ 172-73.

[47]

  *Id*. ¶¶ 222, 232.

misleading.  Those representations included:

- Attributing Medallion Bank's fair value increase to "external interest" from investment banks and third parties, without disclosing that such interest was generated by Medallion Financial's own outreach and that none of the firms had performed their own due diligence;[48]

- Specifically stating in a valuation memo to WeiserMazars that WebBank had been the one to contact Medallion Financial about acquiring Medallion Bank and valuing the bank at over $200 million;[49]

- Omitting that Medallion Financial had fired RPF because it disagreed with its fair value assessment rather than its methodology and that the company had sought out valuation firms that would provide its desired fair value estimate in exchange for investment banking work;[50] and

- Asserting in a signed management letter that Medallion Financial did not instruct, bias, or impact "the independence or objectivity of the specialists" performing its fair valuations.[51]

In addition, the AC alleges that Medallion Financial's third quarter Form 10-Q, intentionally and without justification, overvalued its portfolio of Chicago taxi medallions at $120,000 each despite the fact that the company's internal models instead employed a value of $105,000 and recent transaction data suggested a value of no more than $65,000.[52]  The AC alleges also that Medallion Financial improperly disclosed its valuation process for medallion-backed loans held outside of Medallion Bank, representing that it took into account factors such as a portfolio

---

[48]

*Id.* ¶¶ 180, 185.

[49]

*Id.* ¶ 269.

[50]

*Id.* ¶¶ 170, 184, 187-88.

[51]

*Id.* ¶ 263.

[52]

*Id.* ¶¶ 194, 197-200.

company's earnings, collateral, and indebtedness for all loans when in reality it did so only for loans that were more than 90 days past due.[53]

According to the AC, Medallion Financial continued to manipulate and misrepresent the fair value of Medallion Bank in its 2016 and 2017 financial disclosures. For example, after working with Berenson in the fourth quarter of 2016 to come up with a favorable valuation, the company reported a fair value for Medallion Bank of $280 million, providing the same underlying rationale as in its third quarter filing despite increasing the bank's valuation by over 45 percent.[54] Similarly, Medallion Financial reported a $290.5 million valuation for Medallion Bank in its 2017 Form 10-K, notwithstanding the further devaluation of taxi medallions during the year as well as Medallion Financial's inability to find a buyer for a minority interest in the bank.[55]

### 4.  *The Amended Complaint*

Based on these substantive allegations, the SEC asserts seven causes of action. The AC alleges that: (1) Murstein and Medallion Financial violated Section 17(a) of the Securities Act of 1933 ("Securities Act") (Count One); (2) all defendants violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") (Count Two); (3) Meyers and Ichabod's Cranium violated Section 17(b) of the Securities Act (Count Three); (4) Murstein and Medallion Financial aided and abetted violations of Section 17(b) of the Securities Act and Section 10(b) and

---

[53]     *Id.* ¶¶ 206-11.

[54]     *Id.* ¶¶ 227-32.

[55]     *Id.* ¶¶ 227, 242-46.

Rule 10b-5 of the Exchange Act (Count Four); (5) Medallion Financial violated Section 13 of the Exchange Act and its accompanying rules thereunder (Count Five); (6) Murstein aided and abetted violations of Section 13 of the Exchange Act and its accompanying rules thereunder (Count Six); and (7) Murstein violated Rule 13b2-2 of the Exchange Act (Count Seven).[56]

5.    *Defendants' Motions to Dismiss*

Defendants Murstein and Medallion Financial seek to dismiss the AC for: (1) failing to plead the elements of Counts One and Two regarding Medallion Financial's allegedly fraudulent bank valuations; (2) failing to plead the elements of Counts One, Two, and Four regarding the alleged touting scheme; (3) failing to plead adequately that Murstein and Medallion Financial were aware of or substantially assisted the alleged touting scheme (Count Four); and (4) failing to plead adequately the elements of Counts Five, Six, and Seven regarding Murstein's and Medallion Financial's reporting, recordkeeping, internal controls, and representations to Medallion's auditor.[57] Murstein and Medallion Financial contend also that the SEC's requested relief for disgorgement and an officer and director bar should be stricken from the AC.[58]

Defendants Meyers and Ichabod's Cranium seek to dismiss Count Two of the AC for lacking particularity, failing to connect their actions with the purchase or sale of securities, and

---

[56]

    *Id*. ¶¶ 274-295.

[57]

    Dkt 81 (Medallion & Murstein Mem.) at 14-38; *see* Dkt 80 (Medallion & Murstein Mot.).

[58]

    Dkt 81 (Medallion & Murstein Mem.) at 38-39.

14

failing to allege a false or misleading statement.[59]  They seek to dismiss Count Three for failing to plead adequately the elements of the alleged touting scheme.[60]

## Discussion

### 1.    Legal Standard

To survive a Rule 12(b)(6) motion, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face."[61]  In most cases, a claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[62]  This pleading requirement usually is satisfied by "a short and plain statement of the claim showing that the pleader is entitled to relief."[63]  Complaints alleging securities fraud, however, are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[64]  "Rule 9(b) . . . require[s] a securities fraud complaint to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

---

[59]

Dkt 85 (Meyers & Ichabod's Mem.) at 8-12; *see* Dkt 84 (Meyers & Ichabod's Mot.).

[60]

Dkt 85 (Meyers & Ichabod's Mem.) at 12-16.

[61]

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[62]

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[63]

Fed. R. Civ. P. 8(a)(2).

[64]

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

when the statements were made, and (4) explain why the statements were fraudulent.'"[65]  With regard to Rule 9(b), the Court of Appeals has cautioned that, "[a]lthough pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'"[66]

As noted, a court in deciding a motion to dismiss "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor.[67]  But it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations."[68]  "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"[69]  And even "[w]here a document is not incorporated by reference, the court [nevertheless] may consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[70]

---

[65]

> *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462–63 (2d Cir. 2019) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[66]

> *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)).

[67]

> *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

[68]

> *Id.*

[69]

> *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (in securities action, court may consider "any . . . legally required public disclosure documents filed with the SEC").

[70]

> *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

2.    *The Alleged Fraudulent Valuations in Violation of Section 10(b) (Count Two)*

Section 10(b) of the Exchange Act prohibits both sellers and buyers of securities from employing "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations."[71]  Rule 10b-5, issued pursuant to Section 10(b), makes it unlawful in connection with a security transaction "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[72]  These antifraud provisions were intended to be broad, replacing a "philosophy of *caveat emptor*" in the market with one of full disclosure in an attempt to "prevent rigging of the market and to permit operation of the natural law of supply and demand."[73]

To state a claim under Section 10(b), a complaint must allege that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

---

[71]    15 U.S.C. § 78j(b).

[72]    17 C.F.R. § 240.10b-5.

[73]    *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972); *United States v. Stein*, 456 F.2d 844, 850 (2d Cir. 1972)).

securities."[74]  "The scienter needed in connection with securities fraud is intent 'to deceive,

manipulate, or defraud,' or knowing misconduct."[75]

### A.    Whether the Bank Valuations Were Actionable Opinions

Murstein and Medallion Financial contend that the SEC fails to plead any

misstatement of fact in the AC because Medallion Financial's changes to its valuations of Medallion

Bank "were based on differing subjective judgments and, therefore, are non-actionable opinions"

rather than statements of fact.[76]  The SEC concedes that Medallion Financial's statements about the

bank's valuation were judgments and thus opinions rather than fact, but nonetheless contends that

they are actionable under the relevant precedents.[77]

Historically, the Second Circuit "recognized sparingly few circumstances in which

a statement of opinion would be actionable."[78]  However, the Supreme Court's decision in *Omnicare,*

---

[74]

        *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citing *First Jersey Sec.*, 101 F.3d at 1467).

[75]

        *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (quoting *First Jersey Sec.*, 101 F.3d at 1467).

        Relatedly, the defendants do not contest that Murstein's knowledge and conduct should be imputed to Medallion Financial. *See Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007).

[76]

        Dkt 81 (Medallion & Murstein Mem.) at 14.

[77]

        Dkt 92 (Gov. Opp. Mem.) at 31.

[78]

        *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020).

*Inc. v. Laborers District Council Construction Industry Pension Fund*[79] ("*Omnicare*") greatly expanded the instances in which opinion statements could be the basis for a lawsuit, thus "reduc[ing] the significance of district courts' classification of statements as those of fact or opinion."[80]  Under *Omnicare*, statements of opinion may be actionable in three circumstances: (1) if "the speaker did not hold the belief she professed," (2) if the opinion contained "embedded statements of fact" that are untrue, or (3) if the opinion omits facts such as to "make [the] statement of opinion . . . misleading to an ordinary investor."[81]  Here, the SEC contends that Medallion Financial's misleading bank valuations are actionable under all three prongs.[82]

> i.    *Murstein Allegedly Did Not Believe the Bank Valuations*

Murstein and Medallion Financial rely on two paragraphs in the AC to support the proposition that Murstein genuinely believed Medallion Bank's valuations to be accurate.[83]  Neither paragraph, however, is a simple representation of Murstein's inner thoughts.  Each instead concerns the contents of his unsolicited emails to investment banks seeking artificially to prop up the bank's

---

[79]    575 U.S. 175, 185-95 (2015).

[80]    *Abramson*, 965 F.3d at 176.

[81]    *Omnicare*, 575 U.S. at 185-88.

[82]    Dkt 92 (Gov. Opp. Mem.) at 31.

[83]    AC ¶¶ 142, 170.

valuation so that he could allegedly stave off default.[84]

Other allegations in the complaint adequately show that Murstein did not consider his judgments about Medallion Bank's valuation to be correct.  Most explicitly, the AC states twice that "Murstein knew or recklessly disregarded" that "Medallion Financial's reported fair value for Medallion Bank was overstated" at year-end 2016 and 2017.[85]  And the AC supports that position by alleging, among other things, that: (1) Murstein knew that the value of taxi medallions — which underpinned the majority of Medallion Bank's loans — was decreasing precipitously,[86] (2) Murstein had a strong motivation to misstate Medallion Bank's fair value in order to avoid defaulting on its outstanding loan agreements with six different banks,[87] and (3) Murstein blatantly lied to the auditor regarding the fact that he had solicited and biased Medallion Bank's valuations.[88]  Indeed, the AC clearly alleges that the "[d]efendants understood that the publicly reported numbers were at odds with [their] internal analyses," which Murstein and Medallion Financial concede is precisely the type of fact pattern "where courts have found that a defendant affirmatively disbelieved (or recklessly credited) a statement of opinion."[89]  The SEC was required to plead nothing more at this stage.

---

[84]

Id.

[85]

Id. ¶¶ 234, 245.

[86]

Id. ¶¶ 210-11, 241.

[87]

Id. ¶¶ 114-20, 129, 190-91.

[88]

Id. ¶¶ 263-69.

[89]

Sjunde AP-Fonden v. Gen. Elec. Co., 417 F. Supp. 3d 379, 396 (S.D.N.Y. 2019); see AC ¶¶ 210-11; Dkt 94 (Medallion & Murstein Reply Mem.) at 6.

ii.    *The Bank Valuations Contain Embedded Statements of Fact*

The SEC contends that Medallion Financial's statements on Medallion Bank's valuation contained "embedded statements of fact" that were untrue.  Specifically, it claims that Murstein and Medallion Financial made three "misleading factual statements about the purported justifications for the valuation" in its Third Quarter 2016 10-Q Management's Discussion and Analysis ("MD&A").[90]  Murstein and Medallion Financial do not contest that the statements in that MD&A were factual rather than opinion-based, but instead argue that they were accurate rather than "misleading" and that they were not sufficiently embedded in the valuation.[91]

Medallion Financial's three statements were as follows:

1.    "In the second quarter of 2015, we first became aware of external interest in Medallion Bank and its portfolio assets at values in excess of their book value. Expression of interest in Medallion Bank from both investment bankers and interested parties has continued through 2016";

2.    "[I]n the third quarter of 2016 there was a court ruling involving a marketplace lender that the Company believes heightens the interest of marketplace lenders to acquire or merge with Utah industrial banks"; and

3.    That Medallion Financial had "engaged a valuation specialist to assist the Board of Directors in its determination of Medallion Bank's fair value."[92]

The AC sufficiently alleges that each of these statements was intentionally deceptive and misleading.  Concerning "external interest" in Medallion Bank, the AC contains thorough allegations that any such interest was not genuine or legitimate, but rather was artificially created by

---

[90]

    Dkt 92 (Gov. Opp. Mem.) at 32.

[91]

    Dkt 94 (Medallion & Murstein Reply Mem.) at 6.

[92]

    AC ¶¶ 180-81.

Medallion Financial itself.[93]  The AC alleges also that Murstein already knew this was an inadequate justification for Medallion Bank's supposedly increased valuation before using it, as he was told as much by RPF and WeiserMazars.[94]  Regarding reliance on a prior court ruling — *CFTC v. CashCall, Inc.*[95] — the AC asserts that emails from its investigation demonstrate that Medallion Financial "did not conduct a meaningful inquiry concerning the likely impact of the court ruling," as the case was only found and inserted as a justification on the same day as the Form 10-Q was filed.[96]  Murstein and Medallion Financial deny this because the decision was published over two months before the 10-Q filing, yet such a factual dispute is sufficient to survive a motion to dismiss at this stage.  And while Medallion Financial's representation that it had "engaged a valuation specialist" was technically true, it was intentionally misleading because the company omitted that it had allegedly engaged *several* valuation specialists, ultimately relying only on the one that gave Medallion Bank the valuation it wanted and only after the specialist was offered investment banking work in return.[97]

Contrary to Medallion Financial's assertions, its three justifications were sufficiently embedded in the valuation of Medallion Bank as well.  The Second Circuit recently explained the concept of an embedded statement as follows:

---

[93]

   *Id.* ¶¶ 138-44, 169-70, 222, 232.

[94]

   *Id.* ¶ 185.

[95]

   No. 15-cv-7522-JFW (C.D. Cal. Aug. 31, 2016).

[96]

   AC ¶ 186.

[97]

   *Id.* ¶¶ 187-88.

"A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.' If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete 'statement of a material fact' under the first part of Rule 10b-5 can be proven false."[98]

In other words, when a fact is offered as a *justification* for a belief or opinion, then it is an "embedded fact" and renders the opinion statement actionable if untrue. Here, Medallion Financial offered the three statements listed above as justifications for its opinion on Medallion Bank's valuation. Thus, they were embedded facts upon which that valuation relied. While Medallion Financial may not have used the explicit form, "I believe that x is so because y has occurred," it did state in its Form 10-Q what it supposedly believed Medallion Bank's increased value to have been, and elsewhere argued that it came to this belief *because of* external interest, a valuation specialist, and a court ruling. Accordingly, its claim that the three factual statements "are not 'embedded' in the valuation itself" is toothless.[99]

### iii.    The Bank Valuations Misled Investors by Omitting Material Facts

Finally, the SEC contends that the Medallion Bank valuations were actionable opinion statements because they omitted critical facts about the bases of those opinions and how Murstein and Medallion Financial formed them.[100] Specifically, it alleges that Murstein and Medallion Financial knew that their valuations of Medallion Bank were not in compliance with

---

[98]

*Abramson*, 965 F.3d at 175; *see also New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023) (citing *Abramson*).

[99]

Dkt 94 (Medallion & Murstein Reply Mem.) at 6.

[100]

Dkt 92 (Gov. Opp. Mem.) at 32 (citing *Omnicare*, 575 U.S. at 188).

generally accepted accounting principles ("GAAP") and that they had promised Berenson future investment banking work in return for its supporting valuation of the bank. Yet neither fact was disclosed to investors.[101]

        To begin, the Court need not determine whether Medallion Financial's fair value determinations pursuant to GAAP were "an exercise of subjective judgment" — as the defendants allege — or "objectively improper," as according to the SEC.[102] The Second Circuit held as recently as last year that "matter[s] of subjective judgment" under GAAP, as statements of opinion, "are nonetheless actionable" if an appropriate *Omnicare* exception is pled.[103] Here, the SEC already has alleged that Medallion Financial's bank valuations were actionable opinion statements. Thus, the Court declines to engage with the parties' protracted debate over GAAP.[104]

        Turning to the merits, the AC contains more than sufficient allegations to support the claim that Murstein and Medallion Financial misled investors by withholding information material to Medallion Bank's fair value. Murstein and Medallion Financial did not disclose, for example, that they allegedly had reached this valuation by proactively contacting investment banks to request a valuation; that they had provided the banks with their desired fair value estimates for Medallion

---

[101]

        *Id.* at 32-33.

[102]

        *DeCarlo*, 80 F.4th at 175; *see* Dkt 81 (Medallion & Murstein Mem.) at 14-17; Dkt 92 (Gov. Opp. Mem.) at 24-26.

[103]

        *DeCarlo*, 80 F.4th at 175

[104]

        *See, e.g.*, Dkt 94 (Medallion & Murstein Reply Mem.) at 8 ("[T]he SEC fails to grapple with the inconsistency between admitting that the valuations 'involved judgment calls and were, therefore, statements of opinion,' . . . and arguing that the exercise of those accounting judgments violated GAAP.").

Bank; that those banks expressing any interest in their desired fair value estimates had performed no due diligence on Medallion Bank; and that they had selected a valuation firm, against the repeated concerns of their auditor, that was willing to provide them with the highest fair value estimate.[105] In addition, Murstein and Medallion Financial omitted that the valuation firm they ultimately hired — Berenson — allegedly began to receive investment banking work from Medallion Financial soon after it agreed to provide its desired fair value estimate of Medallion Bank, when it never had received investment banking work from them previously.[106]  While reasonable investors do not "expect that *every* fact known to an issuer supports its opinion statement,"[107] such omissions by Murstein and Medallion Financial were far from being "tangentially related to the valuation [of Medallion Bank] itself," as they claim.[108]  Rather, they were at the heart of how and why Murstein and Medallion Financial were able to represent the value of Medallion Bank as being so high to investors , and thus their omissions made the bank valuations "misleading to a reasonable person."[109]

B.    *Whether the Chicago Medallion Valuations Were Actionable Opinions*

Similarly, Murstein and Medallion Financial contend that Medallion Financial's

---

[105]  *See, e.g.*, AC ¶¶ 138-44, 149-50, 161-66, 169-70, 222, 232.

[106]  *Id.* ¶¶ 239, 241.

[107]  *Omnicare*, 575 U.S. at 190 (emphasis in original).

[108]  Dkt 94 (Medallion & Murstein Reply Mem.) at 7.

[109]  *Omnicare*, 575 U.S. at 194.

25

Chicago taxi medallion valuations were non-actionable opinions rather than factual statements.[110] The SEC again concedes that those valuations were judgments and thus opinions rather than facts, but nonetheless claims that they are actionable for misleading investors by setting the fair value unreasonably high and omitting material transactions of Chicago medallions at far lower prices.[111]

　　　　The AC alleges that Murstein and Medallion Financial in late-2016 represented in various reports and filings that the value of their Chicago taxi medallions was $120,000, despite closely monitoring the market for such medallions and knowing that recent transactions suggested the medallions were worth no more than $60,000-65,000.[112]  Indeed, despite banking regulators allegedly contacting Medallion Financial to express concern over its Chicago medallion valuations and to point out explicitly the recent comparable transactions, Medallion continued to state their value at $120,000 in its 2016 Third Quarter Form 10-Q and listed the "[t]ransfer prices of Chicago medallions" as "N/A" as of September 30, 2016.[113]  The AC contends that under ASC 820, Medallion Financial at least should have used the transaction prices as "level 2" inputs to help calculate the fair value of the Chicago medallions, yet it did not do so.[114]

　　　　With this background, the AC more than sufficiently alleges that the Chicago medallion valuations were actionable opinion statements under *Omnicare*.  The AC does not contest

---

[110]

　　　　Dkt 81 (Medallion & Murstein Mem.) at 18.

[111]

　　　　Dkt 92 (Gov. Opp. Mem.) at 35-36.

[112]

　　　　AC ¶¶ 193-95, 200, 203.

[113]

　　　　*Id*. ¶¶ 196-99, 203.

[114]

　　　　*Id*. ¶¶ 201-02.

— rather, it actually acknowledges — that valuing the medallions would involve some measure of estimation and judgment, as the defendants claim.[115]   Yet the SEC pleads sufficient facts to demonstrate that Murstein and Medallion Financial abused that judgment by arbitrarily setting the value of the medallions at *double* their public market value, disregarding recent transaction data that they should have considered and ignoring warnings from federal banking regulators.[116]   Indeed, Medallion Financial allegedly set the value of its Chicago medallions at $15,000 more than its *own* cash flow models suggested they were worth, yet provided no explanation for doing so.[117]   And the company notably omitted any disclosure of the recent comparable transactions and its own internal valuation from its filings, all of which contributed to mislead investors.   Thus, Murstein's and Medallion Financial's valuation of the Chicago medallions did not "fairly align[] with the information in [its] possession at the time."[118]

Murstein and Medallion Financial protest that even if they "had valued Chicago medallions at $60,000 for Q3 2016 . . . such a valuation would have only constituted a 1.5 [percent] reduction of assets, which 'undercuts an inference of fraud.'"[119]   However, the cases they cite[120] both

---

[115]

    *Id.* ¶ 201.

[116]

    *Id.* ¶¶ 196-97, 202-03.

[117]

    *Id.* ¶¶ 200, 204.

[118]

    *Omnicare*, 575 U.S. at 188.

[119]

    Dkt 81 (Medallion & Murstein Mem.) at 18 n.11 (citing *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 286, 295 (S.D.N.Y. 2014)).

[120]

    *In re Magnum Hunter*, 26 F. Supp. 3d at 286, 295; *In re Kandi Techs. Grp. Sec. Litig.*, No. 17-cv-1944, 2019 WL 4918649, at *8 (S.D.N.Y. Oct. 4, 2019).

27

stand for the proposition that a small reduction in *earnings* or "corporate income" undercuts an inference of fraud.  Yet Murstein and Medallion Financial do not claim that reducing the value of its Chicago medallions would have had only a minimal effect on its earnings.  On the contrary, the AC alleges that medallion-backed loans were the core of Medallion Financial's business.  As it sailed dangerously close to defaulting on its many outstanding loan obligations, even a small decrease in the value of its medallions could have cascaded into a significant effect on earnings.  Accordingly, the fact that Medallion Financial held a relatively small amount of its assets in Chicago medallions does nothing to "undercut" the inference of fraud here.

### C.    *Materiality*

To state a claim under Section 10(b), the AC must allege also that Murstein's and Medallion Financial's misrepresentations or omissions were material — that is, "that a reasonable investor would have considered [them] significant in making investment decisions."[121]  A complaint need not, however,  "assert that the investor would have acted differently if an accurate disclosure was made."[122]

Materiality is "a mixed question of law and fact."[123]  As a result, "a complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that

---

[121]    *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

[122]    *Id.* at 162.

[123]    *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976).

reasonable minds could not differ on the question of their importance."[124]  Yet there is no such contention here.  Nor could there be.  The AC clearly states that Murstein's and Medallion Financial's misleading valuations "materially impacted [its] financial statements" by millions of dollars, and that reasonable investors would have found the real reasons and methods behind Medallion Bank's increases in fair value to have been material had they been disclosed.[125]  Such a conclusion makes intuitive sense as well — if investors had been told explicitly the full extent of Murstein's alleged actions to seek out and generate unsupported valuations of Medallion Bank by third parties, they likely would have put much less weight on the claimed fair value of the company as published.

        Murstein's and Medallion Financial's only recourse is to suggest that their misleading valuations were immaterial in light of the "extensive disclosures" that it otherwise made to investors.[126]  This, too, is misleading.  Murstein and Medallion Financial point to the routine financial disclosures in the firm's 10-K and 10-Q filings to suggest that "any investor could have assessed [Medallion Bank's] value."[127]  Yet to the best of the Court's knowledge (and the defendants do not state otherwise), nowhere in these documents did the company disclose its third-party solicitations, cherry-picking of a valuation specialist, or disputes with its auditor, among other things.  Murstein and Medallion Financial are not safe just because they believe that somebody could have

---

[124]
    *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *see also Ganino*, 228 F.3d at 162.

[125]
    *See* AC ¶¶ 13, 184-85, 188.

[126]
    Dkt 81 (Medallion & Murstein Mem.) at 22.

[127]
    *Id*.

figured out through their public SEC filings that they were misleading their investors.  "If it would take a financial analyst to spot the tension," then "whatever is misleading will remain materially so, and liability should follow."[128]


          D.    *Murstein's* Scienter

        In securities fraud cases, *scienter* "means intent to deceive, manipulate, or defraud, . . . or at least knowing misconduct."[129]  The plaintiff must plead "facts that give rise to a strong inference of fraudulent intent," which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[130]  While the SEC contends that it sufficiently has alleged *scienter* under both tests, the Court need consider only the latter.

        Alleging conscious misbehavior is relatively uncomplicated, "since it encompasses deliberate illegal behavior."[131]  Recklessness, however, is more difficult to define.  At times, the

---

[128]

    *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (citing *Gerstle v. Gamble–Skogmo, Inc*., 478 F.2d 1281, 1297 (2d Cir. 1973)).

[129]

    *First Jersey Sec.*, 101 F.3d at 1467.

[130]

    *Acito v. IMCERA Grp., Inc*., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks omitted) (quoting *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1128 (2d Cir. 1994)).

[131]

    *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Second Circuit has described it as "[a]n egregious refusal to see the obvious"[132] or "a state of mind approximating actual intent, and not merely a heightened form of negligence,"[133] though it perhaps is best understood through "the actual facts of our securities fraud cases."[134]  In this regard, plaintiffs sufficiently have pleaded *scienter* based on recklessness "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."[135]

Such is the case in the AC.  The AC alleges that Murstein knew that the value of taxi medallions was declining rapidly in the mid-2010s, yet nonetheless sought out uninformed third-parties to suggest and generate higher valuations for Medallion Bank, the business of which consisted primarily of medallion-backed loans.[136]  When both his auditor, WeiserMazars, and valuation firm, RPF, told Murstein that these new and uninformed estimates did not justify an increased valuation of Medallion Bank, Murstein fired RPF, disregarding warnings from both parties that Medallion Financial needed to maintain consistency in its methods over time.[137]  Murstein then allegedly went opinion-shopping for a new valuation firm for Medallion Financial, emailing three

---

132

       *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y. 1989)).

133

       *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020) (internal quotation marks omitted) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)).

134

       *Novak*, 216 F.3d at 308.

135

       *Id*.

136

       AC ¶¶ 138-44, 210-11, 241.

137

       *Id*. ¶¶ 149-50, 154-66.

different investment banks and again suggesting his desired valuation for Medallion Bank until one of them, Berenson, agreed to provide it in exchange for future investment banking work.[138]  And in order to get WeiserMazars to audit and sign off on its new valuation for Medallion Bank, Murstein purportedly lied to it about why he fired RPF, how he had solicited Berenson, and whether and how he had prejudiced Berenson's valuations.[139]

Added together, these allegations, if established, would demonstrate thoroughly Murstein's extreme recklessness — and perhaps even conscious misconduct — in obtaining and using the valuations of Medallion Bank.  They would establish that Murstein intentionally ignored all of these warning signs, knowing that they deliberately undermined and contradicted his public valuations, and "egregious[ly] refus[ed] to see the obvious"[140] — that those valuations were unjustified, inconsistent, and too high.  Nor does the AC provide any cover or shelter for Murstein or Medallion Financial.  It alleges that Murstein manipulated Berenson with his desired valuation and the promise of future work in order to get it on board.  Similarly, Murstein allegedly actively ignored WeiserMazars' advice and warnings on numerous occasions, and its approval of Medallion Bank's valuation was misguided given that Murstein allegedly lied to WeiserMazars in its submissions.  Thus, Murstein and Medallion Financial cannot now claim to have relied on these professional opinions when they allegedly knew that they were uninformed and manipulated to begin with.

---

[138]

        *Id.* ¶¶ 169-75, 222, 232.

[139]

        *Id.* ¶¶ 263-69.

[140]

        *Chill*, 101 F.3d at 269 (citation and internal quotation marks omitted).

The same principles apply to the three misleading justifications for Medallion Bank's valuation that were provided in Medallion Financial's Third Quarter 2016 10-Q MD&A — *i.e.*, that external interest, a court ruling, and a valuation specialist all had informed its increased valuation.[141] Murstein made those misleading statements of fact with *scienter* because he allegedly knew they were false when made for the same reasons as stated above, yet chose to issue them anyway to make the bank valuation more credible to the public. Accordingly, the AC adequately alleges Murstein's *scienter*, imputable to Medallion Financial, with respect to both the Medallion Bank valuations and the related justifications for that valuation.

3.    *The Alleged Fraudulent Valuations in Violation of Section 17(a) (Count One)*

Section 17(a) of the Securities Act provides:

"It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[142]

To state a claim under Section 17(a), a plaintiff must plead sufficient facts to satisfy only one of

---

[141]    AC ¶¶ 180-81.

[142]    15 U.S.C. § 77q(a).

these three prongs.[143]  The AC alleges that Murstein and Medallion Financial violated all three.[144]

Murstein and Medallion Financial challenge the allegations brought under Section 17(a) on two grounds.  First, they seek to dismiss all claims brought under all three prongs of Section 17(a) for failing to allege that they made fraudulent statements "in the offer or sale of any securities."[145]  And second, Murstein and Medallion Financial seek to dismiss claims brought only under Section 17(a)(2) for failing to allege that they "obtain[ed] money or property by means of" those fraudulent statements under Section 17(a)(2).[146]  Only the latter challenge succeeds.

Regarding whether the allegedly fraudulent statements were made in the offer or sale of securities, Murstein and Medallion Financial suggest that this Court adopt the narrow reading of this element that was espoused in a 1987 district court ruling in another circuit, *SEC v. Warner*, which "requires that the alleged fraud be used directly in the offer or sale of securities."[147]  This Court respectfully declines the offer.  As other courts in this district have held, it is sufficient that Medallion Financial's stock was traded publicly during the relevant period.[148]

Concerning Murstein's obtaining of property, however, the sole relevant allegation

---

143

    *See, e.g.*, *United States v. Tagliaferri*, 820 F.3d 568, 573 (2d Cir. 2016).

144

    AC ¶¶ 274-76.

145

    Dkt 81 (Medallion & Murstein Mem.) at 26-27.

146

    *Id*. at 26.

147

    652 F. Supp. 647, 650 (S.D. Fla. 1987).

148

    *S.E.C. v. Farnsworth*, 692 F. Supp. 3d 157, 188 (S.D.N.Y. 2023) (citing *United States v Naftalin*, 441 U.S. 768, 773, 778 (1979)); *S.E.C. v. Mudd*, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012).

in the AC states that Murstein "received compensation of approximately $3.54 million for 2014, $3.56 million for 2015, $1.92 million for 2016, and $2.23 million for 2017. His compensation package[s] for those years included salary, bonus, restricted stock awards, country club membership, a driver, a car lease, parking, car insurance and social club memberships."[149]  The SEC claims that this provides "a plausible inference" that Murstein's "bonus and restricted stock awards . . . were influenced by the misstated financial performance of the company,"[150] but the Court sees no grounds for drawing the required inference that Murstein obtained the bonus or stock awards "*by means of*" his fraudulent valuations.[151]  Notably, the AC provides no details regarding when any bonuses or restricted stock awards were paid out, in what amounts, and for what purposes, nor does it even so much as state that they were "influenced by [Murstein's] misstated financial performance of the company."[152]  And the SEC's claims are further undercut by noting that Murstein's compensation *decreased* in 2016 and 2017 during the relevant fraudulent period.  Regardless, "the plain text of the statute, which requires the defendant to have obtained money 'by means of' a material misrepresentation, seems to require a closer causal relationship" than that defendants acted "within the scope of their employment, for which [they were] compensated."[153]

      The same holds true for Medallion Financial, which the SEC contends obtained

---

[149]    AC ¶ 20.

[150]    Dkt 92 (Gov. Opp. Mem.) at 39.

[151]    15 U.S.C. § 77q(a)(2) (emphasis added).

[152]    Dkt 92 (Gov. Opp. Mem.) at 39.

[153]    *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 637 (S.D.N.Y. 2013).

property only "by bond offerings and issuances of restricted stock that coincided with the fraudulent conduct."[154]  The issuances of restricted stock concern the same text from the AC as discussed and dismissed above.  And the bond offerings concern Medallion Financial's issuance in April 2016 of "$33.6 million in notes that paid 9 [percent] interest, which represented a much higher cost of funds than had been available under the revolving lines of credit" and which Medallion Financial later stated were needed for "repaying borrowings under its revolving credit facilities[.]"[155]  Again, the Court notes that there are no allegations in the AC that Medallion Financial was able to issue this debt as a result of its fraudulent statements.  Nor are there allegations that it received its financing at a favorable rate — indeed, the 9 percent interest on the debt was notably *worse* than the 3 percent rate it usually paid.  Moreover, the bond offerings occurred months before Medallion Financial made its allegedly fraudulent valuation statements.  Without more, the Court cannot conclude that the SEC has adequately pleaded that either Murstein or Medallion Financial obtained property by means of their allegedly fraudulent statements.

Accordingly, any claim for relief under Section 17(a)(2) is dismissed.[156]

---

[154]

Dkt 92 (Gov. Opp. Mem.) at 39.

[155]

AC ¶ 119.

[156]

For clarity, the AC pleads sufficient facts to state a claim for relief for scheme liability under Section 17(a)(1) and (a)(3).  While scheme liability must rest on more than just the underlying misstatements and omissions, here, the SEC has alleged that Murstein and Medallion Financial solicited bids, unfairly fired their valuation firm, and lied to their auditor, all of which are extraneous to the misleading valuation statements they published.  *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 53-54 (2d Cir. 2022).  And the defendants never challenged the SEC's claim to relief under Sections 17(a)(1) and (a)(3) for the valuation scheme in their opening briefs, thus forfeiting the argument.

36

4.    *The Alleged Touting Scheme Violations Under Securities Act Section 17(b) and Exchange Act Section 10(b) and Rule 10b-5 (Counts Two and Three)*

The SEC contends that all defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by participating in the alleged touting scheme (Count Two), and that Meyers and Ichabod's Cranium violated Section 17(b) of the Securities Act as well (Count Three).[157]  The defendants' briefs bring multiple challenges to the sufficiency of these claims.[158]

A.    *Murstein and Medallion Financial "Made" the Alleged Touting Misstatements*

Under Rule 10b-5(b), it is "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact . . . in connection with the purchase or sale of any security."[159]  "[O]nly an article's maker, not its benefactor, has a duty to disclose that it was paid for."[160]  Thus, in order to hold Murstein and Medallion Financial primarily liable under Section 10(b) for Meyers' misstatements about his lack of compensation or connection to Medallion, Murstein "must have 'made' the material misstatements."[161]

---

157

The SEC does not appear to allege that the touting scheme violated Securities Act Section 17(a) (Count One).  *See* Dkt 92 (Gov. Opp. Mem.) at 39.

158

Again, the defendants do not contest that Murstein's conduct and *scienter* should be imputed to Medallion Financial, and Meyers' conduct and *scienter* should be imputed to Ichabod's Cranium.  *See Suez Equity Invs.*, 250 F.3d at 101; *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d at 550.

159

17 C.F.R. § 240.10b-5.

160

*Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 103 (2d Cir. 2022) (citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011)).

161

*Janus Cap. Grp.*, 564 U.S. at 141 (2011).

      The Supreme Court has adopted a strict interpretation of how far "maker" liability can extend. In *Janus Capital Group, Inc. v. First Derivative Traders*, the Court narrowly construed the "making" of a statement under Rule 10b-5 as "the approximate equivalent of 'to state,'" with the focus of the inquiry being on who exercised control over the issuance of the statement.[162] "For purposes of Rule 10b-5, the maker of a statement is the person or entity with *ultimate authority* over the statement, including its content and whether and how to communicate it."[163] In reinstating the district court's dismissal of the *Janus* complaint, the Court held that a defendant investment advisor's "assistance" in drafting investment prospectuses, which included significant involvement in their writing and dissemination, did not mean that the advisor had "'made' [those] statements in the prospectuses."[164] "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."[165]

      In arguing that they are not subject to "maker" liability, Murstein and Medallion Financial lean heavily on a recent Second Circuit case, *Noto v. 22nd Century Group, Inc.*, which applied *Janus* and involved facts more similar to the case at hand.[166] There, the defendant's CEO hired a consulting firm to help with investor relations, and the two paid for writers to publish positive

---

[162]
      *Id*. at 142-43.

[163]
      *Id*. at 142 (emphasis added).

[164]
      *Id*. at 148.

[165]
      *Id*. at 142.

[166]
      35 F.4th at 99-104.

articles about the company anonymously and without revealing that they were being compensated.[167]

There were also witness allegations that the CEO "reviewed, edited, and/or approved the paid stock

promotion articles."[168]  Nonetheless, the Circuit held that the complaint failed adequately to allege

that the defendants were "makers" of the statements in the articles.[169]  In so holding, the court

highlighted that the plaintiffs "made no sufficient factual allegation that the articles were published

by anyone except the authors" or that anyone else "even saw them before their publication."[170]  Nor

did the plaintiffs "sufficiently allege that [the] authors lacked final control over the articles' contents

or did not make the ultimate decision as to what specific information to include."[171]  Thus, the

dispute again settled on who had "ultimate control" over the statements being made.[172]

      The AC here, however, contains important differences from the facts pled in *Janus*

and *Noto*.  Most importantly, it alleges that Medallion Financial's general counsel recognized that

many, including the SEC, would view the company as "adopting" Meyers' statements if it hired

---

[167]  *Id.* at 99-100.

[168]  *Id.* at 100 (cleaned up).

[169]  *Id.* at 103.

[170]  *Id.* at 104.

[171]  *Id.*

[172]  *Id.* at 103.  *See also Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) (holding that the fact that some statements were "drafted with the approval and input of some . . . [d]efendants is not sufficient to demonstrate the control essential to maker liability."); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-cv-7536, 2021 WL 1199035, at *28 (S.D.N.Y. Mar. 30, 2021) (same).

39

him.[173]   The company thus purportedly redrafted its consulting agreement with Meyers to state explicitly that Meyers "'must receive the *prior written approval* of both [Medallion Financial's] President and Legal Department,' who were *required* to 'review and approve or reject' any materials" before they were published.[174]   As a result, the AC alleges that Murstein and Medallion Financial were legally vested with the "ultimate control" over Meyers' statements by being contractually obligated to read, revise, and approve or reject them, a stark difference to the precedents cited by the defendants.   Indeed, a more apt comparison would be to *In re Pfizer Inc. Securities Litigation*, in which the Second Circuit concluded that a reasonable jury could find that Pfizer had authority over statements made by another company's employees where there was evidence suggesting that Pfizer had to give final approval before those statements could be published.[175]

In fact, the *Noto* court also explicitly highlighted the allegations that its defendants had final approval power over published articles, noting that these allegations fell short in being "conclusory" and unsupported by "sufficient factual allegations," rather than in being legally incorrect.[176]   Here, however, the AC contains more than adequate factual allegations to support its assertion of control, at least at the motion to dismiss stage.   Beyond quoting from the contract language directly and describing its negotiation — which itself would be sufficient — the AC quotes

---

[173]    AC ¶ 48.

[174]    *Id*. ¶ 49(b) (emphasis added).

[175]    819 F.3d 642, 657 (2d Cir. 2016).

[176]    *Noto*, 35 F.4th at 103.

from Murstein's emails to Meyers telling him what to write about Medallion Financial and directing him to respond to specific negative articles;[177] it alleges that Meyers emailed links to some of his articles to Murstein;[178] and it alleges that Meyers lied by stating in multiple articles that he received no compensation and had no business relationship with any entity about which he wrote.[179]  While there may be a factual dispute about how much of his contractual approval obligation Murstein actually fulfilled, these allegations are sufficient at this point to state a claim that Murstein and Medallion Financial have primary liability under Rule 10b-5 for Meyers' alleged touting misstatements.

### B.    The Touters' Misstatements Were Material and Untrue

In order to state a claim, Rule 10b-5(b) requires the statements at issue to be both "untrue" and "material."[180]  Meyers maintains that the SEC fails to allege a single false or misleading statement by him, a claim which itself is discernibly "untrue."  As discussed above, the AC quotes directly from multiple of Meyers' articles where he stated, for example, that he "wrote this article [him]self," that "it expresses [his] own opinions," that he is "not receiving compensation for it," and that he "ha[s] no business relationship with any company whose stock is mentioned."[181]  All of those

---

[177]    AC ¶¶ 58, 62-64.

[178]    *Id*. ¶ 66.

[179]    *Id.* ¶¶ 53-54, 64.

[180]    17 C.F.R. § 240.10b-5.

[181]    AC ¶¶ 53-54, 64.

statements are in direct conflict with the facts as alleged in the AC.

   The materiality of these alleged misstatements, however, is less objective. Again, the standard is whether they "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[182]  While the statements must "'assume[] actual significance' for a reasonable investor," they "need not be outcome-determinative."[183]

   When "taken together and in context,"[184] Meyers' statements are sufficient to demonstrate materiality.  The AC contends that Meyers authored over 100 articles and 900 public comments  propping up Medallion Financial or its industry in just 18 months, collecting roughly $65,000 for his work.[185]  Not only did he allegedly lie about his compensation, business relationships, and potentially even his authorship of the articles, but he purportedly used a mix of his own name and pseudonyms to make it seem as if his views were more widespread than they truly were.[186]  And Murstein allegedly misrepresented himself as a journalist, contrarian investor, analyst, and CEO instead of a public relations professional, bombarding highly viewed articles that Murstein

---

182

  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted) (quoting *TSC Indus.*, 426 U.S. at 449); *see also Stadnick v. Vivint Solar, Inc*., 861 F.3d 31, 36 (2d Cir. 2017) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)).

183

  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc*., 873 F.3d 85, 146 (2d Cir. 2017) (quoting *TSC Indus.*, 426 U.S. at 449).

184

  *McMahan & Co. v. Wherehouse Ent., Inc*., 900 F.2d 576, 579 (2d Cir. 1990).

185

  AC ¶ 50, App. A.

186

  *Id*. ¶¶ 55-56.

42

told him to target with his various personas.[187]  The sheer scale of these alleged misrepresentations certainly could have influenced some investors into changing their trading decisions on Medallion Financial, particularly if they thought they would be at odds with widespread, educated, and unbiased popular opinion.  At the very least, Meyers' statements were not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[188]

C.    *Murstein's* Scienter

As with the bank valuation scheme, Murstein's *scienter* "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[189]  Again, the Court need consider only Murstein's alleged conscious misbehavior and recklessness in order to determine the sufficiency of the pleadings with respect to *scienter*.

The AC contains numerous allegations suggesting that Murstein at least recklessly supported Meyers' illegal touting — including that he hired someone advertising use of "guerilla PR tactics" to "operate without any detectable connection" to Medallion Financial in the first place, who promised that he would be "constantly writing about the company" and "bashing" its competitors, and whom Murstein knew was frequently publishing under pseudonyms.[190]  However, for the

---

[187]    *Id*. ¶¶ 62, 69.

[188]    *Goldman*, 754 F.2d at 1067; *see also Ganino*, 228 F.3d at 162.

[189]    *Acito*, 47 F.3d at 52 (internal quotation marks omitted) (quoting *Shields*, 25 F.3d at 1128).

[190]    AC ¶¶ 44-45, 55, 66-67.

purposes of surviving a motion to dismiss, it is sufficient that the AC pleads: (1) that Meyers

repeatedly published that he received no compensation from, and had no business relationship with,

Medallion Financial; (2) that Murstein and Medallion Financial signed a contract with Meyers where

they paid him to write such articles and were required to "review and approve" them in advance; and

(3) that Murstein did in fact work closely with Meyers and sometimes tell him what to write.[191]  Such

allegations verge on "deliberate illegal behavior," and at least demonstrate Murstein's "knowledge

of facts . . . contradicting [his] public statements"[192] by paying for and approving statements that

Meyers in fact was *not* being paid.  While the defendants might contest how much Murstein actually

reviewed and approved such statements, such a factual dispute cannot be determinative at this stage.

Accordingly, the AC adequately alleges Murstein's *scienter* for the touting scheme.

### D.    *The AC Sufficiently Pleads Scheme Liability*

In addition to Rule 10b-5(b) "maker" liability, Rules 10b-5(a) and (c) authorize "what

courts have called scheme liability for those who . . . engage in deceitful conduct."[193]  Liability under

these provisions "is triggered where the defendant 'performed an inherently deceptive act that was

---

[191]    *Id.* ¶¶ 48-49, 53-54, 58, 64.

[192]    *Novak*, 216 F.3d at 308.

[193]    *S.E.C. v. Hwang*, 692 F. Supp. 3d 362, 378 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *S.E.C. v. Jean–Pierre*, No. 12-cv-8886, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)).

distinct from an alleged misstatement.'"[194]  Scheme liability is designed to "capture a wide range of conduct."[195]

The central issue for the Court is whether the SEC has alleged that Murstein and Medallion Financial engaged in a deceptive act distinct from the alleged misstatements themselves. In *Lorenzo v. S.E.C.*, the Supreme Court held that scheme liability under Rules 10b-5(a) and (c) — like maker liability under Rule 10b-5(b) — could be premised on false or misleading statements, and that dissemination of those statements sufficed to state a claim for relief.[196]  In applying *Lorenzo*, however, the Second Circuit recently clarified that misstatements or omissions, while relevant, "cannot form the '*sole* basis' for liability under the scheme subsections" — the complaint must state "something extra that makes a violation a scheme," such as *Lorenzo's* dissemination of the misstatements.[197]  The court further clarified that allegations of a defendant's "'participation in the preparation' of misstatements" would not sustain a claim under Rules 10b-5(a) and (c).[198]

The alleged misstatements, made by Meyers and Frigo and endorsed by Murstein,

---

194

    *Farnsworth*, 692 F. Supp. 3d at 189 (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022)).

195

    *Lorenzo v. S.E.C.*, 587 U.S. 71, 79 (2019).

196

    *Id.* at 78-79.

197

    *Rio Tinto plc*, 41 F.4th at 53-54 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005) (emphasis added)).

198

    *Id.* at 54 (quoting *Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, No. 18-8460, 2020 WL 611506, at *7-8 (S.D.N.Y. Feb. 7, 2020)); *see also Hwang*, 692 F. Supp. 3d at 379-80 (allegations that defendant participated in and supervised his employee's attempts to secure trading advantages by providing misleading information to clients did not state claim for scheme liability).

were that the views expressed in the articles at issue were the work of Meyers or Frigo alone and expressed their own opinions, that they received no compensation for them, and that they had no business relationship with any company discussed in the writings, including Medallion Financial.[199] To state a claim then, the SEC must show that Murstein took "inherently deceptive" acts *other* than participating in the preparation of any of those statements — which it does. Most obviously, the AC alleges multiple examples of instances where Murstein told Meyers and Frigo not only *what* to write, but also where and how to publish it or who to target.[200] Additionally, Murstein republished at least two of Frigo's articles on Medallion Financial's own website.[201] These actions are much more akin to "dissemination" rather than "preparation" of the misstatements because of Murstein's authority, discussed above, to control their publication.

Moreover, the allegations of a deceptive scheme include Murstein's coordination and endorsement of Meyers' and Frigo's pseudonymity. The AC asserts that the use of fake names and mass posting was intended to portray a greater level of support and legitimacy than actually existed for Medallion Financial,[202] and that Murstein not only knew about this, but encouraged and occasionally directed it, including by explicitly instructing Frigo to preserve her anonymity.[203] While Murstein insists such actions are legal, there is no requirement of illegality in order for acts to qualify

---

[199]    AC ¶¶ 53-54, 64.

[200]    *Id.* ¶¶ 58, 62, 64, 84-85.

[201]    *Id.* ¶ 95.

[202]    *Id.* ¶¶ 56, 69.

[203]    *Id.* ¶¶ 74-76, 79-83, 86.

as "inherently deceptive." And in any event, the AC includes allegations that Frigo used a fake ID from the internet in order to post on certain websites, and that Murstein instructed Frigo to use her friend's identity and to create a fake resume in order to gain access to those sites, both of which would constitute identity fraud.[204]

Murstein and Medallion Financial again try to hang their hat on the Second Circuit's decision in *Noto*,[205] but that case is distinct from this one in important ways. First, the AC contains stronger allegations of Murstein's dissemination of the articles than in *Noto*, including that he directed Meyers and Frigo on where to publish and whom to target on occasion. Second, in dismissing scheme liability, the *Noto* court emphasized the shortcomings of the complaint's allegations regarding payment to the touters, whereas the AC here contains more robust allegations about how the touters were paid as well as Murstein's and Meyers' repeated denials of those payments. And finally, the AC alleges other facts demonstrating deception and manipulation that are lacking in *Noto*, including that Murstein encouraged and assisted with the anonymity of the

---

[204]

*Id*. ¶¶ 75-82, 86.

To add another argument, the mere fact that Murstein paid Meyers and Frigo to make their misstatements is sufficient to state a claim for scheme liability. *See In re Turquoise Hill*, 625 F. Supp. 3d at 250 ("[P]aying someone else to make a misrepresentation is not itself a misrepresentation," and such allegations can stand "at the heart of the scheme liability claim" (internal quotation marks omitted) (quoting *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc*., 845 F.3d 384, 393 (8th Cir. 2016)). It is not double-counting to hold that a misrepresentation about non-compensation can be supported by the fact of that compensation. Meyers and Murstein had a duty to disclose Meyers' compensation, but did not; they did not then have to take the "extra" step of *stating* that there was no compensation at all. Put differently, paying an actor to appear like an unbiased supporter is its own independent act, separate and distinct from that actor then declaring that they are an unbiased supporter.

[205]

35 F.4th at 106-07.

47

actions in furtherance of the scheme and even with identity fraud. Accordingly, the SEC has sufficiently pled scheme liability under Rules 10b-5(a) and (c).

E.    *Meyers Acted with Particularity and in Connection with Purchase/Sale of Securities*

Finally, Meyers and Ichabod's Cranium seek to dismiss the Section 10(b) and Rule 10b-5 claims against them by arguing that the AC fails to specify Meyers' misstatements or omissions with particularity and that it also fails to connect those misstatements with the purchase or sale of any security.[206] In addition, they seek to dismiss the Section 17(b) claim against them by contending that none of Meyers' communications "describe[d] [a] security" as required by the law.[207] None of these challenges has merit.

The Court has described the specific and particular misstatements by Meyers that are alleged in the AC, which include exact quotes from his publications that the AC contends were untrue. And concerning whether Meyers wrote "in connection with the purchase or sale of any security,"[208] the Court is mindful to interpret the statute "not technically and restrictively, but flexibly" to implement its "broad reading."[209] It is undisputed that Medallion Financial's stock was publicly traded during the relevant period, that Meyers and Murstein were concerned with how "the market" was valuing the company, and that Meyers was hired specifically to target the financial

---

[206]    Dkt 85 (Meyers & Ichabod's Mem.) at 10-12.

[207]    *Id.* at 12-14; *see* 15 U.S.C. § 77q(b).

[208]    15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

[209]    *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (internal citations omitted).

48

media outlets where Medallion Financial's investors received their news and could be influenced.[210] No more need be said on either matter.

Regarding the Section 17(b) challenge, however, there is a dearth of precedent on what it means to "describe" a security under the law. Both parties point only to one out-of-district case, *S.E.C. v. Liberty Capital Group Inc.,* which held that a positive description of a company — but not its securities specifically — nonetheless sufficed to allege a violation of Section 17(b).[211] This Court agrees. To hold otherwise would be to commit to a much narrower reading of Section 17(b), where those looking to commit illegal touting could go as far as to praise a company or its subsidiaries by name and tout at length its future financial prospects, but avoid sanction simply by refraining from mentioning the literal investment vehicle through which it trades. Such a contrary interpretation would ignore the operation of financial advice and advocacy in the real world and doubtless would gut the law.

Here, the AC alleges — and the defendants do not dispute — that Meyers wrote repeatedly and at length to potential investors about the future financial prospects of Medallion Financial while its stock was publicly traded. Again, nothing more is needed at this stage.

5.    *The Alleged Aiding and Abetting of the Touting Scheme (Count Four)*

Murstein and Medallion Financial move also to dismiss Count Four of the AC, which charges them with aiding and abetting the alleged touting scheme in violation of Section 17(b) of

---

[210]

       *See* AC ¶¶ 44-45.

[211]

       75 F. Supp. 2d 1160, 1161 (W.D. Wash. 1999).

the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.  To hold Murstein and

Medallion Financial liable for aiding and abetting, "the government must prove: '(1) the existence

of a securities law violation by the primary . . . party; (2) "knowledge" of this violation on the part

of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement

of the primary violation.'"[212]  These "three components . . . 'cannot be considered in isolation from

one another'" — in other words, convincing evidence of one prong "lessens the burden [the SEC]

must meet in alleging" the other prongs.[213]

      Murstein and Medallion Financial challenge all three components of the test.

However, the allegations in the AC that demonstrate both the underlying securities law violation and

Murstein's and Medallion Financial's *scienter* with respect to touting are sufficient also to

demonstrate that the first two prongs of the test have been satisfied.[214]  Accordingly, the motion turns

on whether Murstein and Medallion Financial "substantially assisted" in "'the *specific* [violation]'

alleged — namely, failure to disclose compensation."[215]

      To show substantial assistance, the SEC need only demonstrate "that the defendant

'in some sort associate[d] himself with the venture, that he participate[d] in it as in something that

---

[212]
    *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985)).

[213]
    *S.E.C. v. Apuzzo*, 689 F.3d 204, 214 (2d Cir. 2012) (quoting *DiBella*, 587 F.3d at 566).

[214]
    *See supra* Sections 4(A)-(D).

[215]
    Dkt 81 (Medallion & Murstein Mem.) at 35 (quoting *S.E.C. v. Paulsen*, No. 18-cv-6718, 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020)).

he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'"[216]  Here, the allegations in the AC display a high degree of knowledge by Murstein and Medallion Financial in Meyers' scheme to tout Medallion without disclosing his compensation.  Recall that the entire *purpose* of hiring Meyers and Ichabod's Cranium was allegedly to employ their "guerilla PR tactics" so that there would be no "detectable connection" to Medallion,[217] which necessarily includes hiding any compensation.  Thus, their hiring alone is sufficient to allege sufficiently that Murstein and Medallion Financial "associate[d themselves] with the venture."[218]  Yet Murstein and Medallion Financial counter that the AC fails to plead explicitly that Murstein "consciously assisted" in hiding the compensation between the parties, arguing that his simple failure to "ca[tch] the compensation non-disclosure" during his review of Meyers' writings does not satisfy the standard for substantial assistance.[219]

Again, the defendants' argument ignores the text of the complaint. The AC alleges that Murstein and Medallion Financial ensured that they would participate in keeping the touting connection secret by explicitly writing into the parties' contract, *at their own direction*, that Murstein and the Medallion Legal Department "were required to review and approve or reject any materials" before publication.[220]  And the AC then contends that Murstein and Medallion Financial actually

---

[216]

     *Apuzzo*, 689 F.3d at 206 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

[217]

     AC ¶ 44.

[218]

     *Apuzzo*, 689 F.3d at 206.

[219]

     Dkt 94 (Medallion & Murstein Reply Mem.) at 23.

[220]

     AC ¶¶ 48, 49(b) (internal quotation marks omitted).

51

participated in the illegal touting scheme to ensure its success by, among other things: directing Meyers on what to write and where to publish;[221] approving articles that Meyers wrote under an alias and/or that explicitly denied receiving any compensation;[222] and failing to correct or inform interested parties that Meyers' articles were written at their direction in exchange for compensation.[223]  Such allegations go far beyond "mere awareness and approval of" the illegal touting scheme,[224] instead establishing, if proven, Murstein's and Medallion Financial's active cooperation and support.

In sum, there is more than enough in the AC to plead sufficiently that Murstein and Medallion Financial provided "substantial assistance" to Meyers and Ichabod Cranium's alleged touting scheme, particularly with respect to knowing and concealing the connection between the parties and the associated compensation.  Accordingly, the AC satisfies all three components of the aiding and abetting test.

6.    *The Alleged Reporting, Records, and Controls Violations (Counts Five, Six, & Seven)*

Next, Murstein and Medallion Financial contend that the AC fails to plead adequately that Medallion Financial violated the reporting, books and records, and internal controls rules of

---

[221]

   *Id.* ¶¶ 58, 62, 64.

[222]

   *Id.* ¶¶ 53-54, 62-66, 70-71.

[223]

   *Id.* ¶ 65.

[224]

   *S.E.C. v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983)).

Exchange Act Sections 13(a), 13(b)(2)(A), and 13 (b)(2)(B), and that Murstein aided and abetted these violations. They contend also that the SEC fails to plead a violation of Exchange Act Rule 13b2-2. Each argument will be taken in turn.

### A.    *Medallion's Reporting, Records, and Internal Controls Violations (Count Five)*

First, Medallion Financial's sole argument supporting dismissal of its Section 13(a) reporting violation centers on its repeated contention that it made no "materially false" statements in its SEC filings.[225] The Court already has refuted this argument: as alleged, Medallion Financial falsely stated values of Medallion Bank and its Chicago medallions on multiple occasions, statements that were particularly material in its SEC filings.[226] No more need be said in this regard.

Medallion Financial's alleged violations of Section 13(b)(2)(A) concern many of the same general facts. Under Exchange Act Section 13(b)(2)(A), an issuer of registered securities must "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."[227] To state a claim, the AC need allege only that the price or methods that Medallion Financial used to value its assets were unreasonable.[228] Medallion Financial asserts that its valuations of Medallion Bank complied with

---

[225]    Dkt 81 (Medallion & Murstein Mem.) at 36.

[226]    *See supra* Sections 2(A)-(C).

[227]    15 U.S.C. § 78m(b)(2)(A).

[228]    *See S.E.C. v. Rio Tinto plc*, No. 17-cv-7994, 2019 WL 1244933, at *19 (S.D.N.Y. Mar. 18, 2019).

GAAP and ASC 820, and thus its reliance on those valuations was reasonable.[229]

Such an argument ignores the numerous allegations to the contrary and turns a blind eye to the many *other* alleged inaccuracies in Medallion Financial's public filings that the SEC asserts. For starters, not only does the AC plead that Medallion Bank's valuations did not comply with GAAP,[230] but it alleges also that Murstein manipulated those valuations by seeking out favorable banks and asking them to provide his desired fair value estimates in return for future investment banking business.[231] These pleadings alone are sufficient to defeat dismissal of the SEC's 13(b)(2)(A) claim. But in addition, the SEC alleges also that the Chicago medallion valuations were overstated in the third quarter of 2016[232] and that their reported loan-to-value ratio was inaccurate in Medallion Financial's 2017 Form 10-K,[233] as summarized in its opposition.[234] Both are well pled. Both are sufficient to state a claim under Section 13(b)(2)(A). Medallion Financial contests neither.[235] Nor could they.

---

[229]

Dkt 81 (Medallion & Murstein Mem.) at 36.

[230]

AC ¶¶ 205-213.

[231]

*See generally id.* ¶¶ 130-170.

[232]

*Id.* ¶¶ 193-204.

[233]

*Id.* ¶¶ 255-260.

[234]

Dkt 92 (Gov. Opp. Mem.) at 54.

[235]

In their reply brief, Murstein and Medallion Financial raise that, as opinion statements, Medallion Financial's valuations of Medallion Bank are not actionable and cannot support a books and records claim. Dkt 94 (Medallion & Murstein Reply Mem.) at 23-24. The Court has already explained why these valuations nonetheless are actionable; for the same

Regarding Section 13(b)(2)(B)'s requirement that defendants "devise and maintain a system of internal accounting controls,"[236] Medallion Financial again maintains that because its underlying valuations were reasonable, this "tack-on claim[]" necessarily must fail as well.[237] Again, the SEC's claim survives dismissal because it adequately pled that the valuations of Medallion Bank were manipulated.  Nor does Medallion Financial's argument make sense as a matter of logic: even if its underlying valuations of Medallion Bank *were* reasonable, it does not follow that Medallion Financial must have had an adequate "system of internal accounting controls to provide reasonable assurances" that they were.[238]  By analogy, just because a nuclear reactor does not melt down does not necessarily mean that there are adequate safety controls in place in case it ever does.

In any event, the AC adequately pleads that Medallion Financial's internal controls were deficient — not merely that they were "circumvented," as Medallion Financial contends.[239]  For example, the AC alleges that there were insufficient checks on the accuracy of Medallion Financial's loan-to-value ratios and inadequate controls to ensure the consistency and accuracy of its valuation techniques and disclosures.[240]  Moreover, it contends that Murstein — as the only individual

---

reasons here, they may form the basis of Section 13(b)(2)(A) liability.  *See supra* Section 2(A).

[236]

15 U.S.C. § 78m(b)(2)(B).

[237]

Dkt 81 (Medallion & Murstein Mem.) at 37.

[238]

15 U.S.C. § 78m(b)(2)(B).

[239]

Dkt 81 (Medallion & Murstein Mem.) at 37 (citing *Rio Tinto plc*, No. 17-cv-7994, 2019 WL 1244933, at *19).

[240]

AC ¶¶ 254-60.

providing valuation material to the auditor, WeiserMazars — had the unrestrained authority and ability to manipulate the valuation of Medallion Bank, with no safeguards in place or procedures designed to ensure that WeiserMazars and valuation specialists received full and accurate information.[241]  Such allegations are sufficient to show the singular, unchecked authority necessary to state a claim under Section 13(b)(2)(B).

B.    *Murstein's Aiding and Abetting of Medallion Financial's Violations (Count Six)*

In order to allege that Murstein aided and abetted Medallion Financial's Section 13 violations, the SEC must plead: "(1) a primary violation of the Exchange Act [by Medallion Financial], (2) actual knowledge of the violation by [Murstein], and (3) that [Murstein] substantially assisted the primary violation."[242]  As before, Murstein's argument for dismissal turns on "substantial assistance" — the Court already has found that the AC sufficiently alleges the underlying primary violation, and Murstein's *scienter* can hardly be questioned considering the AC's allegations that he was the one who devised and sought out the faulty valuations, fired RPF, and misled WeiserMazars, among other actions.

Indeed, the same facts demonstrate that Murstein provided "substantial assistance" to Medallion Financial as well.  Again, the AC alleges that Murstein was the one who generated misleading valuations for Medallion Bank from various banks.[243] Murstein pressured and then fired

---

[241]

Id. ¶¶ 162, 251, 268.

[242]

*S.E.C. v. Espuelas*, 905 F. Supp. 2d 507, 517 (S.D.N.Y. 2012) (internal citations and quotation marks omitted) (applying the same standard as in *Apuzzo*, 689 F.3d at 206).

[243]

AC ¶¶ 138-53, 169-75.

RPF against WeiserMazars' advice when it would not provide a valuation for Medallion Bank that he wanted to report.[244] Murstein signed the misleading third quarter valuation memo for Medallion Financial that underpinned its Form 10-Q and that was provided to WeiserMazars just hours before the Form 10-Q became public.[245] Murstein was involved in the preparation of Medallion Financial's financial statements and approved the comments that WeiserMazars proposed to its filings.[246] And Murstein signed management representation letters in connection with Medallion Financial's filings that contained numerous misleading statements.[247]

Taken in total, these facts sufficiently allege that Murstein had significant — if near total — authority over Medallion Financial's records and valuations, that he went out of his way to misreport and misrepresent key assets for Medallion Financial, that he assisted Medallion Financial in circumventing the controls of its auditor, and that no one at the company possessed any control or exerted any oversight over him in this process.  The best that Murstein can do is contest these factual allegations — *e.g.*, he contests that he made "material misrepresentations" to WeiserMazars.[248]  But such arguments are not ripe on a motion to dismiss.  Accordingly, the SEC has adequately pled its aiding and abetting claims.

---

[244]     *Id.* ¶¶ 154-68.

[245]     *Id.* ¶¶ 176-82.

[246]     *Id.* ¶ 183.

[247]     *Id.* ¶ 265.

[248]     Dkt 94 (Medallion & Murstein Reply Mem.) at 24.

57

C.    *Murstein's Deception of the Auditor (Count Seven)*

Lastly, Murstein and Medallion Financial argue that the AC does not adequately allege that Murstein made material misrepresentations to WeiserMazars, claiming that this count "relies almost entirely on the validity of the SEC's other claims" and that Murstein's representations otherwise were "immaterial."[249]

Rule 13b2-2 states that "[n]o director or officer of an issuer shall, directly or indirectly: (1) [m]ake or cause to be made a materially false or misleading statement to an accountant in connection with . . . (i)[a]ny audit,"[250] and by its plain language requires no showing of *scienter*.[251] Yet even if it did, the SEC has made a sufficient showing.  As has been recounted, now the AC alleges that Murstein signed multiple management letters and valuation memoranda that were provided to WeiserMazars and contained false and manipulated valuations and valuation methodologies for Medallion Bank, among other things.[252]  It alleges that these misrepresentations were material because they allegedly allowed Medallion Financial to avoid posting losses in its filings, which in turn allowed it to avoid defaulting on its many outstanding loans.  No more was needed.  Indeed, the AC far exceeds the requirements necessary to state a claim under Rule 13b2-2.

---

249

    Dkt 81 (Medallion & Murstein Mem.) at 38.

250

    17 C.F.R. § 240.13b2-2.

251

    *S.E.C. v. Stanard*, No. 6-cv-7736, 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009).

252

    AC ¶¶ 263-70; *see also S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 361 (S.D.N.Y. 2016) ("Misstatements in management representation letters . . . are sufficient to state a claim for a violation of Rule 13b2-2.").

7.    *The AC's Request for Disgorgement and an Officer/Director Bar (Remedies)*

Finally, Murstein and Medallion Financial seek to strike two of the remedies requested by the AC: (1) the disgorgement of any ill-gotten gains by defendants; and (2) the permanent bar on Murstein from acting as an officer or director of any public company. Under Rule 12(f), the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."[253] However, "motions to strike under Rule 12(f) are generally disfavored and granted only if there is strong reason to do so."[254] Hence, "it is settled that [a] motion [to strike] will be denied, unless it can be shown that no evidence in support of the allegation would be admissible."[255]

Murstein and Medallion Financial contend that the recent case of *Liu v. S.E.C.*[256] changed the standard of the Court's review at this stage,[257] yet this argument is not justified by any reading of the case. *Liu* concerned the extent of the disgorgement permissible in an SEC civil enforcement action, and did not contain any analysis or discussion of the necessary pleadings to

---

[253]

Fed. R. Civ. P. 12(f).

[254]

*Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 275 (S.D.N.Y. 2020) (citations and internal quotation marks omitted).

[255]

*Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 269 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)); *see also Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 352 (S.D.N.Y. 2023); *eShares, Inc. v. Talton*, __ F.Supp.3d ___, 2024 WL 1348829, at *10 (S.D.N.Y. Mar. 29, 2024); *Spiegel v. Estee Lauder Inc.*, No. 23-cv-11209, 2024 WL 3376497, at *4 (S.D.N.Y. July 11, 2024).

[256]

591 U.S. 71, 77 (2020).

[257]

Dkt 94 (Medallion & Murstein Reply Mem.) at 24-25.

survive a motion to strike.[258]  Applying the appropriate standard, then, Murstein and Medallion Financial have not "shown that no evidence in support of the [disgorgement and permanent bar] allegation[s] would be admissible."[259]  Indeed, regarding disgorgement, the AC alleges that Murstein received substantial "salary, bonus, restricted stock awards, country club membership, a driver, a car lease, parking, car insurance and social club memberships" during the years in which Medallion Financial's performance and valuation were inflated,[260] much of which he could not have received if Medallion had been forced to declare bankruptcy or defaulted on its loan obligations.  On this basis, significant evidence could be introduced to support a showing of Murstein's "ill-gotten gains."  Such evidence would support also the requested officer/director bar, in addition to any evidence supporting the SEC's allegations that Murstein's actions were continuous, widespread, and/or accompanied other unscrupulous business decisions.  Thus, without more, the Court refuses to strike any of the requested remedies requested by the AC at this stage.

---

[258]

      *See generally Liu*, 591 U.S. 71.

[259]

      *Lipsky*, 551 F.2d at 893.

[260]

      AC ¶ 20.

60

### *Conclusion*

For the foregoing reasons, defendants Meyers' and Ichabod's Cranium's motion to dismiss[261] is DENIED.  Defendants Murstein's and Medallion Financial's motion to dismiss[262] is GRANTED to the extent that the claim for relief on Count One under Section 17(a)(2) is dismissed. It is otherwise DENIED in all respects.

SO ORDERED.

Dated:        September 18, 2024

_____
Lewis A. Kaplan
United States District Judge

---

[261]      Dkt 84 (Meyers & Ichabod's Mot.).

[262]      Dkt 80 (Medallion & Murstein Mot.).